MONIQUE C. WINKLER (Cal. Bar No. 213031)
STEVEN BUCHHOLZ (Cal. Bar No. 202638)
MARC D. KATZ (Cal. Bar No. 189534)
  katzma@sec.gov
DAVID ZHOU (NY Bar No. 4926523)
  zhoud@sec.gov
TRACY S. COMBS (Cal. Bar No. 298664)
  combst@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> MATTHEW PANUWAT, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

**SUMMARY OF THE ACTION**

1. This is a case of insider trading by Matthew Panuwat, formerly a business development executive at Medivation Inc. ("Medivation"), a mid-sized oncology-focused biopharmaceutical company.

2. On August 18, 2016, and in the course of Panuwat's employment at Medivation, Panuwat received confidential, nonpublic information in an email from Medivation's Chief

Executive Officer ("CEO") that Medivation would be imminently acquired by pharmaceutical giant Pfizer, Inc. ("Pfizer").

3. As an employee and agent of Medivation, Panuwat owed Medivation a duty of trust and confidence, including a duty to refrain from using Medivation's proprietary information for his own personal gain.

4. Nonetheless, within minutes of receiving this highly confidential news from Medivation's CEO, Panuwat misappropriated Medivation's confidential information by purchasing—from his work computer—out-of-the-money, short-term stock options in Incyte Corporation ("Incyte"), another mid-cap oncology-focused biopharmaceutical company whose value he anticipated would materially increase when the Medivation acquisition announcement became public. Panuwat did not inform anyone at Medivation about his Incyte trades.

5. On August 22, 2016, Medivation publicly announced it would be acquired by Pfizer in an all-cash tender offer at a significant premium to the price at which Medivation shares had been trading. Over the course of the trading day, the price of Medivation shares rose materially by approximately 20%. That same day, the stock price of Incyte rose materially by approximately 8% on the news of Medivation's acquisition and the value of Panuwat's Incyte stock options roughly doubled. By trading ahead of the announcement, Panuwat obtained illicit profits of $107,066.

6. By engaging in this conduct, as further described herein, Panuwat violated and, unless restrained and enjoined by this Court, may continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5].

7. The SEC seeks an order from the Court enjoining Defendant from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; requiring him to pay a civil monetary penalty; barring him from serving as an officer or director of a public company; and providing for other appropriate relief.

**JURISDICTION AND VENUE**

8. The SEC brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d); 78u-1].

9. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.

10. Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

11. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in the Northern District of California.

12. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in San Francisco County.

**DEFENDANT**

13. Defendant Matthew Panuwat, age 44, resides in Walnut Creek, California. From September 2014 to January 2017, Panuwat worked in business development at Medivation. Prior to that time, Panuwat held licenses in the securities industry and was registered with the SEC as an associated person of an investment bank in San Francisco that acted as a broker and dealer in securities.

14. At all relevant times, Panuwat was an expert in the biopharmaceutical industry. He has undergraduate and graduate biology- and pharmaceutical-related degrees, as well as an MBA from a top business school. At the time of his Incyte trades, he had spent over fifteen years in the biopharmaceutical industry, including eight years in the global healthcare investment banking division of a top investment bank and employment in business and strategic development at several biopharmaceutical companies. Panuwat had significant knowledge and experience concerning many aspects of the biopharmaceutical industry, including mergers and acquisitions. At all relevant times, Panuwat was aware of the nature of and prohibitions on insider trading

through his employment at various biopharmaceutical companies and in investment banking. Panuwat is currently an executive at another publicly-traded biopharmaceutical company.

### RELATED ENTITIES

15. Medivation was a mid-cap, oncology-focused biopharmaceutical company incorporated in Delaware with its principal place of business in San Francisco, California until it was acquired by Pfizer Inc., a global pharmaceutical company, on September 28, 2016. Before its 2016 acquisition, Medivation's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "MDVN." In connection with its acquisition by Pfizer, Medivation's stock was delisted from Nasdaq and deregistered with the Commission.

16. Incyte is a mid-cap, oncology-focused biopharmaceutical company incorporated in Delaware with its principal place of business in Wilmington, Delaware. Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is listed on Nasdaq under the ticker symbol "INCY."

### FACTUAL ALLEGATIONS

**A. Panuwat Heads Business Development for Medivation and Pledges Not to Trade on Its Confidential Information.**

17. In 2016, Panuwat's title at Medivation was Senior Director of Business Development. In that role, Panuwat was responsible for business development at Medivation and reported to the company's Chief Financial Officer.

18. Panuwat's role at Medivation included finding, evaluating, and pursuing strategic opportunities to expand Medivation's drug products and development pipeline, primarily through acquisitions and in-licensing. In that role, Panuwat closely tracked the stock prices, drug products, and development pipelines of other biopharmaceutical companies, including Incyte, as well as merger and acquisition activity in the biopharmaceutical industry.

19. At Medivation, Panuwat was entrusted with confidential information involving actual or potential Medivation transactions, including actual or potential acquisitions of or by Medivation.

20. Panuwat agreed, at the outset of his employment with Medivation, that he would keep information he learned during his employment confidential and not make use of such information, except for the benefit of Medivation. Panuwat also signed Medivation's insider trading policy, which prohibited employees from personally profiting from material nonpublic information concerning Medivation by trading in Medivation securities or the securities of another publicly traded company. The policy stated, "During the course of your employment…with the Company, you may receive important information that is not yet publicly disseminated…about the Company. … Because of your access to this information, you may be in a position to profit financially by buying or selling or in some other way dealing in the Company's securities…***or the securities of another publicly traded company***, including all significant collaborators, customers, partners, suppliers, or competitors of the Company. … For anyone to use such information to gain personal benefit…is illegal. …" (Emphasis added.)

**B.    Medivation Becomes an Acquisition Target.**

21. In April 2016, Medivation engaged investment banks to advise the company in assessing its strategic options in light of then-recent efforts by a French pharmaceutical company to acquire Medivation. Panuwat, who himself had years of experience as an investment banker and had specialized in deals involving the pharmaceutical industry, worked closely with Medivation's investment bankers, and with other high-level Medivation executives, to explore Medivation's alternatives, including a possible merger with another company.

22. In the course of his work with the investment banks advising Medivation about its strategic options, Panuwat reviewed presentations authored by the bankers that discussed Medivation's peer companies in the biopharmaceutical industry, *i.e.*, companies that the investment banks concluded were comparable to Medivation based on their professional judgment. In particular, the bankers drew close parallels between Medivation and Incyte, including that both were valuable, mid-cap, oncology-focused companies with a profitable FDA-approved (commercial stage) drug on the U.S. market. Panuwat knew that, in 2016, large-cap pharmaceutical companies were interested in acquiring oncology-focused mid-cap biopharmaceutical companies with commercial-stage drugs; that there were only a few—including

Medivation and Incyte—left to acquire; and that each such acquisition was material to the remaining companies because it made them potentially more valuable acquisition targets and could thus positively affect the stock price of those companies. Panuwat also knew that the previous announcement of the acquisition of a mid-cap oncology-focused company in 2015 by a large-cap pharmaceutical company had resulted in the material increase of the stock prices of both Medivation and Incyte following the announcement.

23. In the course of his work with the investment banks advising Medivation, Panuwat himself noted to the investment bankers that they might want to consider Incyte a comparable company to Medivation. During this time, and as part of his employment by Medivation, Panuwat also tracked both Incyte's and Medivation's stock prices closely, as well as the stock prices of other biopharmaceutical companies. Incyte was frequently listed as a peer mid-cap oncology company to Medivation in analyst reports in the 2015 to 2016 time period.

24. During July and August 2016, Medivation explored whether other, larger pharmaceutical companies might have interest in acquiring Medivation, particularly at a price that was higher than that offered in the spring by the French pharmaceutical company.

25. Panuwat was closely engaged in these discussions. As Medivation confidentially solicited bids from potential acquirers, the investment bankers and other Medivation executives shared information with Panuwat about the potential acquirers' due diligence and share-price bids. Panuwat was closely involved in coordinating Medivation's responses to various due diligence requests during that time and participated in meetings of Medivation's board of directors concerning Medivation's strategic alternatives with respect to a potential merger.

**C.    Panuwat Trades Incyte Options to Capitalize on Medivation's Material Nonpublic Information.**

26. In August 2016, Panuwat learned confidential information through his employment that Medivation was going to be imminently acquired at a significant premium to the company's stock price.

27. On August 12, 2016, Medivation's investment bankers sent Panuwat a summary of bids by potential acquirers indicating that at least five potential acquirers were offering an all-cash

acquisition of Medivation at a premium per share over Medivation's then-current share price and that all the potential acquirers were prepared to move forward quickly.

28. On Sunday, August 14, 2016, Panuwat attended a meeting of the Medivation board of directors at which the board authorized its investment bankers to send letters to the final bidders for Medivation, including Pfizer, soliciting final merger agreement comments by August 18, 2016 and final bids to acquire the company by August 19, 2016. Prior to the August 14, 2016 board meeting, Medivation's investment bankers sent Panuwat copies of these proposed letters, which were marked "Confidential."

29. Several of the emailed communications Panuwat received from the investment bankers during this time indicated that certain potential acquirers of Medivation were intent on moving forward with an acquisition quickly and that Monday, August 22, 2016 was the target date for a public announcement of the acquisition.

30. On Thursday, August 18, 2016, Medivation's CEO sent a group of Medivation executives, including Panuwat, an email relaying that Pfizer's head of business development had called and expressed overwhelming interest in acquiring Medivation and said that Pfizer's CEO would call Medivation's CEO later that day to reiterate that message and resolve final details with respect to an impending acquisition of Medivation by Pfizer.

31. Panuwat learned the foregoing information through his employment at Medivation, and he knew or was reckless in not knowing that the information was material and nonpublic. Panuwat also knew, or was reckless in not knowing, that the information concerning Medivation's imminent acquisition was material not only to Medivation, but also to Incyte, a peer company in the biopharmaceutical industry that was also publicly-traded, mid-cap, and oncology-focused. Medivation's undisclosed acquisition would have been viewed by a reasonable investor in Medivation or Incyte as having significantly altered the total mix of information made available. The public announcement of Medivation's acquisition at a significant premium to its then-current share price would likely have a positive impact on Incyte's stock price. For example, the acquisition of Medivation also made Incyte a more attractive target for acquisition.

32. By virtue of his employment at Medivation, as well as the confidentiality and

insider trading policies that he signed, Panuwat owed Medivation a duty to keep this material nonpublic information confidential, and to refrain from trading on Medivation's confidential information.

33. Nonetheless, within minutes of receiving the Medivation CEO's email on August 18, 2016, and while knowing or being reckless in not knowing that such entrusted information was material and nonpublic, Panuwat used this information concerning the Medivation acquisition to trade. Specifically, Panuwat logged on to his personal brokerage account from his work computer and purchased 578 Incyte call option contracts with strike prices of $80, $82.50, and $85 per share—significantly above Incyte's stock price of $76 to $77 per share at the time—and the soonest possible expiration date, September 16, 2016. Panuwat was aware that Incyte was not expected to make any significant announcement, such as issuing a quarterly earnings report, before the options expiration date. Rather, Panuwat anticipated that Incyte's stock price would jump within less than a month on public disclosure of the upcoming Medivation acquisition announcement. Panuwat had never traded Incyte stock or options before.

34. Panuwat did not seek pre-clearance or authorization of his Incyte options trades from anyone at Medivation, nor did he inform anyone at Medivation about his Incyte options trades. Panuwat's undisclosed, self-serving use of Medivation's information to purchase securities, in breach of his duty of trust and confidence, defrauded Medivation and undermined the integrity of, and investor confidence in, the securities markets.

35. On Saturday, August 20, 2016—two days after Panuwat purchased the Incyte call options—Medivation signed a merger agreement with Pfizer. As reflected in prior analyst reports, Medivation's investment bankers included Incyte as a comparable publicly-traded company in their fairness opinions regarding the $81.50 price per share offered by Pfizer to acquire Medivation. The $81.50 price per share offered by Pfizer represented a significant premium over the prior, publicly-known unsolicited acquisition proposal of $52.50 per share by the French pharmaceutical company in April 2016.

36. On Monday, August 22, 2016, before market open, and four days after Panuwat purchased the Incyte options, Medivation publicly announced that it had entered into an agreement

and plan of merger whereby it would be acquired by Pfizer at a price of $81.50 per share, a 21.4% premium over its closing price of $67.16 per share on Friday, August 19, 2016, and a 69.8% premium to the average closing prices for the shares for the 52-week period ended on August 19, 2016.  At market open on August 22, 2016, Medivation's stock price climbed materially to $80.62, a 20% increase over the prior trading day's closing price of $67.16.

37. Incyte's stock price also materially increased on August 22, 2016.  Incyte's stock price, which had closed at $76.11 on Friday, August 19, 2016, opened at $79.80, reached a high of $84.39, and closed at $81.98 on Monday, August 22, 2016, approximately 8% higher than the prior trading day's close.  A number of other mid-cap biopharmaceutical companies' stock prices also materially increased on the day of the Medivation acquisition announcement.  Analyst reports published on August 22 and 23, 2016 noted the positive impact of the Medivation acquisition announcement on Incyte's and other peer biopharmaceutical companies' stock prices.

38. As a result of his trading in Incyte call options in advance of the August 22, 2016 Medivation announcement, Panuwat generated ill-gotten gains of $107,066.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

39. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 38.

40. By engaging in the conduct described above, Defendant Panuwat, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

(a) Employed devices, schemes, or artifices to defraud;

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

41.     By reason of the foregoing, Defendant Panuwat violated, and unless restrained and enjoined is likely in the future to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Panuwat is currently a Chief Business Officer at another publicly-traded biopharmaceutical company where he plays a similar role to his Medivation employment, is privy to similarly material non-public information, and is presented with opportunities to violate the securities laws again.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

**I.**

Permanently enjoin Defendant Panuwat from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

Issue an order requiring Defendant Panuwat to pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

**III.**

Prohibit Defendant Panuwat from serving as an officer or director of any entity having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**V.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 17, 2021

Respectfully submitted,

*/s/ Tracy S. Combs*
MARC D. KATZ
DAVID ZHOU
TRACY S. COMBS
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION