1  MONIQUE C. WINKLER (Cal. Bar No. 213031)
   STEVEN BUCHHOLZ (Cal. Bar No. 202638)
2  MARC D. KATZ (Cal. Bar No. 189534)
     katzma@sec.gov
3  DAVID ZHOU (NY Bar No. 4926523)
     zhoud@sec.gov
4  TRACY S. COMBS (Cal. Bar No. 298664)
     combst@sec.gov
5
   Attorneys for Plaintiff
6  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2800
7  San Francisco, CA 94104
   Telephone: (415) 705-2500
8  Facsimile:  (415) 705-2501

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14  SECURITIES AND EXCHANGE          Case No. 21-cv-06322-WHO
    COMMISSION,
15                                   **SECURITIES AND EXCHANGE**
              Plaintiff,             **COMMISSION'S OPPOSITION TO**
16                                   **DEFENDANT'S MOTION TO DISMISS**
         v.
17                                   Date:        January 12, 2022
    MATTHEW PANUWAT,
18                                   Time:        2:00 p.m.
              Defendant.
19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 3

        A.      Panuwat Pledged Not to Trade on Material Nonpublic
                Information Learned From His Employer Medivation........................................ 3

        B.      In 2016, Panuwat Learned Nonpublic Information About the
                Imminent Acquisition of Medivation. .................................................. 4

        C.      The Acquisition Information Was Material.............................................. 5

        D.      Panuwat Understood that the Acquisition Information Was
                Material. ................................................................................................. 5

        E.      Panuwat Acted on the Material Nonpublic Information to
                Make Undisclosed Trades in Incyte Options and Reaped an
                Illegal Profit. .......................................................................................... 6

III.    LEGAL STANDARDS ........................................................................................ 7

        A.      Federal Rule of Civil Procedure 12(b)(6)............................................... 7

        B.      Federal Rule of Civil Procedure 9(b)...................................................... 7

        C.      The Misappropriation Theory of Insider Trading.................................... 7

IV.     ARGUMENT ....................................................................................................... 8

        A.      The Complaint States a Claim for Relief................................................. 8

                1.      The Complaint Adequately Alleges the Acquisition
                        Information Was Nonpublic. ..................................................... 8

                2.      The Complaint Adequately Alleges the Acquisition
                        Information Was Material........................................................... 9

                3.      The Complaint Adequately Alleges a Breach of Duty. ........................ 15

                4.      The Complaint Adequately Alleges Scienter and
                        Alleges the Fraud with Particularity Under Rule 9(b)............................ 17

        B.      Panuwat's Due Process Arguments Should Be Rejected. ................................. 21

V.      CONCLUSION.................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ........................................... 13

*Ariz. State Bd. for Charter Schools v. U.S. Dep't of Educ.*, 464 F.3d 1003 (9th Cir. 2006)........... 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 7

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................. 10, 11, 15

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) .............................................. 14

*Brody v. Transitional Hospitals Corp.*, 280 F.3d 997 (9th Cir. 2002)........................................ 14

*Carpenter v. United States*, 484 U.S. 19 (1987) ...................................................................... 12

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) ........................................... 24

*Cooper v. Pickett*, 137 F.3d 616 (9th Cir. 1997)...................................................................... 20

*Dirks v. SEC*, 463 U.S. 646 (1983) ........................................................................................... 9

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)............................................................. 18, 21

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) ................................................................ 7, 20

*Gebhart v. SEC*, 595 F.3d 1034 (9th Cir. 2010) .................................................................. 7, 18

*Gen. Elec. Co. v. U.S. Env't Protection Agency*, 53 F.3d 1324 (D.C. Cir. 1995) ................. 23, 24

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ................................................... 21

*McFadden v. United States*, 576 U.S. 186 (2015) ................................................................. 21

*McNally v. United States*, 483 U.S. 350 (1987)..................................................................... 25

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266 (3d Cir. 1998) ................. 23

*Salman v. United States*, 137 S. Ct. 420 (2016)..................................................................... 24

*SEC v. Adler*, 137 F.3d 1325 (11th Cir. 1998) ....................................................................... 19

*SEC v. Berry*, 580 F. Supp. 2d 911 (N.D. Cal. 2008) ......................................................... 7, 18

*SEC v. Clark*, 915 F.2d 439 (9th Cir. 1990)........................................................................... 23

*SEC v. DeGarmo*, No. 92 Civ. 2347, Compl. (D. Colo. Dec. 2, 1992) ................................... 22

*SEC v. Hooshiari*, No. 99 Civ. 2043, Compl. (N.D. Ga. Aug. 9, 1999) ................................. 22

*SEC v. Huang*, 684 Fed. App'x 167 (3d Cir. 2017)....................................................... 12, 22, 24

*SEC v. Levin*, 232 F.R.D. 619 (C.D. Cal. 2005) ..................................................................... 21

1    *SEC v. Moshayedi*, No. 12 Civ. 1179, 2013 WL 12172131 (C.D. Cal. Sept. 23, 2013) ................ 19

2    *SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) ........................................................................ 16, 19, 25

3    *SEC v. Phan*, 500 F.3d 895 (9th Cir. 2007) ................................................................................. 10

4    *SEC v. Richman*, No. 21 Civ. 1911 (CRB), 2021 WL 5113168 (N.D. Cal. Nov. 3, 2021) ............ 20

5    *SEC v. Sabhlock*, No. 08 Civ. 4238 (CRB), 2009 WL 10690310 (N.D. Cal. Feb. 18, 2009)...... 7, 15

6    *SEC v. Talbot*, 530 F.3d 1085 (9th Cir. 2008) ....................................................................... passim

7    *SEC v. Texas Gulf Sulphur*, 401 F.2d 833 (2d Cir. 1968) ........................................................... 18

8    *SEC v. Todd*, 642 F.3d 1207 (9th Cir. 2011) ................................................................................ 18

9    *SEC v. Truong*, 98 F. Supp. 2d 1086 (N.D. Cal. 2000)................................................................. 19

10    *SEC v. Willis*, 777 F. Supp. 1165 (S.D.N.Y. 1991) ..................................................................... 22

11    *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971)......................................... 23

12    *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ...................................................... 11, 13

13    *United States v. Brown*, 555 F.2d 336 (2d Cir. 1977)................................................................... 23

14    *United States v. Bryan*, 58 F.3d 933 (4th Cir. 1995)............................................................... 12, 13

15    *United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986) ................................................ 11, 12, 13

16    *United States v. Falcone*, 257 F.3d 226 (2d Cir. 2001) ............................................................... 16

17    *United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010) ............................................................ 21

18    *United States v. Libera*, 989 F.2d 596 (2d Cir. 1993) .................................................................. 12

19    *United States v. O'Hagan*, 521 U.S. 642 (1997)...................................................................... passim

20    *United States v. Reyes*, 660 F.3d 454 (9th Cir. 2011) ................................................................... 11

21    *United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998) .......................................................... 19, 20

22    *United States v. Willis*, 737 F. Supp. 269 (S.D.N.Y. 1990) ......................................................... 23

23    *Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987)........................................................... 7

24    *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ................................................... 20

25    *Walling v. Beverly Enters.*, 476 F.2d 393 (9th Cir. 1973) ........................................................... 20

26    *Zell v. InterCapital Income Secs., Inc.*, 675 F.2d 1041 (9th Cir. 1982)......................................... 13

27

28

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ............................................................... 7

Federal Rule of Civil Procedure 9(b) ............................................................... passim

**REGULATIONS**

17 C.F.R. § 240.10b-5............................................................................. passim

17 C.F.R. § 240.10b5-1(a) ....................................................................... passim

17 C.F.R. § 240.10b5-1(b) ............................................................................. 19

17 C.F.R. § 240.10b5-2(b)(1) ......................................................................... 16

**STATUTES**

Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) .......................... passim

1    Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") respectfully

2    submits this Opposition to Defendant's Motion to Dismiss.

3    **I.   <u>INTRODUCTION</u>**

4    The SEC's Complaint alleges that Defendant Matthew Panuwat engaged in insider trading

5    by misappropriating from his employer nonpublic information that was material to a peer company,

6    and using that information to trade in the securities of that peer company.  Panuwat learned through

7    his job that his employer, a mid-sized, cancer-focused biopharmaceutical company named

8    Medivation Inc., would soon be acquired.  Panuwat understood that this information would allow

9    him to profitably trade the securities of a comparable mid-sized, cancer-focused biopharma company

10   named Incyte Corp.  Panuwat misappropriated the material nonpublic information and purchased

11   out-of-the-money, short-term call options in Incyte.  Panuwat earned $107,066 in illicit profits when

12   Incyte's stock price jumped after the acquisition was announced.  Together, these allegations in the

13   Complaint state an insider trading case under the misappropriation theory in violation of Section

14   10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

15   Panuwat, however, argues that the Complaint should be dismissed because it does not

16   sufficiently plead the elements of the misappropriation theory and does not plead fraud with the

17   particularity required under Federal Rule of Civil Procedure 9(b).  He also contends that the

18   Complaint should be dismissed on due process grounds.  None of these arguments has merit, and

19   Panuwat's motion to dismiss should be denied.

20   *First*, Panuwat asserts that the Complaint does not sufficiently plead that the acquisition-

21   related information—which included not just the ultimate acquisition, but the confidential bidding

22   and negotiation process involving Medivation (collectively, the "Acquisition Information")—was

23   nonpublic.  This argument fails because the Complaint contains numerous allegations that make

24   clear the acquisition process and the information about the imminent acquisition were confidential

25   and nonpublic.  *Panuwat* Complaint ("Compl.") ¶¶ 19, 22, 25-32 (Dkt. No. 1).

26   *Second*, Panuwat contends that the Complaint does not sufficiently plead the materiality of

27   the Acquisition Information to Incyte and its investors.  But Panuwat again ignores numerous

28

allegations in the Complaint that explain why the information concerning Medivation's imminent acquisition was material not only to Medivation and Medivation's investors, but also to Incyte and Incyte's investors. *Id.* ¶¶ 22-23, 31. Panuwat disagrees with these materiality allegations and he repeatedly draws inferences from his own factual claim that Incyte was an "unrelated company." (*Panuwat* Def. Mot. to Dismiss ("MTD") at 12 (Dkt. No. 18)). However, Panuwat's argument is inappropriate on a motion to dismiss, for which the Complaint's allegations are accepted as true and reasonable inferences are drawn in favor of the SEC.

*Third*, Panuwat claims that the Complaint does not allege a breach of the duty of trust and confidence he owed to Medivation because Medivation never provided him with confidential information about Incyte. This argument retreads his materiality claims and similarly disputes the well-pled facts. The Complaint is clear that the Acquisition Information was Medivation's corporate property, and that Panuwat breached his duty to Medivation by personally trading on the basis of that information. Compl. ¶¶ 20, 32.

*Fourth*, Panuwat incorrectly claims that the Complaint fails to plead scienter. The Complaint pleads in detail how Panuwat "defrauded" his employer Medivation by feigning loyalty to Medivation while making undisclosed, self-serving trades on the basis of the corporate information that Medivation had entrusted to him as its employee and agent. *Id.* ¶¶ 32-34, 40. The Complaint also explains that Panuwat knew, or was reckless in not knowing, that the information was nonpublic and material to Incyte. *Id.* ¶¶ 31, 33. These same allegations provide more than sufficient details about the "who, what, where, when, and how" of Panuwat's fraudulent scheme to satisfy the Rule 9(b) particularity requirement.

*Finally*, Panuwat concludes by arguing that this case is "novel" and that, as a result, he did not have the notice sufficient for due process that his trading on such information was illegal. Panuwat also asserts that this case expands the outer limits of the insider trading laws and may lead to the prohibition of "trading in the securities of all 'industry' 'comparable' companies." (MTD at 19.) However, the government and the SEC have previously brought similar enforcement actions against individuals for misappropriating inside information from their employer that was material

1  to, and used to trade in, more than one issuer that was not affiliated with their employer.

2  Furthermore, courts have rejected due process challenges because the insider trading prohibition is

3  properly cabined by, among other elements, materiality and scienter.  This case does not plow new

4  legal ground.  Instead, it applies the well-established elements of the misappropriation theory.

5      For these reasons, Panuwat's motion to dismiss should be denied in its entirety.

6  **II.    BACKGROUND**

7      The Commission's Complaint alleges that Panuwat misappropriated confidential, nonpublic

8  information from his employer Medivation relating to the company's imminent acquisition by

9  pharmaceutical giant Pfizer, Inc.  Compl. ¶¶ 30, 33.  Panuwat knew, or was reckless in not knowing,

10 that this information was material not only to Medivation and its investors, but to Incyte and its

11 investors, because Incyte was a comparable biopharmaceutical company.  *Id.* ¶ 31.  He acted on this

12 material nonpublic information to trade in out-of-the-money, short-term Incyte call options, and he

13 made an illicit profit of $107,066 when Incyte's stock price increased following the public

14 announcement of the acquisition.  *Id.* ¶¶ 33, 37-38.

15     The Complaint asserts that Panuwat engaged in illegal insider trading in violation of the anti-

16 fraud provisions of the Exchange Act, namely, Section 10(b) and Rule 10b-5.  *Id.* ¶¶ 39-41.  The

17 allegations in the Complaint specify with particularity how Panuwat, acting with scienter,

18 misappropriated and then traded on the nonpublic information from Medivation in breach of a duty

19 of confidentiality owed to Medivation, and how that information was material to Incyte.

20     **A.    Panuwat Pledged Not to Trade on Material Nonpublic Information Learned
21          From His Employer Medivation.**

22     In 2016, Panuwat worked as the senior director of business development at Medivation and

23 was responsible for finding, evaluating, and pursuing acquisition opportunities.  *Id.* ¶¶ 17-18.  In the

24 course of his duties, Panuwat was entrusted with, among other things, confidential information about

25 actual or potential acquisitions of, or by, Medivation.  *Id.* ¶ 19.

26     At the start of his employment with Medivation, Panuwat signed an express confidentiality

27 agreement in which he agreed to keep information that he learned during his employment

28 confidential.  *Id.* ¶ 20.  The agreement also specified that he could not make use of such information

other than for the benefit of Medivation. *Id.* In addition, Panuwat signed Medivation's insider trading policy, which barred him from using nonpublic information about Medivation to trade in either the securities of Medivation or those of other publicly traded companies. *Id.* Notably, the insider trading agreement anticipated that an insider might use such information to trade in "the securities of another publicly traded company, including all significant collaborators, customers, partners, suppliers, or competitors of the Company," and warned Panuwat that using "such information to gain personal benefit . . . is illegal." *Id.*

      **B.**      **In 2016, Panuwat Learned Nonpublic Information About the Imminent Acquisition of Medivation.**

In April 2016, following acquisition overtures from a pharmaceutical company, Medivation hired investment banks to advise about its strategic options, including a merger with a different company. *Id.* ¶ 21. "Panuwat, who himself had years of experience as an investment banker and had specialized in deals involving the pharmaceutical industry, worked closely with Medivation's investment bankers, and with other high-level Medivation executives," and, as part of that work, Panuwat "reviewed presentations authored by the bankers that discussed Medivation's peer companies in the biopharmaceutical industry." *Id.* ¶¶ 21-22. "[T]he bankers drew close parallels between Medivation and Incyte, including that both were valuable, mid-cap, oncology-focused companies with a profitable FDA-approved (commercial stage) drug on the U.S. market." *Id.* ¶ 22.

Panuwat remained closely involved as Medivation and its bankers confidentially solicited bids from other potential suitors during the summer of 2016. *Id.* ¶ 25. On August 12, 2016, Panuwat learned that at least five potential acquirers had made bids at a premium to Medivation's then-current share price. *Id.* ¶¶ 26-27. Two days later, on August 14, 2016, Panuwat was in attendance at a meeting of Medivation's board of directors during which the board authorized its bankers to send solicitation letters to the final group of bidders, which included Pfizer. *Id.* ¶ 28. The bankers had sent Panuwat copies of the letter in advance of the meeting, and those letters were marked "Confidential." *Id.* Panuwat was also included on emails from the bankers that specified an August 22, 2016 target date for announcing the anticipated acquisition. *Id.* ¶ 29.

1      Then, on August 18, 2016, Panuwat learned that Pfizer had "expressed overwhelming
2  interest in acquiring Medivation." *Id.* ¶ 30.  He was one of the Medivation executives included on
3  an email from Medivation's CEO in which the CEO described his conversation with a top executive
4  of Pfizer.  *Id.*  Medivation's CEO also wrote in the email that Pfizer's CEO would be calling him
5  later that day to reiterate Pfizer's interest and resolve final details of the proposed acquisition.  *Id.*

6          **C.      The Acquisition Information Was Material.**

7      The Complaint alleges that the Acquisition Information was material not just to Medivation,
8  but also to a reasonable investor trading in Incyte's securities.  That was true because, in 2016,
9  "large-cap pharmaceutical companies were interested in acquiring oncology-focused mid-cap
10  biopharmaceutical companies with commercial-stage drugs" and "there were only a few—including
11  Medivation and Incyte—left to acquire." *Id.* ¶ 22.  Given the limited supply of such companies, "the
12  acquisition of Medivation also made Incyte a more attractive target for acquisition." *Id.* ¶ 31.  In
13  addition, the confidential information that a number of suitors had offered to pay a premium to buy
14  Medivation was also material because it showed that major pharmaceutical companies were indeed
15  interested in buying mid-sized companies, and suggested that the remaining companies, like Incyte,
16  were "potentially more valuable acquisition targets." *Id.* ¶¶ 22, 31.  As a result, the nonpublic
17  information that Panuwat learned in 2016 "would have been viewed by a reasonable investor in
18  Medivation or Incyte as having significantly altered the total mix of information made available"
19  and thus was material to both companies and their investors. *Id.* ¶ 31.  Indeed, in general, Incyte
20  was frequently listed as a peer mid-cap oncology company to Medivation in analyst reports in the
21  2015 to 2016 time period, *id.* ¶ 23, and "Medivation's investment bankers included Incyte as a
22  comparable publicly-traded company in their fairness opinion" when they weighed the eventual
23  winning bid by Pfizer, *id.* ¶ 35.

24          **D.      Panuwat Understood that the Acquisition Information Was Material.**

25      The Complaint alleges that Panuwat knew, or was reckless in not knowing, that the
26  Acquisition Information was material to a reasonable Incyte investor.  *Id.* ¶ 31.  In his role at
27  Medivation, he "closely tracked the stock prices, drug products, and development pipelines of other

28

biopharmaceutical companies, including Incyte, as well as merger and acquisition activity in the biopharmaceutical industry." *Id.* ¶ 18.  He was aware that the "announcement of the acquisition of a mid-cap oncology-focused company in 2015 by a large-cap pharmaceutical company had resulted in the material increase of the stock prices of both Medivation and Incyte following the announcement." *Id.* ¶ 22.  And Panuwat knew that Medivation and Incyte were comparable companies.  *Id.* ¶ 23.  Indeed, Panuwat worked closely with the investment bankers hired by Medivation, reviewed the bankers' confidential presentations that "drew close parallels between Medivation and Incyte" in analyzing Medivation's acquisition opportunities, and was aware of the investment bankers' conclusion that, based on their "professional judgment," Medivation and Incyte were "comparable." *Id.* ¶ 22.

> **E.    Panuwat Acted on the Material Nonpublic Information to Make Undisclosed Trades in Incyte Options and Reaped an Illegal Profit.**

Despite his understanding that the Acquisition Information was both nonpublic and material, Panuwat quickly traded based on that information within minutes of receiving the Medivation CEO's email on August 18, 2016.  *Id.* ¶ 33.  Panuwat logged into his personal brokerage account and purchased Incyte call option contracts with strike prices that were significantly above the then-current market price.  *Id.*  Panuwat did not preclear his trades, and he did not disclose them to anyone at Medivation afterward.  *Id.* ¶ 34.  It is clear that he traded based on the Acquisition Information because he chose the soonest expiration date available for the options even though he knew that Incyte would not be making any significant announcement in that time frame.  *Id.* ¶ 33.  He had never previously traded in Incyte stock or options.  *Id.*

The Pfizer acquisition of Medivation was publicly announced four days later on the morning of August 22, 2016.  *Id.* ¶ 36.  Incyte's stock price increased materially by approximately eight percent, rising from the prior day's close of $76.11 to a close of $81.98.  *Id.* ¶ 37.  The stock prices of a number of other mid-cap biopharmaceutical companies also materially increased that day.  *Id.* As a result of his options trading, Panuwat earned ill-gotten gains of $107,066.  *Id.* ¶ 38.

III.    **LEGAL STANDARDS**

A.      **Federal Rule of Civil Procedure 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *SEC v. Sablock*, No. 08 Civ. 4238 (CRB), 2009 WL 10690310, at *2 (N.D. Cal. Feb. 18, 2009) (quoting *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)).

B.      **Federal Rule of Civil Procedure 9(b)**

Rule 9(b) provides, in part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In securities fraud actions, the plaintiff must plead with particularity the circumstances constituting the fraud so that the defendant can prepare an adequate answer. *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995). This notice requirement is satisfied by allegations of the "time, place and nature of the alleged fraudulent activities." *Id.* (internal quotation marks omitted). Unlike private securities plaintiffs, the SEC need only plead scienter generally. *SEC v. Berry*, 580 F. Supp. 2d 911, 921 (N.D. Cal. 2008). "Scienter may be established by demonstrating that the defendant acted recklessly." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010) (internal quotation marks and alteration omitted).

C.      **The Misappropriation Theory of Insider Trading**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, make it unlawful for any person to trade on the basis of material nonpublic information in breach of a duty to the source of the information. *See United States v. O'Hagan*, 521 U.S. 642, 650-52 (1997). The "classical" (or "traditional") theory of insider trading, which applies "when a corporate insider trades in the securities of his corporation on the basis of

material, nonpublic information," *id.* at 651-52, is not relevant here because Panuwat was not an insider at Incyte.  Instead, the Complaint alleges that Panuwat is liable under the "misappropriation" theory, which "reaches trading by corporate outsiders, not insiders."  *SEC v. Talbot*, 530 F.3d 1085, 1091 (9th Cir. 2008).  "Under this theory, 'a person commits fraud "in connection with" a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information.'"  *Id.* (quoting *O'Hagan*, 521 U.S. at 652).  "[T]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information."  *Id.* (quoting *O'Hagan*, 521 U.S. at 652).  "A company's confidential information" qualifies as "property," and an agent's undisclosed misappropriation of such information for personal trading "defrauds the principal of the exclusive use of that information" and "constitutes fraud akin to embezzlement."  *O'Hagan*, 521 U.S. at 652-54.  To state a claim under the misappropriation theory of insider trading, a plaintiff must allege that the defendant "knowingly misappropriated confidential, material, and nonpublic information for securities trading purposes, in breach of a duty arising from a relationship of trust and confidence owed to the source of the information."  *Talbot*, 530 F.3d at 1092.

## IV.   ARGUMENT

### A.   The Complaint States a Claim for Relief.

Panuwat argues that the Complaint does not sufficiently allege with particularity the elements of insider trading under the misappropriation theory.  Because the Complaint alleges sufficient facts with particularity to state a claim for relief, Panuwat's argument fails.  Panuwat asserts his own contrary factual allegations regarding materiality, but factual disputes are improper on a motion to dismiss.  Accordingly, his motion should be denied.

#### 1.   *The Complaint Adequately Alleges the Acquisition Information Was Nonpublic.*

Panuwat claims that the Complaint does not sufficiently allege that the Acquisition Information was confidential and nonpublic.  (MTD at 10.)  He is wrong.  Information is nonpublic if it has not been disclosed "by a public release through the appropriate public media, designed to

1   achieve a broad dissemination to the investing public generally and without favoring any special

2   person or group." *Dirks v. SEC*, 463 U.S. 646, 653 n.12 (1983) (internal quotation marks omitted).

3   The Complaint clearly alleges that, in the course of his duties as the senior director of business

4   development at Medivation, "Panuwat was entrusted with confidential information involving actual

5   or potential Medivation transactions, including actual or potential acquisitions of or by Medivation."

6   Compl. ¶ 19.  In the summer of 2016, Panuwat was kept apprised by other Medivation executives

7   and the company's investment bankers as "Medivation confidentially solicited bids from potential

8   acquirers." *Id.* ¶ 25.  Then, "[i]n August 2016, Panuwat learned confidential information through

9   his employment" about Medivation's imminent, "undisclosed" acquisition by Pfizer, and "he knew

10  or was reckless in not knowing that the information was material and nonpublic." *Id.* ¶¶ 26, 30-32;

11  *see also id.* ¶ 33 (specifically alleging that the Pfizer acquisition information contained in the email

12  sent by Medivation's CEO on August 18, 2016 was "nonpublic").

13          Panuwat faults the Complaint for not alleging whether "Pfizer's interest in acquiring

14  Medivation was confidential and nonpublic leading up to" the August 18, 2016 email from

15  Medivation's CEO.  (MTD at 14.)  But the Complaint does allege that the bidding process and

16  Medivation's communications with potential suitors were confidential.  Compl. ¶¶ 26, 30-32.  In

17  any event, whether the earlier interest of Pfizer in particular was public or not is irrelevant because

18  the Acquisition Information that Panuwat misappropriated included the nonpublic fact that Pfizer

19  "expressed overwhelming interest in acquiring Medivation" to Medivation's CEO on August 18,

20  2016, which was a strong indication that Medivation's acquisition was imminent.  *Id.* ¶ 30.

21  Accordingly, the Complaint adequately alleges that the Acquisition Information was nonpublic.

22          **2.     *The Complaint Adequately Alleges the Acquisition Information Was***
               ***Material.***

23

24          Panuwat's primary argument in his motion is that the Complaint fails to plead that the

25  Acquisition Information was material to Incyte.  This argument lacks merit because the Complaint

26  sufficiently alleges the materiality of the information to a reasonable Incyte investor.  Panuwat

27  fundamentally disagrees with those allegations, and he insists throughout his motion that Incyte was

28

an "unrelated company." (*See, e.g.*, MTD at 1, 2, 4, 6, 7, 12.)  But he cannot contest the truth of the Complaint's allegations at this stage of the litigation.

Information is material if there is a substantial likelihood that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  As an initial matter, the Complaint clearly alleges that "the information concerning Medivation's imminent acquisition was material not only to Medivation, but also to Incyte," which were comparable issuers of publicly-traded securities.  Compl. ¶¶ 22-23, 31, 35.

The Complaint explains the factors in 2016 that tied together the fortunes of Medivation, Incyte, and other mid-sized, cancer-focused drug companies.  At that time, pharmaceutical heavyweights were interested in buying companies like Medivation, but "there were only a few— including Medivation and Incyte—left to acquire." *Id.* ¶ 22.  Indeed, the Acquisition Information that Panuwat misappropriated included the confidential information that a number of potential suitors had offered premiums to acquire Medivation. *Id.* ¶¶ 22, 31.  As a result, "each such acquisition was material to the remaining companies because it made them potentially more valuable acquisition targets and could thus positively affect the stock price of those companies." *Id.* ¶ 22.  A year earlier, the acquisition of another peer company "had resulted in the material increase of the stock prices of both Medivation and Incyte." *Id.*  That is among the reasons why the "Medivation's undisclosed acquisition would have been viewed by a reasonable investor in Medivation or Incyte as having significantly altered the total mix of information made available." *Id.* ¶ 31.

In attacking the sufficiency of these materiality allegations, Panuwat primarily focuses on certain allegations about his knowledge of Incyte and his thoughts on the effect the Medivation acquisition would have on Incyte's stock.[1]  (*See* MTD at 10 ("[T]he SEC pleads only vague conclusions that Panuwat's knowledge of the potential Medivation acquisition was material to the

---

[1] Panuwat also asserts that the Complaint does not "allege facts demonstrating the basis for Panuwat's alleged beliefs regarding the materiality of the information at issue to other companies." (MTD at 10-11.)  This argument is a red herring.  It is irrelevant whether the Acquisition Information was material to "other companies" because the Complaint only charges Panuwat with illegally misappropriating and acting on information that was material to Incyte.

1    purchase of Incyte securities.").)   But he is focused on the wrong allegations.   Materiality does not

2    depend on the subjective thought processes of the defendant; rather, "the standard of materiality is

3    judged from the perspective of a 'reasonable investor,' and is therefore an objective one."   *United*

4    *States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011) (internal quotation marks and alteration omitted);

5    *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) ("The question of materiality,

6    it is universally agreed, is an objective one, involving the significance of an omitted or

7    misrepresented fact to a reasonable investor.").   The Complaint's allegations about Panuwat's

8    knowledge and mindset describe his scienter, not materiality.

9          Relatedly, Panuwat also complains that the Complaint does not allege "whether or not the

10   news of Medivation's forthcoming acquisition *would* make other biopharmaceutical companies

11   more valuable acquisition targets and *would* positively affect the stock price of other unrelated

12   companies."   (MTD at 10.)   But Panuwat again misconstrues the materiality standard.   The

13   Complaint need only allege that the undisclosed Acquisition Information "would have been viewed

14   by a reasonable investor in Medivation or Incyte as having significantly altered the total mix of

15   information made available."   Compl. ¶ 31; *see Basic*, 485 U.S. at 231-32.   In any event, the

16   Complaint does also allege that the price of Incyte stock increased materially by approximately eight

17   percent following the public announcement of the acquisition, Compl. ¶ 37, which is further proof

18   of the materiality of that information to a reasonable investor, *see Talbot*, 530 F.3d at 1097-98

19   ("Courts look to a variety of factors to determine whether information is 'material' under § 10(b)

20   and Rule 10b–5," including "an increase in the stock price after public announcement of the

21   merger.") (citation omitted).

22         Next, Panuwat argues that Medivation and Incyte "did not have any business relationship"

23   and therefore information concerning Medivation could not be material to Incyte.   (MTD at 2.)   But

24   the case law makes clear that no business transaction or relationship between the two companies is

25   required to prove materiality.   In *United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986), which

26   the Ninth Circuit discussed with approval in *Talbot*, employees of the *Wall Street Journal* were held

27   liable for trading on nonpublic information about issuers named in an influential business column.

28

*See Talbot*, 530 F.3d at 1093-94 (citing *Carpenter*, 791 F.2d at 1026, *aff'd by an evenly divided Supreme Court*, 484 U.S. 19, 24 (1987)).  It did not matter to materiality that the *Wall Street Journal* was not engaged in a business "transaction" and did not have a business "relationship" with the issuers discussed in the column.  *Carpenter*, 791 F.2d at 1026-27, 1032 n.9; *see also United States v. Libera*, 989 F.2d 596, 597-99, 602 (2d Cir. 1993) (holding that it was unlawful to trade on pre-publication information about issuers contained in a business magazine column, even though the magazine was not engaged in a business transaction or relationship with those issuers).

Panuwat also contends that, notwithstanding the Complaint's materiality allegations, the Acquisition Information could not have been material to Incyte as a matter of law because the information did not concern anything directly involving Incyte.  (*See* MTD at 12 (arguing that "the SEC does not allege that Panuwat was aware of any confidential information involving Incyte"); *id.* at 16 ("There are no cases . . . bar[ring] an individual from trading in the securities of a company that has no direct connection to the alleged inside information and merely shares certain subjective similarities.").)  As support for his argument, Panuwat points to Rule 10b5-1(a), 17 C.F.R. § 240.10b5-1(a), which discusses the prohibition on "the purchase or sale of a security of any issuer, on the basis of material nonpublic information *about that* security or issuer."  *Id.* (emphasis added) (cited by MTD at 9).  Panuwat contends that nonpublic information is not "about that . . . issuer," and thus is not material, unless the information is directly about the issuer itself.

This argument, which tries to improperly narrow the meaning of materiality, defies common sense.  It is uncontroversial that information can be material to more than one company.  For example, nonpublic information about the credit card revenues for individual retailers may be material not only to the credit card company, but also to each of the retailers.  *See SEC v. Huang*, 684 Fed. App'x 167, 169, 177 (3d Cir. 2017) (affirming jury verdict finding defendant liable for misappropriating credit card revenues to trade in the securities of 105 issuers).  Furthermore, there is nothing unusual about the fact that information about a transaction, event, or decision made by one particular entity can have a material impact on other companies, especially those in the same industry.  *See, e.g.*, *United States v. Bryan*, 58 F.3d 933, 938-39 (4th Cir. 1995) (employee of state

1  lottery misappropriated nonpublic information about the planned expansion of video lottery gaming
2  to trade in the securities of three video lottery manufacturing companies[2]).

3       The intuitive proposition that information could affect more than one company is confirmed
4  by the text of the Exchange Act's anti-fraud provisions. Section 10(b) prohibits insider trading in
5  the connection with the purchase or sale of "any security." 15 U.S.C. § 78j(b). Rule 10b-5 likewise
6  broadly prohibits insider trading in connection with the purchase or sale of "any security." 17 C.F.R.
7  § 240.10b-5. The anti-fraud provisions, "by statute and rule, are broad and, by repeated use of the
8  word 'any,' are obviously meant to be inclusive," *Affiliated Ute Citizens of Utah v. United States*,
9  406 U.S. 128, 151 (1972), because "the intent of the 1934 [Exchange] Act was to condemn all
10 manipulative or deceptive trading 'whether the information about a corporation or its securities
11 originates from inside *or outside* the corporation,'" *Carpenter*, 791 F.2d at 1030 (quoting H.R. Rep.
12 No. 98-355, 98th Cong., 1st Sess. 3, 4 (1983)) (emphasis added). Accordingly, the Acquisition
13 Information was not "so obviously unimportant that no reasonable shareholder" in Incyte could have
14 viewed it as significantly altering the total mix of information made available. *Zell v. InterCapital*
15 *Income Secs., Inc.*, 675 F.2d 1041, 1045 (9th Cir. 1982) (citing *TSC Indus.*, 426 U.S. at 449).

16      Panuwat's reliance on Rule 10b5-1(a) is misplaced. He cherry-picks the phrase "material
17 nonpublic information about that . . . issuer" from the rule and incorrectly reads it to mean that the
18 information must directly involve the issuer with whom a trader is linked, but the rule does not
19 support that interpretation. 17 C.F.R. § 240.10b5-1(a). As discussed above, it is common sense that
20 information regarding business decisions by a supplier, a purchaser, or a peer can have an impact on
21 a company and therefore be "about"—or, in other words, "concerning" or "relating to"—that
22 company. Indeed, the rule describes that it is illegal to trade on the basis of material nonpublic
23 information about "any issuer," in breach of a duty of trust and confidence owed "to the issuer of

24  ───────────────

25      [2] In *Bryan*, which was decided two years before the Supreme Court in *O'Hagan* resolved a
    circuit split and endorsed the misappropriation theory, the Fourth Circuit disagreed with the Ninth
26  and Second Circuits and held that "criminal liability under section 10(b) cannot be predicated upon"
    the misappropriation theory. 58 F.3d at 952. That is why the Fourth Circuit reversed the defendant's
27  securities fraud conviction even though the court itself acknowledged that the defendant's "conduct
    clearly constituted criminal activity under this theory of misappropriation." *Id.* at 945.
28

that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information." *Id.* Thus, the rule recognizes that material nonpublic information about an issuer can come from a source other than the issuer itself.

Furthermore, Rule 10b5-1(a) only defines what constitutes "trading 'on the basis of' material nonpublic information" and "does not modify the scope of insider trading law in any other respect"; to the contrary, the "law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5." Rule 10b5-1 (Preliminary Note). And Rule 10b5-1(a) by its terms only generally notes what insider trading violations "include," rather than limiting insider trading to certain types of misappropriations. *Cf.* Section 10(b) (prohibiting "any manipulative or deceptive device or contrivance"); *O'Hagan*, 521 U.S. at 652-54 (construing the misappropriation theory).

Notably, Panuwat cites no legal authority for his assertion that Section 10(b) and Rule 10b-5 only prohibit trading in the securities of an issuer when the trader has inside information about the same issuer. He quotes one line from *Brody v. Transitional Hospitals Corp.* to make the claim that "the SEC has forbidden 'those possessing inside information about a company to trade *in that company's securities*'—not in the securities of some third party." (MTD at 16 (quoting *Brody*, 280 F.3d 997, 1000 (9th Cir. 2002).) But *Brody* does not support his argument because that case did not announce a holding on the question of what kind of information qualifies as material and nonpublic. Instead, the central legal question in *Brody* was whether private plaintiffs who had not traded in a particular security had standing to sue the issuer and its officers and directors for damages. *See Brody*, 280 F.3d at 1000-05 (applying a contemporaneous trading rule from *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) to private plaintiffs[3]).

Panuwat also selectively quotes the Ninth Circuit's *Talbot* opinion to argue that the information must pertain to a financial transaction involving "the issuer of the securities allegedly manipulated." (MTD at 9 (quoting *Talbot*, 530 F.3d at 1097).) *Talbot* makes no such holding. Rather, the Ninth Circuit was explaining that, on remand, the trier of fact would have to decide

---

[3] The contemporaneous trading rule "imposes no limitation on the standing of the SEC to bring actions" under Section 10(b) and Rule 10b-5. *Blue Chip Stamps*, 421 U.S. at 751 n.14.

whether nonpublic information about a third-party company's impending acquisition was material to that company. *See Talbot*, 530 F.3d at 1097. The line from *Talbot* was itself a quotation from the Supreme Court's *Basic* opinion, in which the Court announced the materiality standard for Section 10(b) and Rule 10b-5 and then applied that standard to determine whether nonpublic information about a potential merger was material. 485 U.S. at 231-32. When the Supreme Court set forth the standard, it did not hold that information can only be material if it involves the issuer of the traded securities. Instead, the Supreme Court explained that any "omitted fact," including information about "corporate developments," is material if it affects the "total mix" of information about an issuer. *Id.* This contradicts the narrow interpretation of materiality advocated by Panuwat.

Apart from his legal arguments, Panuwat inserts factual allegations throughout his motion about how Incyte was "an unrelated biopharmaceutical company that was not viewed as a competitor by Medivation" in support of his argument that the Complaint does not sufficiently plead materiality. (MTD at 6 (emphasis omitted); *see also id.* at 2 ("Medivation and Incyte . . . did not even view themselves as competitors . . . ."); *id.* at 12 (describing Incyte as an "unrelated company")).) But, as described above, the Complaint alleges that Incyte was a comparable peer company and that its stock price increased materially following the announcement of the Medivation acquisition, all of which must be accepted as true on a motion to dismiss. *See Sabhlock*, 2009 WL 10690310, at *2. Panuwat will have the opportunity to dispute the SEC's evidence of materiality at trial, *see Talbot*, 530 F.3d at 1097 (materiality involves "assessments peculiarly within the province of the trier of fact" (internal quotation marks omitted)), but he cannot do so now. His repeated factual allegations that Medivation and Incyte were very different companies should be ignored.

Accordingly, the Complaint adequately pleads that the nonpublic Acquisition Information was material to Incyte. Panuwat's argument to the contrary should be rejected.

### 3.   *The Complaint Adequately Alleges a Breach of Duty.*

Panuwat asserts that the Complaint does not adequately plead that he breached his duty of trust and confidence to Medivation by trading in Incyte options because he did not have "any

confidential information regarding Incyte."[4]   (MTD at 12.)   Like his materiality argument, this

contention hinges on the assumption that the Acquisition Information would not be material to Incyte

or its reasonable investors.   Indeed, Panuwat expressly argues that allegations that he purchased

"securities of an unrelated company about which he was not provided with material nonpublic

information" are not sufficient to plead the breach of duty element.   (*Id.*)   Because the Complaint

adequately pleads materiality, Panuwat's related argument about the breach of duty fails.

Panuwat, however, points to Medivation's insider trading policy as proof that Medivation

itself did not regard the Acquisition Information as being material to Incyte.   (*Id.* at 11.)   That policy

prohibited Panuwat from using nonpublic information to trade in "the securities of another publicly

traded company, including all significant collaborators, customers, partners, suppliers, or

competitors of the Company."   Compl. ¶ 20.   Panuwat contends that, because the Complaint does

not allege that Incyte fell into any of the enumerated categories, Medivation "did not contemplate

trading in the securities of an unrelated company, such as Incyte, as prohibited trading under the

policy" and thus his trading did not breach a duty to Medivation.   (MTD at 12.)

The insider trading policy does not support Panuwat's argument.   He misreads the plain

language of the policy, which specifically prohibits insiders from using nonpublic information to

trade in "the securities of another publicly traded company," Compl. ¶ 20, and Incyte is publicly

---

[4] Panuwat does not appear to contest that the Complaint adequately alleges that he owed a duty of trust and confidentiality to Medivation.  That is not surprising because the Complaint clearly explains that, as an "employee and agent" of Medivation, he owed Medivation a duty to refrain from using its proprietary information for his personal gain.  Compl. ¶ 3; *see O'Hagan*, 521 U.S. at 654-55 (relying on Restatement (Second) of Agency §§ 390, 395 (1958)); *SEC v. Obus*, 693 F.3d 276, 289 (2d Cir. 2012) ("An agent has a duty . . . not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." (quoting Restatement (Third) of Agency § 8.05 (2006))).   In addition, Panuwat signed an express confidentiality agreement in which he agreed to "keep information he learned during his employment confidential and not make use of such information, except for the benefit of Medivation."  Compl. ¶ 20.  It is well-established that whenever a person agrees to maintain information in confidence, then a duty of trust and confidence exists.  *See, e.g.*, *O'Hagan*, 521 U.S. at 663 (recognizing that the requisite duty may be "fiduciary, contractual, or [a] similar obligation"); *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) (noting that a duty exists under the misappropriation theory of liability when "there is explicit acceptance of a duty of confidentiality"); *accord* 17 C.F.R. § 240.10b5-2(b)(1) (stating that a "'duty of trust or confidence' exists . . . [w]henever a person agrees to maintain information in confidence").

traded, *id.* ¶ 16.   The  policy  then  used  the  word  "including"  to  provide  a  non-exclusive  and illustrative list of types of publicly traded companies. *Cf. Ariz. State Bd. for Charter Schools v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007-08 (9th Cir. 2006) ("In both legal and common usage, the word 'including' is ordinarily defined as a term of illustration, signifying that what follows is an example of the preceding principle.").   Furthermore, the insider trading policy was not the sole source of Panuwat's duty of trust and confidentiality to Medivation.   He signed the express confidentiality agreement, Compl. ¶ 20, and he also assumed such a duty by virtue of being an employee of Medivation, *see supra* note 4.

Almost as an aside, Panuwat mentions several times in his motion that "the Complaint does not allege that Panuwat owed a duty of trust and confidence to Incyte."  (MTD at 7; *see also id.* at 12.)  But he does not argue that such a duty is necessary to state a claim for relief, and for good reason: the Ninth Circuit has squarely held that the misappropriation theory does not require that the trader  and  the  originating  source  of  the  material  nonpublic  information  be  linked  through  a continuous chain of fiduciary duties. *Talbot*, 530 F.3d at 1093.  Instead, the trader need only owe a duty of trust and confidence to the source of the information on which he traded. *Id.* at 1093-94.  In *Talbot*, the defendant traded on material nonpublic information about LendingTree that he learned through his employment at Fidelity.   Although neither the defendant nor Fidelity owed a duty to LendingTree, the Ninth Circuit ruled that the defendant's breach of his duty to Fidelity was sufficient as a matter of law to satisfy the breach-of-duty element. *Id.* at 1092 n.2, 1097.  The same is true in this case.  The Complaint alleges that Panuwat breached his duty of trust and confidence owed to Medivation, which is sufficient to state a claim irrespective of his relationship with Incyte.

Accordingly, the Complaint adequately pleads that Panuwat breached his duty to Medivation by trading on the material nonpublic information he learned in the course of his job at Medivation.

### 4.    *The Complaint Adequately Alleges Scienter and Alleges the Fraud with Particularity Under Rule 9(b).*

Panuwat contends that the Complaint does not sufficiently plead his scienter because it does not  allege  that  he  "actually  used  the  material  nonpublic  information  regarding  Medivation's acquisition when he placed his trade in Incyte."  (MTD at 13.)  To make this incorrect argument, he

1    again ignores numerous allegations in the Complaint that establish he acted with an intent to deceive

2    the source of the material nonpublic information, Medivation. *See, e.g.*, Compl. ¶¶ 32-34, 40.

3        The Supreme Court has defined "scienter" in the context of Section 10(b) as a "mental state

4    embracing intent to deceive, manipulate, or defraud." *SEC v. Todd,* 642 F.3d 1207, 1215 (9th Cir.

5    2011) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). The SEC "may

6    establish scienter by proving either actual knowledge or recklessness." *Gebhart*, 595 F.3d at 1040

7    (internal quotation marks omitted). The SEC need only plead scienter generally. *Berry*, 580 F.

8    Supp. 2d at 921.

9        The allegations in the Complaint satisfy this standard. The Complaint alleges that Panuwat

10   "defrauded" Medivation by personally trading on the basis of information that Medivation entrusted

11   to him. Compl. ¶¶ 32-34, 40; *see O'Hagan*, 521 U.S. at 652-55. Panuwat knew, or was reckless in

12   not knowing, that the Acquisition Information was nonpublic, *see* Compl. ¶¶ 26, 30-32, and material,

13   *see id.* ¶ 31. Indeed, he traded in risky out-of-the-money, short-term Incyte options because he

14   "anticipated Incyte's stock price would jump" when the Pfizer acquisition was announced, based on

15   his knowledge of the parallels between Medivation and Incyte (including those drawn by

16   Medivation's investment bankers in their presentations), and of the mid-cap, cancer-focused

17   biopharmaceutical industry more generally. *Id.* ¶¶ 18, 22-23, 33; *see SEC v. Texas Gulf Sulphur*,

18   401 F.2d 833, 851 (2d Cir. 1968) (trading activity is "objective evidence"). The allegations also

19   sufficiently plead that Panuwat knew, or was reckless in not knowing, that his trading would violate

20   a confidence he had with Medivation. He traded even though he had signed a confidentiality

21   agreement and an insider trading policy in which he pledged not to trade on nonpublic information

22   he learned on the job. Compl. ¶ 20. The Complaint describes how Panuwat made his trades "within

23   minutes" of receiving the Pfizer acquisition information without seeking preclearance first. *Id.* ¶¶

24   33-34. Moreover, he did not disclose the trades to Medivation after the fact.[5] *Id.* ¶ 34. Taken

25   together, these allegations sufficiently plead Panuwat's intent to deceive Medivation.

26   _____

27       [5] Panuwat criticizes the allegation regarding his failure to seek preclearance because the
     Complaint does not allege whether Medivation required preclearance. (MTD at 14.) But his failure

28

Panuwat argues that the Complaint does not sufficiently allege that he "actually used the material nonpublic information" when he purchased the Incyte options.  (MTD at 13.)  He finds this "actual use" standard in a Ninth Circuit opinion from 1998 and a subsequent district court opinion.  (*Id.* (citing *United States v. Smith*, 155 F.3d 1051, 1067-70 (9th Cir. 1998) and *SEC v. Truong*, 98 F. Supp. 2d 1086, 1095 (N.D. Cal. 2000))).  But he does not acknowledge that "*Smith* was decided before the SEC's promulgation of Rule 10b5-1 in 2000, which specifically provides the definition for 'on the basis of' in insider trading cases."  *SEC v. Moshayedi*, No. 12 Civ. 1179, 2013 WL 12172131, at *14 (C.D. Cal. Sept. 23, 2013).  Rule 10b5-1(b) provides that a person trades "on the basis of" material nonpublic information "if the person making the purchase or sale was *aware* of the material nonpublic information when the person made the purchase or sale."  17 C.F.R. § 240.10b5-1(b) (emphasis added).  "[B]ecause the SEC subsequently promulgated a rule interpreting the phrase 'on the basis of,' the Court defers to the SEC's definition."  *Moshayedi*, 2013 WL 12172131, at *14.  Thus, the Complaint need only plead that Panuwat was aware of the material nonpublic information, and it clearly does so.[6]  *Id.*

Even assuming for the sake of argument that the "actual use" standard of *Smith* applied here (which it does not), the Complaint alleges sufficient facts to meet that standard.  Indeed, the Complaint expressly alleges that "Panuwat *used* this information concerning the Medivation acquisition to trade."  Compl. ¶ 33 (emphasis added); *see also id.* ¶ 34 (describing "Panuwat's undisclosed, self-serving use of Medivation's information").  Notably, he purchased short-term options in order to benefit from the nonpublic information he learned from his job that the acquisition

---

to disclose the trades to the company both before and after is relevant to his intent to deceive and thus his scienter.  *See Obus*, 693 F.3d at 285 (explaining that, "[b]ecause the misappropriation theory is based on a fiduciary duty to the source of the information, only disclosure to the source prevents deception").

[6] Before *Smith* was decided, the Eleventh Circuit held in the civil enforcement case *SEC v. Adler* that, "when a trader buys or sells securities while in the possession of material non-public information, courts should employ an evidentiary presumption of a 'strong inference' of use."  *Truong*, 98 F. Supp. 2d at 1095 (quoting *Adler*, 137 F.3d 1325, 1337 (11th Cir. 1998)).  *Smith* held that this presumption cannot be applied in criminal insider trading cases, *see* 155 F.3d at 1069, but specifically "express[ed] no view as to whether or not an *Adler*-type presumption may be employed in *civil* enforcement proceedings under Rule 10b-5," *id.* at 1069 n.27; *see also Truong*, 98 F. Supp. 2d at 1095.

was imminent.  *Id.* ¶¶ 29-30, 33.  The Complaint also alleges that Panuwat had never before traded in Incyte stock or options.  *Id.* ¶ 33.  The *Smith* Court described a fact pattern strikingly similar to the one alleged here to illustrate a situation in which the Court was "confident that the government would have little trouble demonstrating 'use'" of material nonpublic information.  155 F.3d at 1069; *see id.* (positing a scenario in which "an individual who has never before invested comes into possession of material nonpublic information and the very next day invests a significant sum of money in substantially out-of-the-money call options").

The same allegations that establish Panuwat's scienter also plead the fraud with particularity as required by Rule 9(b).  Because the purpose behind Rule 9(b) is to ensure that the defendant can prepare an adequate answer, *Fecht*, 70 F.3d at 1082, the rule is satisfied by allegations of "'the who, what, when, where, and how' of the misconduct charged," *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).  The Complaint clearly alleges that Panuwat (who) committed insider trading (what) by misappropriating material nonpublic information from Medivation and acting on it to trade in Incyte call options (how) in his personal brokerage account (where) shortly after receiving that information on August 18, 2016 (when).  Compl. ¶¶ 30-34.

Panuwat demands a number of additional details that are not required by Rule 9(b) and are not necessary for Panuwat to understand the charges against him.  For example, Panuwat argues that the Complaint, which alleges that he reviewed the bankers' presentations, does not specify how many he reviewed, when he received them, "the context in which Incyte was referenced, or the basis for including Incyte as an alleged 'comparable' company."  (MTD at 6 (citing Compl. ¶¶ 22, 35).)  Similarly, he faults the Complaint for not alleging whether Medivation or Incyte's stock prices "were ever statistically correlated" before the acquisition announcement.  (*Id.* at 10-11.)

None of these details is necessary for Panuwat to understand the alleged fraud and "prepare an adequate answer."  *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973).  Rule 9(b) "does not require the granular details that Defendant[] appear[s] to call for" because the rule "'does not require nor make legitimate the pleading of detailed evidentiary matter.'"  *SEC v. Richman*, No.

21 Civ. 1911 (CRB), 2021 WL 5113168, at \*4 (N.D. Cal. Nov. 3, 2021) (quoting *Walling*, 476 F.2d at 397); *see also SEC v. Levin*, 232 F.R.D. 619, 624 (C.D. Cal. 2005) ("[T]he SEC is not required to plead detailed evidence concerning each and every fraudulent act alleged."); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 30, 38-44   (2011) (statistical correlation is not necessary to plead materiality).

*     *     *

In sum, the Complaint pleads more than sufficient allegations to state a claim for relief under Section 10(b) and Rule 10b-5.

**B.     Panuwat's Due Process Arguments Should Be Rejected.**

Panuwat advances a due process claim that the SEC has never before charged a case with the specific fact pattern presented here: namely, that a defendant acted on nonpublic information learned about Company A but also material to Company B to trade in the securities of Company B.  (MTD at 16.)  Panuwat asserts that, because he did not have notice as required by the Due Process Clause that such conduct would be illegal, the insider trading laws should be void for vagueness as applied to him.  (*Id.* at 17.)

Panuwat's due process argument lacks merit.  *First*, courts have repeatedly rejected similar due process challenges in both civil and criminal insider trading cases on the ground that the scienter element of the crime, which must be proven by the government or the SEC, is a "sturdy safeguard[]" to sustaining liability under the misappropriation theory.  *O'Hagan*, 521 U.S. at 665.  The Supreme Court has recognized in many different contexts that "a scienter requirement in a statute alleviates vagueness concerns."  *McFadden v. United States*, 576 U.S. 186, 197 (2015) (internal quotation marks and alteration omitted).

In insider trading cases, the SEC must prove that the defendant had the "intent to deceive, manipulate, or defraud."  *Hochfelder*, 425 U.S. at 193 & n.12.  In view of this scienter requirement, the anti-fraud provisions of the securities laws do not violate the Due Process Clause because "it cannot be said that an ordinary person is not able to conform his or her conduct to acting without fraudulent intent."  *United States v. Laurienti*, 611 F.3d 530, 542 (9th Cir. 2010) (internal quotation

1  marks omitted); *see also O'Hagan*, 521 U.S. at 666 ("[T]he statute's requirement of the presence of

2  culpable intent as a necessary element of the offense does much to destroy any force in the argument

3  that application of the statute in circumstances such as [the defendant's] is unjust." (internal

4  quotation marks and alteration omitted)); *SEC v. Willis*, 777 F. Supp. 1165, 1174 (S.D.N.Y. 1991)

5  (rejecting due process claim because "Rule 10b-5's proscription of fraudulent and deceptive

6  practices upon any person in connection with the purchase or sale of a security provided adequate

7  notice" to defendant that his deceptive conduct may be unlawful).  Accordingly, Section 10(b) and

8  Rule 10b-5 are not void for vagueness as applied to Panuwat's illegal trading.

9        *Second*, labeling this case "novel," as Panuwat argues, makes no difference to the analysis.

10  The allegations of the Complaint are based on the common-sense proposition that nonpublic

11  information can be material to more than one company.  The SEC has routinely charged cases

12  involving unlawful trading on information that was material to more than one issuer.  Almost 30

13  years ago, in 1992, the SEC brought a case against an employee of a national laboratory who

14  misappropriated material nonpublic information about the laboratory's procurement process to trade

15  in the stocks of companies who were bidding for contracts.  *SEC v. DeGarmo*, No. 92 Civ. 2347 (D.

16  Colo. Dec. 2, 1992); *see also SEC v. Hooshiari*, No. 99 Civ. 2043 (N.D. Ga. Aug. 9, 1999) (charging

17  a defendant who misappropriated the material nonpublic information that his employer and its

18  collaborators had decided not to award a contract to a manufacturing company, and then shorted that

19  manufacturing company's stock).  More recently, in January 2015, the SEC alleged that an employee

20  of a credit card company misappropriated nonpublic information about retailers' credit card revenues

21  and traded in those retailers' stocks.  *Huang*, 684 Fed. App'x at 168-70.  That information was

22  material not just to his employer, but to "over 100 consumer retail companies," and, in January 2016,

23  a jury found the defendant liable for violating Section 10(b) and Rule 10b-5.  *Id.* at 169, 171; *see*

24  *also id.* at 177 (Third Circuit affirming the jury's verdict).  Accordingly, the instant case is not unique

25  in alleging that the nonpublic Acquisition Information was material to two issuers, Medivation and

26  Incyte.  Compl. ¶ 31.  And certainly the harm caused by Panuwat's misconduct is not "novel"

27  because it inflicts the same sort of damage to market integrity and investor confidence that results

28

1  from any fiduciary's trading on misappropriated inside information.  *See O'Hagan*, 521 U.S. at 658-
2  59.

3       *Third*, Panuwat is incorrect in his claim that the SEC is in effect announcing a new regulation
4  through this enforcement action and that he did not receive advance notice.  (MTD at 17.)  This case
5  simply applies the well-established elements of the misappropriation theory, which was recognized
6  by the Supreme Court in 1997 in *O'Hagan*, and by the Ninth Circuit even earlier in *SEC v. Clark*,
7  915 F.2d 439 (9th Cir. 1990).    Although Panuwat contends that the boundaries of the
8  misappropriation theory are uncertain, "it has been the law of this circuit for many years" and thus
9  Panuwat "had fair notice . . . that the conduct charged might violate Section 10(b)."  *United States*
10  *v. Willis*, 737 F. Supp. 269, 277 (S.D.N.Y. 1990).  "The fact that there is no litigated fact pattern
11  precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved
12  but hardly provides an escape from the penal sections of the securities fraud provisions here
13  involved."  *Id.* (quoting *United States v. Brown*, 555 F.2d 336, 339-40 (2d Cir. 1977)); *see also*
14  *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971) ("Section 10(b) and
15  Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities,
16  whether the artifices employed involve a garden type variety of fraud, or present a unique form of
17  deception," because "[n]ovel or atypical methods should not provide immunity from the securities
18  laws." (internal quotation marks omitted)).  This Court is not deprived of enforcing the securities
19  laws against Panuwat even if "no court or regulator had previously chosen to exercise such authority
20  with respect to the practice challenged here."  *Newton v. Merrill, Lynch, Pierce, Fenner & Smith,*
21  *Inc.*, 135 F.3d 266, 274 (3d Cir. 1998).  In any event, Panuwat signed Medivation's insider trading
22  policy, which warned him that trading in the securities of "another publicly traded company" for
23  personal gain may be "illegal."  Compl. ¶ 20.

24       Panuwat relies on administrative law holdings that stand only for the unremarkable
25  proposition that the Due Process Clause may be implicated if an agency issues a rule and guidance
26  with respect to its applicability, and later changes that guidance to apply retrospectively.  In *General*
27  *Electric Co. v. U.S. Environmental Protection Agency*, the EPA brought an administrative
28

1    enforcement action that, for the first time, announced a new interpretation of an existing waste

2    disposal regulation, even though "different divisions of the enforcing agency disagree[d]" about that

3    interpretation.   53 F.3d 1324, 1326-27, 1331-34 (D.C. Cir. 1995) (cited by MTD at 17).   In

4    *Christopher v. SmithKline Beecham Corp.*, "despite the industry's decades-long practice of

5    classifying pharmaceutical detailers as exempt employees," the Department of Labor "never initiated

6    any enforcement actions with respect to detailers or otherwise suggested that it thought the industry

7    was acting unlawfully" before 2009.   567 U.S. 142, 157 (2012) (cited by MTD at 17-18).   Neither

8    case is relevant here.   The Complaint alleges all the elements of the existing insider trading laws as

9    developed through federal decisions and common-law principles of agency.   To the extent that

10   Panuwat disagrees with the allegations about materiality and scienter, he can contest them at trial.

11   *See Talbot*, 530 F.3d at 1097.

12        Next, Panuwat complains that the outer limits of the insider trading laws would be "entirely

13   unclear" if this Complaint is not dismissed.   (MTD at 19.)   He argues that individuals will not know

14   "which companies could be viewed by the SEC as 'comparable' and how broad is the scope of the

15   same 'industry' for such purposes," and thus will not know whether they can trade in Company B

16   after they learn nonpublic acquisition information about Company A.   (*Id.* at 18-19.)

17        These concerns lack merit because the insider trading laws are cabined by, among other

18   elements, the materiality and scienter requirements.   Materiality is an objective inquiry that does not

19   depend on the subjective "views" of the SEC, while scienter requires proof that the defendant knew

20   or was reckless in not knowing that the nonpublic information was material.   *See supra* Sections

21   IV.A.2 and 4.   The Complaint does not allege that Panuwat unlawfully traded in a general industry

22   or that trading in any company within that industry would be unlawful, but instead explains why the

23   nonpublic Acquisition Information was material to Incyte and its investors.   "At most, [Panuwat]

24   shows that in some factual circumstances assessing" whether information is material to more than

25   one security or issuer "will be difficult" for the factfinder, but that does not render the case against

26   him unconstitutionally "ambigu[ous]" or "uncertain[]."   *Salman v. United States*, 137 S. Ct. 420,

27   428-29 (2016) (rejecting vagueness challenges to insider trading conviction); *see also Huang*, 684

28

Fed. App'x at 169 (in a case in which misappropriated credit card data was used to trade in multiple issuers, the "primary dispute at trial was whether the . . . data was material"). The Complaint also alleges that Panuwat acted with intent to deceive and defraud Medivation. *See supra* Section IV.A.4. As a result, this case does not expand the scope of the existing insider trading laws.

Panuwat analogizes this case to *McNally v. United States*, a criminal case in which the Supreme Court rejected the government's argument that the mail fraud statute extended to the "intangible right of the citizenry to good government." 483 U.S. 350, 356 (1987) (cited by MTD at 18-19). But *McNally* is readily distinguishable. The statute there criminalized frauds involving "money or property," and the Court in *McNally* declined to expand those categories to include intangible rights. *Id.* at 358-60. As discussed above, Panuwat's main objection is that the Acquisition Information in this case should not be considered material to Incyte. But there is nothing unusual about disloyal employees misappropriating this type of corporate property—an unannounced acquisition is a "prototypical example of material non-public information." *SEC v. Obus*, 693 F.3d 276, 289 n.3 (2d Cir. 2012). The trier of fact can apply the materiality standard to determine whether the Acquisition Information would have altered the total mix of information available to a reasonable Incyte investor. Unlike in *McNally*, the Commission's case against Panuwat fits within the long-standing elements of Section 10(b)'s misappropriation theory.

Accordingly, Panuwat's due process argument should be rejected.

## V.     **CONCLUSION**

For the reasons set forth above, the Court should deny Defendant's motion to dismiss the Complaint.

Dated: December 6, 2021          Respectfully submitted,


                                 */s/ David Zhou*
                                 David Zhou
                                 Marc D. Katz
                                 Tracy S. Combs
                                 Attorneys for Plaintiff
                                 SECURITIES AND EXCHANGE COMMISSION