UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

MATTHEW PANUWAT,

    Defendant.

Case No. 21-cv-06322-WHO

**ORDER DENYING MOTION TO DISMISS**

Re: Dkt. No. 18

Defendant Matthew Panuwat moves to dismiss a complaint brought by the Securities and Exchange Commission ("SEC") that Panuwat calls an unprecedented expansion of the Securities Exchange Act of 1934 (the "Exchange Act"). The SEC alleges that Panuwat used confidential information about the acquisition of Medivation, his employer, to buy stock options in Incyte Corp., earning $107,066 in profit. It has sufficiently pleaded that the information about the acquisition was nonpublic and material to Incyte, as the acquisition would make Incyte a more valuable acquisition target. The SEC has also adequately alleged that Panuwat breached a duty to Medivation by using the information to purchase stock in a publicly traded company. As pleaded, Panuwat acted with scienter. Allowing the SEC to proceed on this theory of liability does not violate his due process rights. His motion to dismiss is denied.

## BACKGROUND

Between 2014 and 2017, Panuwat worked at Medivation, a "mid-cap, oncology-focused biopharmaceutical company." Compl. [Dkt. No. 1] ¶¶ 13, 15. At the start of his tenure, Panuwat signed the company's insider trading policy, which stated in part:

> "During the course of your employment . . . you may receive important information that is not yet publicly disseminated . . . about the Company. . . . Because of your

> access to this information, you may be in a position to profit financially by buying or selling or in some other way dealing in the Company's securities . . . or the securities of another publicly traded company, including all significant collaborators, customers, partners, suppliers, or competitors of the Company. . . . For anyone to use such information to gain personal benefit . . . is illegal."

*Id*. at ¶ 20.

In 2016, Panuwat was a senior director of business development, a role that included "finding, evaluating, and pursuing strategic opportunities to expand Medivation's drug products and development pipeline, primarily through acquisitions and in-licensing." *Id*. at ¶¶ 17-18. As part of that job, Panuwat "closely tracked the stock prices, drug products, and development pipelines of other biopharmaceutical companies," including Incyte, another "valuable, mid-cap, oncology-focused [company] with a profitable FDA-approved (commercial stage) drug on the U.S. market." *Id*. at ¶¶ 18, 22. He also received confidential information about Medivation, including actual or potential acquisitions of or by the company. *Id*. at ¶ 19.

In April 2016, Medivation brought in investment banks to explore possibly merging with another company. *Id*. at ¶ 21. The SEC contends that Panuwat worked closely with these bankers and high-level Medivation executives in assessing the company's options, and reviewed presentations that "discussed Medivation's peer companies in the biopharmaceutical industry," including Incyte. *Id*. at ¶¶ 21-22. It further alleges that "Panuwat himself noted to the investment bankers that they might want to consider Incyte a comparable company to Medivation," and "closely" tracked the stock prices of both companies. *Id*. at ¶ 23.

During July and August 2016, Medivation confidentially solicited bids from potential acquirers, information about which was shared with Panuwat. *Id*. at ¶ 25. On August 12, the bankers sent Panuwat a summary of bids, indicating that at least five companies made premium, all-cash offers and that all were "prepared to move forward quickly." *Id*. at ¶ 27. Two days later, Panuwat attended a meeting of the Medivation board of directors, which authorized the bankers to send letters soliciting final bids by August 19, 2016. *Id*. at ¶ 28. The bankers had previously sent Panuwat copies of those letters, which were marked "Confidential." *Id*.

On August 18, 2016, Medivation's CEO sent company executives, including Panuwat, an email indicating that Pfizer, Inc. ("Pfizer") had expressed "overwhelming interest" in acquiring

2

Medivation and that Pfizer's CEO would call Medivation's CEO later that day to "resolve final details with respect to an impending acquisition." *Id*. at ¶ 30. Within minutes of receiving that email, Panuwat purchased 578 Incyte call option contracts with an expiration date of September 16, 2016. *Id*. at ¶ 33. Panuwat, who had never traded Incyte stock or options before, did not inform anyone at Medivation of his actions. *Id*. at ¶¶ 33-34.

On August 20, 2016, Medivation signed a merger agreement with Pfizer, which was publicly announced two days later, before the market opened. *Id*. at ¶ 35-36. Medivation's stock prices then climbed from $67.16 per share to $80.62. *Id*. at ¶ 36. The stock prices of other mid-cap biopharmaceutical companies also increased that day, including Incyte's. *Id*. at ¶ 37. Incyte's price per share rose from $76.11 to $79.80, reaching a high of $84.39 before closing at $81.98. *Id*. Panuwat earned $107,066 as a result. *Id*. at ¶ 38.

The SEC brought this suit on August 17, 2021, alleging that Panuwat violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. Dkt. No. 1. Panuwat moved to dismiss on November 1, 2021. Dkt. No. 18. I heard oral argument on January 12, 2022.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts his allegations as true and draws all reasonable inferences in his favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to

accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Claims brought under Section 10(b) of the Exchange Act and Rule 10b-5 must also satisfy the heightened pleading standard for fraud claims set forth in Federal Rule of Civil Procedure 9(b). *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Rule 9(b) requires parties to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

**DISCUSSION**

Section 10(b) of the Exchange Act makes it unlawful for any person buying or selling securities to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78(j)(b). Rule 10b-5 prohibits any person, "directly or indirectly . . . in connection with the purchase or sale of any security," from:

a) Employing "any device, scheme, or artifice to defraud;"

b) Making "any untrue statement of a material fact" or omitting "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;" or

c) Engaging "in any act, practice, or course of business which operates or would operate as fraud or deceit upon any person."

17 C.F.R. § 240.10b-5. Rule 10b5-1(a) defines "manipulative and deceptive devices," which:

> "include, among other things, the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed . . . to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information."

*See id*. § 240.10b5-1(a).

There are two theories of insider trading liability which violate Section 10(b) and Rule 10b-5. *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). The "traditional" or "classical theory" arises "when a corporate insider trades in the securities of his corporation on the basis of

4

material, nonpublic information." *Id*. Under the "misappropriation theory," a person violates the law "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id*. at 652. "In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *Id*. In other words, the misappropriation theory "reaches trading by corporate outsiders, not insiders." *SEC v. Talbot*, 530 F.3d 1085, 1091 (9th Cir. 2008).

The SEC brings its claim against Panuwat under the misappropriation theory. *See* Oppo. [Dkt. No. 19] 7:26-8:4. In order to hold him liable, the SEC must show that Panuwat "knowingly misappropriated confidential, material, and nonpublic information for securities trading purposes, in breach of a duty arising from a relationship of trust and confidence owed to the source of the information." *See Talbot*, 530 F.3d at 1092.

Panuwat's argument is two-fold. First, he asserts that the complaint should be dismissed because the SEC failed to adequately plead: (1) that the information at issue was material and nonpublic; (2) that Panuwat breached his duty to Medivation; and (3) that Panuwat acted with intent to defraud, otherwise known as scienter. *See* Mot. to Dismiss ("MTD") [Dkt. No. 18] 9-12. Next, he contends that this is a novel application of the misappropriation theory by the SEC, which would improperly expand the law and violate Panuwat's due process rights. *See id*. at 15.

### I. FAILURE TO STATE A CLAIM

#### a. Confidential, material, and nonpublic information

A fact is material if there is a substantial likelihood that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also Talbot*, 530 F.3d at 1097 (stating that a fact is material "if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to buy or sell securities."). Because the standard is considered from the perspective of a "reasonable investor," it is objective. *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011).

5

When mergers are involved, materiality is a fact-dependent inquiry focused "on the probability that the transaction will be consummated, and its significance to the issuer of the securities." *Basic*, 485 U.S. at 250. Courts consider factors including "indicia of interest in the transaction at the highest corporate levels," "the size of the two corporate entities and of the potential premiums over market value," and any increase in stock price after the merger is publicly announced. *Id*. at 239; *Talbot*, 530 F.3d at 1097.

The bulk of the parties' arguments center on whether the information about the impending Pfizer-Medivation acquisition was material to Incyte. According to Panuwat, it was not. *See* MTD at 9-10. He argues that Rule 10b5-1(a) requires the SEC to prove that he traded in Incyte's securities "on the basis of material nonpublic information 'about that security or issuer.'" *Id*. at 9:23-25. He contends that the SEC has not shown that he possessed any confidential information about Incyte at the time he purchased the stock options. *Id*. at 9:25-26. Instead, he said, the SEC makes a conclusory argument that because Panuwat had confidential information about Medivation, it was material to "other allegedly similar biopharmaceutical companies," including Incyte. *Id*. at 9:27-10:2.

The SEC accuses Panuwat of attempting to "improperly narrow the meaning of materiality." Oppo. at 12:19. It notes that information can be material to more than one company.[1] *See id*. at 12:20. The SEC then turns to the language of Section 10(b) and Rule 10b-5, which it contends supports the proposition that information is material to more than one company by broadly prohibiting insider trading in connection with "any security." Oppo. at 13:3-15. It reads Rule 10b5-1(a) similarly, arguing that "it is common sense that information regarding business decisions by a supplier, a purchaser, or a peer can have an impact on a company and therefore be 'about'—or, in other words, 'concerning' or 'relating to'—that company." *Id*. at 13:19-22. Moreover, the SEC asserts, Rule 10b5-1(a) is not exhaustive, as it only describes what insider trading violations "include" rather than provide a limited list. *Id*. at 14:7-9.

---

[1] Panuwat concedes that information may be material to more than one company, noting that pending acquisitions "necessarily involve material nonpublic information about both the target company and acquiring company, and potentially other bidders or related companies that are specifically involved in the transaction." *See* Reply [Dkt. No. 22] 10:13-18.

6

The SEC's reading of Section 10(b) and the regulations is more persuasive than Panuwat's. Section 10(b) and Rule 10b-5 cast a wide net, prohibiting insider trading of "*any* security" using "*any* manipulative or deceptive device." *See* § 78j(b); § 240.10b-5 (emphasis added). Importantly, Rule 10b5-1(a) does not state that the information "about that security or issuer" must come from the security or issuer itself in order to be material.[2] *See* § 240.10b5-1(a). It only requires that the information be material and nonpublic. *See id*.

Moreover, the rule is not exhaustive. It states that "manipulative and deceptive devices . . . *include, among other things*, the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer." *See id*. (emphasis added). Even if Rule 10b5-1(a) required that the information about the security or issuer come from the same security or issuer, this language indicates that it would be only one example of a manipulative and deceptive device prohibited by law.

Panuwat contends that the presumption in *Basic*, as reinforced by *Talbot*, is that "information is material in the merger context to the two corporate entities negotiating the transaction, not to all companies in the field." *See* Reply at 9:1-5. But the holding in *Basic* does not assign a source to the information at issue. *See Basic*, 485 U.S. at 250. Rather, it only focuses on whether the information is significant "to the issuer of the securities." *Id*. Neither *Basic* nor *Talbot* foreclose the possibility that information may be significant to an issuer even if it comes from outside the company. If information may be material to more than one company—as the parties agree—it follows that it may be material to more than the two companies specifically engaged in the transaction.

Through this lens, the SEC has sufficiently pleaded that the information about Medivation's looming acquisition was material to Incyte. The complaint alleges in adequate detail that, given the limited number of mid-cap, oncology-focused biopharmaceutical companies with commercial-stage drugs in 2016, the acquisition of one such company (Medivation) would make

---

[2] The only context in which Rule 10b5-1(a) mentions "the source of the material nonpublic information" relates to breach, not materiality itself. *See* 17 C.F.R. § 240.10b5-1(a) (". . . in breach of a duty of trust or confidence that is owed . . . to any other person who is the source of the material nonpublic information.").

the others (i.e., Incyte) more attractive, which could then drive up their stock price. *See* Compl. at ¶ 22. It is reasonable to infer that the Pfizer-Medivation merger would be consummated, considering the conversations between Pfizer executives and Medivation's CEO indicating "overwhelming interest" in the deal. *See id*. at ¶ 30. Given the number of other companies who tried to acquire Medivation, it is also reasonable to infer that those that were unsuccessful would then turn their attention to Incyte. *See id.* at ¶ 27. The Medivation-Pfizer transaction would thus be significant to Incyte, and a reasonable Incyte investor would consider it important in deciding whether to buy or sell Incyte stock. This is further confirmed by the assertion that Incyte's stock price increased on the day that the Pfizer-Medivation merger was announced. *See id*. at ¶ 37.

The information related to the Medivation acquisition was also confidential and nonpublic. Information becomes public when it is disclosed in a manner "designed to achieve a broad dissemination to the investing public generally and without favoring any special person or group." *Dirks v. SEC*, 463 U.S. 646, 653 n.12 (1983). The SEC sufficiently alleges that in August 2016, Panuwat received confidential information about the company's impending acquisition, including: (1) a summary of bids; (2) letters soliciting final bids that were marked "Confidential;" (3) internal emails, including the August 18 message from Medivation's CEO describing Pfizer's "overwhelming interest" in acquiring Medivation and plans to "resolve final details" by phone later that day. *See* Compl. at ¶¶ 26-30. Pfizer's acquisition of Medivation was publicly announced on August 22. *Id*. at ¶ 36. Panuwat is alleged to have purchased the Incyte stock options after receiving the Medivation CEO's email on August 18; the information about the impending acquisition had not been broadly disseminated to the investing public. *See id*. at ¶ 33. Accordingly, the information was confidential and nonpublic.

At this point in the litigation, the SEC has sufficiently alleged that the information about Medivation's acquisition was confidential, nonpublic, and material to Incyte.

### b. Breach of duty

Under the misappropriation theory, a trader may be liable if she breached "some fiduciary, contractual, or similar obligation to the owner or rightful possessor of the information." *See O'Hagan*, 521 U.S. at 663 (citation omitted); *Talbot*, 530 F.3d at 1096 (same). The parties do not

8

dispute that Panuwat owed a duty to Medivation. *See* Oppo. at 16 n.4 ("[H]e owed Medivation a duty."); Reply at 13:28 ("Panuwat owed a duty to Medivation.").[3] The issue is whether Panuwat breached that duty by purportedly using the information about Medivation's acquisition to buy the Incyte stock options.

Panuwat primarily contends that he did not breach his duty to Medivation because the company's insider trading policy did not prohibit trading in Incyte securities. MTD at 11:27-28. He argues that the SEC failed to allege that Incyte was a significant collaborator, customer, partner, supplier, or competitor of Medivation, as would be covered by the policy. *Id*. at 11:28-12:2.

This argument is not compelling. The plain language of the policy covers "the securities of another publicly traded company, *including*" the enumerated categories. *See* Compl. at ¶ 20 (emphasis added). I read "including" in this context the same way I read it in the context of Rule 10b5-1(a). The word does not cabin the policy's applicability to only the types of companies listed. Rather, those companies are mere examples of what is covered. *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."); *Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006) ("In both legal and common usage, the word 'including' is ordinarily denied as a term of illustration, signifying that what follows is an example of the preceding principle."). Because Incyte is a publicly traded company, it is covered by Medivation's insider trading policy. *See id*. at ¶ 16.

Accordingly, the SEC has sufficiently pleaded that Panuwat breached his duty to Medivation by using the information about the acquisition to buy the Incyte stock options.

### c. Scienter

Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976). Scienter may be established "by proving either actual knowledge or recklessness." *Gebhart v. SEC*, 595 F.3d 1034, 1040 (9th Cir.

---

[3] The complaint alleges that this duty arose under Panuwat's employment at Medivation, along with the confidentiality and insider trading policies that he signed. Compl. at ¶ 32.

2010). It is a subjective inquiry that "turns on the defendant's actual state of mind." *Id*. at 1042.

Courts within this circuit disagree whether scienter requires a defendant to actually use the material nonpublic information in carrying out the trade, or whether she must simply be aware of it. *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202-03 (C.D. Cal. 2008) ("Scienter . . . for insider trading requires that the insider actually use . . . the inside information in deciding to make the trade."); *SEC v. Moshayedi*, No. CV-12-01179, 2013 WL 12172131, at *13-14 (C.D. Cal. Sept. 23, 2013) ("[T]o show that [the defendant] traded 'on the basis of' nonpublic, material information, the SEC must demonstrate his awareness of possession of that information."). The Ninth Circuit has held that scienter under Section 10(b) and Rule 10b-5 requires that the government show actual use. *United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998). However, *Smith* was a criminal case—the court expressly left open whether the same standard would apply to a civil proceeding. *See id*. at 1069 n.27. *Smith* also predates the 2000 promulgation of Rule 10b5-1, which states that a person purchases or sells a security "on the basis of" material nonpublic information "if the person making the purchase or sale *was aware of* the material nonpublic information when the person made the purchase or sale." *See* § 240.10b5-1(b) (emphasis added). The SEC's claim against Panuwat satisfies either standard.

Panuwat argues for the actual use standard, which he contends was not met because the SEC's allegations that he "used" the information about Medivation's acquisition to purchase the Incyte stock options lacks the specificity required by Rule 9(b). MTD at 13-14. I disagree. In *Smith*, the Ninth Circuit held that "[a]ny number of types of circumstantial evidence" might indicate that a trader used the information at issue. *See* 155 F.3d at 1069.

> "Suppose, for instance, that an individual who has never before invested comes into possession of material nonpublic information and the very next day invests a significant sum of money in substantially out-of-the-money call options. We are confident that the government would have little trouble demonstrating 'use' in such a situation, or in other situations in which unique trading patterns . . . suggest that an investor had used inside information."

*Id*. The allegations here parallel those in *Smith*. Although Medivation had been exploring a potential acquisition over the preceding months, it was not until after Panuwat received an email indicating a deal was imminent that he purchased the Incyte stock. He did not wait a day, as did

10

the hypothetical trader in *Smith*, but acted "within minutes." *See* Compl. at ¶ 33. And he had never traded in Incyte stock before. *Id*. Taken together, this suggests—at least for pleading purposes—that Panuwat used the information at issue when he purchased the Incyte stock.

The SEC also sufficiently pleads that Panuwat was "aware of" material nonpublic information when he purchased the Incyte stock. The complaint alleges, in detail, that Panuwat was aware of Medivation's impending acquisition—by way of the CEO's email—just before trading. *See id*.

In sum, the SEC has adequately shown that the information about Medivation's acquisition was nonpublic, confidential, and material to Incyte, that Panuwat breached his duty to Medivation by using that information to purchase Incyte stock options, and that he acted with the requisite scienter. Panuwat's motion to dismiss for failure to state a claim is DENIED.

## II. DUE PROCESS

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966). The same is true for regulations. "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *United States v. Approx. 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) (citing *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995)). To provide adequate notice, the law or regulation must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

The Supreme Court has held that "a scienter requirement in a statute alleviates vagueness concerns." *See McFadden v. United States*, 576 U.S. 186, 197 (2015) (internal quotation marks omitted); *see also Gonzales v. Carhart*, 550 U.S. 124, 150 (2007) "The scienter requirements narrow the scope of the Act's prohibition and limit prosecutorial discretion."). The Ninth Circuit has similarly recognized scienter's negation of vagueness. *See, e.g., United States v. Laurienti*, 611 F.3d 530, 542 (9th Cir. 2010) ("[T]he failure to disclose is illegal only if done with intent to

11

defraud; it cannot be said that 'an ordinary person is not able to conform his or her conduct to' acting without fraudulent intent.").

Panuwat argues that the SEC's claim—"that confidential information regarding an acquisition involving Company A should also be considered material to Company B (and presumably companies C, D, E, etc.) that operate within the same general industry"—stretches the misappropriation theory beyond what comports with due process. MTD at 16:9-11. Before this case, he argues, "no one . . . ever understood the insider trading laws to prohibit the type of conduct alleged." *Id*. at 15:15-17.

It is true that there appear to be no other cases where the material nonpublic information at issue involved a third party. The SEC conceded this at oral argument. However, the SEC's theory of liability falls within the general framework of insider trading, as well as the expansive language of Section 10(b) and corresponding regulations. Scienter and materiality provide sufficient guardrails to insider trading liability.

The SEC's allegations fit under two underlying principles: that the misappropriation theory "reaches trading by corporate outsiders, not insiders," and that information may be material to more than one company. *See Talbot*, 530 F.3d at 1091. The first is grounded in precedent, the second in commonsense. Panuwat may dispute the number of companies to which information may be material, but, as explained above, the relevant case law does not foreclose the possibility that the number exceeds two.

The SEC's theory of liability comports with the language of Section 10(b), Rule 10b-5, and Rule 10b5-1(a). Panuwat insists that I "must interpret the securities laws and SEC rules enacted thereunder as written." *See* Reply at 6:9. I am. Section 10(b) prohibits traders from using "*any* manipulative or deceptive device." 15 U.S.C. § 78(j)(b) (emphasis added). Rule 10b-5 uses equally expansive language, prohibiting *"any* device, scheme, or artifice to defraud," "*any* untrue statement of a material fact," and "*any* act, practice, or course of business which operates or would operate as fraud or deceit." 17 C.F.R. § 240.10b-5 (emphasis added). Finally, Rule 10b5-1(a) provides that "manipulative and deceptive devices . . . *include, among other things*, the purchase or sale" of securities based on material nonpublic information about that security or issuer. *Id*. §

12

240.10b5-1(a) (emphasis added). As written, the law and regulations prohibit more conduct than is expressly stated in Rule 10b5-1(a)—and can include Panuwat's purported actions.

Panuwat's argument that the parameters of insider trading laws will become "entirely unclear" should this case proceed as pleaded ignores two important checks on liability: materiality and scienter. *See* MTD at 19:18-19. Whether information about an acquisition of Company A is material to Company B (or Company C, D, or E) will depend on any number of factors, as established in *Basic* and *Talbot*. If those factors are not met, the information will not be material and the trader will not be liable. And if the information *is* material, the trader will not be liable unless he acted with the requisite intent to defraud. An ordinary trader understands that buying or selling securities with such an intent is prohibited by law. So long as the trader does not act with scienter, he will not be liable for insider trading.

It is also worth noting that the Supreme Court has cautioned against dismissing claims of insider trading predicated on new or unusual schemes:

> We do not think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is usually associated with the sale or purchase of securities. We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

*Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n.7 (1971) (citing *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967).

Panuwat is accused of such a scheme here. Although unique, the SEC's theory of liability falls within the contours of the misappropriation theory and the language of the applicable law. The SEC has sufficiently alleged that Panuwat acted with scienter, and therefore had notice that his purported actions were prohibited by law. His motion to dismiss on due process grounds is DENIED.

## CONCLUSION

For the reasons articulated above, Panuwat's motion to dismiss is DENIED. He shall answer within 20 days of the date of this Order below. A Case Management Conference will be

held on March 8, 2022, at 2 p.m.  A Joint Case Management Statement will be due by March 1, 2022.

**IT IS SO ORDERED.**

Dated: January 14, 2022

_____
William H. Orrick
United States District Judge