**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Jack P. DiCanio (Cal. Bar No. 138782)
Jack.DiCanio@skadden.com
Ashley L. Phillips (Cal. Bar No. 318397)
Ashley.Phillips@skadden.com
525 University Avenue, Suite 1400
Palo Alto, California 94301
T: +1 650 470 4500

**VEDDER PRICE (CA), LLP**
Anthony Pacheco (Cal. Bar No. 128277)
Apacheco@vedderprice.com
Maura L. Riley (Cal. Bar No. 319826)
Mriley@vedderprice.com
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 424 204 7700

**VEDDER PRICE P.C.**
Brooke E. Conner (*Pro Hac Vice*)
Bconner@vedderprice.com
222 N. LaSalle Street
Chicago, Illinois 60601
T: +1 312 609 7500

*Attorneys for Defendant Matthew Panuwat*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>MATTHEW PANUWAT,<br><br>　　　　　　Defendant. | Case No. 3:21-cv-06322-WHO<br><br>**DEFENDANT MATTHEW PANUWAT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Declaration of Anthony Pacheco*]<br><br>Date:　　　November 8, 2023<br>Time:　　　2:00 p.m.<br>Judge:　　 Hon. William H. Orrick<br>Trial Date: March 25, 2024 |

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### NOTICE OF MOTION

PLEASE TAKE NOTICE that on November 8, 2023, at 2:00 p.m., in the Courtroom of the Honorable William H. Orrick, United States District Court, Defendant Matthew Panuwat ("Defendant" or "Mr. Panuwat") will and hereby does move the Court for an order granting summary judgment pursuant to Federal Rule of Civil Procedure 56 against the United States Securities and Exchange Commission ("SEC"). This motion is based on this notice of motion and supporting memorandum of points and authorities, the Declaration of Anthony Pacheco and all exhibits attached thereto, and such other written or oral argument as may be presented at or before the time this motion is deemed submitted by the Court.

### RELIEF REQUESTED

Pursuant to Federal Rule of Civil Procedure 56, Panuwat seeks an order granting summary judgment in his favor and dismissing the SEC's claim.

Dated: September 27, 2023

VEDDER PRICE (CA), LLP

By: _____

Anthony Pacheco

*Attorneys for Defendant Matthew Panuwat*

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- 2 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 6

STATEMENT OF UNDISPUTABLE FACTS .................................................... 8

I.     MR. PANUWAT'S BACKGROUND ........................................................ 8

II.    THE PUBLIC MEDIVATION SALE PROCESS ................................... 10

III.   THE INCYTE TRANSACTION ................................................................ 13

STANDARD ...................................................................................................... 15

ARGUMENT ..................................................................................................... 16

I.     ELEMENTS OF INSIDER TRADING .................................................... 16

II.    THE SEC CANNOT SHOW THAT PANUWAT MISAPPROPRIATED NONPUBLIC INFORMATION .............................................................. 17

      A.    The Medivation Sale Was Decidedly Public. .......................... 17

III.   THE SEC CANNOT SHOW THAT PANUWAT MISAPPROPRIATED INFORMATION THAT WAS MATERIAL *TO INCYTE* ............................. 20

      A.    Medivation and Incyte Were Fundamentally Different Companies. ................... 20

      B.    Incyte and Medivation Did Not Consider Each Other Competitors, Nor Did Their Executives. ............................ 22

      C.    Documents Prepared for Valuation Purposes in Connection with the Medivation Sale Process Do Not Establish or Suggest Correlation in Stock Price. ................... 22

      D.    The Market Did Not Associate Incyte with Medivation. ....................... 25

IV.   THE SEC CANNOT ESTABLISH THAT PANUWAT BREACHED A FIDUCIARY DUTY TO MEDIVATION ................................................... 27

      A.    The Plain Text of Medivation's Policies Did Not Prohibit the Incyte Trades. .................... 28

      B.    Medivation Management Did Not Consider Company Policy to Prohibit the Incyte Trades. .................... 29

V.    THE SEC'S CLAIM FAILS BECAUSE THERE IS NO EVIDENCE THAT PANUWAT ACTED WITH SCIENTER ................................................... 30

      A.    Panuwat Could Not Have "Used" the Supposed MNPI Because the Final Bid Had Not Been Submitted at the Time of Panuwat's Incyte Trades. .............. 31

      B.    Mr. Panuwat's Reasons for Making the Investment Were Unrelated to the Medivation Sale Process and Consistent with His Prior Investment Practices. .................... 32

      C.    Access to MNPI Is Not Sufficient to Establish Scienter. ........................ 34

CONCLUSION .................................................................................................. 35

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- 3 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Aaron v. SEC,*
   446 U.S. 680 (1980) ................................................................................................ 30

5

6

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................................ 15

7

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ................................................................................................ 20

8

9

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ................................................................................................ 16

10

*Dirks v. SEC,*
   463 U.S. 646 (1983) ................................................................................ 17, 18, 27

11

12

*Fairbank v. Wunderman Cato Johnson,*
   212 F.3d 528 (9th Cir. 2000) .................................................................................. 15

13

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,*
   210 F.3d 1099 (9th Cir. 2000) ................................................................................ 15

14

15

*SEC v. Goldinger,*
   106 F.3d 409, 1997 WL 21221 (9th Cir. 1997) ................................................ 17, 35

16

17

*SEC v. Horn,*
   No. 10-cv-955, 2010 WL 5370988 (N.D. Ill. Dec. 16, 2010) ................................. 17

18

*SEC v. Mayhew,*
   121 F.3d 44 (2d Cir. 1997) ............................................................................... 17, 18

19

20

*SEC v. Moshayedi,*
   No. CV-12-01179, 2013 WL 12172131 (C.D. Cal. Sept. 23, 2013) ...................... 30

21

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.,*
   296 F.R.D. 241 (S.D.N.Y. 2013) ............................................................................ 34

22

23

*SEC v. Rorech,*
   720 F. Supp. 2d 367 (S.D.N.Y. 2010) ........................................ 13, 25, 33, 34

24

25

*SEC v. Talbot,*
   530 F.3d 1085 (9th Cir. 2008) ................................................................................ 20

26

*SEC v. Tang,*
   No. C-09-05146 JCS, 2012 WL 10522 (N.D. Cal. Jan. 3, 2012) .......................... 17

27

28

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 4 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

# TABLE OF AUTHORITIES
(continued)

Page

*SEC v. Truong*,
  98 F. Supp. 2d 1086 (N.D. Cal. 2000) .............................................................. *passim*

*Summers v. Teichert & Son, Inc.*,
  127 F.3d 1150 (9th Cir. 1997) ............................................................................ 16

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ........................................................................................... 20

*United States v. Chow*,
  993 F.3d 125 (2d Cir. 2021) ............................................................................... 17

*United States v. Mylett*,
  97 F.3d 663 (2d Cir. 1996) ................................................................................. 18

*United States v. O'Hagan*,
  521 U.S. 642 (1997) .............................................................................. 16, 17, 27

*United States v. Smith*,
  155 F.3d 1051 (9th Cir. 1998) ............................................................................ 30

**Statutes**

15 U.S.C. § 78j(b) .................................................................................... 16, 20, 27

**Other Authorities**

17 C.F.R. § 240.10b-5 ................................................................................... 16, 20

17 C.F.R. § 240.10b5-1(a) ................................................................................... 20

Fed. R. Civ. P. 56 ........................................................................................... 15, 35

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 5 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

**INTRODUCTION**

This case is about a life sciences professional, Matthew Panuwat ("Mr. Panuwat"), who recognized an opportunity to lawfully invest in the securities of a respected biopharmaceutical company, Incyte Corporation ("Incyte"), when its stock price was down. Five years after Mr. Panuwat's investment, however, the U.S. Securities and Exchange Commission ("SEC") accused Mr. Panuwat of wrongdoing. The SEC's theory is that Mr. Panuwat's Incyte investment constituted insider trading because Incyte and the company where Mr. Panuwat worked, Medivation, Inc. ("Medivation"), were similar companies in the biopharmaceutical industry at the time of Mr. Panuwat's Incyte investment, which occurred when Medivation was exploring a sale process that resulted in its acquisition by Pfizer, Inc. ("Pfizer") in 2016. To be clear, the SEC's theory is a novel expansion of the existing insider trading laws. But this is the wrong test case. To survive summary judgment, the SEC must make a showing sufficient to establish the existence of each element which is essential to its case and upon which it will bear the burden of proof at trial— in short, if the SEC fails to make this showing as to any one essential element of insider trading, Mr. Panuwat is entitled to summary judgment. Discovery has concluded, and the facts contradict the SEC's speculative allegations on every element: Incyte and Medivation were fundamentally different companies with no economic or business connection, Medivation's policies did not prohibit Mr. Panuwat's investment, and Mr. Panuwat's reasons for making the investment were entirely separate from the Medivation sale process and consistent with his prior investment practices. Because the SEC cannot meet its burden of proof, the Court must grant summary judgment in Mr. Panuwat's favor.

Mr. Panuwat was a business development executive at Medivation, a San Francisco biopharmaceutical company, when he made what he thought were run-of-the-mill trades in the securities of an unrelated company, Incyte. After spending years as a life sciences investment banker, Mr. Panuwat often invested in the stock market when he had time, and his strategy was always to invest in biopharmaceutical companies whose businesses he understood. In early August 2016, he recognized a promising opportunity to invest in a company he admired—Incyte—when he noticed its stock price was temporarily depressed, despite announcing positive financial results,

Vedder Price (CA), LLP
Attorneys at Law
Los Angeles

Defendant's Motion For Summary Judgment

- 6 -

SEC v. Panuwat
Case No. 3:21-cv-06322-WHO

including that revenue from its primary drug, Jakafi, had grown 46 percent compared to the previous year. After Incyte's stock price continued to decrease for several days, Mr. Panuwat purchased Incyte call options, expecting that Incyte's stock price would soon return to where it had been in the six (6) days prior to his investment. This Incyte investment was consistent with many of Mr. Panuwat's other investments, when he bought short-term out-of-the money call options in biopharmaceutical companies whose stock prices had recently declined. And like those other investments, Mr. Panuwat profited on the sale of some Incyte call options and lost money on other Incyte call options. He had no reason to give the Incyte trades a second thought for many years— as anyone who regularly invests in the stock market will tell you, sometimes an investment theory turns out to be correct, and sometimes it does not.

What Mr. Panuwat could not have anticipated was that the SEC would bring an action against him—without rulemaking, notice, or new statutes—based on a novel theory of insider trading. Industry observers have nicknamed this theory "shadow trading." This case has been widely discussed as an untested expansion of insider trading theory in the legal and business communities since it was filed, because it raises the danger level for market participants who at times are in possession of material nonpublic information about their employer or certain other companies and may trade *for unrelated reasons in unrelated companies*, not thinking that they may later be accused of impropriety. Mr. Panuwat's conduct did not implicate any of the typical grounds for insider trading—Mr. Panuwat did not trade in the stock of his employer, Medivation, any of its potential acquirers, or a company with any business relationship with Medivation, nor did he tip anyone else that they should invest in such a company before Medivation was acquired. Rather, the SEC's insider trading theory is that the Incyte investment was a "substitute" for insider trading: because Mr. Panuwat was aware that Medivation had been engaged in a sale process since March 2016 (Mr. Panuwat's investment was in August 2016) and was entertaining a round of bids in August 2016, he knew a Medivation sale was impending and decided to invest in the securities of another company (Incyte), hoping that its stock price would benefit from a Medivation acquisition, without running afoul of insider trading laws. The problem is, the SEC's theory is not what happened, and it cannot prove the elements of insider trading are met here.

Vedder Price (CA), LLP
Attorneys at Law
Los Angeles

Defendant's Motion For Summary
Judgment

- 7 -

SEC v. Panuwat
Case No. 3:21-cv-06322-WHO

1    The SEC is attempting to hold Mr. Panuwat liable for insider trading when the facts of this
2    case do not fit within the SEC's theory or constitute illegal trading under the federal securities laws.
3    While the SEC may argue Mr. Panuwat's investment was suspicious, "[s]uspicious trading by itself
4    cannot suffice to warrant an inference" of insider trading. *SEC v. Truong*, 98 F. Supp. 2d 1086,
5    1097 (N.D. Cal. 2000). The SEC cannot demonstrate that Medivation acquisition information was
6    both nonpublic and material *to Incyte*, a biopharmaceutical company that had no relationship or
7    business dealings with Mr. Panuwat's employer, Medivation, and no connection to the Medivation
8    sale process. There is no evidence establishing that the two companies were economically linked
9    prior to the Medivation acquisition, or that Mr. Panuwat knew or should have known a Medivation
10   acquisition would make an acquisition of Incyte—a fundamentally different company across every
11   important business metric—more likely. The facts do not demonstrate that Mr. Panuwat purchased
12   Incyte securities on the basis of nonpublic information regarding Medivation; rather, the evidence
13   supports Mr. Panuwat's good-faith basis for his investment that was unrelated to the Medivation
14   acquisition, based on public information regarding Incyte, and consistent with his prior investment
15   patterns and experience in the industry. For these and other reasons as set forth in more detail below,
16   there are no triable issues of material fact.

17   Mr. Panuwat respectfully requests that this Court grant summary judgment and dismiss the
18   SEC's insider trading claim against him.

19   <h3 style="text-align:center"><u>STATEMENT OF UNDISPUTABLE FACTS</u></h3>

20   **I.    <u>MR. PANUWAT'S BACKGROUND</u>**

21   Mr. Panuwat has spent his career in the biopharmaceutical industry. He earned a Bachelor
22   of Science Degree in Biology with a minor in Chemistry from Santa Clara University and a Master
23   of Science Degree in Physiology and Biophysics from Georgetown University. (Panuwat SEC
24   Testimony (hereinafter "<u>Panuwat SEC Tr.</u>") 18:25–20:6.) After completing his collegiate and post-
25   graduate studies, Mr. Panuwat worked as a scientist at a startup biotechnology company, focusing
26   on early-stage research in neuroscience and oncology. (*Id.* at 20:18–21:5.) During this time,
27   Mr. Panuwat developed an interest in the business side of the biotechnology industry, so he decided

28

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT                          - 8 -                    SEC V. PANUWAT
                                                          CASE NO. 3:21-CV-06322-WHO

1  to pursue a Master of Business Administration degree at the University of California, Los Angeles

2  ("UCLA"). (*Id.* at 18:25–20:6.)

3          During business school, Mr. Panuwat interned in the Global Healthcare Investment Banking

4  Group at a large investment bank in San Francisco and ultimately spent eight years as an investment

5  banker, where his role was to help advise biotechnology and pharmaceutical companies on mergers

6  and acquisitions, business development, licensing, equity and debt financings, strategic and

7  financial planning, royalty monetization, and investor relations. (*Id.* 23:22–28:25.) In 2014, Mr.

8  Panuwat joined a biotechnology company as Director of Corporate Strategic Development, and

9  shortly thereafter joined Medivation as Senior Director of Business Development in September

10  2014. (*Id.* at 33:8–42:7.)

11         Medivation was an oncology drug development and sales company with one successful

12  prostate cancer drug, Xtandi, that is a standard of care for prostate cancer. (*Id.* at 39:21–42:7;

13  Medivation Annual Report (Form 10-K) at 2 (Feb. 26, 2016).[1]) Medivation's competitors were

14  prostate cancer companies with lead drugs, including Johnson & Johnson—one of the biggest

15  pharmaceutical companies in the world—which had a very successful prostate cancer drug that

16  Xtandi was competing head-to-head with. (Panuwat SEC Tr. 48:21–49:24; Medivation Form 10-K

17  at 11, 22 (Feb. 26, 2016).) When Mr. Panuwat joined Medivation, it had very few drug candidates

18  in its development pipeline. He was brought in to help Medivation expand its pipeline through

19  mergers and acquisitions or licensing opportunities. (Panuwat SEC Tr. 46:20–48:20.) Because of

20  his role, Mr. Panuwat closely tracked developments in the biopharmaceutical industry, including

21  the performance of drug products, advancement of development pipelines, stock prices, and

22  mergers and acquisitions. (*Id.* at 52:22–55:20.)

23         Mr. Panuwat does not have any professional experience as a stock trader, equity research

24  analyst, or investor. In his spare time, Mr. Panuwat is an active stock market observer and investor.

25  His interest in securities trading started long before his professional career. Mr. Panuwat started

26  investing in equity securities when he was in high school. (*Id.* at 68:18–19.) Mr. Panuwat's

27  investment philosophy is simple—trade in companies you understand and that you believe in. (*Id.*

28

---

[1] Citations to a company's Annual Report (Form 10-K) hereinafter referred to as "Form 10-K."

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 9 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

at 68:25–69:5.) Initially, Mr. Panuwat invested in technology companies, but over time his focus shifted to the biopharmaceutical industry. (*See id.* at 69:6–11.) Within the biopharmaceutical industry, the majority of Mr. Panuwat's investments have been in oncology and neuroscience companies—what he knows best, due to his educational background and experience. (*See id.* at 69:21–70:9.)

In summary, by 2016, Mr. Panuwat had approximately 15 years of experience in the biopharmaceutical industry, including in research and development, investment banking, and business and strategic development at several biopharmaceutical companies.

## II.    THE PUBLIC MEDIVATION SALE PROCESS

In 2016, Medivation became embroiled in a highly publicized—and reluctant—sale process. Beginning with early rumors in March 2016 that the pharmaceutical company Sanofi S.A. ("Sanofi") had approached Medivation about a potential acquisition, the likelihood of a Medivation transaction was closely tracked in the public domain for months, until Medivation was ultimately acquired by Pfizer in August 2016.

The publicity began nearly instantly. On March 22, 2016, the Chief Executive Officer of Sanofi, Olivier Brandicourt ("Dr. Brandicourt"), contacted David Hung, M.D., CEO of Medivation ("Dr. Hung"), on an unsolicited basis to discuss Sanofi's acquisition interest in Medivation. (Dep. Ex. 5 at 19.) Almost immediately thereafter, in late March, media publications reported rumors of Sanofi's potential acquisition interest in Medivation and that Medivation had hired financial advisors, J.P. Morgan,[2] in connection with the defense of a possible strategic transaction.[3] Following those media reports, four industry participants contacted J.P. Morgan and Medivation to indicate interest in participating in any strategic discussions Medivation might initiate. (Dep. Ex. 5 at 19.) The Medivation board of directors determined that, given the speculative nature of the expressions of interest, the then-current market price of Medivation's common stock, and the potential value in Medivation's well-defined strategic plan, it was not the appropriate time for

---

[2] On April 22, 2016, Medivation also engaged Evercore Group LLC ("Evercore") as financial advisors. (Dep. Ex. 5 at 20.)

[3] Carl O'Donnell & Greg Roumeliotis, *Medivation Working with JPMorgan on Takeover Approaches*, REUTERS (Mar. 30, 2016), https://www.reuters.com/article/us-medivation-m-a/medivation-working-with-jpmorgan-on-takeover-approaches-sources-idUSKCN0WW2J3.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 10 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

Medivation to engage in discussions relating to a strategic transaction with Sanofi or any other party. (*Id.*) To put it simply: Medivation did not want to sell. Dr. Hung communicated the board's decision to Dr. Brandicourt. (*Id.*)  But Sanofi would not back down without an extremely public fight:

- On April 15, 2016, Dr. Hung received an unsolicited letter from Dr. Brandicourt, setting forth a nonbinding proposal from Sanofi to acquire Medivation for $52.50 per share of Medivation's Common Stock ("Sanofi's $52.50 proposal"). (*Id.*) On April 28, 2016, Sanofi issued a press release publicly announcing Sanofi's $52.50 proposal. (Sanofi Report of Foreign Private Issuer (Form 6-K), Ex. 99.1 (Apr. 28, 2016).[4]

- Medivation quickly responded, issuing a press release on April 29, 2016, announcing the Medivation board of directors' determination that Sanofi's $52.50 proposal substantially undervalued Medivation and was not in the best interests of Medivation and its stockholders. (Medivation Current Report (Form 8-K), Ex. 99.1 (Apr. 29, 2016).[5]

- On May 5, 2016, Sanofi issued a press release restating the terms of Sanofi's $52.50 proposal and threatening to commence a stockholder consent solicitation to remove and replace the Medivation board of directors if Medivation did not engage in discussions with Sanofi. (Sanofi Form 6-K, Ex. 99.1 (May 5, 2016).)

- On May 12, 2016, Sanofi announced that it had filed for premerger notification. (Sanofi Form 6-K, Ex. 99.1 (May 12, 2016).)

- On May 27, 2016, Medivation filed a preliminary consent revocation statement with the SEC, publicly urging its stockholders to reject Sanofi's attempt to replace the board of directors. (Medivation Form 8-K, Ex. 99.1 (May 27, 2016).)

- On June 27, 2016, Sanofi submitted an increased proposal of $58.00 per share. (Dep. Ex. 5 at 20.) Medivation's board rejected this revised, unsolicited proposal on June 30, 2016, and announced that decision in a press release. (Medivation Form 8-K, Ex. 99.1 (July 5, 2016).)

As described above, throughout the hostile takeover attempt, Medivation and Sanofi issued press releases, publicly filed with government agencies, and otherwise provided fodder for media and equity research outlets, who eagerly reported on the takeover attempt and the leaks surrounding it. (*See, e.g.*, Dep. Ex. 22.)

In June 2016, Medivation pivoted. Rather than cede to market pressure to accept a proposal that substantially undervalued Medivation, the Medivation board decided it should seek to control any process to explore a potential third-party transaction. (Dep. Ex. 5 at 19.) Accordingly, J.P.

---

[4] Citations to a company's Report of Foreign Private Issuer (Form 6-K) hereinafter referred to as "Form 6-K."
[5] Citations to a company's Current Report (Form 8-K) hereinafter referred to as "Form 8-K."

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- 11 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

Morgan, Evercore, and Medivation contacted twelve industry participants, including Pfizer, to explore preliminary interest in a potential strategic transaction. (*Id.*)

The market was aware that Medivation had entered into a sale process. As early as May 3, 2016, Reuters reported that Pfizer had approached Medivation about a potential takeover. (Dep. Ex. 22.) On July 5, 2016, Medivation issued a press release announcing that the company had entered into confidentiality agreements with several parties, including Sanofi, that expressed interest in exploring a potential transaction. (*See* Medivation Form 8-K (July 5, 2016).) Industry analysts, including Citi and Leerink, then publicly informed market participants that Medivation had set a "mid-August deadline" for indications of interest. (*See* Dep. Exs. 18, 19.) On August 17 and 19—in between bidding rounds—media outlets named Pfizer, Sanofi, Celgene, Gilead, and Merck ("<u>Interested Parties</u>") as the five major pharmaceutical companies that had submitted indications of interest that month.[6]

The Interested Parties participated in five rounds of bidding:

1. <u>August 8, 2016</u> – Each of the five Interested Parties submitted non-binding written preliminary proposals for the acquisition of Medivation.

2. <u>August 12, 2016</u> – Two of the Interested Parties submitted written revised proposals.

3. <u>August 14, 2016</u> – J.P. Morgan and Evercore sent a written instruction letter to each Interested Party, requiring a definitive written proposal by 12:00 p.m. Pacific time on Friday, August 19, 2016.

4. <u>August 19, 2016</u> – Pfizer and three other Interested Parties submitted definitive proposals for an all-cash acquisition of Medivation. Two of the five Interested Parties then ceased participation in the strategic transaction process.

5. <u>August 20, 2016</u> – Pfizer and two other Interested Parties submitted final proposals. Following approval of the Medivation board of directors, Pfizer and Medivation executed the merger agreement and Medivation executed the Rights Amendment. (Dep. Ex. 5 at 24–26.)

Throughout this process, Mr. Panuwat was copied on certain emails going back and forth between the Medivation team, lawyers, and the investment bankers. The SEC's case relies heavily

---

[6] Carl O'Donnell & Greg Roumeliotis, *Exclusive: Merck Enters Race for Cancer Drugmaker Medivation*, REUTERS (Aug. 17, 2016), https://www.reuters.com/article/idUSL1N1AY153; Andrew McConaghie, *Merck, Pfizer and Gilead All Interested in Medivation Buy-Out*, PHARMAPHORUM (Aug. 19, 2016), https://pharmaphorum.com/news/merck-pfizer-gilead-interested-medivation-buy-2.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 12 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

on one of these emails—Mr. Panuwat was one of many people copied on an email from Medivation CEO Dr. Hung indicating that the pharmaceutical giant Pfizer "really wants this [acquisition]." (Dep. Ex. 15.) Dr. Hung sent the email on August 18, 2016 at 12:19 p.m., *before* the final two rounds of bidding occurred. The email did not state that there was a done deal or that Pfizer had submitted a revised offer. It did not state that Medivation's board of directors would accept Pfizer's offer if and when it was submitted. There is no evidence that Mr. Panuwat interacted with this email in any way or that he even read it prior to purchasing Incyte securities—he did not respond to it or forward it, and he does not remember receiving it. (*See* Panuwat SEC Tr. 432:8; Panuwat Dep. 138:24–147:18.) *See SEC v. Rorech*, 720 F. Supp. 2d 367, 410 (S.D.N.Y. 2010) ("Potential 'access' to material nonpublic information, without more, is insufficient to prove that [the defendant] actually possessed any such information."). By that point, Mr. Panuwat's involvement in the sale process had tapered off. (*See* Panuwat SEC Tr. 194:16–196:11.) Moreover, Medivation had received several bids throughout 2016 that were rejected by the Medivation board of directors. While Mr. Panuwat knew several companies were interested in acquiring Medivation, it was his impression that Medivation was not willing to take just any offer for the company. (Panuwat Dep. 145:4–147:6; Panuwat SEC Tr. 156:3–158:5.) All told, Dr. Hung's August 18, 2016 email would not have been significant to Mr. Panuwat, who, like Dr. Hung, believed that "a deal is only done when you've finally signed." (Hung Dep. 59:9–17; *see* Panuwat Dep. 144:25–146:8.)

Mr. Panuwat left on a previously planned family vacation prior to when the final two rounds of bids were submitted on August 19, 2016. (Panuwat Dep. 134:8–11.) The Medivation deal was finalized on August 20, 2016. (Dep. Ex. 5 at 25–26.) On August 22, 2016, Pfizer and Medivation issued a joint press release announcing the transaction. (Medivation Form 8-K (Aug. 22, 2016).)

## III.   THE INCYTE TRANSACTION

Mr. Panuwat had actively followed Incyte for at least ten years prior to his investment in the company. (Panuwat Dep. 128:22–132:14; Panuwat SEC Tr. 145:9–146:21.) In 2016, Incyte had been a very successful pharmaceutical company for a long time. (Panuwat SEC Tr. 145:9–146:21.) Mr. Panuwat considered Incyte a large-cap pharmaceutical company, given the size of the company and market share of its successful main drug, Jakafi, which was a JAK inhibitor for myelofibrosis

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 13 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

1  (a spleen disorder). (*Id.* at 146:19–148:13.) Incyte also had an extensive pipeline, including another

2  drug in development for rheumatoid arthritis and other anti-inflammatory diseases (not oncology).

3  (Incyte Form 10-K at 6–11 (Dec. 31, 2016).) Incyte tended to have at least a dozen programs in

4  clinical studies at any given time. (*Id.*)  Given these significant differences, Mr. Panuwat and his

5  colleagues at Medivation did not consider Incyte a competitor of Medivation. (Panuwat SEC Tr.

6  146:19–148:15; Hung Dep. 17:16–18:10; Jarrett Dep. 31:2–11; Piscitelli Dep. 20:21–23:16.) Nor

7  did Medivation or Incyte identify each other as competitors in SEC filings.[7]  (*See* Incyte Form 10-

8  K at 15–16 (Feb. 12, 2016); Medivation Form 10-K at 11–12 (Feb. 26, 2016).) Incyte was viewed

9  by Medivation employees as a much larger company whose success the team at Medivation hoped

10  to emulate. (*See* Panuwat SEC Tr. 377:4–15; Piscitelli Dep. 20:11–22:7.)

11      On August 9, 2016, Incyte announced its second quarter 2016 earnings announcement. The

12  company's earnings surpassed market expectations: this positive performance was driven by 46

13  percent growth in the revenue from Incyte's primary drug, Jakafi, as compared to the same period

14  of the previous year. (Incyte Form 8-K, Ex. 99.1 (Aug. 9, 2016).) Further, Incyte raised its net

15  income guidance and noted that it expected to generate positive cash flows for the remainder of the

16  year. (*Id.* at 7–8.) Even though it had announced a very positive quarterly performance, the market

17  had a negative reaction to Incyte's earnings announcement. (Panuwat SEC Tr. 340:8–345:11.) The

18  day of the earnings announcement, August 9, the stock closed down 2 percent, at $86.48 (from

19  $88.04 from the previous day). (S&P Capital IQ Report on Incyte Share Pricing (Aug. 2016).[8])

20  Incyte's share price continued to decline from $88.04 on August 8, 2016, to $76.48 on August 17,

21  2016, a decline of 13.13 percent. (*Id.*)

22      Mr. Panuwat could not see why. Incyte's stock price had already suffered steep declines

23  over the previous year which continued after the recent earnings announcement, and the trend did

24  not seem due to factors that he believed affected the fundamentals of the company. (Panuwat Dep.

25  130:1–131:5; Panuwat SEC Tr. 340:8–345:11; *see* INCY Share Pricing (Aug. 2015).) To

26  Mr. Panuwat, this inexplicable undervaluation was unusual and rare, and therefore an interesting

27

28

[7] Incyte's most senior officer in business development, Keith Mikkelson, provided testimony that Incyte did not consider Medivation a competitor in 2016. (Dkt. No. 51, Mikkelson Decl. ¶ 9.)
[8] Citations to the S&P Capital IQ Reports hereinafter referred to as "INCY Share Pricing."

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
- 14 -
SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

investment opportunity. (Panuwat SEC Tr. 340:8–345:11.) Generally, when Mr. Panuwat sees this type of pattern, stock prices revert, and he felt there was a reasonable likelihood that Incyte's stock price would increase back to where it had traded just days prior, over the course of the next month or so. (*Id*. at 345:12–356:22.)

On August 18, 2016, Incyte's stock price traded lower again and closed at $76.16. (INCY Share Pricing, Aug. 2016.) On that day, Mr. Panuwat purchased out-of-the-money call options in Incyte stock. Specifically, he purchased 578 Incyte call option contracts with strike prices of $80.00, $82.50, and $85.00 per share with an expiration date of September 16, 2016. (Dkt. No. 27, Answer ¶ 33.) This purchase of out-of-the-money options of high-quality, undervalued companies was an investment strategy Mr. Panuwat pursued several times during this period. Options were not a new tool for Mr. Panuwat—he had been familiar with options for at least 10 years and had previously purchased short term call options in biopharmaceutical companies. (Panuwat SEC Tr. 86:2–18; *see* SEC Ex. 8.)

Mr. Panuwat sold some of his Incyte call options on August 24, 2016, for a profit. (Panuwat SEC Tr. 210:2–214:8; SEC Ex. 8 at SEC_SF-4131_MLPFS_001798–99.) Next, he sold a number of calls on September 12 and September 14, 2016, for a loss. (Panuwat SEC Tr. 212:14–17; *see also* SEC Ex. 8 at SEC_SF-4131_MLPFS_001813–14.) This was not unexpected—Mr. Panuwat can recall many examples of holding investments for too long and losing money, or selling too quickly where he could have made more. (Panuwat Dep. 136:11–137:7; Panuwat SEC Tr. 213:11–17.) He accepted his win-some, lose-some luck and his life moved on, until the SEC began its investigation.

## STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Where, as here, the plaintiff bears the burden of proof at trial, a defendant seeking summary judgment need only **produce evidence that negates an essential element of the non-moving party's claim or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate**

Vedder Price (CA), LLP
Attorneys at Law
Los Angeles

Defendant's Motion For Summary Judgment

- 15 -

SEC v. Panuwat
Case No. 3:21-cv-06322-WHO

**burden of persuasion at trial**. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000) (moving party satisfies its burden on summary judgment by showing "an absence of evidence to support an essential element of a claim").

Courts must grant summary judgment if the nonmoving plaintiff fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the nonmoving plaintiff fails to make such a showing on any essential element of the case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted). In short, if the SEC fails to make this showing as to any one essential element of insider trading, Mr. Panuwat is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ARGUMENT

This Court should grant summary judgment for Panuwat because, despite a lengthy investigation and two years of active litigation, the SEC has adduced no evidence that Mr. Panuwat misappropriated confidential information that was material to Incyte; that Mr. Panuwat breached a duty to Medivation; and cannot produce more than "a mere scintilla" of circumstantial evidence that Mr. Panuwat acted with scienter. *Summers*, 127 F.3d at 1152.

## I.    ELEMENTS OF INSIDER TRADING

Section 10(b) of the Securities and Exchange Act and Rule 10b-5 prohibit fraud in connection with the sale of securities, including insider trading. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. A complaint may allege such a claim under either a classical theory or a misappropriation theory. The classical theory targets corporate insiders. *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997). The SEC brought this case under the misappropriation theory,

Vedder Price (CA), LLP
Attorneys at Law
Los Angeles

Defendant's Motion For Summary Judgment

- 16 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

in which a person "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id.* at 652. The misappropriation theory is typically used to prosecute tipper-tippee liability. *See United States v. Chow*, 993 F.3d 125, 138–139 (2d Cir. 2021).

Here, to survive a motion for summary judgment, the SEC must set forth concrete evidence supporting the following elements of insider trading: (1) Mr. Panuwat was in possession of material nonpublic information, (2) he breached a duty of confidentiality he owed to the source of the information, and (3) he acted with scienter. *See O'Hagan*, 521 U.S. at 651–52; *Dirks v. SEC*, 463 U.S. 646, 654 (1983). If the SEC fails to muster proof as to **any** of these required elements, and falls back instead on speculation and suspicion, then summary judgment for the defendant must follow. *See, e.g., Truong*, 98 F. Supp. 2d at 1097 (granting summary judgment and recognizing that "[s]uspicious trading by itself cannot suffice to warrant an inference" of insider trading); *SEC v. Tang*, No. C-09-05146 JCS, 2012 WL 10522, at *24 (N.D. Cal. Jan. 3, 2012) (summary judgment granted where the SEC presented "no admissible evidence that [defendant] had access to insider information"); *SEC v. Horn*, No. 10-cv-955, 2010 WL 5370988, at *6 (N.D. Ill. Dec. 16, 2010) (summary judgment granted where SEC's theory would impermissibly "require a jury to speculate that certain successful trades were the product of acquiring nonpublic information"); *SEC v. Goldinger*, 106 F.3d 409, 1997 WL 21221, at *1–2 (9th Cir. 1997) (affirming summary judgment where SEC failed to present "sufficient evidence" to prove tip of material, nonpublic information).

As the deposition testimony and documents in this case overwhelmingly establish, the SEC does not have enough evidence of these essential elements to carry its ultimate burden of persuasion at trial.

## II.   THE SEC CANNOT SHOW THAT PANUWAT MISAPPROPRIATED NONPUBLIC INFORMATION

### A.   The Medivation Sale Was Decidedly Public.

Given the information available, the SEC cannot meet the "nonpublic" element of its misappropriation theory. Trading based on public information does not violate the statute. *See SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997). As the Second Circuit wrote in *Mayhew*:

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- 17 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

1

2

3

4

> Information becomes public when disclosed to achieve a broad
> dissemination to the investing public generally and without favoring
> any special person or group . . . . Moreover, to constitute non-public
> information under the act, information must be specific and more
> private than general rumor.

5   *Id.* at 50 (quoting *Dirks*, 463 U.S. at 653; *United States v. Mylett*, 97 F.3d 663, 666 (2d Cir. 1996)).

6   Here, the market was aware of the Medivation sale process every step of the way, even the

7   likelihood of a transaction being announced in mid-August 2016. Specific events of the Medivation

8   sale were detailed extensively in Medivation's public filings, Medivation press releases, and the

9   public filings and press releases of Sanofi, including the fact that Medivation entered into

10  confidentiality agreement with multiple companies. The evidence in this case uniformly confirmed

11  that details of the Sanofi bid and Medivation's defense were widely reported and publicly discussed

12  from March through August 2016:

13
14
15

- The market was aware of the sale process, including two acquisition proposals of $52.50 per share and up to $61.00 per share that were determined by the Medivation board of directors to be inadequate. (*See* Dep. Ex. 5 at 19–20; Medivation Form 8-K, Ex. 99.1 (Apr. 29, 2016); Medivation Form 8-K, Ex. 99.1 (July 5, 2016).)

16
17
18

- 

19
20
21

- Josh Bleharski ("Bleharski"), Ph.D., a J.P. Morgan investment banker leading the deal team, testified that once Medivation rejected Sanofi's initial offer, "[o]ther pharma companies heard of that in the public domain and made it known that they would be interested in participating" in the sale process. (Bleharski Dep. 29:5–31:1.)

22
23

- Medivation's CFO, Jennifer Jarrett ("Ms. Jarrett"), testified that the Sanofi offer to Medivation was considered very public in the biotech industry. (Jarrett Dep. 46:6–48:2.) There were leaks throughout 2016 about the Medivation sale process. (*Id.* 159:10–161:2.)

24
25
26

- Dominic Piscitelli, the Vice President of Finance ("Mr. Piscitelli"), testified that Sanofi's hostile bid "was very, very, very" public and "covered by every analyst" and "numerous media outlets." (Piscitelli Dep. 46:19–51:2.) "Everyone in the life science space" was "well, well aware" of Medivation's sale process. (*Id.* 49:22–50:5.)

27

- Dr. Hung testified that after the first hostile bid by Sanofi, "everyone knew" that Medivation had been approached and was likely in discussions for a sale. (Hung Dep. at 53:12–23.)

28

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 18 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

- The market was aware that Sanofi would be in a position to significantly increase its offer and complete due diligence quickly if Medivation engaged in discussions (which subsequently occurred). It is undisputed by the Parties that Medivation publicly rejected Sanofi's revised proposal and announced it had entered into confidential disclosure agreements with third parties, including Sanofi. (SEC Resp. to RFA No. 69; *see also* Medivation Form 8-K (July 5, 2016).)

Moreover, the Medivation sale process and its multiple bidders were tracked in the public domain by media and equity research analysts for months, between March and August 2016. (*See, e.g.*, Dep. Ex. 18; Dep. Ex. 19; Dep. Ex. 22.) And Pfizer's interest was widely publicized. For example, as early as May 3, 2016, reports noted that "Pfizer Inc has approached U.S. cancer drug maker Medivation Inc to express interest in an acquisition, raising the possibility of a bid rivaling a $9.3 billion offer by Sanofi SA." (Dep. Ex. 22. at 1.)

Finally, it was public information that Medivation would likely be sold in mid-August to one of the Interested Parties. (*See* McCarty Dep. 286:23–288:18, 303:19–308:5; Panuwat Dep. 141:15–144:10.) An August 10, 2016 Citi analyst report noted: "The CEO's remarks, ***particularly in the context of a mid-August deadline*** (imposed by Medivation) for indications of interest, suggest this may have been a farewell bid to MDVN investors." (Dep. Ex. 18 (emphasis added).) On the same day, Leerink reported: "[S]ince media reports have stated that ***MDVN has requested for final bids by mid-August***, reaffirming guidance should help to avoid a last-minute issue in the deal process." (Dep. Ex. 19 (emphasis added).) On August 17 and 19, 2016 media reports named the five bidders who had submitted indications of interest.[9]

While the final details of the transaction—the final buyer, the final price, and the ultimate timing of the execution of the merger—were not yet known to the market when Mr. Panuwat traded on August 18, 2016, Mr. Panuwat did not yet possess that information either. (*See* McCarty Dep. 91:13–19, 315:20–316:1; Panuwat Dep. 143:4–147:18.)  Neither did anyone else, as final bids had not yet been submitted at the time Mr. Panuwat invested in the Incyte securities. (*See infra* Section V(A).) Both Mr. Panuwat and a reasonable investor watching the mergers and acquisitions space in the biopharmaceutical industry at the time possessed the following information: a Medivation

---

[9] O'Donnell & Roumeliotis, *supra*, at 12; McConaghie, *supra*, at 12.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- 19 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

deal was likely forthcoming; Pfizer, along with many other companies, was interested in Medivation; and bids were due in mid-August.

### III.    THE SEC CANNOT SHOW THAT PANUWAT MISAPPROPRIATED INFORMATION THAT WAS MATERIAL *TO INCYTE*

Information is only material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available." *Truong*, 98 F. Supp. 2d at 1098 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). While courts apply a backward-looking test in assessing materiality, the key here is that there is no bright-line rule, and materiality depends upon the totality of the circumstances. *See Basic*, 485 U.S. 224 at 236 (noting the determination of materiality requires "delicate assessments" and the SEC has been cautioned against confining materiality to a rigid formula) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448–449 (1976)). To determine whether information is material for purposes of Section 10(b) and Rule 10b-5, courts must look to "the magnitude of the transaction *to the issuer of the securities allegedly manipulated*" and "consider such facts as the size of the two corporate entities and of the potential premiums over market value." *SEC v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008) (emphasis added) (citing *Basic*, 485 U.S. at 239).

Critically, the SEC must prove that a defendant traded in the securities of an issuer on the basis of material nonpublic information "*about that security or issuer*." 17 C.F.R. § 240.10b5-1(a) (emphasis added). Mr. Panuwat or Medivation did not possess any actual confidential information *about Incyte* at the time Mr. Panuwat purchased Incyte securities. Rather, the SEC is asking the Court to infer that because Mr. Panuwat was aware of confidential information regarding one biopharmaceutical company (Medivation), such information was material to some or all other allegedly similar biopharmaceutical companies (Incyte and an unknown and unstated amount of potential other companies). Such a conclusion is unsupported by the evidence.

### A.    Medivation and Incyte Were Fundamentally Different Companies.

Medivation and Incyte did not consider themselves comparable or competitor companies, nor did the market. Although Incyte and Medivation were biopharmaceutical companies with

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 20 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

oncology product offerings, the evidence overwhelmingly establishes that they were fundamentally different companies. Medication was a "very rare" company because of its profitability and its unique, "game-changing" prostate cancer treatment product, Xtandi. (Hung Dep. 43:16–44:16.) It had unusual value because "there weren't very many companies that had as good a drug as [Medication] did that had been as profitable." (*Id.* at 70:2–21.) Put simply, witnesses contemporaneously involved with Medication's sale process agreed the correlations between Incyte and Medication are "generic," at best. (Panuwat SEC Tr. 214:20–25; Piscitelli Dep. 20:21–25:22; Baxter Dep. 26:24–32:16; Bleharski Dep. 78:1–82:13; Lange Dep. 51:2–54:1.)

The two companies had no overlap with approved drug products. Each company had different drugs, with different mechanisms of action, approved for different diseases with different commercial potential, prescribed by different types of physicians, and used to treat different patients. (*Compare* Incyte Quarterly Report (Form 10-Q)[10] (Aug. 9, 2016) *with* Medication Form 10-Q (Aug. 9, 2016).) There was also no apparent research overlap between the companies despite the extensive number of programs in development—each company's programs in development included entirely different drugs with different mechanisms of action. (*Id.*)

Incyte's marketed product portfolio and research and development pipeline focused on oncology, hair loss, dermatitis, rheumatoid arthritis, lupus, and graft-versus-host disease. (*See* Incyte 10-Q at 32–39 (Aug. 9, 2016).) Incyte had an approved drug, Jakafi, for myelofibrosis and polycythemia vera—two very rare blood disorders. (*See id.* at 32.) In the United States, Jakafi commercialization was led solely by Incyte, and Incyte's sales were directed to hematologists. (*See id.*) Most notably, Incyte's marketed products and research and development pipeline did not include programs for prostate cancer, the single disease area for which Medication was known.

In contrast, Medication's marketed product portfolio and research and development pipeline were focused on oncology. Medication had only one approved drug, Xtandi, for prostate cancer—one of the most prevalent cancers. (*See* Medication Form 10-Q at 7 (Aug. 9, 2016).) Medication's sales were directed to urologists and oncologists. The SEC does not dispute that

---

[10] Citations to a company's Quarterly Report (Form 10-Q) hereinafter referred to as "Form 10-Q."

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- 21 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

Medivation and Incyte had lead drugs approved for the treatments of different diseases and different patients. (SEC Resp. to RFA Nos. 6–7, 16–17.)

And as previously indicated, there was no collaboration or other business relationship between the companies. (Dkt. No. 51, Mikkelson Decl. ¶ 9; *see infra* Section IV(A).)

### B.      Incyte and Medivation Did Not Consider Each Other Competitors, Nor Did Their Executives.

Because of the differences in their product portfolios and development pipelines, Incyte and Medivation did not view themselves as competitors. In SEC filings, Medivation did not identify Incyte as a competitor, nor did Incyte identify Medivation as a competitor. Rather, Incyte described its competition as including "fully integrated pharmaceutical companies, that are pursuing pharmaceuticals that are competitive with JAKAFI and our drug candidates." (Incyte Form 10-K at 15 (Feb. 12, 2016).) Likewise, Medivation described its competitors as those companies competing with its drug Xtandi and other products in its pipeline. (*See* Medivation Form 10-K at 11–12 (Feb. 26, 2016).) Approximately two dozen companies and products were listed by Medivation as competitors, and none were related to Incyte. (*Id.*)

Deponents involved in the Medivation deal overwhelmingly confirmed that Medivation management did not consider Incyte a competitor, including Dr. Hung, the founder, President, and CEO; Mr. Piscitelli, the Vice President of Finance; and Ms. Jarrett, the CFO. (Hung Dep. 17:20–18:10; Piscitelli Dep. 22:9–23:16; Jarrett Dep. 31:2–11.) And Incyte executives have testified that they did not consider Medivation a competitor. (Dkt. No. 51, Mikkelson Decl. ¶ 9.) Investment bankers advising Medivation agreed that Medivation was not a competitor of Incyte. (*See* Bleharski Dep. 55:7–16 (because a "competitor" is a company with a drug on the market competing directly with one of Medivation's drugs, Incyte was not a competitor).)

### C.      Documents Prepared for Valuation Purposes in Connection with the Medivation Sale Process Do Not Establish or Suggest Correlation in Stock Price.

The SEC relies on documents prepared in connection with the Medivation sale process that referenced Incyte, along with several other companies in the biopharmaceutical sector, to suggest that there was a correlation between the stock prices of Medivation and Incyte. This theory is not

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 22 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

1  supported by the context in which those analyses were conducted: to triangulate an approximate

2  per share value for Medivation.

3       As the investment bankers testified, the documents were not intended to demonstrate an

4  economic link or trading correlation between Medivation and Incyte. In connection with the

5  Medivation fairness opinions prepared by J.P. Morgan and Evercore, dozens of companies,

6  including Incyte, were used to derive a range of multiples based on certain financial metrics, such

7  as firm value to revenue, firm value to EBITDA, and enterprise value to net revenue. (Dep. Ex. 5

8  at 35–39, 42–46; Bleharski Dep. 38:22–43:10.) The purpose of this analysis was not to identify

9  companies that might be positively impacted by the Medivation acquisition or that might

10  themselves be a potential post-transaction acquisition target. (Baxter Dep. 38:13–19; Lange Dep.

11  47:13–48:22.) Rather, the purpose of the analysis was to approximate a range of implied per share

12  equity values for Medivation, which could be compared to the acquisition consideration. (*See* Dep.

13  Ex. 5 at 35–39, 42–46; Baxter Dep. 31:16–32:5, 102:8–24; Bleharski Dep. 38:22–43:10.)

14       As advisors on the sale process, J.P. Morgan and Evercore selected a group of companies

15  that may have shared some similarities with Medivation across a broad spectrum of variables, such

16  as industry, commercial products, financials, size, and/or stage of development. ██████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ██████████████████████████████; *accord* Bleharski Dep. 116:19–117:14 ("comparable"

26  companies were selected "based on any number of criteria we deem relevant").) That is precisely

27  the situation with Medivation. Medivation was unique in the biopharmaceutical industry because

28  its commercial product was the world's top selling drug for prostate cancer, one of the most

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 23 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

prevalent cancers, and it had recently surpassed its key competitor, Johnson & Johnson. (*See* Medivation Form 8-K, Ex. 99.2 (May 6, 2016).) It had achieved worldwide annual net sales of $2.2 billion. (*See id.* at Slide 7.) Less than four years after FDA approval, Xtandi had become the eighth leading oncology drug by worldwide sales and was among products being sold by much more established companies such as Roche, Novartis, Eli Lilly, Johnson & Johnson, Celgene, and Bristol Myers Squibb. (*See id.* at Slide 12.)

Furthermore, Medivation's research and development pipeline included a potential best-in-class PARP inhibitor, which was a highly valuable and promising program in development for multiple cancers. (*See id.*) Because there were no companies with a similar profile, the bankers' presentations and fairness opinions referenced companies that had certain limited and much more general similarities to Medivation. For example, J.P. Morgan's analysis included all publicly traded biotechnology companies in the Nasdaq Biotechnology Index focused on the research and development of drugs with a market valuation of approximately $100 billion to $7 billion—an extraordinarily broad range of companies. (*See* Dep. Ex. 5 at 32.)

Similarly, the Evercore analysis included all publicly traded biotechnology companies in the Nasdaq Biotechnology Index focused on the research and development of drugs with a market valuation of approximately $30 billion to $7 billion—again, an extraordinarily broad range of companies. (*See id*. at 39.) The lack of truly similar reference points was not lost on either J.P. Morgan or Evercore. J.P. Morgan specifically noted that the companies were not "identical to Medivation and . . . may have characteristics that are materially different from that of Medivation." (*Id*. at 32.) Additionally, J.P. Morgan noted that these "analyses necessarily involve complex considerations and judgments concerning differences in financial and operational characteristics of the companies involved and other factors that could affect the companies differently than would affect Medivation." (*Id*.)

Likewise, Evercore stated that "none of these companies is directly comparable to Medivation." (*Id*. at 39.) And a simple review of the selected companies demonstrates just how different each was to Medivation and to each other: the diverse range of companies under "Public Trading Multiples," included Celgene (~7,000 employees, annual revenue over $9 billion, multiple

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 24 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

blockbuster commercial products focused on oncology and inflammatory diseases); Alexion Pharmaceuticals (~3,000 employees, annual revenue over $2.5 billion, multiple commercial products focused on rare diseases); Vertex Pharmaceuticals (~2,000 employees, annual revenue over $1 billion, multiple commercial products focused cystic fibrosis and hepatitis C); BioMarin Pharmaceutical (over 2,000 employees, annual revenue over $0.8 billion, and multiple commercial products focused on rare diseases); and Seattle Genetics (~750 employees, annual revenue of over $0.3 billion, one commercial product focused on hematology). (*Id*. at 32.)

**D.    The Market Did Not Associate Incyte with Medivation.**

Medivation was not sufficiently similar to Incyte that a reasonable investor would expect (1) a stock price correlation between the two companies or (2) that acquisition interest in Medivation would suggest, imply, or lead to acquisition interest in Incyte.

The SEC can only point to sweeping generalities and assumptions in support of its theory. There is no evidence to suggest the mere fact that there was acquisition interest in Medivation, a company focused on oncology, and specifically prostate cancer, would mean that there was or would likely be acquisition interest in Incyte, a company with a much broader portfolio focused on oncology, hair loss, dermatitis, rheumatoid arthritis, lupus, and graft-versus-host disease. And acquisition interest in a company with the world's top selling drug for prostate cancer (Medivation) would not mean that there would likely be acquisition interest in a company over two times larger with an approved drug for rare blood disorders and a more substantial pipeline (Incyte). Medivation was unique, even among companies in the biotechnology industry. (Medivation Form 8-K, Ex. 99.2 (May 6, 2016) at Slide 35.)

Even assuming *arguendo* that acquisition interest in Medivation promoted interest in Incyte, the fact that Medivation was in an active sale process was public knowledge for months. (*See supra* Section II(A).) "A generalized confirmation of an event that is 'fairly obvious' to every market participant who was knowledgeable about the company or the particular instrument at issue is not material information." *Rorech*, 720 F. Supp. 2d at 410 (quoting *SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir. 1979) (finding general information that was consistent with market news was not material nonpublic information)); *see also Truong*, 98 F. Supp. 2d at 1099 (finding that the SEC

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 25 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

did not show how "vague information could have altered the 'total mix' of information available to investors" as required to be material, particularly in light of prior public disclosures).

Moreover, the stock prices of Medivation and Incyte or other companies operating in the same industry were not known to be economically linked prior to the Medivation acquisition announcement. (*See* McCarty Dep. 110:17–124:9.) For example, the one analyst report referencing Incyte in connection with a Medivation acquisition—a May 9, 2016 Cowen Research Report—noted that Incyte had not "benefit[ted] from the premiums being discussed" for Medivation and characterizing Medivation as "a far inferior mid cap oncology company."  It also highlighted the material differences between Incyte and Medivation, including Incyte's "larger revenue base . . . projected to grow at a more substantial pace," "meaningful royalties (20%) on a second product," and "homegrown pipeline of 14 candidates."[11]

Furthermore, Medivation was acquired as part of an industry consolidation of drug products and development pipelines focused on prostate cancer. (Piscitelli Dep. 177:16–180:21.) ███████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████

Individual biopharmaceutical companies are acquired for very specific and differentiated drug products, development pipelines, and/or technologies, and not all companies working in the

[11] Eric Schmidt & Marc Frahm, *Building for the Future While Jakafi's Growth Remains Robust*, Cowen & Co. (May 9, 2016), https://www.cowen.com.

Vedder Price (CA), LLP
Attorneys at Law
Los Angeles

Defendant's Motion For Summary Judgment

- 26 -

SEC V. Panuwat
Case No. 3:21-cv-06322-WHO

1  oncology field are similarly attractive or substitutable from an acquisition perspective. (McCarty

2  Dep. 142:15–149:24.) ████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████ History

6  proved this right. Incyte did not receive acquisition offers in 2016 or 2017. (Dkt. No. 51, Mikkelson

7  Decl. ¶ 12.) ████████████████████████████████████████

8        Finally, if there were a correlation between the stock prices of Medivation and Incyte,

9  evidence would show that news of the Medivation acquisition would have correlated with the

10  movement of Incyte's stock price prior to the August 22, 2016 Medivation transaction

11  announcement, as well as in connection with prior industry acquisitions, as the SEC suggests. (Dkt.

12  No. 1, Complaint ¶ 22.) But it did not, according to regression analyses and event studies. (McCarty

13  Dep. 204:12–213:9, 331:15–344:7.) Here, the SEC cannot demonstrate it was reasonable for

14  Mr. Panuwat to anticipate Incyte's stock price would increase in a statistically significant manner

15  based on Medivation's historic price movements up to the date of his purchase of Incyte securities

16  on August 18, 2016.

17  **IV.  THE SEC CANNOT ESTABLISH THAT PANUWAT BREACHED A FIDUCIARY DUTY TO MEDIVATION**

18

19        As defined in *O'Hagan*, the misappropriation theory holds that a section 10(b) violation

20  occurs when an individual "misappropriates confidential information for securities trading

21  purposes, in breach of a duty owed to the source of the information." 521 U.S. at 652. Importantly,

22  *O'Hagan* involved the breach of a recognized fiduciary duty—that between a lawyer and his firm

23  and client. The defendant traded in the shares of the target company of a proposed acquisition based

24  on information misappropriated from his law firm and its client. *Id.* at 656. As it did in *Dirks*, the

25  Court in *O'Hagan* emphasized that there is no general duty to refrain from trading based on material

26  nonpublic information, and that a duty to disclose or abstain from trading "arises from a specific

27  relationship between two parties." *Id.* at 661. The SEC does not have sufficient evidence to support

28  this element.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- 27 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

### A. <u>The Plain Text of Medivation's Policies Did Not Prohibit the Incyte Trades.</u>

Medivation's "Policy Regarding Securities Trading by Company Personnel and Treatment of Confidential Information" ("<u>Insider Trading Policy</u>") provides:

> During the course of your employment, temporary assignment, consultancy or directorship with the Company, you may receive important information that is not yet publicly disseminated ("***inside information***"), about the Company or about other publicly-traded companies with which the Company has business dealings. Because of your access to this information, you may be in a position to profit financially by buying or selling or in some other way dealing in the Company's securities (including not only stock but also debt securities such as convertible notes) or the securities of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors of the Company, or to disclose such information to a third party who does so (a "***tippee***").

(Dep. Ex. 43 at 9 (emphasis in original).) The "Company" refers to Medivation. (*Id.*)

As a threshold matter, Incyte was not a "collaborator[], customer[], partner[], supplier[] or competitor[]" of Medivation. (Dkt. No. 51, Mikkelson Decl. ¶ 9.) Every witness asked about the policy confirmed that Medivation and Incyte did not have any business relationship meeting this standard. (*Id.* ("Incyte did not have a business relationship with Medivation in 2016 or 2017. In particular, Incyte and Medivation were not significant collaborators, competitors, customers, suppliers, or partners during that period."); Guernsey Dep. 18:9–22:18 (confirming same); Hung Dep. 17:16–20:11 (confirming same); Piscitelli Dep. 25:23–27:10 (Medivation had "no relationship with Incyte in any way, shape, or form"); Incyte Form 10-K at 15 (Feb. 12, 2016) (Medivation not referenced as a competitor); Medivation Form 10-K at 11–12 (Feb. 26, 2016) (Incyte not referenced as a competitor).) As Kenneth Guernsey ("<u>Mr. Guernsey</u>"), Medivation's lead outside counsel, testified, this policy, and these policies generally, were intended to be limited to companies that had business dealings with Medivation—to focus on information about Medivation and other companies which might disclose their confidential information to that company and its personnel in the course of business dealings. (Guernsey Dep. 18:22–21:4.) He agreed the policy would not have applied to trades in Incyte. (*Id.* at 22:20–23:4.)

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 28 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

This interpretation is consistent with other language in the policy that limits its application to trades in Medivation securities or the securities of other companies that had business dealings with Medivation. (Dep. Ex. 43 at 9 (stating "you may receive important information that is not yet publicly disseminated ('**inside information**'), about the Company or about other publicly-traded companies **with which the Company has business dealings**"; "[t]his policy continues to apply to your transactions in the Company's securities **or the securities of other public companies engaged in business transactions with the Company**"; "[a]nyone who effects transactions in the Company's securities **or the securities of other public companies engaged in business transactions with the Company . . .** on the basis of insider information is subject to both civil liability and criminal penalties, as well as disciplinary action by the Company" (emphasis added).) This language is "fully limited in its description to [Medivation] and other companies with which it has business dealings." (Guernsey Dep. 25:9–11; *accord* Piscitelli Dep. 32:18–33:3 (it is "quite clear" this policy applies to "significant ongoing relationships or transactions" Medivation had, like with Astellas).)

Medivation's other securities policies support a more limited interpretation as well. The "Trading Window Policy Applicable to All Company Personnel: Pre-clearance Policy Applicable to Directors and Officers at the Level of Vice President and Above," on its face, applies only to trades in Medivation. (Dep. Ex. 43 at 13.) This policy "certainly doesn't" apply to securities trades in companies other than Medivation. (Guernsey Dep. 41:2–7.)

### B.   Medivation Management Did Not Consider Company Policy to Prohibit the Incyte Trades.

Key Medivation personnel testified that the Medivation Insider Trading Policy was not inclusive of Incyte, which is consistent with the language of the policy as discussed above. (*See, e.g.*, Piscitelli Dep. 20:21–25:22; Hung Dep. 18:25–20:11; Guernsey Dep. 18:9–22:18.)

Dr. Hung, Medivation's founder, President, and CEO, testified that he interpreted the Insider Trading Policy to mean employees are not allowed to use nonpublic information to trade in a company or other companies with which Medivation had business dealings. (Hung Dep. 22:1–23:6.) He explained that Medivation did not have any business dealings with Incyte in 2016. (*Id*.)

Vedder Price (CA), LLP
Attorneys at Law
Los Angeles

Defendant's Motion For Summary
Judgment                                           - 29 -                        SEC v. Panuwat
                                                                         Case No. 3:21-cv-06322-WHO

Mr. Piscitelli, Medivation's Vice President of Finance, similarly testified that the Medivation Insider Trading Policy did not apply to trading in Incyte under the facts of this case. Mr. Piscitelli also testified that if he wanted to trade Incyte securities, it would not be contrary to Medivation's Insider Trading Policy, and explained that he did not have material, nonpublic information about Incyte that he would be relying on when making such trade. (Piscitelli Dep. 173:10–175:10.) He testified that such a purchase would not have violated any other policy at Medivation, and it would not have required pre-clearance from Medivation. (*Id.*)

Mr. Guernsey, Medivation's lead outside counsel, likewise testified that Medivation's Insider Trading Policy was not intended to "sweep that broadly" as to apply to trades in Incyte. The thrust of the Insider Trading Policy was directed at the issuer (Medivation) and other companies with which it has business dealings. (Guernsey Dep. 22:19–26:6.) Mr. Guernsey was particularly well suited to opine on the application of the Insider Trading Policy, given his firsthand role as Medivation's lead outside counsel.

Accordingly, Mr. Panuwat did not have any red flags or other indication that trading in unrelated securities in the biotechnology sector was potentially improper.

## V.     THE SEC'S CLAIM FAILS BECAUSE THERE IS NO EVIDENCE THAT PANUWAT ACTED WITH SCIENTER

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980). Ninth Circuit courts disagree whether scienter requires a defendant to actually use the material nonpublic information in carrying out the trade, or whether he or she must be aware of it. *See, e.g.*, *Truong*, 98 F. Supp. 2d at 1095 (citing *United States v. Smith*, 155 F.3d 1051, 1067–70 (9th Cir. 1998)) ("[T]he government may not rest upon a demonstration that the suspected inside trader bought or sold while in possession of inside information; rather, it must, at a minimum, prove that the suspect used the information in formulating or consummating his trade."); *SEC v. Moshayedi*, No. CV-12-01179, 2013 WL 12172131, at *13–14 (C.D. Cal. Sept. 23, 2013) ("[T]o show that [the defendant] traded 'on the basis of' nonpublic, material information, the SEC must demonstrate his awareness of possession of that information."). Here, not only is there no evidence suggesting that Mr. Panuwat actually

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 30 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

used the material nonpublic information regarding Medivation's acquisition when he placed his trade in Incyte, there is no evidence indicating that he was actually aware of it or that it factored into his analysis or decision to purchase in any way whatsoever.

**A.  Panuwat Could Not Have "Used" the Supposed MNPI Because the Final Bid Had Not Been Submitted at the Time of Panuwat's Incyte Trades.**

As an initial matter, there is no evidence that Mr. Panuwat was engaged in or even aware of communications regarding Medivation's acquisition timing on August 18, 2016. Mr. Panuwat has no recollection of receiving emails regarding the deal status or timing and testified that he was no longer involved in the sale process to the extent he previously had been. (Panuwat Dep. 139:22–140:14, 28:7–30:2; Panuwat SEC Tr. 156:24–158:13, 194:16–20.) No witness testified that Mr. Panuwat was aware of the expected deal timing or involved in discussions on or around August 18, 2016, and there is no document or evidence suggesting otherwise. In fact, the evidence suggests Mr. Panuwat was out of the office and not engaged in the sale process. (*See infra* Section V(C).)

Moreover, the evidence demonstrates that Medivation had been exploring its strategic options for several months and that its acquisition by Pfizer had not been determined at the time of Mr. Panuwat's trade in Incyte. Mr. Panuwat purchased out-of-the money call options on August 18, 2016. (Dkt. No. 27, Answer ¶ 33.) The final two rounds of the bidding process for Medivation occurred *after* he traded on August 18, 2016. (Dep. Ex. 5 at 24–26.) At the time, Mr. Panuwat knew that Medivation had received several bids throughout 2016 that were rejected by Medivation's board of directors. There were no active bids at the time of Mr. Panuwat's Incyte investment, and it is not uncommon for mergers and acquisitions transactions to fall through at the last minute. Moreover, Panuwat knew that Dr. Hung personally did not want to sell the company. (Panuwat Dep. 145:17–146:14; *see* Hung Dep. 27:4–28:14 (Dr. Hung's priority was to get life-changing therapies to patients as soon as possible, and he was not convinced larger pharmaceutical companies had the same priority).)

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 31 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████   Multiple witnesses testified that there was overwhelming competition even at the eleventh hour. It was not clear who would be the winning bidder, or that a bidder would be approved, until Medivation received the final round of bids on August 20, 2016. (Baxter Dep. 139:12–140:17; Jarrett Dep. 133:6–136:11; Piscitelli Dep. 140:13–144:3.)

In short: "A deal is only done when you've finally signed." (Hung Dep. 59:9–17.) The final two rounds of bidding, the final determination of deal timing by the Medivation board of directors, the execution of the merger agreement, and the final approval of the transaction by the board of directors occurred *after* Mr. Panuwat made his investment in Incyte. The Pfizer merger deal was executed on August 20, 2016. It was publicly announced on August 22, 2016. (Dep. Ex. 5 at 26.) Consequently, there is no evidence demonstrating that Mr. Panuwat "used" information that Pfizer would acquire Medivation to place trades in Incyte.

### B.   Mr. Panuwat's Reasons for Making the Investment Were Unrelated to the Medivation Sale Process and Consistent with His Prior Investment Practices.

So why did Mr. Panuwat make these trades in Incyte when he did? The answer is simple—Mr. Panuwat's trading pattern was driven by his consistent investing philosophy, work schedule, personal obligations, available capital, and tax considerations.

In the first half of 2016, Mr. Panuwat was fully occupied in connection with the Medivation sale process, and he simply did not have the time to focus on the stock market and to actively trade. (Panuwat SEC Tr. 326:8–327:13.) As his role in the Medivation sale process wound down toward the end of the second quarter of 2016, Mr. Panuwat had more time to re-engage with the stock market. (*See id.* 326:8–328:2.) Mr. Panuwat had an influx of capital from a prior investment that resulted in significant tax liability, so he began investing with the knowledge that any potential losses could be used to offset gains already realized in 2016. (*Id.* at 326:8–328:2.) His subsequent investments followed a consistent pattern: he would analyze the biotechnology market more deeply, make a short-term investment, exit the investment, and then look for his next investment opportunity. (*See* SEC Ex. 8.) Mr. Panuwat followed this pattern when he traded in at least four

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- 32 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

different biotechnology companies in July and August 2016 using different investment vehicles, including call options. (*Id.*)

Mr. Panuwat made an investment in Incyte because he observed a significant recent decline in Incyte's stock price, and he believed that the company was undervalued. In 2016, Incyte's stock price experienced a meaningful decline. Its stock price decreased more than 40% over the prior year, and over 15% in the days leading up to Mr. Panuwat's investment. (*Compare* INCY Share Pricing, Aug. 2016 *with* INCY Share Pricing, Aug. 2015.) Mr. Panuwat did not believe this decline was based on business fundamentals or future outlook. Indeed, in the second quarter of 2016, Incyte posted revenue of $246.3 million, which soundly beat forecasts.[12] After reporting these financial results, Incyte's stock price surprisingly declined the following seven trading days. (INCY Share Pricing (Aug. 2016).) Because he believed that the stock price was undervalued, Mr. Panuwat purchased inexpensive options, hoping for a positive market adjustment. This purchase of out-of-the-money options of high quality, undervalued companies was an investment strategy Mr. Panuwat pursued several times during this period. (*See* SEC Ex. 8.)

"[T]rading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Rorech*, 720 F. Supp. 2d at 414 (citation omitted). In *Rorech*, the alleged tippee purchased the same type of securities he had purchased "previously on several occasions." *Id.* Likewise, Mr. Panuwat's purchase of call options in Incyte is consistent with his other trades in 2016, both before and after the Incyte transactions, when Mr. Panuwat bought only short-term out-of-the money calls—like the Incyte contracts—in biopharmaceutical companies whose stock prices had recent declines. (SEC Ex. 8.) He tended to hold these positions for a relatively short period of time, from 13 to 22 days. (*Id.*) Mr. Panuwat was focused on investing in biopharmaceutical companies in 2016 and the vast majority of his investments were in that sector. (*Id.*) Mr. Panuwat invested based on his belief that the stock prices of these high-quality biopharmaceutical companies were undervalued and would therefore rebound within a short period of time. Some of Mr. Panuwat's trades were successful; others were not. The fact that Mr. Panuwat had not traded Incyte options before is also

---

[12] *Incyte Beats Street 2Q Forecasts*, ASSOCIATED PRESS (Aug. 9, 2016).

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 33 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

1   consistent with his previous and subsequent investments—having invested in call options in

2   biopharmaceutical companies for almost 20 years, he rarely makes the same options investment

3   more than once. (Panuwat Dep. 132:2–14.) Accordingly, both the timing and method of

4   Mr. Panuwat's Incyte investment is consistent with his pattern of trading in 2016.

5          **C.      Access to MNPI Is Not Sufficient to Establish Scienter.**

6          Conjecture alone is insufficient to establish scienter. *SEC v. One or More Unknown Traders*

7   *in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 253 (S.D.N.Y. 2013) ("Piling inference upon

8   inference in this way does not provide the requisite strong support for the inference that the

9   Defendants acted with scienter.") The SEC hangs its hat on an email Dr. Hung sent to a large group

10  of recipients that had been involved in the Medivation sale process on August 18, 2016. (Dep. Ex.

11  15.) But Dr. Hung's August 18, 2016 email did not communicate anything specific about the

12  Medivation sale process, other than what was already known to the public market. There is no

13  evidence that Mr. Panuwat had anything to do with this email—he was not in the meeting, he did

14  not respond to the email, and he was not talking to people about the deal. And the email itself is not

15  a reason to prompt his trade. Not a single witness or document provided evidence that Mr. Panuwat

16  read Dr. Hung's email or was even aware of it prior to purchasing Incyte securities. *See Rorech*,

17  720 F. Supp. 2d at 410 ("Potential 'access' to material nonpublic information, without more, is

18  insufficient to prove that [the defendant] actually possessed any such information."). At the time

19  Dr. Hung sent the email on August 18, 2016 (Dep. Ex. 15), there was a bidding war among five

20  companies seeking to acquire Medivation. It was not certain that Medivation would be sold. (Hung

21  Dep. 125:19–127:8.) Based on Dr. Hung's email, Mr. Panuwat would not have known that Pfizer

22  would acquire Medivation because there were still bid proposals, merger agreements, and board

23  approval outstanding. (Panuwat Dep. 145:4–147:6.)

24         In fact, Mr. Panuwat was not even in the office during the final days of the sale process. (*Id.*

25  139:22–140:14.) By August, Mr. Panuwat's role in the Medivation sale process, which had

26  previously included assessing strategic alternatives and drafting press releases and presentations,

27  as well as preparing the company for conference calls, meetings, and Q&A, decreased. (*Id.* 28:7–

28  30:2; Panuwat SEC Tr. 156:24–158:13, 194:16–20.) The process of receiving, analyzing, and

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT                                    - 34 -                    SEC V. PANUWAT
                                                                     CASE NO. 3:21-CV-06322-WHO

responding to the bids was handled by senior management, the board, and the financial and legal advisors. (Panuwat SEC Tr. 191:16–21.) Mr. Panuwat was also juggling family obligations in August 2016. His son with severe special needs was hospitalized, and Mr. Panuwat was spending all of his time either at the hospital or caring for his young daughter at home. (Panuwat Dep. 133:24–135:9.) Mr. Panuwat was on vacation with his parents and daughter when Medivation received the final two rounds of bids and when the agreement with Pfizer was finalized. (*Id*. 124:18–128:18.)

Ultimately, the SEC may not base insider trading actions on "strained inferences and speculation." *Truong*, 98 F. Supp. 2d at 1098 (citing *Goldinger*, 106 F.3d 409, 1997 WL 21221 (9th Cir. 1997)) (finding that a case based on "massive and well-timed" trades by alleged tippees was "weak and speculative" and that "there is a vast difference between circumstantial evidence and pure speculation.") The SEC's case against Mr. Panuwat relies on the latter: pure speculation.

## CONCLUSION

For these reasons, the SEC cannot prove that Mr. Panuwat misappropriated material, nonpublic information as a matter of law. Mr. Panuwat respectfully requests that the Court issue an order granting summary judgment in his favor and dismissing the SEC's insider trading claim pursuant to Federal Rule of Civil Procedure 56.

Dated: September 27, 2023                    VEDDER PRICE (CA), LLP

By: _____

Anthony Pacheco

*Attorneys for Defendant Matthew Panuwat*

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

- 35 -

SEC V. PANUWAT
CASE NO. 3:21-CV-06322-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2023, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system and that all counsel of record will be served via the Notice of Electronic Filing generated by CM/ECF.

/s/ Anthony Pacheco
Anthony Pacheco