1

2

3

4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    SECURITIES AND EXCHANGE              Case No. 21-cv-06322-WHO
     COMMISSION,
8                                         
                    Plaintiff,            **ORDER DENYING DEFENDANT'S**
9                                         **MOTION FOR SUMMARY**
             v.                           **JUDGMENT**
10
     MATTHEW PANUWAT,
11                                        
                    Defendant.
12

13          Defendant Matthew Panuwat moves for summary judgment in this civil enforcement

14   proceeding by the Securities and Exchange Commission ("SEC") for violations of federal

15   securities laws prohibiting insider trading.  The SEC alleges that Panuwat used confidential

16   information about the acquisition of Medivation, his employer, to buy stock options in a different

17   company, Incyte Corp., earning $107,066 in profit.  It has shown genuine disputes of material fact

18   concerning (i) whether Panuwat received nonpublic information, (ii) whether that information was

19   material to Incyte, (iii) whether Panuwat breached his duty to Medivation by using its confidential

20   information to personally benefit himself, and (iv) whether Panuwat acted with scienter.  As a

21   result, Panuwat's motion is DENIED.[1]

22   ───────────────────────

23   [1] Panuwat seeks leave to seal transcript excerpts of third-party testimony given by Edmund Baxter
     and Douglas Giordano, which the Protective Order designated "Confidential" and "Highly
24   Confidential," respectively, per the request of Mr. Baxter and Mr. Giordano.  Dkts. 37, 64.
     Panuwat also seeks to seal those portions of his motion that reference those excerpts.  *See* Dkt. No.
25   37.  As the designating parties, Mr. Baxter and Mr. Giordano were required to file statements of the
     applicable legal standard and reasons for keeping the documents under seal within 7 days of
26   Panuwat filing his motion for summary judgment.  *See* Civil Local Rule 79-5(f)(3).  Mr. Giordano
     has done so and provided compelling reasons to seal the limited transcript excerpts he has
27   identified.  I grant Panuwat's motion to seal regarding Mr. Giordano's testimony.

28   Mr. Baxter did not file such a statement.  Panuwat shall notify Mr. Baxter, through counsel, of this
     order and his obligation to file a statement pursuant to L.R. 79-5(f)(3).  This statement should be

# BACKGROUND

Panuwat is accused of violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). The undisputed facts are summarized below.

Between 2014 and 2017, Panuwat worked at Medivation, a "mid-cap, oncology-focused biopharmaceutical company." Panuwat SEC Testimony ("Panuwat SEC Tr.") 33:8-42:7. When Panuwat started working for Medivation, he signed the company's Insider Trading Policy. Def. Motion For Summ. Judgment ("Mot.") Ex. 43 at 9. He also signed Medivation's Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement"). *See* Mot. Ex. 21 (Agreement & Policy) at 394; Pl. Opposition ("Oppo.") Ex. B at 81:18-82:16; 88:5-23.

Medivation had one successful prostate cancer drug on the market, Xtandi. *See* Medivation Annual Report (Form 10-K) at 2 (Feb. 26, 2016). Panuwat was responsible for finding, evaluating, and pursuing acquisition opportunities for Medivation. Panuwat SEC Tr. 46:20-48:20. As part of that job, Panuwat tracked developments in the biopharmaceutical industry. *Id.* 52:22-55:20.

In late March 2016, Medivation was approached by another pharmaceutical company, Sanofi S.A. ("Sanofi"), which wanted to acquire it. Medivation was not interested. Mot. Ex. 15 (Medivation Schedule 14D-9) at 19. Panuwat helped prepare presentations and disclosures related to Medivation's efforts to repel Sanofi's attempted takeover. *See id.*; *see also* Oppo. Ex. A (May 2020 Panuwat Dep.) at 188:23-190:16; 384-85. In mid-April 2016, Sanofi made an unsolicited offer to buy Medivation's shares at $52.50 per share, which was less than Medivation's most recent trading price. *See* Mot. Ex. 15 at 17. Sanofi announced this offer publicly and Medivation rejected it publicly. *See id*.

This began a months-long public fight over what Medivation described as Sanofi's "hostile takeover attempt." *Id.* at 11:20-22. During this time, the Medivation board directed the

---

submitted within 14 days of this order. The SEC will have five days after that to respond. If Mr. Baxter does not submit this statement, I will unseal the identified transcript excerpts and corresponding portions of the motion.

company's investment bankers, J.P. Morgan and Evercore, to contact several industry participants and assess preliminary interest in acquisition by a party other than Sanofi. *Id.* Ex. 15 at 19. Per direction of the board, Medivation and its investment bankers contacted twelve industry participants, including the multibillion dollar biopharmaceutical company Pfizer, to "explore preliminary interest in a potential strategic transaction." *Id.*

This sale process provoked analysis by both Medivation insiders and outside analysts about Medivation's relative position as compared to other biopharmaceutical companies. Medivation's CFO identified Incyte as one of "very few" midcap oncology assets left in the industry as of April 2016; Medivation was another. Oppo. Ex. F (April 28 email from Medivation CFO to Panuwat and attachment) at 21524.

Around the same time, financial analysts were discussing the potential effect that a Medivation acquisition could have on other biopharmaceutical companies. This included speculation about how a larger company acquiring Medivation could impact Incyte. Oppo. Exs. Q-T. Some analysts theorized that Medivation's acquisition could have a positive impact on Incyte's attractiveness to buyers, *see id.* Ex. Q, particularly given the "scarcity" value inherent to both companies' status as $10 billion-range biotech companies and mid-cap cancer assets. *See id.* Ex. R.

Panuwat was involved in both the search for an appropriate buyer and analysis about the impact of the eventual sale. During that time, Panuwat indicated to an Evercore investment banker that although there were only a few late stage oncology companies that directly compared to Medivation, Incyte was "cool" and their data was "good" and "first in class." *See* Oppo. Ex. E at 2.

The sale process for Medivation was confidential; all parties were referred to by code-names. Oppo. Ex. B (Mar. 2023 Panuwat Dep.) at 77:16-78:1. Medivation was called "Van Gogh," *id.* at 77:14-78:1, Sanofi was called "Seurat," and Pfizer was called "Picasso." *Id.* Ex. D (Baxter Dep.) at 131:2-7; 135:14-138:3. Panuwat was often privy to confidential details about the sale process, as evidenced by his inclusion on email strings that used code names and contained specifics about the final stages of sale, and his own testimony. *See, e.g.* Oppo. Ex. H (Aug. 12

1   email and attached bid summary); Ex. B at 118:5-119:8, Ex. I (Aug. 14 email and attached

2   proposal guidelines); Ex. A (Panuwat Dep.) at 217:22-218:2.

3        The market had a general idea of how Medivation's sale process was progressing.  On July

4   5, 2016, Medivation issued a press release that it had entered into confidentiality agreements with

5   several parties interested in acquiring it, *see* Medivation Form 8-K (July 5, 2016), and financial

6   reporting publications told market participants that Medivation had set a "mid-August deadline"

7   for indications of interest.  *See* Mot. Exs. 18, 19.  Throughout the sale process, the proposed sale

8   prices and exact timing of the interested parties' bids were *not* disclosed to the public.  *Id.* Ex. C

9   (Piscitelli Dep.) at 69:24-70:10.  Certain Medivation employees, including Panuwat, were often

10   privy to those details.  For instance, on August 14, 2016, select Medivation employees, including

11   Panuwat, were informed that bids from interested parties were due on August 19, 2016, *see id.* Ex.

12   I (Aug. 14 email threat including six Medivation employees), and that Medivation's goal was to

13   announce an acquisition on August 22, 2016.  *Id.*  The market was not aware of these specific

14   dates.

15        On August 18, 2016, Medivation CEO David Hung sent Panuwat at his work email

16   address and twelve other Medivation employees an email at 12:19 PM Pacific Time ("P.T.")

17   containing information about the status of the Medivation sale process that was not available to the

18   public.  *See id.*  Ex. J (August 18, 2016, email fr Medivation CEO David Hung to Medivation

19   employees including Panuwat) (hereafter, the "Hung Email").  It stated that "Picasso" (Pfizer) had

20   "reiterated [to Hung] how much they really want this," that Pfizer wanted the deal "in this

21   weekend" and named a specific price point for it.  *Id.*  No evidence suggests that this information

22   was shared with anyone other than the 13 people included on the email chain.

23        Seven minutes later, at 12:26 PM P.T., Panuwat started purchasing Incyte call options.  *See*

24   Oppo.  Ex. K (Summary of Trades).  Between 12:26 PM to 12:59 PM P.T., Panuwat purchased

25   578 Incyte call options for a total of $116,905.  *Id.*  He purchased at three different strike prices:

26   $80, $82.50, and $85.  *Id.*  Panuwat's purchases at each strike price represented, respectively,

27   81%, 70%, and 84% of the daily volume of those call options sold in the market.  *See* Oppo. Ex. L

28

United States District Court
Northern District of California

4

(Bloomberg Screen Shot).[2]

On Monday, August 22, 2016, Pfizer's acquisition of Medivation was announced before the markets opened. *Id.* Ex. N (Pfizer Press Release). That day, Incyte's stock price opened at $79.80 and closed at $81.98, which was 7.7% higher than the prior trading day's close. *Id.* Ex. P (Incyte Stock Prices Summary).[3] On Wednesday, August 24, 2016, Panuwat sold 300 of the 578 call options for a profit; he sold the remainder in September of the same year. All told, Panuwat made a total of $120,031.32. *See id.* Ex. K.

The SEC brought this suit on August 17, 2021, alleging that Panuwat violated Section 10(b) of the Exchange Act and Rule 10b-5 when he made this trade. Dkt. No. 1. I denied Panuwat's motion to dismiss, Dkt. No. 26, and after discovery, Panuwat moved for summary judgment. Dkt. No. 63.[4]

## LEGAL STANDARD

### A.       Section 10(b) of the Securities Exchange Act of 1934

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person purchasing or selling securities "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules

---

[2] The SEC requests that I take judicial notice under Fed. R. Evid. 201(b)(2) of Exhibit L, which is a screenshot of Bloomberg's record of the volume of options trading in Incyte stock options over the period during which Panuwat traded. I will. Doing so is consistent with the Ninth Circuit's holding in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, where the court found it "proper" for a district court to take judicial notice of reported stock price histories and other "publicly available financial documents." 540 F.3d 1049, 1064, n. 7 (9th Cir. 2008).

[3] The SEC also requests that I take judicial notice of Exhibits O and P, which describe various stock price points for Medivation and Incyte stock from August 1, 2016, to August 31, 2016. For the same reasons I gave *supra*, n. 2, I will take judicial notice of Exhibits O and P, with the note that Panuwat is correct that the price increase was 7.7% from closing on Friday, August 19, to closing on Monday, August 22, not 8% as the SEC stated.

[4] I granted the Investor Choice Advocates Network's ("ICAN") motion for leave to file an amicus brief in support of Panuwat's motion. Dkt. No. 81. ICAN advances two arguments, neither of which are addressed in Panuwat's papers (although Panuwat joins both). *See* Dkt. No. 82. I did not find either argument particularly persuasive and simply note that this Order is not contrary to other courts' decisions to refrain from issuing a blanket ban on trading based on nonpublic information. *See e.g. U.S. v. O'Hagan*, 521 U.S. 642 (1997). Every element of the misappropriation theory of insider trading must be met for the SEC to survive summary judgment.

United States District Court
Northern District of California

and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); *United States v. O'Hagan*, 521 U.S. 642, 650-52 (1997).  Pursuant to this Act, a person commits fraud "in connection with" a securities transaction, and violates § 10(b) and Rule 10b-5, "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. at 652.

"The misappropriation theory reaches trading by corporate outsiders, not insiders." *S.E.C. v. Talbot*, 530 F.3d 1085, 1091 (9th Cir. 2008).  It "premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *Talbot*, 530 F.3d at 1091 (quoting *O'Hagan*, 521 U.S. at 652).  A fiduciary's "undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *Id.*  A trader is therefore liable if he "knowingly misappropriated confidential, material, and nonpublic information for securities trading purposes, in breach of a duty arising from a relationship of trust and confidence owed to the source of the information." *Talbot*, 530 F.3d at 1092.

### B.      Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.*  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

United States District Court
Northern District of California

facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

To survive summary judgment, the SEC must set forth affirmative evidence sufficient for a jury to find in its favor on each element of insider trading. For its misappropriation theory, the SEC must show that Panuwat "knowingly misappropriated confidential, material, and nonpublic information for securities trading purposes, in breach of a duty arising from a relationship of trust and confidence owed to the source of the information." *See Talbot*, 530 F.3d at 1092.

## I.    MISAPPROPRIATION OF MATERIAL NON-PUBLIC INFORMATION

The first question is whether the SEC has shown that Panuwat received material, nonpublic information (hereafter, "MNPI") from Medivation. I will consider materiality and the nonpublic nature of the information separately.

### A.    The Material Element

I ruled at the motion to dismiss phase that information may be material to more than one company and that information does not need to come from the issuer of the security to be material. *See* MTD Order 7:4-7; 7:17-21. The question now is whether the SEC has shown a connection between Medivation and Incyte such a jury could find that a reasonable investor would view the information in the Hung Email as altering the "total mix" of information available about Incyte. I conclude that it has made that showing.

Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Because the standard is considered from the perspective of a "reasonable investor," it is objective. *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011). When mergers are involved, as was true here, materiality is a fact-dependent inquiry focused "on the probability that the transaction will be consummated, and its significance to the issuer of the securities." *Basic*, 485 U.S. at 250; *see also* MTD Order 6:1-6. Courts consider factors including "indicia of interest in the transaction at the

1    highest corporate levels," "the size of the two corporate entities and of the potential premiums

2    over market value," and, critically for the SEC's case, any increase in stock price after the merger

3    is publicly announced.  *Id.* at 239; *Talbot*, 530 F.3d at 1097.

4        As I noted in my prior order, Section 10(b) and Rule 10b-5 prohibit insider trading of "*any*

5    security" using "*any* manipulative or deceptive device."  MTD Order 7:1-6; *see* § 78j(b); §

6    240.10b-5 (emphasis added).  While the MNPI traded upon must be "about [the] security or

7    issuer" whose securities are being traded, Rule 10b5-1(a) does not state that the information

8    "about that security or issuer" must come from the security or issuer of the security to be material.

9    *See* MTD Order 7:1-6; § 240.10b5-1(a); *see also United States v. Carpenter*, 791 F.3d 1024, 1026-

10   27, 1032 n. 9 (2d Cir. 1986), *aff'd by an evenly divided Supreme Court*, 484 U.S. 19, 24 (1987).[5]

11       Panuwat contends that the SEC is asking me to infer that "because [he] was aware of

12   confidential information regarding one biopharmaceutical company (Medivation), such

13   information was material to some or all other allegedly similar biopharmaceutical companies."

14   Mot. 20:20-25; *see also* Panuwat Reply ("Repl.") [Dkt. No. 79] 17:15-22.  I disagree with this

15   characterization.  The SEC is asking me to infer that because Panuwat was aware of confidential

16   information about Medivation—information made available to him by receipt of the August 18

17   Hung Email—and because Medivation and Incyte were connected as part of a niche section of the

18   biopharmaceutical market, Panuwat was aware of information that was material to Incyte.

19                          **1.    Market Connection**

20        To start, whether a market connection exists between Medivation and Incyte is critical for

21   materiality.  Panuwat argues that the SEC cannot show market connection because Medivation and

22   Incyte were "[f]undamentally [d]ifferent [c]ompanies." Mot. 20; Repl. 17:25-18:7. But this matter

23   is disputed.  The SEC has shown evidence suggesting that the market did not perceive the

24   companies to be undisputedly different from one another.  While the parties agree that Medivation

25   _____

26   [5] In *Carpenter*, a reporter from the *Wall Street Journal* misappropriated prepublication
     information regarding the contents of a financial news column for his own personal profit.
27   *Carpenter*, 791 F.3d at 1026-27.  There, the Supreme Court affirmed the Second Circuit's holding
     that even though the victim of the fraud, the *Journal*, was not a buyer or seller of the stocks traded
28   in or otherwise a market participant, the fraud was nevertheless considered "in connection with" a
     purchase or sale of securities within the meaning of the statute and the rule.  *Id.*

United States District Court
Northern District of California

1   and Incyte had leading drugs approved for treating different diseases and patients, *see* SEC Resp.

2   to RFA Nos. 6-7, 16-17, and that they did not share approved drug products or develop the same

3   drugs, *see* Mot. Ex. 8 (Hung Dep.) at 34:16-44:16, the SEC has shown that analyst reports and

4   financial news articles repeatedly linked Medivation's acquisition to Incyte's future. *See* Oppo.

5   15; *id.* Exs. Q-T.

6          One such report, published in May 2016, stated "Medivation M&T Talk Makes [Incyte]

7   Shares Look Very Appealing." *Id.* Ex. Q. It reported that the "acquisition interest in [Medivation]

8   highlights the attractiveness of [Incyte], yet [Incyte] shares have yet to benefit from the premiums

9   being discussed for what is in our view a far inferior mid cap oncology company." *Id.*

10          Panuwat argues that because the report noted that Incyte had not benefitted from the

11   premiums being discussed and that Medivation was a "far inferior mid cap oncology company," it

12   serves as proof that the stock prices of the two companies were "not known to be economically

13   linked" prior to the Medivation acquisition announcement. Mot. 26:3-5. The SEC references the

14   same report as evidence that the market *did* consider Medivation and Incyte's stock performance

15   to be linked, focusing on the part of the report that explained how acquisition interest in

16   Medivation highlighted Incyte's value to other potential acquirers. Oppo. 8:20-9:6. This report

17   can be interpreted in more than one way, supporting a dispute of material fact.

18          Other articles highlight the dispute over how the market viewed Medivation and Incyte in

19   relation to one another. The SEC points to an article shared within Medivation where analysts

20   reported that "'a scarcity of valuable biotech assets'" available for purchase by larger biotech and

21   pharmaceutical companies "should keep a floor under Medivation—*and by implication . . .*

22   *Incyte.*" *Id.* Ex. R (emphasis added). Reporting after the acquisition was announced provides

23   further evidence that the market considered the fates of Medivation and Incyte to be potentially

24   linked. *See, e.g. id.* Ex. S ("This morning [Pfizer] announced they were acquiring [Medivation] . .

25   . and we examine any potential direct or indirect implications for our biotech universe . . . other

26   names in our group we think could be on the hunt and/or takeout candidates include . . . [Incyte].")

27   And another report, also published after the acquisition was announced, predicted that given the

28   small number of midsize biotech companies with "high-quality assets," Incyte could "interest

buyers" in the wake of Medivation's acquisition.  *Id.* Ex. T.

Panuwat concedes that he is a sophisticated investor with a robust history in trading.  *See* Repl. 7:16-23 ("This is not the case of an unsophisticated person . . . [t]his is the case of a hobby trader who spent years following the markets in specific industry . . . Panuwat studied, followed, and researched Incyte for many years prior to the trades at issue." (citing Oppo. 8:2)).  This would allow a jury to infer that he was aware of these reports and that they may have influenced his perspective on the biopharmaceutical market.  He also commented positively on Incyte months before he made the purchases on August 16, 2018.  *Id.* 7:23-25.  When these facts are considered, as they must be, in the light that is most favorable to the SEC, they support the SEC's theory that a reasonable investor such as Panuwat—who paid careful attention to the biopharmaceutical market, and specifically to Incyte—could have perceived Medivation and Incyte to be connected in the market such that pertinent information about one was material to the other.

Panuwat protests that "witnesses contemporaneously involved with Medivation's sale process agreed the correlations between Incyte and Medivation are 'generic,' at best[.]"  *See* Mot. at 21; Panuwat SEC Tr. at 214:20-25; Piscitelli Dep. at 20:21-25:22.  This may be true.  A jury is free to validate or discount these perspectives, as they are other subjective accounts of a disputed issue.

Panuwat also argues that Incyte and Medivation did not consider each other competitors.  Mot. 22; *see* Incyte Form 10-K at 15 (Feb. 12, 2016)); Medivation Form 10-K at 11-12 (Feb. 26, 2016) (showing both companies described their competition in ways that did not seem to include the other).  But no legal authority suggests that a reasonable investor would conclude that Medivation's acquisition would only affect the stock price of companies that directly competed with Medivation.  Panuwat's arguments do not dispel the disputes of material fact discussed above.

### 2.     Other Evidence of Materiality

The SEC also identifies evidence suggesting that Medivation's investment bankers considered Incyte a "comparable peer" to Medivation because they were both mid-sized, cancer-related drug companies with commercial product in a market where the scarcity of such companies

played a large role in their value.  *See* Oppo. 15, Ex. F at 21532; *id.* at 21534 (bar chart showing Medivation and Incyte listed as two out of a small number of "commercial oncology focused companies" with a $5 billion to $75 billion market cap); Ex. G at 25784 (investor presentation stating that "Medivation has significant scarcity value as one of the few profitable, commercial-stage oncology companies).  This is more evidence from which a jury could infer that a reasonable investor such as Panuwat might have understood details about Medivation's acquisition like those he allegedly read in the Hung email to impact Incyte and its future in the market.  In the small pool that the two companies occupied, where scarcity was at least speculated to translate into market value, a jury could find that a reasonable investor might understand information about one company's acquisition to "alter the total mix of information" about the other, making that news material to Incyte.

Finally, changes in stock price after previously unknown information is disclosed to the market is "strong evidence" of how reasonable investors understand the significance of that information.  Oppo. 13:25-14:7 (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 948-49 (9th Cir. 2003)).  The SEC has shown that Incyte's stock increased by 7.7% after the market learned that Pfizer acquired Medivation.  *See* Oppo. Ex. P.  Panuwat responds that Incyte's stock prices had changed "by at least 7.7% in one day over 400 times during the time Incyte has been a publicly traded company." Repl. 20:4-7 (citing Pacheco Reply Decl., Ex. 44).  Again, it is possible that the stock price increase was unrelated to the Medivation sale.  But a jury could reasonably find that it was further indication of the two companies' connection in the market, and therefore probative of materiality.  There is at least a material dispute whether the information Panuwat received in the Hung Email was material to Incyte.

### B.  The Nonpublic Element of Misappropriation

Under section 10(b) and Rule 10b–5, information remains "nonpublic" until either (1) the information is "disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,'" or (2) "although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular

stock.'" *S.E.C. v. Mayhew*, 121 F.3d 44, 50 (2d. Cir. 1997) (quoting *Dirks v. S.E.C.*, 463 U.S. 646, 653 (1997) and *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993)).  I next consider whether the SEC has shown that the information was also nonpublic and available to Panuwat because of his position with Medivation.  I conclude that it has.

It is undisputed that Panuwat knew the identities of the five companies that had submitted bids to acquire Medivation, the bids that each company had made, and that the bidding process was pushing up the sale price.  Oppo. Ex. D (Panuwat Dep.) at 135:14-138:3; Ex. H at 48294.  He knew that Medivation wanted to announce a final sale on Monday, August 22, 2016.  Oppo. Ex D at 118:6-25-119:10; *id.* Ex. I (internal Medivation email chain).  And on August 18, 2016, the Hung Email was sent to him that communicated the Medivation CEO's one-on-one conversations with two Pfizer executives indicating that Pfizer "really want[ed] this [acquisition]" and provided details about the expected timing and price point of the deal.  *Id.* Ex. J (the Hung Email); Mot. 13:1-3, Dep. Ex. 15.  The parties disagree about whether the information in the email was nonpublic and whether the SEC has shown that Panuwat read the email.  I will address each dispute in turn.

### 1. The Contents of the Hung Email

The SEC claims that once Panuwat received the Hung Email he "possessed sensitive, nonpublic information about the Medivation sale process, which Medivation had attempted to keep confidential."  Oppo. 11:12-14.  Panuwat insists that he had access to no more information about the sale process than did the public.

Panuwat contends that "the market was aware of the Medivation sale process every step of the way, even the likelihood of a transaction being announced in mid-August 2016," making the information in the Hung Email redundant to the public record.  *See* Mot. 18:6-8.  In his papers and at oral argument, Panuwat encouraged me to consider the testimony of several Medivation executives who stated that Medivation's rejection of the Sanofi offer was very public in the biotech industry and that it was public information that Medivation would likely be sold in mid-August to "one of the Interested Parties," of which Pfizer was known to be one.  *See id* 18:13-19:20; *id.* Ex. 5 (Bleharski Dep.) at 29:5-31:1; Ex. 9 (Jarrett Dep.) at 46:6-48-2; Ex. 13 (McCarty

Dep.) at 286:23-288:1, 303:19-308:5.  He notes that on August 10, 2016, a Citi analyst report stated that "[t]he [Medivation] CEO's remarks, particularly in the context of a mid-August deadline . . . for indications of interest, suggest this may have been a farewell bid for [Medivation] investors."  Mot. Ex. 17 (Leerink Analyst Report).  He adds that on August 17 and 19, 2016, certain media reports named five bidders who had submitted indications of interest.  Mot. 19:18-19; *id.* at 12 n. 6.  But he also acknowledges, critically, that the "*final details* of the transaction— the final buyer, the final price, and the ultimate timing of the execution of the merger—*were not yet known to the market on August 18, 2016*[.]" *Id.* at 19:20-24 (emphasis added).

The SEC argues that these "final details" constituted the nonpublic information that Panuwat misappropriated.  It contends that because Panuwat had access to these details, he possessed more reliable information about Incyte's future than did the public.  Oppo. 12:10-14.  At the least, that presents a triable issue of fact.  Courts have held that "[r]umors or press reports about the transaction . . . are difficult to evaluate because their source may be unknown," and "[a] trier of fact may find that information obtained from a particular insider, even if it mirrors rumors or press reports, is sufficiently more reliable, and, therefore, is material and nonpublic, because the insider tip alters the mix by confirming the rumor or reports." *United States v. Contorinis*, 629 F.3d 136, 144 (2d Cir. 2012).  In contrast to the analyst reports that speculated on the impact of acquisition given a "mid-August deadline," *see* Oppo. 12:16-20; Mot. Exs. 17, 18, the information in the Hung Email was specific and carried indicia of reliability: it came directly from Medivation's CEO, bankers, and lawyers about the timing, likelihood, and price of the deal.  *See* Oppo. 12:16-20.  These factors made the information available to Panuwat in the Hung Email more reliable than information that did not carry those same bona fides.

Panuwat argues that he did not have access to the "final details" information when he traded Incyte securities, nor did "anyone," because "final bids had not yet been submitted at the time [he] traded Incyte securities."  Mot. 19:22-25.  More bids were made after Panuwat received the Hung Email and the deal was not yet "done."  But, if the facts are viewed in the light that is most favorable to the SEC, a jury could find that the Hung Email contained information that was different enough from—and more detailed than—the information available to the market, making

1   it nonpublic information.  As I will discuss in further detail below, *infra* III(2)(B), that the final

2   bids were not yet submitted does not preclude a jury from finding that Panuwat knew more than

3   the public about the Pfizer deal.  There is a dispute of material fact about whether the information

4   in the Hung Email was nonpublic.

5                    **2.       Whether Panuwat Read the Hung Email**

6           There is also a dispute of material fact whether Panuwat read the Hung Email so that he

7   could have possessed the allegedly nonpublic information it contained.[6]  Panuwat argues that

8   "[t]here is no evidence that [he] interacted with this email in any way or that he even read it prior

9   to purchasing Incyte securities." Mot. 13:6-8; *see also* Repl. 11:19-23.  He says that he did not

10  forward the email or reply to it and that he does not remember receiving it.  *See* Panuwat SEC Tr.

11  at 432:8; Panuwat Dep. 138:24-147:18.[7]

12          There is an obvious dispute here.  The Hung Email was sent to his email address.  Oppo.

13  11:25-27; *see id.* Ex. J.  Panuwat did not set an out-of-office reply or provide other corroborating

14  evidence that he was unavailable or lacked the ability to read it.[8]

15          And the SEC points out that Panuwat was sending and receiving emails from his work

16  address (the same email address that the Hung Email was sent to) on that same day.  Specifically,

17  on August 18 at 4:25 PM, Panuwat replied to what appears to be a recruitment email from another

---

[6] This dispute is also critical to Panuwat's argument that the SEC has failed to show that he was aware of the allegedly material nonpublic information for the purposes of establishing scienter.  It will be discussed in more depth later, *infra* III(2)(B).

[7] Panuwat also claims that the SEC could have forensically attempted to determine if Panuwat received, opened, and read the email, and because it did not means that this evidence fails.  *See* Repl. 11:19-25.  This is meritless.  The email was sent to Panuwat, at his Medivation work address, while he was actively employed by Medivation.  A reasonable jury could easily infer from those facts alone that Panuwat read the email.

[8] Panuwat has admitted that he was "very involved" in Medivation's strategic response to Sanofi's hostile takeover attempt, which the SEC argues increases the likelihood that he did read the email.  Oppo. Ex. A at 188:23-190:16 (Panuwat acknowledging that he worked on the Sanofi hostile takeover bid); Ex. C at 60:6-61:7 (Piscitelli stating that Panuwat prepared slides for presentation to other potential acquirers); 62:14-63:23 (same).  Panuwat contends that his previous involvement in the acquisition process does not lead to the inference that he read the August 18 email because "[his] involvement had tapered off" by the time the email was sent.  Motion at 13:11-12; *see* Panuwat SEC Tr. 194:16-196:11. This argument does little to rebut the SEC's claim that Panuwat could have read the Hung Email and become aware of the information it contained.

United States District Court
Northern District of California

company; at 6:51 PM, he sent an internal email asking about how to remove pages from a PDF to a work colleague, and at 9:17 PM he sent another work email to Medivation's investment banks, J.P. Morgan and Evercore.  *See* Oppo. Ex. M.  These emails, sent within hours of receiving the Hung Email, seem to contradict Panuwat's testimony that he was not in the office or not focused on work responsibilities and for that reason did not read the email.[9]  A jury could reasonably infer that Panuwat was working on August 18, 2016, and that he was engaging with his email, which would significantly increase the likelihood that he read the email from his CEO.  And then, of course, there is the reasonable inference drawn from his purchases of the Incyte options within seven minutes of the Hung email's transmission.

That Panuwat was familiar with Incyte, commented positively on the company earlier in 2016, but bought no stock in it until seven minutes after receiving an email that contained information about the Medivation's price point, sale timeline, and purchaser, could be interpreted by a jury as suggestive of both materiality and misappropriation.  There is enough evidence to create a material dispute that Panuwat received nonpublic information on August 18, 2016.

## II.    BREACH OF DUTY

To demonstrate a material dispute, the SEC must also show facts that, when considered in a light most favorable to the SEC, establish that Panuwat breached "some fiduciary, contractual, or similar obligation" to Medivation when he traded Incyte call options.  *United States v. O'Hagan*, 521 U.S. 642, 663 (1997).  The duty to abstain from trading "arises from a specific relationship between two parties." *Id.* at 661.  But that relationship is not limited to a relationship between a corporation's insiders and shareholders.  *Id.*  The Supreme Court has observed that liability under the misappropriation theory arises when there is an expectation that the trading party will keep the source's information confidential.  *Id.* at 663.  The SEC advances three separate theories of how

---

[9] In addition, Panuwat provided inconsistent testimony whether he was on vacation or otherwise out of the office when the email was sent.  In May 2020, when he was first questioned about the Incyte trades, he testified that he did not remember where he was on August 18, 2016.  Oppo. 18, Ex. A at 181:10-14.  In November 2020, he basically said the same thing.  Oppo. Ex. A at 429:14-21.  But when he testified in March 2023, he stated for the first time that he was often not in the office in August 2016, that he was not in the office on August 18, and that on the days preceding the Incyte trades he was "really not focusing on any work responsibilities." *Id.* Ex. B at 138:11-19, 139:18-140:14.

United States District Court
Northern District of California

Panuwat breached a duty of trust and confidence to Medivation.  I conclude that there is evidence that he breached a duty under all three; any one would be sufficient to meet the breach element of misappropriation to survive summary judgment.

### 1.    The Insider Trading Policy

First, the SEC contends that Panuwat breached a specific duty not to trade on inside information arising from Medivation's Insider Trading Policy.  Oppo. 23:18-25:23.   It reads:

> During the course of your employment, temporary assignment, consultancy or directorship with the Company, you may receive important information that is not yet publicly disseminated ("***inside information***"), about the Company or about other publicly-traded companies with which the Company has business dealings. Because of your access to this information, you may be in a position to profit financially by buying or selling or in some other way dealing in the Company's securities (including not only stock but also debt securities such as convertible notes) or the securities of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors of the Company, or to disclose such information to a third party who does so (a "***tippee***").

Mot. 28, Ex. 21 at 9 (emphasis in original).

The plain language of the policy covers "the securities of another publicly traded company, *including*" the listed categories.  As explained in my prior order, this list is not exhaustive.  *See* MTD Order 9:10-22 (citing *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.")); *see Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006) ("In both legal and common usage, the word 'including' is ordinarily denied as a term of illustration, signifying that what follows is an example of the preceding principle.").  A jury could determine that the types of companies listed in the Insider Trading Policy are not necessarily the only types of companies that the Policy covers.

Panuwat's argument to the contrary may persuade a jury, but it cannot prevail at summary judgment.  He contends that the plain text of the policy does not prohibit the Incyte trade because Incyte does not fall within any of the categories enumerated in the Insider Trading Policy.  He argues that since Incyte was not a "collaborator[], customer[], partner[], supplier[] or competitor[]" of Medivation, and did not have a business relationship with Medivation, his trade

16

1    could not have breached the Policy.  Mot. 28:1-2; *see also* Mikkelson Decl. ¶ 9.  He cites the

2    testimony of Medivation employees who agree that Medivation and Incyte did not have any

3    business relationship meeting the standard laid out in the Insider Trading Policy.  Mot. 28:16-23;

4    Ex. 7 (Guernsey Dep.) at 18:9-22:18; Ex. 8 (Hung Dep.) at 17:15-20:11; Ex. 12 (Piscitelli Dep.) at

5    25:23-27:10. [10]

6        That said, the plain language of the Insider Trading Policy allows for the SEC's

7    interpretation.  The Policy prohibits Medivation employees from trading based on MNPI that they

8    receive through their employment about other publicly traded companies.  Incyte is a publicly

9    traded company.  Because Incyte *does* fall within the ambit of Medivation's Insider Trading

10   Policy, a jury could find that Panuwat breached the policy when he traded Incyte stock options

11   based on "inside information" to which he was privy.[11]  *See e.g.* MTD Order 9:10-20.

12       In short, there are disputes of material fact whether the Insider Trading Policy prohibited

13   trades like Panuwat's Incyte trade.  This is sufficient to support the breach of duty element of

14   misappropriation that the SEC must prove.

15                    **2.    The Confidentiality Agreement**

16       Second, the SEC contends that Panuwat breached his duty under the Confidentiality

17   Agreement to refrain from using Medivation's confidential information for his own personal

18   benefit.  Panuwat argues that the only evidence that he disclosed or used confidential company

19   information for personal gain is the Hung Email and subsequent trade, that Medivation used code

20   names, and that Panuwat did not disclose his trades.  That is sufficient to support the theory.

21       A "'duty of trust or confidence' exists . . . [w]herever a person agrees to maintain

22   information in confidence."  17 C.F.R. § 240.10b5-2(b)(1); *see also O'Hagan*, 521 U.S. at 663.

23   ―――――――――――――

24   [10] The SEC objects to this testimony from Guernsey, Hung at the Hung Deposition lines 20:12-
     23:6, and Piscitelli at Piscitelli Deposition lines 32:18-33:12 because the statements regarding the
25   Insider Trading Policy constitute legal opinions that are not "helpful . . . to determining a fact in
     issue," Fed. R. Evid. 701(b), are irrelevant (Fed. R. Evid. 401) and lack foundation, either under
26   Fed. R. Evid. 701(a) if I consider the testimony to be a lay opinion, or Fed. R. Evid. 602 if I
     consider it as the testimony of a percipient witness.  I will assume without deciding that this
27   testimony is admissible, but it is neither dispositive or persuasive.

28   [11] A jury could find that Panuwat was privy to inside information for the same reasons it could
     find that he was privy to nonpublic information, *see supra* I(B).

United States District Court
Northern District of California

The Confidentiality Agreement provided that Panuwat would "hold in strictest confidence, and not [] use, except for the benefit of the Company . . . confidential knowledge, data, or other proprietary information relating to . . . financial information or other subject matter pertaining to any business of the Company . . ." Mot. Ex. 21; Oppo. Ex. B at 81:18-82:16. The Supreme Court has found that employees who endeavor to maintain confidentiality on behalf of their employer in so doing can create a duty sufficient to support liability under the misappropriation theory of insider trading. *See Carpenter v. United States*, 484 U.S. 19, 23, 27 (1987) (where the Court, in affirming the defendant's conviction for violation of Section 10(b) of the Exchange Act, recognized that a person who acquires special information by virtue of a confidential relationship with another is not free to exploit that information for his personal benefit).

When considered in a light that is most favorable to the SEC, the facts could support a jury finding that Panuwat (a) owed Medivation a duty of confidentiality and trust that arose when he signed the Confidentiality Agreement, (b) obtained confidential information about Medivation's sale process in the Hung Email, and (c) exploited that information for his personal benefit when he bought Incyte stock options seven minutes after reading the email, and later sold those options for a profit. The question of whether Panuwat breached a duty of trust and confidence arising from the Medivation Confidentiality Agreement is not suitable for resolution at summary judgment.

### 3.      Entrustment with Confidential Information

Third, the SEC contends that Panuwat breached a duty of trust and confidence that was created when his employer, Medivation, entrusted him with confidential information. Panuwat argues that this theory fails because his case is distinguishable on the facts from the cases that the SEC cites and because the evidence against him is "circumstantial" and "weak." Again, I disagree.

Under the misappropriation theory, "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *O'Hagan*, 521 U.S. at 652. A company's "confidential information" has "long been recognized as property," to which the corporation has "the exclusive right and benefit." *Carpenter*, 484 U.S. at 26. Under §

18

United States District Court
Northern District of California

1   10(b), there is no "general duty between all participants in market transactions to forgo actions

2   based on material, nonpublic information," but there are specific duties that arise when the

3   wrongdoer traded based on information that he converted to his own use "in violation of some

4   fiduciary, contractual, *or similar obligation* to the owner or rightful possessor of that information."

5   *See Dirks v. S.E.C.*, 463 U.S. 646, 655 (1983) (quoting *Chiarella*, 445 U.S. at 233).

6       The SEC draws useful comparisons between this case and *S.E.C. v. Talbot.* 530 F.3d

7   1085, 1091 (9th Cir. 2008).  In *Talbot*, the Ninth Circuit held that a qualifying relationship of trust

8   and confidence arose from the defendant's position inside his company because that position

9   involved the company entrusting the defendant with confidential information.  *Id.*  The court did

10  not rely on a written confidentiality agreement or insider trading policy in determining that the

11  defendant breached a duty to his company when he traded on the basis of MNPI that he learned at

12  a board meeting.  It rooted the defendant's duty to his company in traditional principles of agency

13  law. *Id.* at 1094 (citing Restatement (Second) of Agency § 395).  The court determined that the

14  defendant had misappropriated his company's property (its confidential information) to which the

15  company had a right of exclusive use and that this constituted "fraud akin to embezzlement." *Id.* at

16  1094.  Similarly, Panuwat's duty arose from his employment with Medivation.  He was entrusted

17  with confidential information by Medivation.  He breached his duty when he traded on it for his

18  own personal benefit without disclosing that fact to Medivation.

19      Panuwat only briefly addresses this theory of breach, calling it a "red herring." Repl. 16:7-

20  10.  He repeats the same arguments—that the SEC has provided only circumstantial evidence that

21  he used confidential Medivation information for personal gain and that the SEC's other evidence

22  that the information was confidential is "weak."  The law makes no distinction between the weight

23  of circumstantial and direct evidence,, and as I explained earlier, there is a clear dispute on

24  Panuwat's use of confidential information for personal gain.  The jury will resolve disputes over

25  the strength of the evidence.

26      Panuwat also appears to argue that he did not have a "recognized fiduciary duty" to

27  Medivation, so there was no duty to breach.   His argument comes up short for two main reasons.

28  Rule 10b-5 does not require that a defendant in a misappropriation case learn the MNPI from the

1    company in whose securities he trades.  *See supra* I(A); *see also* MTD Order 7:4-7; 7:17-21.

2    Moreover, the crux of this theory of breach, rooted as it is in principles of agency law, is that no

3    explicit fiduciary duty is required to give rise to a duty of trust and confidence.

4         The SEC offered sufficient evidence that Panuwat was entrusted with Medivation's

5    confidential information and used it for his personal benefit.  A jury could find that Panuwat

6    breached his duty to maintain his employer's confidential information.

7    **III.    SCIENTER**

8         A trader is liable if he "knowingly misappropriated confidential, material, and nonpublic

9    information for securities trading purposes, in breach of a duty arising from a relationship of trust

10   and confidence owed to the source of the information."  Talbot, 530 F.3d at 1092.  To meet the

11   "knowingly" element of misappropriation, a defendant must have the requisite scienter.  The final

12   question for this motion is whether the SEC has shown that Panuwat acted with scienter when he

13   allegedly traded based on MNPI he learned during the course of his employment with Medivation.

14   While the Ninth Circuit is split on whether scienter requires that the defendant merely be "aware"

15   of the MNPI or if he must "use" the MNPI, the SEC has shown sufficient evidence to support a

16   jury finding on either standard.

17        Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud."

18   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976).  It may be established "by proving

19   either actual knowledge or recklessness." *Gebhart v. SEC*, 595 F.3d 1034, 1040 (9th Cir. 2010).  It

20   is a subjective inquiry that "turns on the defendant's actual state of mind." *Id*. at 1042.  In

21   evaluating whether a defendant had scienter, courts consider, among other things, the timing of the

22   sales and whether the sales were consistent with the insider's trading history.  *See No. 84 Emp.-*

23   *Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp*., 320 F.3d 920, 938 (9th Cir.

24   2003).  Courts within this circuit are split on whether scienter requires a defendant to use the

25   material nonpublic information in carrying out the trade, or whether she must simply be aware of

26   it.  *See, e.g. In re Countrywide Fin. Corp. Sec. Litig*., 588 F. Supp. 2d 1132, 1202-03 (C.D. Cal.

27   2008) ("Scienter . . . for insider trading requires that the insider actually use . . . the inside

28   information in deciding to make the trade."); *SEC v. Moshayedi*, No. CV-12-01179, 2013 WL

United States District Court
Northern District of California

20

12172131, at *13-14 (C.D. Cal. Sept. 23, 2013) ("[T]o show that [the defendant] traded 'on the basis of' nonpublic, material information, the SEC must demonstrate his awareness of possession of that information.").

As I have already explained, the SEC has shown enough to support a jury finding that Panuwat received and read the Hung Email.  *Supra* I(B)(2).  For that reason, Panuwat's initial, somewhat cursory argument that the SEC cannot demonstrate scienter because "there is no evidence that Mr. Panuwat was engaged in or was even aware of communications regarding Medivation's acquisition timing on August 18, 2016," fails.  *See* Mot. 31:6-12.

Panuwat advances other arguments that the SEC has failed to show that he could have "used" the supposed MNPI, but the SEC has shown disputes of material fact as to each. Fundamentally, when considering whether a defendant had scienter, among the relevant factors to consider is the timing of the sales, which sheds light on whether a defendant used MNPI.  Here, the SEC's strongest evidence—evidence that would allow a jury to find that Panuwat used the information he learned in the Hung Email to make the Incyte trades—is the proximity between Panuwat's receipt of the email and his initiation of the trades.  Seven minutes elapsed between those two events.  Oppo. Exs. A, K.  This raises a strong suspicion of scienter.  *See e.g. Am. W. Holding Corp.*, 320 F.3d at 939 (where the court found that the defendant's sales over a three month period when the company's officials were making optimistic statements regarding the company's financial outlook to suggest scienter).[12]

_____

[12] Panuwat further contends that facts suggesting mere access to MNPI are insufficient to allow a jury to find scienter, and for that reason, the SEC has failed to meet its burden.  Mot. 34:5. He is correct on the law, but his argument fails because the SEC has not merely shown that he had "access" to the information in question: it has provided affirmative evidence that he was aware of and used the alleged MNPI.  *See supra* I(A), (B).  The instant case differs from the out-of-circuit cases that Panuwat cites.  In *SEC vs. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, the government failed to plausibly allege at the pleading stage how the defendants could have obtained material nonpublic information, leading the district court to dismiss the case.  296 F.R.D. 241, 243 (S.D.N.Y 2013).  And in *SEC v. Rorech*, the SEC's only evidence that the defendant could have been aware of or could have used the alleged MNPI was that his fellow employees were allegedly in possession of such information.  720 F.Supp. 2d 367, 410 (S.D.N.Y. 2010).  In *Rorech*, the court noted that the investment bank where the defendant worked had "walls" in place to ensure that information did not flow from one employee to another, and SEC provided no evidence that those walls had failed.  *Id.*  Here, in contrast, the parties agree that an email containing the supposed MNPI was sent directly to Panuwat, and the SEC has shown evidence sufficient to support a jury finding that he read the email.  *Supra* I(B)(2).  The SEC has shown

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Also relevant is the defendant's trading history.  Here, the parties dispute whether

2   Panuwat's trading history supports or undercuts the scienter element of misappropriation.  He had

3   typically purchased common stock and mutual funds.  Oppo. Ex. 14 at 285-307.  Despite having a

4   robust trading portfolio, he had only purchased stock options like the Incyte call options on two

5   other occasions.  *Id.*  Other circuits have noted that out-of-the-money, short-term options like the

6   Incyte call options Panuwat purchased on August 18, 2016, are risky absent inside information.

7   Oppo. 20:8-13 (citing *SEC v. Clark*, 60 F.4th 807, 810 (4th Cir. 2023)).  A jury could find that

8   these facts, taken alongside the rest, suggest scienter.

9   Panuwat, in contrast, contends that his trading history prevents the SEC from proving that

10  he used MNPI to make the Incyte trades because his reasons for making the Incyte investment

11  were "driven by his consistent investing philosophy, work schedule, personal obligations,

12  available capital, and tax considerations," not by any MNPI he allegedly learned from Medivation.

13  Mot. 32:15-17; 33:18-22.  He explains that in early 2016, he had not been focused on trading, *see*

14  Panuwat SEC Tr. at 326:8-327:13, and he reengaged in the second quarter of 2016.  *See id.* at

15  326:8-328:2.  He argues that his Incyte trade "followed [a] pattern" he established in that second

16  quarter.  Mot. 32:25-26; *see id.* Ex. 14 (SEC Ex. 8).

17  He can make that argument to the jury.  The SEC has a counter explanation.  Panuwat's

18  pattern argument does not preclude summary judgment.  Indeed, Panuwat has provided

19  inconsistent testimony about why he traded in Incyte, first testifying that he did not recall why he

20  made the trades or any specific events around the time that he did that motivated the investment,

21  *see* Oppo. Ex. A at 173:11-174:5, and then later testifying very specifically that he had made the

22  trades because he "believed Incyte was undervalued at the time . . . had suffered very steep

23  declines over the previous year . . . and I believed that the stock price would increase . . . over the

24  next month or so . . . so I chose to make an investment in call options[.]"  *see id.* at 340:14-20,

25  344:11-345:11.  This tends to discredit him as a narrator of events surrounding the trade at issue.

26  Panuwat also argues that the SEC has failed to show how he could have used information

27

28  _____

more than that Panuwat had "access" to the allegedly material nonpublic information.

United States District Court
Northern District of California

1  in the Hung Email because Medivation's acquisition by Pfizer was not finalized when Panuwat

2  bought Incyte call options.  Mot. 31:14-18.  He points out that the final two rounds of bidding

3  happened after he traded on August 18, 2016.  *See* Ex. 5 at 24-26.  He also says that several bids

4  had been rejected by Medivation's board of directors that year so there was no guarantee that

5  Pfizer would win out even considering the information in the email.  He summarizes this argument

6  by quoting David Hung's statement, "[a] deal is only done when you've finally signed."  Mot. Ex.

7  8 (Hung Dep.) at 59:9-17.

8       That's an argument, but it is not dispositive. In *Basic Inc. v. Levinson*, while evaluating

9  materiality, the Supreme Court refused to exclude from the definition information concerning

10 merger discussions on the basis that the final agreement about price and structure had yet to be

11 reached.  485 U.S. 224, 231-32 (1988).  Similarly, that the deal with Pfizer was not yet official

12 would not prevent a jury from finding that Panuwat used the information contained in the Hung

13 Email to make the Incyte trade, just as it would not prevent a jury from finding that Panuwat knew

14 more about the Pfizer acquisition than the public did.

15      The SEC has shown affirmative evidence sufficient to support a jury finding that Panuwat

16 misappropriated MNPI.  There are disputes of material fact pertaining to each element of

17 misappropriation that preclude summary judgment.

18                              **CONCLUSION**

19      For the foregoing reasons, Panuwat's motion for summary judgment is DENIED.  The

20 parties are reminded to contact Judge Hixson to schedule a settlement conference.

21      **IT IS SO ORDERED.**

22  Dated: November 20, 2023

23

24                                          _____
                                            William H. Orrick
25                                          United States District Judge

26

27

28

23