UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>MATTHEW PANUWAT,<br><br>        Defendant. | Case No. 21-cv-06322-WHO<br><br>**PRETRIAL ORDER RULING ON MOTIONS IN LIMINE**<br><br>Re: Dkt. Nos. 98, 107 |

At the Pretrial Conference on February 26, 2024, I heard argument on the parties' motions in limine. My rulings follow.

I. **PANUWAT'S MOTIONS IN LIMINE**

    A. **Preclude Use of the Phrase "Insider Trading"**

Panuwat moves to preclude the SEC from using the phrase "insider trading" throughout its case. *See* Defendant's Motions in Limine ("Def. Mot.") [Dkt. No. 107] 1:22-3:24. DENIED.

Many courts have recognized misappropriation as a form of insider trading. While it is true that "[t]he misappropriation theory reaches trading by corporate outsiders, not insiders," *see S.E.C. v. Talbot*, 530 F.3d 1085, 1091 (9th Cir. 2008), and that the misappropriation theory "premises liability on a fiduciary-turned trader's deception of those who entrusted him with access to confidential information," *see Talbot*, 530 F.3d at 1091 (quoting *O'Hagan*, 521 U.S. at 652), that does not remove it from the umbrella of insider trading. District courts within the Ninth Circuit and the Ninth Circuit itself have recognized misappropriation liability as a kind of insider trading liability. *See e.g. U.S. v. Smith*, 155 F.3d 1051, 1063 n.19 (9th Cir. 1998) ("The Supreme Court recently recognized a second type of insider trading liability: the so-called 'misappropriation theory' of liability."); *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 878 (N.D. Cal. 2017) (summarizing

the "misappropriation theory of insider trading" and repeatedly using the phrase "insider trading" to describe the defendants' trades). Panuwat's argument that these cases, *Smith* and *Sabrdaran*, were simply "in error" is unconvincing. Def. Mot. 2:11-16.

The SEC's theory of the case is that Panuwat received confidential information through his role as an insider at Medivation, and then used that information to trade for his own personal benefit. The SEC portrays this as an insider trading case. It is entitled to think of it in that way. I will instruct the jury that the phrase "insider trading" is a term of art, and that it is not pejorative. Prejudice will not arise from using the phrase at trial.

### B. Preclude the SEC from Eliciting Any Facts About Panuwat's Trades in Tesaro and Relypsa

Panuwat moves to preclude the SEC from eliciting any facts about Panuwat's trades in two biopharmaceutical companies that were not Incyte other than the fact that those trades occurred. Def. Mot. 3:25-5:23. DENIED.

Panuwat intends to introduce his Tesaro and Relypsa trades to "rebut a claim that his trade in Incyte was unusual." Def. Mot. 4:7-8. He wishes to include evidence of the "number of options purchased and amount of his investments," and he wants to show that he traded securities other than Incyte in 2016 and in 2015, that he specifically traded other biopharma stocks, and had a gain from those securities. *Id.* 4:4-7; Pretrial Hearing Transcript [Dkt. No. 121] 57:3-13. If the evidence is cabined to the facts that these trades occurred in 2016, that they were in biopharma stocks, and that he had a gain from those trades and was less averse to risk as a result, the SEC has agreed not to cross-examine Panuwat further about the Tesaro and Relypsa trades. *Id*. at 57:1-58:17. But if Panuwat opens the door and seeks to establish how many options he bought, how much he spent, when he traded, and/or that he bought call options specifically, the SEC intends to use evidence of the two trades to show: "the propitious timing of Defendant's trades, their riskiness, his extraordinary gains, and his connections to inside information." SEC's Opposition to Def. Mot. ("Oppo. to Def. Mot.") [Dkt. No. 110] 3:13-20; *see* SEC MIL No. 3 ("The SEC moves to conditionally permit evidence and argument regarding the circumstances of Defendant's trades in the securities of Relypsa, Inc. . . . and Tesaro, Inc.").

2

1          Panuwat argues that to allow the SEC to discuss these trades for anything further than the
2   fact that they occurred would risk prejudicing the jury against him because the SEC could
3   "suggest that Mr. Panuwat's trades in Tesaro and Relypsa were suspicious." Def. Mot. 4:19-21.
4   At the pretrial hearing, Panuwat emphasized that the SEC investigated him for wrongdoing for
5   these trades but never charged him. *See* Pretrial Hearing Tr. 61:1-7. He argues that the SEC
6   wants to use the two trades to create a perception in the jury's mind that because he has made prior
7   "suspicious" trades, he is more likely to have violated securities laws by trading Incyte options.
8   And he says he received no discovery from the SEC on those trades.

9          It appears to me that Panuwat would like to use the Tesaro and Relypsa trades to justify or
10  explain his Incyte trade. The SEC agrees not to delve into those trades as long as the testimony
11  stays at a high level, as previously described. The SEC has stated that it does not intend to
12  "inject" Tesaro and Relypsa into the case, nor will it argue at trial that Panuwat "never purchased
13  call options before" August 2016, as Panuwat worries that it will. *See* Oppo. to Def. Mot. 3:24-
14  27; Def. Mot. 4:6-8. But if Panuwat wants to make the two trades a more central part of his
15  defense, I will not preclude the SEC from cross-examining him on them. Panuwat did not bring
16  any discovery dispute over these trades to my attention until the Pretrial Conference and I will not
17  address them now. If the SEC attempts to use an exhibit it refused to disclose during discovery, I
18  will address objections at trial.

19         **C.     Preclude Analyst and News Reports**

20         Panuwat moves to preclude the SEC from introducing news articles and analyst reports as
21  evidence. DENIED without prejudice to objection at trial.

22         The defendant is correct that newspaper articles and market analyst reports are hearsay and
23  inadmissible if offered to prove the truth of the matter asserted. But the SEC is correct that such
24  reports would also tend to show how a reasonable investor might have understood Medivation,
25  Incyte, Pfizer, and other similar biopharmaceutical companies to be related in the market.
26  Accordingly, the SEC may offer news or analyst reports to show the way that the market discussed
27  Medivation and Incyte relative to each other, or for the effect that news of Pfizer acquiring
28  Medivation had on the market, or if they fall within other hearsay exceptions or exclusions. It

3

1 may not offer them for their truth.

2     Additionally, it is unclear why any news reports after the date of the Incyte trade would be
3 relevant, but I will address this at trial if necessary.

    **D.**    **Preclude Video Footage of the SEC's Investigative Interviews**

    Panuwat moves to exclude use of the video of his May 15, 2020, testimony from evidence. DENIED. The SEC may also use excerpts from the video in its opening statement.

    The SEC has provided a declaration attesting that the SEC took Panuwat's sworn investigative testimony on May 15, 2020, and again on November 6, 2020, both times recorded on video. LaMarca Decl. [Dkt. No. 118]. It appears that the recording service never provided the November video to the SEC; the SEC has no record of it, and the service did not have a copy. *Id.* ¶ 6-8. Defense counsel did not request the video recording until December 15, 2023, nine months after the close of fact discovery. *Id.* There is a transcript of the November testimony.

    Panuwat cites to Rule 37(e)(1) for the rule that sanctions may be issued when a party "failed to take reasonable steps to preserve" electronic evidence. Sanctions are not appropriate here. The SEC's declaration shows that it acted reasonably. While Panuwat urges that his testimony in November 2020 was more knowledgeable than in May 2020, that is not a reason to preclude the use of the video of his first day of testimony. He has the November transcript to clarify any testimony and will testify as well. Federal Rule of Evidence 106, which counsel raised at the hearing, is inapplicable to this situation: the statements in May and November are available, and the video in May is intact. Rule 106 does not preclude its use merely because the video in November is missing.

    **E.**    **Exclude Dr. Becker's Testimony**

    Panuwat moves to exclude Dr. Becker's expert testimony about merger and acquisition dynamics in the biopharmaceutical industry. DENIED.

    Federal Rule of Evidence 702 governs expert testimony. It provides:
    A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    (b) the testimony is based on sufficient facts or data;

4

(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.
Fed. R. Evidence 702.

The district court judge must ensure that all admitted expert testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993). In performing its gatekeeper function under *Daubert*, the court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc*., 2013 WL 4779709 at * 7 (9th Cir. June 19, 2013).

Dr. Becker is qualified to opine on mergers and acquisitions. *See* Becker Report [Dkt. No. 107] ¶ 10 (listing Dr. Becker's qualifications as Deputy Director in charge of the Office of Litigation Economics in the Division of Economic and Risk Analysis at the SEC, and stating that Dr. Becker worked as a principal at the Economic Consulting group at Deloitte, and received her M.B.A. and Ph.D in Financial Economics from the University of Chicago Booth School of Business). Despite Dr. Becker's background, Panuwat contends that she is unqualified to opine about mergers and acquisitions in the biopharmaceutical industry because: (1) she "lacks" "specific industry knowledge"; (2) she relies on event studies on Incyte's stock prices that she conducted on three dates that Panuwat argues are "cherry-picked without any objective basis for their selection"; and (3) her opinions "rely on conclusory assertions regarding the purported effect of the Pfizer/Medivation merger on Incyte and other biopharma companies." *See* Def. Mot. 8:23-9:16. I will address each concern in turn.

### 1. Dr. Becker is qualified.

For Dr. Becker's first conclusion that "[e]conomists would expect new information about Medivation's merger to increase Incyte's stock price, as well as the prices of other companies in the industry," Panuwat argues that she lacks specific biopharmaceutical knowledge. *See* Def. Mot. 10-11. He raises this argument several times throughout his motion for various opinions that Dr. Becker provides. *Id.* 13:7-16; 23:17-23; 25:12-17. It may be grist for cross-examination, but it is not a reason to strike her opinion.

The cases Panuwat cites in support of his argument are not on point. For instance, in

5

*United States v. Santini*, a criminal appeal regarding a conviction for possession with intent to distribute, the Ninth Circuit held that a psychiatrist's testimony that he had reviewed the appellant's "rap sheet" was inadmissible under Rule 404(b) to show the defendant's "extensive law enforcement contacts" in large part because the testimony was not admitted into evidence or examined by the district court, and because the psychiatrist admitted that he "found the rap sheet hard to understand." 656 F.3d 1075, 1078 (9th Cir. 2011). Dr. Becker, in contrast, has a thorough understanding of market interactions and has researched the relevant industry and Panuwat's trade history. *See* Becker Report ¶¶ 11, 13-14. And she does not concede that she lacks understanding in the relevant matters.

In *White v. Ford Motor Co.*, another case Panuwat cites, an expert (a metallurgist) testified about what caused a Ford truck to tragically roll over child, killing the child and ultimately leading to a products liability case against Ford. 312 F.3d 998, 1008-09 (9th Cir. 2002). He opined on whether "spontaneous disengagement" of the parking brake caused the truck to roll down an incline: he opined that the wear and tear on the brake was consistent with disengagement. That was appropriate expert testimony, but he then went on to assume facts about how parties had acted around the accident and what had caused the truck to roll down the driveway, killing the child. The Ninth Circuit described the foundation for the rest of his opinion as "skimpy" because he based it on "simple logic,": it "established no more foundation than anyone trained in any kind of engineering, or even a lay person . . . would have to venture the opinion." *See id.*

Here, Dr. Becker makes a series of observations about how companies in the same industries interact with one another, and draws conclusions based on expert literature and studies. *See* Becker Report ¶¶ 15, 16-20; 15, n.2. She cites four separate articles in the *Journal of Financial Economics* to support her first premise, which, contrary to Panuwat's assertions, *see* Def. Mot. 12:7-13:16, is perfectly appropriate. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1233-34 (9th Cir. 2017) (reversing the district court's decision to exclude expert testimony, noting that the district court "improperly ignored the experts' experience [and] reliance on a variety of literature and studies," and that the district court "overemphasized" that the experts "did not develop their opinions based on independent research[]"). Dr. Becker relied on her

6

1    experience, expertise, and review of literature to conclude that "[e]conomists would expect new
2    information about Medivation's merger to increase Incyte's stock price." Hers is not a layman's
3    opinion; it will be helpful to the jury.

4        Panuwat protests that Dr. Becker has "zero experience" in the biopharma industry. Def.
5    Mot. 11:14. He argues that she also lacks "direct professional experience in mergers and
6    acquisitions." *Id.* 11:25. But she has significant experience in market and risk analysis. *See*
7    Becker Report ¶ 10. Her opinions about how the market would perceive Medivation and Incyte's
8    stock prices in relation to one another do not require the kind of intricate biopharmaceutical
9    knowledge that Panuwat claims that they do. Nor are they conclusory; their basis is well
10   established.[1] Panuwat's concerns go to the weight of Dr. Becker's opinions, not their
11   admissibility.

        **2.**        **The methodology Dr. Becker uses in her Expert Report is an issue for cross-examination, not exclusion.**

Panuwat seeks to exclude Dr. Becker's event study results and corresponding opinions provided in her Expert Report because he argues that her methodology was unreliable. He claims that she "cherry-picked" the dates for which she performed event studies, that her event studies' sample sizes were too small to be reliable, and that her opinions are conclusory or speculative. Def. Mot. 16:20-22:19. I disagree, largely because the caselaw that Panuwat cites is inapposite and because Dr. Becker has provided reasonable explanations for her methods.

        **a.**        **Cherry-picking**

Dr. Becker was asked to opine on the possible causal effects of Medivation's acquisition by Pfizer on Incyte's share price. Panuwat acknowledges that Dr. Becker explained her methodology. *See* Def. Mot. 18:1-11. He takes issue with that methodology and the adequacy of her reasoning, *see id.* 18:12-21.

---

[1] Despite Panuwat's insistence that Dr. Becker may not rely on news or analyst reports, which I address in more detail later, an expert may rely on hearsay (like those reports) "'[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *United States v. Holguin*, 51 F.4th 841, 856 (9th Cir. 2022) (quoting Fed. R. Evidence 703). Dr. Becker's conclusions are not ripe for exclusion merely because they rely in part on third-party information sources.

1          Panuwat cites exclusively "fraud-on-the-market" cases to support his argument that Dr.
2   Becker "cherry picked" dates for her event studies. *See* Def. Mot. 18-19 (citing *In re Countrywide*
3   *Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009); *Brown v. China Integrated Energy*
4   *Inc.*, 2014 WL 12576643, at *7-8 (C.D. Cal. Aug. 4, 2014); and *Bricklayers & Trowel Trades Int'l*
5   *Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014), all "fraud-on-the-
6   market" securities cases). Those cases require different proof than misappropriation cases.
7   Establishing a fraud-on-the-market theory of liability requires that the plaintiff show evidence of
8   market efficiency prior to the at-issue misrepresentation or omission by the defendant. In fraud-
9   on-the-market cases, experts *cannot* only consider a few dates where there were large price
10  reactions. They must consider longer periods of time to get an overall sense of market efficiency.
11  Oppo. to Def. Mot. 14; *see also In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 612, n.
12  80 (C.D. Cal. 2009) (noting that an efficient market is one that rapidly reflects new changes in
13  prices); *Brown*, 2014 WL 12576643, at *7-8 (where the court determined that one of the plaintiff's
14  experts had no protocol for selecting which events he included in his event studies, and instead
15  inappropriately considered the "market's reaction" to certain events to determine their materiality,
16  and that this was incongruent with the expert's task, which was to helpfully opine on whether the
17  market was overall efficient prior to alleged misrepresentations).

18          Here, Dr. Becker's purpose was to determine whether news that materially moved the
19  stock of a potential biopharma acquisition target had a spillover effect on Incyte's stock price;
20  evidence that it did would support the theory that material nonpublic information ("MNPI") about
21  Medivation's impending acquisition by Pfizer would be material to Incyte. As the SEC points out,
22  "the very nature of the analysis requires a significant market reaction affecting the target
23  company's stock." Oppo to Def. Mot. At 14:13-14. Unlike the expert in *Brown*, Dr. Becker had a
24  reason for picking the dates that she did; they were days where both Medivation and Incyte's stock
25  prices rose at the same time. She analyzed them to see whether the elevation was correlated.

26          Panuwat argues that there were days that Medivation merger news was published, and its
27  stock rose, that Dr. Becker did not include in her event studies. Def. Mot. 17:19-26. She only
28  draws conclusions regarding the dates she studied, not the dates Panuwat wishes she had studied.

8

1    She chose March 31, 2016 as one of the dates for her studies, as opposed to the other two days
2    Panuwat proposes where Medivation merger news was also published, because on March 31,
3    2016 there was a far greater stock price increase for Medivation and it experienced a statistically
4    significant rise in stock price.  The omission of the other two dates from Dr. Becker's event
5    studies is grist for cross-examination.  It is not a basis for exclusion.  Dr. Becker is qualified, she
6    had an articulable methodology for choosing the dates that she did, and Panuwat has cited no case
7    suggesting that the methodology she used was per se inappropriate for this kind of securities case.[2]
8    *Id.* 18:1-21; Becker Report ¶¶ 22, 23, 33.

### b. Sample size

Panuwat's second argument, that Dr. Becker's sample sizes for her event studies were too small, is also no reason to exclude her testimony.  The cases that the defendant cite once again involve courts excluding testimony because experts used too-small sample sizes for their event studies in the context of *fraud-on-the-market* claims.  *See, e.g. In re Vale S.A. Securities Litigation*, 2022 WL 122593, *6 (E.D.N.Y. Jan. 11, 2022) (considering whether the plaintiffs' expert in fraud-on-the-market class securities litigation showed market efficiency prior to the alleged misrepresentation); *see also Brown*, 2014 WL 12576643, at *7-8; and *Bricklayers & Trowel Trades Int'l Pension Fund*, 752 F.3d 82, 92.  Panuwat points to no case suggesting that the misappropriation theory of liability has a similar requirement.

### c. Reliance on news and analyst reports

Panuwat also objects that Dr. Becker's second and third conclusions about the relationship between Medivation and other companies in the industry are based on "conclusory and speculative" assertions and should be excluded.  *See* Def. Mot. 19-22.  He argues that Dr. Becker "summariz[es] third-party sources . . . without offering independent analysis," in violation of rules

---

[2] Panuwat cites *Bricklayers & Trowel Trades Int'l Pension Fund* for the rule that a plaintiff's expert may not "cherry pick" dates where the dates in question bear no relationship to the allegations in the complaint, and where there is a "complete disconnect between the event study and the complaint." 752 F.3d 82, 91.  *Bricklayers* is also a fraud-on-the-market case.  And it is further distinguishable because Dr. Becker's chosen event studies were clearly related to the allegations in the complaint.

9

against hearsay.[3] He cites *United States v. Velasquez* for the rule that an expert may not "simply transmit . . . hearsay to the jury." 2011 WL 5573243 (N.D. Cal. Nov. 14, 2011), aff'd, 745 F. App'x 283 (9th Cir. 2018).

While Panuwat is correct that experts cannot be used as vehicles for hearsay, that is not the purpose for which Dr. Becker intends to use the relevant news and analyst reports. She has stated that:

> When conducting event studies, it is important to check for potentially confounding news. Confounding news, in this case, would be other information that was released regarding Incyte that was unrelated to Medivation's merger announcement on August 22, 2016. To check for confounding news, I reviewed analyst reports and news reports regarding Incyte published around August 22, 2016.

Becker Report ¶ 25

Experts may rely on hearsay where an expert in the field would reasonably rely upon such information to form an opinion. *See* Fed. R. Evidence Rule 403; *see also S.E.C. v. Moshayedi*, 2013 WL 12129282, *2 (C.D. Cal. Nov. 20, 2013) ("The Rule 702(b) 'facts or data' upon which the expert opinion must be based may come from the expert's personal observation, or the expert may simply be 'made aware of' those facts or data. The 'facts or data' need not be independently admissible if those facts or data are of the type(s) experts in the field would reasonably rely upon.") (internal quotations and citations omitted).

Dr. Becker cites to news and analyst reports to screen for confounding news and confirm her opinions about what caused Incyte's stock price increase on August 22, 2016; this is perfectly acceptable. *See* Becker Report ¶ 31; *Moshayedi*, 2013 WL 12129282, at *2. Panuwat may contest these opinions at trial.

### 3. Dr. Becker's Rebuttal Report is appropriate.

Panuwat argues that much of Dr. Becker's testimony in her Rebuttal Report, Dkt. No. 107, Ex. 2, should be excluded because she "improperly offers several opinions that require specialized knowledge of the biopharma industry." Def. Mot. 23-24. This argument fails for the same reasons

---

[3] As for Panuwat's argument that Dr. Becker's "Conclusion #6" should be excluded because her description of an "85% positive return over a year" change in Incyte's stock price as being "large" is speculative, *see* Def. Mot. 18, I am not convinced. Dr. Becker is more than qualified to provide the jury with her expert opinion on what constitutes a "large" positive stock price return. Panuwat may provide an alternative perspective at trial.

discussed in the preceding sections. Dr. Becker is welcome to rebut Mr. McCarty's expert testimony, as she has done, as he is welcome to contest hers. *See* Def. Mot. 20-21, 24.

Panuwat also contends that Dr. Becker's statistical regressions are affirmative opinions, not rebuttals to Mr. McCarty. I disagree. Dr. Becker's regressions operate to rebut Mr. McCarty's opinion that "Medivation and Incyte's stock prices did not respond similarly to new information." *See* Def. Mot. 24:18-19, 24:25-28 (internal quotation omitted); Oppo. to Def. Mot. 20. This is appropriate. Panuwat is of course welcome to cross-examine Dr. Becker about the bases for her opinions. The jury will determine what weight her opinions should be given.

Panuwat's other issues with the Rebuttal Report are unpersuasive. Dr. Becker does not seek to testify as to Panuwat's state of mind, and if she does, I will instruct the jury to ignore such testimony.

## II. SEC'S MOTIONS IN LIMINE

### A. Preclude Mr. Pines' Expert Testimony

The SEC moves to strike Lawrence Pines' rebuttal report and preclude him from testifying at trial. It argues that his opinions do not constitute a proper rebuttal. SEC's Motions in Limine ("SEC Mot.") [Dkt. No. 98] 1:1-16. DENIED.

The SEC argues that Panuwat failed to timely disclose that Mr. Pines would provide affirmative opinions, but merely designated him as a rebuttal expert to Dr. Becker. *See* Bussey Decl. Ex. B (Pines Report). It claims that Mr. Pines' testimony does not rebut Dr. Becker but actually "consists entirely of affirmative opinions" and that this prejudicially prevented the SEC from rebutting *him*.

While some of Mr. Pines' opinions are not direct contradictions of Dr. Becker's opinions, they may defuse their impact. *See Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.,* 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018) (holding that an expert report did not "directly 'contradict' [another expert's] opinions, but it [did] provide important context intended to 'defuse the impact' of a critical inference drawn from [the other expert's] report") (internal citations omitted).[4] This is

---

[4] This is a standard that has been employed by several courts in the Northern District—it appears to have originated from a Seventh Circuit decision in 2008, which held that "the proper function of

11

1  proper rebuttal. But to the extent that Mr. Pines has raised "new" theories or opinions that require
2  a response, the SEC may do so with a report by March 11, if necessary.

### B. Preclude Testimony About the Meaning of Medivation's Policies

The SEC moves to preclude testimony concerning the meaning of Medivation's Insider Trading and Confidentiality Policies or any non-party witness' understanding of them. SEC Mot. 6:24-7:2. DENIED in part, GRANTED in part.

The jury will be asked to decide whether Panuwat breached a duty to Medivation, either by violating the terms of express agreements he signed with the company or by violating his general duty as an employee entrusted with confidential information to disclose or abstain from trading. Understanding the meaning of Medivation's internal policies and practices vis-à-vis the kind of trade Panuwat made is critical to the jury's ability to decide whether he breached his duty.

To this end, Panuwat may testify to what he understood the policies to mean as of the date of the Incyte trade and why (including any lack of training, lack of knowledge of his conduct as misappropriation, conversations with executives, or similar testimony). Medivation employees Hung, Piscitelli and Guernsey may testify about: (1) non-hearsay conversations with Panuwat about issues related to the policies/trading with Incyte or similar companies; (2) trainings regarding the policies; and (3) enforcement of the policies. They may describe their perception of the culture of the office as it may relate to the Incyte trade. They may not claim that that there was a policy, practice, or understanding without a sufficient foundation having been laid. They may not speak to the legal meaning of the policies. They may not speculate.[5]

### C. Include Evidence of Tesaro and Relypsa Trades

The SEC moves to conditionally permit evidence and argument regarding the circumstances of Panuwat's trades in the securities of Relypsa, Inc. ("Relypsa") and Tesaro Inc ("Tesaro"). SEC Mot. 11:1-16. *See* discussion of defendant's MIL #2.

---

rebuttal evidence is to contradict, impeach, or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir. 2008).

[5] Although I do not exclude Guernsey, Medivation's lead outside counsel, Panuwat should proceed with caution. Guernsey apparently never spoke with Panuwat about the policies. He should not testify about his understandings of the policies beyond the parameters laid out above.

**D.     Preclude Evidence and Argument Regarding Panuwat's "Extremely Severe Special Needs" Child.**

The SEC moves to preclude testimony that Panuwat was supporting a child with severe special needs when he purchased Incyte call options in August 2016.  SEC Mot. 14:1-6.  DENIED but proceed with caution.

To the extent that Panuwat's child's challenges are relevant to his conduct in this matter, he may testify to those facts.  But he should not use his child's condition to attempt to evoke sympathy from the jury, either in testimony or argument.  Reference to the child should be fact-based and brief.

**E.     Preclude Evidence and Argument Regarding Adverse Consequences of Liability Verdict**

The SEC moves to preclude testimony or argument about any adverse consequence that Panuwat may suffer if found liable.  SEC Mot. 15:1-6.  GRANTED in part.

Panuwat wants to testify that he is an experienced "hobbyist trader," that he has a background in finance and is well-versed on the consequences of liability for securities violations.  Oppo. to SEC Mot. 18:10-14.  He also plans to tell the jury about his career aspirations as of the date of the trade.  *Id.* 18:14-15.  Panuwat argues that his preexisting knowledge of the penalties surrounding insider trading tends to show that he had no intent to deceive Medivation when he traded Incyte options.  This testimony is admissible unless it veers into testimony about the consequences he may face in this case, in which case it will be struck.

I will instruct the jury that: "The remedies provided by law for a claim brought by the SEC are for the court to decide.  You may not consider remedies in deciding whether the SEC has proved its case against Mr. Panuwat by a preponderance of the evidence."  *See* Dkt. No. 103 at 59.

**F.     Preclude Evidence and Argument that SEC's Case is Unique or Novel**

The SEC moves to preclude witnesses and counsel from describing the SEC's theory of insider trading as "unique," "novel," "unprecedented," or "unusual" and also from characterizing the enforcement action that the SEC is bringing here as "unanticipated," "unexpected," or brought without fair notice.  SEC Mot. 16:9-15.  GRANTED in part, DENIED in part.

Panuwat may testify that he was unaware of similar cases; this goes to scienter and the

13

1  deception element of misappropriation. But I have already determined that this case may go to

2  trial, and the defense should not suggest that the misappropriation theory on which the case is

3  based is improper. Panuwat's expert witness Michiel McCarty may corroborate that insider

4  trading cases typically involve trading stock of the company whose MNPI was learned by the

5  defendant, as that is an accurate reflection of the existing caselaw. However, no one can

6  characterize the case as "highly unusual," "unique," "novel," "unanticipated," "unexpected," or

7  brought without fair notice, as the prejudicial risk of such rhetoric outweighs its probative value.

8  Again, I advise the parties proceed with caution and raise concerns with me during trial if this

9  becomes an issue.

### G. Preclude Argument that the SEC Should Have "Forensically Examined" Pre-Trading Email That Panuwat Received

The SEC moves to preclude defense counsel from arguing at trial that, because the SEC did not "forensically examine" the email that Medivation's CEO sent to Panuwat before he traded, the jury can or should infer that he never read that message. SEC Mot. 17:21-27. **GRANTED**.

Panuwat made his trade within 7 minutes of the time the email with the confidential information was sent. If he wants to argue that he never saw the email, he may do so, of course. But he may not argue that it was the SEC's burden to do a forensic examination of the computer. Circumstantial evidence is equivalent in weight to direct evidence, and the circumstantial evidence here is strong. Panuwat did not hire an expert on this topic, which was never a focus of discovery. It is a red herring, and its prejudicial effect would outweigh any possible probative value to the jury.

### H. Preclude Defendant from Presenting Deposition Testimony of Witnesses Without Notice and Demonstration of Unavailability

I will address this if it comes up at trial.

**IT IS SO ORDERED.**

Dated: March 8, 2024

William H. Orrick
United States District Judge