MONIQUE C. WINKLER (Cal. Bar No. 213031)
JASON H. LEE (Cal. Bar No. 253140)
BERNARD B. SMYTH (Cal. Bar No. 217741)
  smythb@sec.gov
JASON M. BUSSEY (Cal. Bar No. 227185)
  busseyja@sec.gov
MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
  meyerhoferm@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MATTHEW PANUWAT,<br><br>　　　　　Defendant. | Case No. 21-cv-06322-WHO<br><br>**SECURITIES AND EXCHANGE COMMISSION'S MOTION TO IMPOSE REMEDIES AND ENTER FINAL JUDGMENT**<br><br>Date:　　August 7, 2024<br><br>Time:　　2:00 p.m.<br><br>Hon. William H. Orrick |

**TABLE OF CONTENTS**

I.    NOTICE OF MOTION ............................................................................................... 1

II.   INTRODUCTION ..................................................................................................... 1

III.  STATEMENT OF FACTS ........................................................................................ 2

      A.   Panuwat Owed Medivation A Duty of Trust And Confidence
           That He Knew Precluded Him From Using Medivation's
           Information For Personal Profit.................................................................... 2

      B.   Panuwat Learned Nonpublic Information About Medivation's
           Acquisition................................................................................................... 3

      C.   Panuwat Knew That Medivation's Acquisition Was Material
           To Incyte .................................................................................................... .5

      D.   Panuwat Secretly Used His Knowledge Of Medivation's
           Acquisition To Buy Incyte Call Options .................................................... 6

      E.   Pauwat Repeatedly Testified Untruthfully .................................................. 7

IV.   ARGUMENT ......................................................................................................... 10

      A.   The Court Should Permanently Bar Panuwat From Acting As
           An Officer Or Director Of A Public Company ......................................... 10

           1.   Egregiousness ................................................................................. 10

           2.   Role Or Position During The Fraud................................................ 11

           3.   Degree of Scienter ......................................................................... 12

           4.   Economic Stake .............................................................................. 13

           5.   Likelihood That Misconduct Will Recur........................................ 13

      B.   The Court Should Impose A Civil Monetary Penalty Of
           $321,197.40 ............................................................................................... 16

      C.   The Court Should Permanently Enjoin Panuwat From
           Violating Section 10(b) and Rule 10b-5 of the Exchange Act .................. 18

V.    CONCLUSION...................................................................................................... 20

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Carpenter v. United States*, 484 U.S. 19 (1987) .......................................................................... 12

*SEC v. Apuzzo*, 184 F. Supp. 3d 1 (D. Conn. 2016)...................................................................... 15

*SEC v. Bankosky*, No. 12 Civ. 1012 (HB), 2012 WL 1849000
   (S.D.N.Y. May 21, 2012)......................................................................................... 12, 13, 15

*SEC v. Bankosky*, 716 F.3d 45 (2d Cir. 2013)............................................................................. 12

*SEC v. Chan*, 465 F. Supp. 3d 18 (D. Mass. 2020)...................................................................... 19

*SEC v. Chan*, No. 20-1985, 2022 WL 1315624 (1st Cir. Jan. 26, 2022).................................... 19

*SEC v. Chapman*, 826 F. Supp. 2d 847 (D. Md. 2011) ............................................................... 11

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996)........................................................................... 18, 20

*SEC v. First Pac. Bancorp*, 142 F.3d 1186 (9th Cir. 1998) ................................................. 10, 14

*SEC v. Gowrish*, No. C 09-5883 SI, 2011 WL 2790482 (N.D. Cal. July 14, 2011)............. 16, 19

*SEC v. Gunn*, No. 3:08-CV-1013-G, 2010 WL 3359465 (N.D. Tex. Aug. 25, 2010).......... 10, 11

*SEC v. Melvin*, No. 1:12-cv-2984-CAP, 2017 WL 11696403 (N.D. Ga. June 22, 2017)........... 18

*SEC v. Morano*, No. 3:18-cv-00386-HZ, 2019 WL 1440262 (D. Or. Apr. 1, 2019)............ 16, 17

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ............................................................................ 18

*SEC v. Murphy*, 50 F.4th 832 (9th Cir. 2022) ............................................................................ 19

*SEC v. Palmisano*, 135 F.3d 860 (2d Cir. 1998)........................................................................ 16

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ............................................................................ 10, 15

*SEC v. Rajaratnam*, 918 F.3d 36 (2d Cir. 2019)........................................................................ 16

*SEC v. Sabrdaran*, 252 F. Supp. 3d 866 (N.D. Cal. 2017) .............................................. 12, 14, 15

*SEC v. Suman*, 684 F. Supp. 2d 378 (S.D.N.Y. 2010)................................................................ 19

*SEC v. Williky*, 942 F.3d 389 (7th Cir. 2019) ............................................................................ 16

STATUTES

Exchange Act Section 10(b), 15 U.S.C. § 78u(d)(1) ................................................................ 18

Exchange Act Section 10(b), 15 U.S.C. § 78u(d)(2) ................................................................ 10

Exchange Act Section 10(b), 15 U.S.C. §§ 78u-1(a)(1) ........................................................... 16

Exchange Act Section 10(b), 15 U.S.C. §§ 78u-1(a)(2) ........................................................... 16

Exchange Act Section 10(b), 15 U.S.C. § 78u-1(e) ................................................................. 16

Exchange Act Section 12, 15 U.S.C. § 78*l* ........................................................................... 20

Exchange Act Section 15(d), 15 U.S.C. § 78o(d) .................................................................... 20

## I.   NOTICE OF MOTION

Plaintiff Securities and Exchange Commission ("SEC") respectfully moves this Court to enter a final judgment that permanently and unconditionally bars Defendant Matthew Panuwat ("Panuwat") from serving as an officer or director of a public company, orders Panuwat to pay a civil penalty of $321,197.40, and permanently enjoins Panuwat from violating Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"). The Court has scheduled argument on this motion for August 7, 2024 at 2:00 p.m.

## II.   INTRODUCTION

On April 5, 2024, a jury unanimously found that Panuwat defrauded his employer, Medivation, Inc. ("Medivation"), and committed insider trading by using his knowledge of Medivation's impending merger announcement to make leveraged, short-term, highly profitable trades in Incyte Corporation ("Incyte") call options. This was egregious misconduct, especially for someone in Panuwat's position. Panuwat was part of the inner circle of Medivation's senior leadership. Medivation entrusted Panuwat with its most sensitive business secrets, and Panuwat knew that he was forbidden from using this information to enrich himself in the stock market. But he did exactly that. At the very conclusion of Medivation's acquisition process, amid his deep involvement in helping his employer conclude the most important transaction in its corporate life, Panuwat used about half his base salary, $117,380.20, to bet that Medivation's merger announcement would boost Incyte's stock price. Panuwat's Incyte trade—comprised of short-term, out-of-the-money call options—was designed to maximize the value that could be extracted from the nonpublic information that he possessed, and it netted him about $120,000 in illicit profits.

Panuwat made his trades in secret. He did not tell anyone at Medivation about his Incyte trades, either before or after he made them. And later, when the SEC investigated Panuwat's trades, he doubled down on his deception by giving false testimony designed to evade responsibility for his misconduct. He falsely denied that his Incyte trades were based on Medivation's nonpublic information. He concocted a false alternative explanation for why he had bought Incyte call options. And he made other statements that falsely minimized his awareness of,

1  and participation in, Medivation's acquisition process. In short, Panuwat repeatedly showed a

2  willingness to resort to illegal and deceptive conduct when he thought it would suit his own ends.

3  　　　　To date, Panuwat has not faced any serious consequences for his misconduct. He has had

4  free use of his $120,000 in illicit gains for the last eight years. He continues to work as a senior

5  executive at a publicly-traded pharmaceutical company. And because of that work, he presumably

6  continues to enjoy access to material, nonpublic information. In other words, Panuwat retains the

7  means and the opportunity to engage in insider trading, and he is not currently subject to any order

8  that would prevent him from doing so.

9  　　　　The SEC accordingly requests that the Court impose strong remedies on Panuwat to deter

10  Panuwat and other executives from engaging in similar misconduct in the future. The SEC

11  respectfully requests that the Court permanently bar Panuwat from serving as an officer or director

12  of a public company, order Panuwat to pay a civil monetary penalty of $321,197.40, and

13  permanently enjoin Panuwat from violating Section 10(b) and Rule 10b-5 of the Exchange Act.

14  **III.    STATEMENT OF FACTS**

15  　　　　**A.    Panuwat Owed Medivation A Duty of Trust And Confidence That He**
16  　　　　　　　　**Knew Precluded Him From Using Medivation's Information For**
    　　　　　　　　**Personal Profit**

17  　　　　In 2016, Panuwat was Medivation's Head of Business Development, and he reported

18  directly to the company's Chief Financial Officer ("CFO") and Chief Executive Officer ("CEO").

19  Smyth Decl. Ex. A (Trial Tr. 1124:3-6 (Testimony of Matthew Panuwat))[1]; Ex. B (TX 1320). His

20  main responsibilities were to look for business opportunities and collaborations that Medivation

21  could pursue with other companies. Ex. A (Trial Tr. 928:4-9 (Panuwat)); *id.* (Trial Tr. 377:4-9

22  (Testimony of Jennifer Jarrett)). Panuwat's role gave him access to Medivation's most sensitive

23  information, whose confidentiality he knew he was required to maintain. *Id.* (Trial Tr. 923:7-10,

24  1128:20-23 (Panuwat)). He also knew he was not permitted to exploit Medivation's confidential

25  information for his own benefit. *Id.* (Trial Tr. 1128:24-1129:2 (Panuwat)). Panuwat specifically

26  _____

27  [1] Lettered exhibits are attached to the Declaration Of Bernard B. Smyth In Support Of Securities And
    Exchange Commission's Motion To Impose Remedies and Enter Final Judgment, submitted

28  concurrently with this motion.

understood that he was not allowed to use such information to trade securities. *Id.* (Trial Tr. 1166:16-19 (Panuwat)).

Panuwat signed two policies in which he promised not to use Medivation's confidential information for personal gain. In Medivation's Confidential Information and Invention Assignment Agreement, Panuwat agreed "not to use, except for the benefit of the Company . . . any trade secrets, confidential knowledge, data or other proprietary information relating to . . . business plans, financial information or other subject matter pertaining to any business of the Company." Ex. C (TX 1371) at 1. Panuwat certified that he read and understood this agreement. *Id.* at 4, 5. Panuwat also signed Medivation's Policy Regarding Securities Trading, which declared: "Because of your access to [inside information], you may be in a position to profit financially by buying or selling or in some other way dealing in the Company's securities . . . or the securities of another publicly-traded company." Ex. D (TX 1372) at 1. The securities trading policy continued: "For anyone to use such information to gain personal benefit . . . is illegal." *Id.* Panuwat certified that he read, understood, and agreed to abide by Medivation's securities trading policy as well. *Id.*

## B.   Panuwat Learned Nonpublic Information About Medivation's Acquisition

On April 15, 2016, the large drug company Sanofi made an unsolicited proposal to buy Medivation. Ex. E (TX 1213) at 19. Medivation rejected Sanofi's proposal, but in June, Medivation began actively seeking other companies that might be interested in acquiring it. *Id.* at 20, 22. That process ultimately resulted in a competitive auction between five large drug companies: Sanofi, Pfizer, Merck, Gilead, and Celgene (typically referred to at Medivation by their code names: Seurat, Picasso, Matisse, Gaugin, and Cezanne). Ex. A (Trial Tr. 261:20-262:16 (Testimony of Edmund Baxter)). On August 8, all five of these companies submitted competing written proposals to buy Medivation. Ex. E (TX 1213) at 24.

Panuwat was part of a core team of six senior Medivation executives who worked on this auction process, and he remained actively involved right up until he traded on August 18. Ex. A (Trial Tr. 255:15-256:16 (Baxter)); *id.* (Trial Tr. 378:23-380:7, 478:18-480:4 (Jarrett)); *id.* (Trial Tr.

1   1096:10-22 (Panuwat)). He attended daily meetings with the other core team members where they

2   discussed what was happening in the sale process. *Id.* (Trial Tr. 378:23-380:7 (Jarrett)). And Panuwat

3   was deeply involved in the due diligence aspect of the auction process: attending meetings,

4   conferring with colleagues, and helping collect and load materials into the diligence data room. *Id.*

5   (Trial Tr. 1103:10-24 (Panuwat)); *id.* (Trial Tr. 382:1-11 (Jarrett)).

6        As a result of his involvement, Panuwat was aware of the confidential bids that the five

7   prospective buyers submitted; he knew that those bids were higher than Medivation's then-current

8   stock price; that most of the bids were within a few dollars of one another on a per-share basis; and

9   that the two lowest bidders had pleaded to be let back into the bidding process after being told they

10  would be dropped. *Id.* (Trial Tr. 1112:2-1114:5, 1127:24-1128:19 (Panuwat)); Ex. CC (TX 1294).

11  These developments—which appeared uniquely promising to Medivation's lead banker—were not

12  only confidential; they made it highly likely Medivation would be sold for a large premium. Ex. A

13  (Trial Tr. 249:21-250:23, 255:10-14, 258:13-20 (Baxter)); *id.* (Trial Tr. 450:2-20 (Jarrett)). Panuwat

14  was also aware of a very specific and confidential timeline for concluding the auction process. *Id.*

15  (Trial Tr. 263:13-265:5, 277:18-24, 291:21-292:6 (Baxter)). Specifically, Panuwat knew that, after

16  receiving the bidders' initial proposals on August 8, Medivation had asked each of the five

17  prospective buyers to submit a definitive acquisition proposal on Friday, August 19 and that

18  Medivation was aiming to announce an acquisition publicly on Monday, August 22. *Id.* (Trial Tr.

19  1102:11-17, 1130:14-22 (Panuwat)); *id.* (Trial Tr. 471:9-472:24 (Jarrett)); Ex. F (TX 1301); Ex. G

20  (TX 1209). The vast majority of Medivation's roughly 900 employees were not privy to any of this

21  sensitive, nonpublic information, as the company went to great lengths—including using the

22  codenames for the bidders, holding meetings behind closed doors, and limiting email distributions—

23  to maintain secrecy. Ex. A (Trial Tr. 382:12-24 (Jarrett)); *id.* (Trial Tr. 262:14-22 (Baxter)); Ex. H

24  (Panuwat Deposition Tr. 59:6-22).

25        At 12:19 PM on Thursday, August 18, 2016, Panuwat received an email from Medivation's

26  CEO, David Hung, indicating that Medivation and Pfizer were on track to sign a deal that weekend.

27  Ex. I (TX 1338). The email specifically referred to Medivation and Pfizer "signing" an agreement

28  "this weekend." Ex. J (TX 1333); Ex. I (TX 1338); Ex. A (Trial Tr. 288:6-12 (Baxter)); *id.* (Trial Tr.

462:11-463:9 (Jarrett)). The email also indicated that Pfizer would propose only "minimal[]" changes to the draft acquisition agreement that Medivation had provided, signifying that its due diligence was nearly complete. Ex. J (TX 1333); Ex. A (Trial Tr. 464:5-19 (Jarrett)). Dr. Hung's email marked an important development; Medivation's investment banker Edmund Baxter and the company's CFO, Jennifer Jarrett, both interpreted it as indicating Medivation would likely sign an acquisition deal very soon. *Id.* (Trial Tr. 290:17-25 (Baxter)); *id.* (Trial Tr. 466:3-10 (Jarrett)). This email, like the bid details and the deal timeline, was confidential. *Id.* (Trial Tr. 490:3-15 (Jarrett)).

### C.     Panuwat Knew That Medivation's Acquisition Was Material To Incyte

As Medivation's Head of Business Development, Panuwat researched other oncology companies, including Incyte, and tracked their stock prices. *Id.* (Trial Tr. 1152:21-1153:16 (Panuwat)). He was aware that Medivation's investment bankers considered Incyte to be one of Medivation's "peer" companies and viewed Medivation and Incyte as "scarce assets" belonging to a small group of mid-sized, commercial, oncology-focused companies. Ex. K (TX 1266) at 18; Ex. A (Trial Tr. 301:16-21 (Baxter)); Ex. L (TX 1277) at 32. Panuwat was also familiar with media coverage observing that acquisition interest in Medivation was a positive factor for Incyte's prospects. Ex. M (TX 1216) at 1-2; Ex. N (TX 1220) at 4. And Panuwat was aware that Incyte's stock price had reacted positively to a mid-cap oncology drug company acquisition a year earlier, when AbbVie acquired Pharmacyclics. Ex. O (TX 1260) at 26; Ex. A (Trial Tr. 424:18-20, 432:15-433:10 (Jarrett)); *id.* (Trial Tr. 593:14-595:10 (Testimony of Dr. Chyhe Becker)); *id.* (Trial Tr. 1153:17-25 (Panuwat)).

Sophisticated traders know that it is normal for public company acquisition announcements to boost the stock prices of other similar companies. When one company in an industry announces that it is being acquired, the stock prices of other companies in the same industry typically increase. *Id.* (Trial Tr. 558:3-11 (Becker)). The more closely related a company is to the company being acquired, the bigger this "spillover effect" tends to be. *Id.* (Trial Tr. 559:6-13 (Becker)). Consequently, sophisticated market observers, like Panuwat, would have expected Incyte's stock price to increase when Medivation announced it was being acquired. *Id.* (Trial Tr. 595:11-21 (Becker)).

### D.   Panuwat Secretly Used His Knowledge Of Medivation's Acquisition to Buy Incyte Call Options

As noted above, on August 18, 2016, at 12:19 PM, Panuwat received an email from Medivation's CEO reporting that Medivation and Pfizer were on track to sign an acquisition agreement that weekend. Ex. I (TX 1338). Seven minutes later, Panuwat started buying Incyte call options. Ex. P (TX 1386). In the space of 33 minutes, he spent $117,380.20 on Incyte call options, all expiring on September 16, 2016, less than a month later. *Id.* The options had strike prices of $80.00, $82.50, and $85.00 (*id.*), which were higher than Incyte's August 18 closing stock price of $76.16. Ex. Q (TX 2968). These options were substantially riskier investments than Incyte common stock; they gave Panuwat the potential to earn a higher return, but they also presented a risk that Panuwat could have lost his entire investment. Ex. A (Trial Tr. 546:11-14, 548:20-23 (Becker)); Ex. R (TX 1700) at 2.

These options trades were unusual for Panuwat. Panuwat purchased options far less often than he purchased equities. Ex. S (TX 1418) at 1. Additionally, the $117,380.20 that Panuwat spent on Incyte options was more than four times larger than any of his previous options purchases. *Id.* at 3. In fact, Panuwat's Incyte purchase was larger than *any* of his previous securities purchases to date. *Id.* at 2; Ex. A (Trial Tr. 1044:13-19 (Panuwat)). And Panuwat had never previously purchased any Incyte securities. *Id.* (Trial Tr. 1170:4-12 (Panuwat)). As the jury rightly concluded, the circumstances of Panuwat's Incyte trades—their close temporal proximity to Dr. Hung's email, their size and riskiness, and their unusualness as compared to Panuwat's prior trading history—show that Panuwat traded because of his knowledge of Medivation's impending acquisition announcement.

Panuwat did not tell anyone about—or seek approval for—his Incyte trades, either before he made them or in the days, weeks, or months afterwards. He did not tell his boss, Jennifer Jarrett. *Id.* (Trial Tr. 489:11-24 (Jarrett)). He did not tell his investment banker friend, Edmund Baxter. *Id.* (Trial Tr. 296:11-25 (Baxter)). He did not even tell his work friend Dominic Piscitelli, with whom he had discussed investment opportunities on prior occasions, and whose email, Panuwat claimed, first gave him the idea to trade Incyte call options. *Id.* (Trial Tr. 949:2-950:4, 1035:4-14, 1159:3-14 (Panuwat)); *id.* (Trial Tr. 824:19-21, 825:16-18 (Testimony of Dominic Piscitelli)); Ex. T (TX 2601). Panuwat

maintained his silence even though the Incyte trades were remarkably successful, netting him $120,031.32—a more than 100% return—in just a few weeks. Ex. P (TX 1386).

### E.       Panuwat Repeatedly Testified Untruthfully

Panuwat has testified under oath about his Incyte trades four times: twice during the SEC investigation that preceded this lawsuit, once at his deposition in this case, and then finally when he took the stand at trial. During each of those four appearances, Panuwat was untruthful about why he traded Incyte. He consistently denied trading based on his knowledge of Medivation's impending acquisition announcement and constructed a false alternative explanation that grew more and more detailed over time.

During his May 2020 testimony to SEC investigators, Panuwat denied that the Medivation acquisition was a factor in his Incyte trades. When asked, "Did you buy your Incyte call options on August 18, 2016, because you believed Incyte's stock price would increase and thereby your options prices would increase on the news of Medivation acquisition?" Panuwat gave a firm, unambiguous denial: "No." Ex. U (May 2020 Testimony Tr. 214:9-14). But, tellingly, Panuwat was unable to give an alternative explanation for his trade. He claimed, vaguely, that his reason for investing in Incyte was a "valuation idea," and when the SEC investigator asked him what that meant, his response was equally vague: "[T]he stock generally seems lower than it should be." *Id.* (May 2020 Testimony Tr. 184:7-23).

Panuwat did not provide any actual explanation for his trades until his second round of SEC testimony, six months later, in November 2020. At that appearance, Panuwat claimed he bought Incyte call options because he had observed Incyte's stock price decline ten days in a row despite the company having issued what Panuwat viewed as positive quarter-end financial results. Ex. A (Trial Tr. 979:10-19 (reading of transcript of Panuwat's November 2020 SEC testimony)). He gave a substantially similar explanation at his March 2023 deposition. Ex. H (Panuwat Deposition Tr. 130:1-25).

At trial, Panuwat added more details to his story. He testified, for the first time, that his trades were partially motivated by a tax strategy. Ex. A (Trial Tr. 1034:12-1035:3 (Panuwat)). He also asserted, for the first time, that a Goldman Sachs email forwarded to him by Dominic

1 Piscitelli in July 2016, which recommend buying Incyte options, was what first prompted him to

2 consider trading in Incyte. *Id.* (Trial Tr. 1035:4-14 (Panuwat)). Conversely, Panuwat unqualifiedly

3 denied at trial—both on direct and cross examination—that information about Medivation's

4 acquisition had anything do with his Incyte trades. *Id.* (Trial Tr. 923:14-17; 1005:9-13; 1166:4-15;

5 1169:7-20 (Panuwat)). Specifically, on cross-examination, he testified as follows:

6         Q. Now, I want to be clear about this: Is it your testimony that you did not use
        Medivation's confidential information when you purchased your Incyte call

7         options?

8         A. That's right.

9         Q. And you're not saying that that was one of several reasons for the purchase;
        right?

10         A. That's right.

11         Q. You're not saying it was a small part of your decision?

12         A. It was no part.

13         Q. That's right. It's your position that it had nothing to do with your trades.

14         A. That's right. (*Id.* (Trial Tr. 1166:4-15))

15     The jury, in finding that Medivation's confidential information was a "significant factor in

16 defendant's decision to buy Incyte call options," rejected this testimony. *Id.* (Trial Tr. 1275:23-

17 1276:2 (Jury Instructions)); Ex. V (Jury Inst. No. 19). If one accepts the jury's verdict, the

18 inescapable conclusion is that Panuwat repeatedly gave false answers under oath about the reason

19 for his Incyte trades.

20     Panuwat was untruthful about other matters as well. In an effort to suggest he did not trade

21 based on Medivation's nonpublic information, Panuwat falsely minimized his participation in, and

22 knowledge of, the acquisition process. For example, when SEC investigators asked Panuwat how

23 much of his work time the acquisition process was taking up, Panuwat claimed, "It became

24 diminishingly so I think by the time in August 2016." Ex. U (May 2020 Testimony Tr. 194:16-20).

25 This was false. At trial, the SEC introduced numerous emails demonstrating that Panuwat was still

26 deeply involved in the acquisition process in August 2016. *E.g.,* Ex. W (TX 1295); Ex. X (TX

27 1296); Ex. Y (TX 1306); Ex. Z (TX 1308); Ex. AA (TX 1334); Ex. BB (TX 1337). This evidence

28

1  forced Panuwat to admit at trial, for the first time, that he was indeed actively working on the

2  Medivation sales process up until the day he traded. Ex. A (Trial Tr. 1096:10-22 (Panuwat)).

3         Similarly, when SEC investigators asked Panuwat if he was aware, in August 2016, of the

4  pricing details of the bids that the potential acquirers had submitted, Panuwat replied, "Not to my

5  knowledge, I do not believe so." Ex. U (May 2020 Testimony Tr. 195:3-16). This too was false.

6  The SEC introduced evidence at trial showing that Panuwat received a detailed summary of the

7  prospective buyers' bids. Ex. CC (TX 1294). The SEC also introduced evidence that Panuwat

8  attended a board meeting where the bids were discussed. Ex. G (TX 1209). And the SEC elicited

9  testimony that Panuwat, up until the date he traded, participated in daily meetings with other

10  Medivation executives where they discussed the bid process. Ex. A (Trial Tr. 479:14-480:4

11  (Jarrett)); Ex. DD (TX 1344). This again forced Panuwat to admit at trial that, contrary to what he

12  had told the SEC previously, he knew the specific bid prices when he bought Incyte call options on

13  August 18. Ex. A (Trial Tr. 1127:15-1128:10 (Panuwat)).

14         Finally, Panuwat also claimed that he was probably not in the office on the day he traded,

15  that he had not been present much in the weeks leading up to that day, and that he did not recall

16  reading the email from his CEO indicating that a deal between Pfizer and Medivation was

17  imminent before trading. At his 2023 deposition, when asked if he told anyone that he was buying

18  Incyte call options, Panuwat said, "As I mentioned, most of the time I was not in the office around

19  this time period." Ex. H (Panuwat Deposition Tr. 138:1-10). When asked specifically whether he

20  was at work that day, Panuwat hedged, but ultimately answered the question in the negative,

21  saying, "I don't believe so." *Id.* (Panuwat Deposition Tr. 139:21-140:14). At trial, the SEC

22  introduced exhibits and elicited testimony refuting this assertion, as well as the suggestion that he

23  did not read the email from his CEO before he traded. The SEC introduced several emails Panuwat

24  sent on August 18, both before and after he received the email from his CEO, and Panuwat

25  admitted that he did not typically work from home. Ex. B (TX 1320); Ex. EE (TX 1328); Ex. AA

26  (TX 1334); Ex. FF (TX 1343); Ex. A (Trial Tr. 1093:24-1094:2 (Panuwat)). In particular, the SEC

27  introduced an August 18 email where Ms. Jarrett told Mr. Panuwat the physical location of that

28  day's meeting among Medivation's core team of senior executives. Ex. DD (TX 1344). Panuwat's

response to the email—"someone needs to include this important info in planners"—suggests he was physically in the office and attended the meeting in person. *Id*.

In short, Panuwat's conduct throughout this litigation and the preceding investigation has demonstrated a readiness to give false testimony whenever he believed it might advance his own interests. He has never acknowledged the true reason for his Incyte trades. Instead, he has tried to conceal that truth with additional false statements.

## IV.   ARGUMENT

### A.   The Court Should Permanently Bar Panuwat From Acting As An Officer Or Director Of A Public Company

The Court may prohibit any person who violates Section 10(b) of the Exchange Act from acting as an officer or director of a public company, *i.e.*, a company whose securities are registered under the Exchange Act. 15 U.S.C. § 78u(d)(2); *see also SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998) ("The district court has broad equitable powers to fashion appropriate relief for violations of the federal securities laws, which include the power to order an officer and director bar."). Such a bar can be permanent or time-limited. 15 U.S.C. § 78u(d)(2). "In determining whether to order the bar, a court may consider: '(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.'" *First Pac. Bancorp*, 142 F.3d at 1193 (quoting *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)). These factors are neither necessary nor exclusive. *See Patel*, 61 F.3d at 141. As explained below, five of these six factors (each one except "repeat offender status") weigh in favor of imposing an officer-and-director bar, making that relief appropriate here.

#### 1.   Egregiousness

Panuwat's insider trading violation was egregious. In determining whether conduct is egregious, some courts have considered the nature of the violation (*e.g.*, whether it involved merely "technical" rules or requirements) and whether the defendant breached fiduciary or similar duties. *SEC v. Gunn*, No. 3:08-CV-1013-G, 2010 WL 3359465, \*4 (N.D. Tex. Aug. 25, 2010).

Both factors support a finding of egregiousness here. First, "[i]nsider trading is a flagrant, deliberate, and serious violation of the federal securities laws; in no sense is it merely technical." *Id.* Second, Panuwat, as a core member of Medivation's leadership team, was entrusted with highly confidential information that his employer expected him to safeguard. But despite knowing that he was prohibited from using Medivation's business secrets for personal securities trades, Panuwat did just that. While deeply engaged in helping Medivation conclude the most important transaction in its corporate life, Panuwat secretly wagered roughly half his base salary on a short-term bet specifically designed to extract value from the nonpublic information he possessed about Medivation's impending acquisition. This abuse of trust makes Panuwat's conduct "egregious" for purposes of assessing the propriety of an officer-and-director bar. *See SEC v. Chapman*, 826 F. Supp. 2d 847, 858 (D. Md. 2011) ("Although this is Chapman's first offense, his abuse of his clients' trust and use of his investment management company to promote [his business's] well-being over that of his clients renders the offense egregious enough to merit imposing a permanent officer and director bar."); *see also Gunn*, 2010 WL 3359465, *4 (finding that isolated act of insider trading was egregious and supported issuance of injunction).

## 2. Role or Position During The Fraud

Panuwat's role at Medivation also counsels in favor of a permanent bar. He was Medivation's Head of Business Development and, by his own admission, reported directly to the CEO and CFO of the company. He did not come into possession of Medivation's material, nonpublic information by luck or happenstance. Rather, Panuwat was entrusted with nonpublic information about Medivation's acquisition because, in a company with around 900 employees, he was one of the six "core" senior executives specifically tasked with managing the acquisition process. In fact, Panuwat's own resume, prepared at the time he traded, touted his role as a "Core team member (1 of 6) in the hostile defense and consent solicitation" process, boasted that he "report[ed] to the CEO and CFO," and highlighted that he was "involved in various corporate objectives including strategy planning, portfolio management, investor relations, legal matters and financing strategies." Ex. B (TX 1320); Ex. A (Trial Tr. 1121:6-1124:11 (Panuwat)).

Medivation entrusted Panuwat with its nonpublic information for the specific purpose of benefitting the company and, by extension, its shareholders. As this Court observed, "A company's 'confidential information' has 'long been recognized as property,' to which the corporation has 'the exclusive right and benefit.'" *SEC v. Panuwat* (Order Denying MSJ) [Dkt. 85] at 18 (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)). Medivation's other senior executives, its Board of Directors, and ultimately its shareholders had every reason to trust that Panuwat would honor his duty to use Medivation's confidential information solely for the benefit of the company and would not misuse that information for his own gain. Panuwat's insider trading betrayed that trust and warrants a permanent bar. *See SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 891 (N.D. Cal. 2017) (holding that defendant's role, as one of a small number of executives with material nonpublic information, supported imposing a permanent officer-and-director bar as a remedy for insider trading); *SEC v. Bankosky*, No. 12 Civ. 1012(HB), 2012 WL 1849000, at *2 (S.D.N.Y. May 21, 2012) (*aff'd* 716 F.3d 45 (2d Cir. 2013)) (imposing a 10-year officer-and-director bar on an employee who insider traded while "acting in a corporate or fiduciary capacity as director of Business Development and Global Licensing, where he and his colleagues were involved in the due diligence and negotiations for deals with other pharmaceutical companies").

### 3.  Degree of Scienter

Panuwat's high degree of scienter also weighs in favor of a permanent bar. At the time he traded, Panuwat understood what insider trading was, having worked for multiple public companies as well as an investment bank. Ex. A (Trial Tr. 1007:20-1008:12 (Panuwat)). Panuwat admitted knowing he was not permitted to use Medivation's confidential information for his own personal benefit. *Id.* (Trial Tr. 1128:24-1129:2 (Panuwat)). He also more specifically admitted knowing that he was not allowed to use that information to trade securities. *Id.* (Trial Tr. 1166:16-19 (Panuwat)). And he signed two separate written policies documenting these obligations. Nonetheless, Panuwat defrauded Medivation and exploited his access to nonpublic information about Medivation's acquisition by using it to make profitable, short-term options trades. In finding Panuwat liable for insider trading, the jury found that he "acted knowingly or recklessly with an intent to defraud Medivation." *Id.* (Trial Tr. 1277:4-6 (Jury Instructions)); Ex. GG (Jury Inst. No.

21). The jury also found that Panuwat "knew that the information he received from Medivation was both nonpublic and material to Incyte or acted recklessly as to whether the information was both material and nonpublic, and knew that, or acted recklessly as to whether, he lacked consent from Medivation to use the information." Ex. HH (Jury Inst. No. 16); Ex. A (Trial Tr. 1274:10-15 (Jury Instructions)).

Other facts elicited by the SEC at trial confirm that Panuwat knew his actions were improper. He did not tell anyone about his Incyte trades, even though his friend Dominic Piscitelli had sent him an email about an Incyte call options trade just three weeks prior, and even though the two socialized often and regularly discussed other trades. And when the SEC asked Panuwat why he had bought Incyte options, he did not tell the truth. He first insisted that he could not remember any details about the purchase, and then he later constructed an elaborate false narrative. These actions demonstrate that Panuwat knew that he had engaged in unlawful conduct. *See Bankosky*, 2012 WL 1849000, at *2-*3 (defendant's scienter supported a 10-year officer-and-director bar where trades were "timed to significant corporate events" and the court was also "trouble[d]" by the defendant's "responses to the SEC's investigation and his failure to provide the Court any assurance of his acceptance of responsibility").

### 4. Economic Stake

Panuwat had an economic stake in his misconduct. He personally realized profits of about $120,000 from his unlawful misappropriation of Medivation's confidential information. Moreover, Panuwat maximized the value of the non-public information he possessed about Medivation's impending merger announcement by buying out-of-the-money call options set to expire in less than one month. These facts also support imposing an officer-and-director bar. *See Bankosky*, 2012 WL 1849000, at *1-*3 (imposing 10-year bar on defendant with insider trading profits of $63,000).

### 5. Likelihood That Misconduct Will Recur

Finally, a permanent officer-and-director bar is appropriate because of the substantial risk that Panuwat will engage in similar misconduct again in the future. As described above, Panuwat has testified about these matters four times, and each time he gave false and misleading answers.

Panuwat's false testimony was not limited to the reason for his Incyte trades; he also testified untruthfully about his involvement in the acquisition process, his knowledge of the bid details, and his whereabouts the week of the trades. Although this is Panuwat's first violation of the federal securities laws, his willingness to give false testimony makes him unfit to serve as an officer or director of a public company. If Panuwat is allowed to serve as an officer or director of a public company, he will gain possession of additional material nonpublic information, and his pattern of deceptive conduct suggests he would be willing to use such information to insider trade again.

In *SEC v. Sabrdaran*, the most recent civil insider trading case previously tried in the Northern District of California, Judge Corley ordered a permanent officer-and-director bar and emphasized this factor. 252 F. Supp. 3d 866. She determined that, although four of the six *First Pac. Bancorp* factors weighed *against* imposing a permanent bar, such a bar was warranted, for two reasons. First, the defendant there, Dr. Sasan Sabrdaran, "was one of a small number of people privy to" the highly confidential information he tipped to his friend, who then used it to trade. *Id.* at 891. Second, and more important, he engaged in deceptive conduct during the SEC's investigation and at trial:

> The final factor—likelihood that that misconduct will recur—is the most important factor in the unique circumstances of this case. Dr. Sabrdaran's conduct over the course of the SEC's investigation and during trial establish that he is likely to engage in dishonest misconduct again. Time and time again, when faced with difficult questions, Dr. Sabrdaran declined to tell the truth.

*Id.* Judge Corley reasoned that Sabrdaran's repeated dishonesty demonstrated an "instinct to lie" which made it "likely that [he] will again engage in dishonest misconduct, rendering him substantially unfit to serve as an officer or director of a public company." *Id.* at 892.

The same reasoning applies here. As detailed above, Panuwat was repeatedly untruthful when faced with difficult questions. His dishonesty spanned a lengthy period, from his first appearance before SEC investigators in May 2020 through his April 2024 trial testimony. And Panuwat, like Sabrdaran, was one of a small number of people at his company with access to the relevant material, nonpublic information.

1    In fact, the rationale for imposing a bar on Panuwat is stronger than was the rationale for

2    imposing a bar on Sabrdaran. Panuwat had a financial stake in his misconduct: he personally

3    realized about $120,000 in profits from misusing his employer's confidential information.

4    Sabrdaran, on the other hand, received no monetary gain from his misconduct. *Id.* at 891.

5    Moreover, Panuwat is currently employed as the Chief Business Officer at a public company,

6    putting him in a position to engage in insider trading again in the future.[2] Sabrdaran, by contrast,

7    testified that he had "lost his career" due to the SEC's case and was unemployed when Judge

8    Corley imposed remedies. *Id.* at 909.

9    The risk of Panuwat engaging in misconduct again in the future is further demonstrated by

10   his failure to accept responsibility for his misconduct. Throughout the SEC investigation and this

11   litigation, Panuwat has continually maintained that he did nothing wrong. His refusal to accept that

12   he broke the law—particularly when considered alongside his misleading testimony—suggests he

13   is likely to engage in the same conduct again in the future. *See Bankosky*, 2012 WL 1849000, at *3

14   (imposing 10-year bar against a first-time offender for insider trading, where defendant gave

15   misleading testimony and did not accept responsibility for his misconduct); *see also SEC v.*

16   *Apuzzo*, 184 F. Supp. 3d 1, 10 (D. Conn. 2016) (imposing a permanent officer-and-director bar

17   based on the defendant's "inability to recognize the wrongfulness of the egregious conduct in

18   which he engaged (which would carry over to comparable misconduct) and his lack of candor even

19   when under oath").

20   In sum, five of the *Patel* factors support imposing an officer-and-director bar here.

21   Panuwat's insider trading constituted an egregious securities violation; he carried out the scheme

22   by abusing his role as a high-level executive; he acted with intent to defraud, as evidenced by his

23   contemporaneous silence and later lack of candor under oath; he deliberately maximized his

24   profits; and, today, he is both unrepentant and still employed as a Chief Business Officer in the

---

25

26   [2] ORIC Pharmaceuticals, Inc.'s most recent Form 10-Q quarterly report, filed with the SEC on May
     6, 2024, states: "On April 5, 2024, a jury found our Chief Business Officer liable for insider trading."

27   (*See* page 51.) The absence of the word "former" suggests that Panuwat remains employed at the
     company. *Available at:*

28   https://www.sec.gov/Archives/edgar/data/1796280/000095017024053582/oric-20240331.htm.

1  highly volatile biotech industry, providing opportunities for further misconduct. These five factors

2  outweigh the sixth and only factor favoring Panuwat, his first-time offender status.

3      **B.**    **The Court Should Impose A Civil Monetary Penalty Of $321,197.40**

4      The Court may impose a civil monetary penalty on a person who engages in insider

5  trading, the amount of which "shall not exceed three times the profit gained" from the unlawful

6  conduct. 15 U.S.C. §§ 78u-1(a)(1), (2). "[T]he overriding concern of the civil penalty against

7  insider trading is to 'effect general deterrence and to make insider trading a money-losing

8  proposition.'" *SEC v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019) (quoting *SEC v. Rajaratnam*, 918

9  F.3d 36, 41 (2d Cir. 2019)). Such deterrence also "serves other important nonpunitive goals, such

10  as encouraging investor confidence, increasing the efficiency of financial markets, and promoting

11  the stability of the securities industry." *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998).

12  District courts in the Ninth Circuit have used a six-factor test when determining the

13  appropriateness and amount of insider trading penalties: "(1) the egregiousness of the violations;

14  (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4)

15  whether the defendant concealed his trading; (5) what other penalties arise as the result of the

16  defendant's conduct; and (6) whether the defendant is employed in the securities industry." *SEC v.*

17  *Morano*, No. 3:18-cv-00386-HZ, 2019 WL 1440262, at *3 (D. Or. Apr. 1, 2019) (quoting *SEC v.*

18  *Gowrish*, No. C 09-5883 SI, 2011 WL 2790482, at *9 (N.D. Cal. July 14, 2011)). Considered

19  together, these factors support a penalty of $321,197.40, which is equal to three times Panuwat's

20  trading profits, as measured based on the August 22, 2016 prices of his Incyte call options.[3]

21      As explained above, Panuwat's conduct was egregious. Panuwat was a sophisticated trader

22  and former investment banker who was familiar with the prohibition against insider trading. Yet he

23  _____

24  [3] As proven at trial, Panuwat's realized insider trading profits were $120,031.32. Ex. P (TX 1386).
25  However, 15 U.S.C. § 78u-1(e) defines "profit gained" not as realized profits, but as "the difference
   between the purchase or sale price of the security and the value of that security as measured by the
26  trading price of the security a reasonable period after public dissemination of the nonpublic
   information." Dr. Chyhe Becker calculated that if Panuwat had sold all his Incyte call options at the
27  last-traded price on August 22, 2016, the date Medivation announced its acquisition, his profits would
   have been $107,065.80. *See* Ex. II (Expert Report of Chyhe Becker, Ph.D., dated April 28, 2023).
28  Multiplied by three, this generates a penalty amount of $321,197.40.

1   not only used Medivation's confidential information to trade—something he admitted knowing

2   that he was not allowed to do—but then repeatedly declined to tell the truth about it afterwards.

3   Moreover, Panuwat's role at Medivation, involving potential business combinations, required him

4   to handle highly sensitive information. His misconduct therefore went to the very core of his

5   responsibilities as one of Medivation's senior employees.

6       Panuwat's net worth also weighs in favor of a significant penalty. Panuwat testified in May

7   2020 that in June of 2016 he had a net worth of around $2 million. Ex. U (May 2020 Testimony

8   Tr. 138:18-24). The SEC presumes that this number has increased substantially in the intervening

9   eight years, as Panuwat has continued to work as a senior executive at a public company. Ex. A

10  (Trial Tr. 826:13-827:7 (Piscitelli)). Moreover, the sizes of Panuwat's investments increased

11  substantially over the 2016 to 2020 period, further suggesting that his net worth continued to

12  increase. Ex. JJ (TX 2965) (showing five investments of more than $48,000 prior to 2016, and

13  dozens of such investments from 2016 to 2020); Ex. KK (TX 2984) (summarizing Panuwat's

14  trades over the 2008 to 2020 period). Only a significant penalty will have an appropriate deterrent

15  effect.

16      Panuwat also concealed his trading. As explained above, he did not disclose his trades to

17  anyone at Medivation, and when the SEC asked him about the reasons for his trades, he testified

18  untruthfully. *See Morano*, 2019 WL 1440262 at *3-*6 (ordering defendant to disgorge all trading

19  profits and pay an *additional* penalty equal to twice those profits in a case where defendant lied to

20  investigators).

21      The absence of other financial consequences also counsels in favor of a significant

22  monetary penalty. Panuwat has enjoyed the benefit of his illicit Incyte trading profits for the last

23  eight years, including being able to redeploy those gains in his subsequent trades in the stock

24  market. Also, unlike many insider trading cases, the SEC here did not seek disgorgement of

25  Panuwat's trading profits, and the SEC has, for its penalty calculation, conservatively estimated his

26  "profit gained" as $107,065.80, even though Panuwat himself viewed the trades as netting him

27  roughly $120,000 in profits. *See* fn. 3, *supra*; *see also* Ex. A (Trial Tr. 1046:10-14 (Panuwat)). A

28

higher penalty is therefore necessary to ensure both that Panuwat does not profit from his

misconduct *and* that the Court's judgment has an appropriate deterrent effect.

   While Panuwat is not presently employed in the securities industry, he worked as an

investment banker for eight years before he joined Medivation. *Id.* (Trial Tr. 926:3-11 (Panuwat)).

And he continues working in a role at a public company that will likely continue providing him

access to insider information and opportunities to re-offend.

   Finally, although this is Panuwat's first violation of the securities laws, a substantial

penalty is still warranted. Monetary remedies equal to three times trading profits may be ordered

against first-time violators when other factors support the imposition of a significant penalty. *See*

*SEC v. Melvin*, No. 1:12-cv-2984-CAP, 2017 WL 11696403, at *1 (N.D. Ga. June 22, 2017)

(ordering, in a case involving "an isolated incident" of insider trading, the defendant to disgorge

his trading profits *plus* pay a penalty equal to twice those profits). A penalty of $321,197.40, equal

to three times Panuwat's trading profits, is therefore appropriate.

### C.   The Court Should Permanently Enjoin Panuwat From Violating Section 10(b) and Rule 10b-5 of the Exchange Act

   The Exchange Act authorizes courts to grant injunctions against future violations of the

securities laws. 15 U.S.C. § 78u(d)(1). To obtain a permanent injunction against future violations

of Section 10(b) and Rule 10b-5 of the Exchange Act, the SEC must show a reasonable likelihood

of future violations. *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996). This entails consideration of

factors such as "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the

infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood,

because of defendant's professional occupation, that future violations might occur; (5) and the

sincerity of his assurances against future violations." *Id.* at 1295-96 (citing *SEC v. Murphy*, 626

F.2d 633, 655 (9th Cir. 1980)).

   Four of these five factors support the entry of a permanent injunction. As explained above,

Panuwat acted with a high degree of scienter. He misappropriated Medivation's confidential

business information for securities trading purposes, despite knowing that he was prohibited from

doing so. The jury found that Panuwat acted knowingly or recklessly and with an intent to defraud,

1  which supports entering an injunction. *See Gowrish*, 2011 WL 2790482, at *4 (jury finding that

2  defendant acted with scienter in insider trading case weighed in favor of entering a permanent

3  injunction).

4      Panuwat has never recognized his conduct as wrongful. Throughout the SEC's

5  investigation, and at trial, Panuwat has continually maintained that he did nothing improper. This

6  also weighs in favor of a permanent injunction. *See id.* at *6 (entering permanent injunction

7  against defendant who "continue[d] to maintain that he did not commit insider trading, despite the

8  jury's clear findings to the contrary").

9      Panuwat's professional occupation also makes future violations likely. He continues to

10  work at a public company in the drug industry, where market-moving, nonpublic information

11  about matters like drug trials and potential business combinations is common. *See, e.g., SEC v.*

12  *Chan*, 465 F. Supp. 3d 18, 38 (D. Mass. 2020), *aff'd*, No. 20-1985, 2022 WL 1315624 (1st Cir.

13  Jan. 26, 2022) (entering a permanent injunction against a defendant who engaged in insider trading

14  while employed at a biopharmaceutical company because "as a biostatistician, Chan may have

15  access to material, nonpublic information in the future").

16      Finally, Panuwat has not provided *any* assurances—let alone sincere ones—against future

17  violations. As explained above, Panuwat repeatedly gave untruthful testimony, including at trial,

18  that was designed to evade responsibility for his violations of the federal securities laws. And he

19  continues to deny using Medivation's confidential information to trade Incyte's securities,

20  testimony the jury rejected as lacking credibility. Any assurances Panuwat might provide now

21  against future misconduct therefore have little value. *See SEC v. Murphy*, 50 F.4th 832, 851 (9th

22  Cir. 2022) (affirming district court order that "discredited the [defendants'] assurances against

23  future violations because of their failure to completely recognize the wrongfulness of their past

24  conduct"); *see also Murphy*, 626 F.2d at 656.

25      Although Panuwat was found liable for only one act of insider trading, a permanent

26  injunction is still warranted. A court may enter a permanent injunction against future violations of

27  the securities laws in the absence of multiple violations if other factors suggest that such relief is

28  warranted. *See SEC v. Suman*, 684 F. Supp. 2d 378, 392-93 (S.D.N.Y. 2010) (imposing permanent

1  injunction on insider traders without referencing any prior violations; one defendant had misled

2  government investigators and also possessed professional expertise that could provide an

3  opportunity for future violations); *see also Fehn*, 97 F.3d at 1296 ("[W]e conclude that the

4  evidence was adequate to support the permanent injunction issued by the district court. Although

5  the second factor weighs in Fehn's favor, since the SEC cites no other securities law violations on

6  Fehn's part, other factors weigh against him.").

7  **V.**     **CONCLUSION**

8      For the foregoing reasons, the SEC respectfully requests that the Court enter a final

9  judgment that permanently and unconditionally bars Panuwat from serving as an officer or director

10  of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act

11  [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act

12  [15 U.S.C. § 78o(d)], orders Panuwat to pay a civil monetary penalty of $321,197.40, and

13  permanently enjoins Panuwat from violating Section 10(b) and Rule 10b-5 of the Exchange Act.

14

15  Dated: May 29, 2024                    Respectfully submitted,

16

17                                        */s/ Bernard B. Smyth*
                                          Bernard B. Smyth

18                                        Jason M. Bussey
                                          Matthew Meyerhofer

19                                        Attorneys for Plaintiff
                                          SECURITIES AND EXCHANGE COMMISSION

20

21

22

23

24

25

26

27

28