# Exhibit L

| From: | Flemming, Conor <Conor.Flemming@Evercore.com> |
|---|---|
| To: | 'David Hung' <David.Hung@medivation.com>;Jennifer Jarrett <Jennifer.Jarrett@medivation.com>;Marion McCourt <marion.mccourt@medivation.com>;Andrew Powell <Andrew.Powell@medivation.com>;Dominic Piscitelli <dominic.piscitelli@medivation.com>;Anne Bowdidge <anne.bowdidge@medivation.com>;Matt Panuwat <matthew.panuwat@medivation.com>;Carolyn Tang <carolyn.tang@medivation.com>;Johanna Kleckner (johanna.kleckner@medivation.com)" <johanna.kleckner@medivation.com>;Samina Bari <samina.bari@medivation.com>;Guernsey, Kenneth <kguernsey@cooley.com>;Leigh, Jamie" <jleigh@cooley.com>;Beerle, Ben <bbeerle@cooley.com>;Lieberman, Anne E" <alieberman@cooley.com>;Kondracki, Jonie <jkondracki@cooley.com>;Robbins, Matt <mrobbins@cooley.com>;Bob Marese <bmarese@mackenziepartners.com>;Dan Burch <dburch@mackenziepartners.com>;dsullivan@mackenziepartners.com <dsullivan@mackenziepartners.com>;dwhissel@mackenziepartners.com <dwhissel@mackenziepartners.com>;'daneff@wlrk.com' <daneff@wlrk.com>;'RCChen@wlrk.com' <RCChen@wlrk.com>;'IANussbaum@wlrk.com' <IANussbaum@wlrk.com>;Medivation-SVC <Medivation-SVC@SARDVERB.com> |
| CC: | EVR Project Masterpiece <EVRProjectMasterpiece@Evercore.com>;Project Masterpiece (project_masterpiece@jpmorgan.com)" <project_masterpiece@jpmorgan.com> |
| Sent: | 6/23/2016 6:21:38 PM |
| Subject: | ISS Prep Pack |
| Attachments: | 2016.06_Project Masterpiece_ISS Prep Pack.pdf |

Team,

Please find attached the updated ISS prep pack incorporating the comments received since last distribution. Please note that all of the market-based metrics have been refreshed since the last distribution.

Password: **starrynight**

Best,
Conor

**Conor Flemming**
**EVERCORE**
2494 Sand Hill Road, Suite 200 | Menlo Park, CA 94025
T: (650) 561-0153 | M: (415) 302-6800
conor.flemming@evercore.com

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, and destroy the original message. Thank you

**EXHIBIT 1277-0001**

## ISS Prep Pack

Project Masterpiece

June 2016

EVERCORE J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

*These materials have been prepared by Evercore Group L.L.C. ("Evercore") for Van Gogh, Inc. (the "Company") to whom such materials are directly addressed and delivered and may not be used or relied upon for any purpose other than as specifically contemplated by a written agreement with Evercore. These materials are based on information provided by or on behalf of the Company and/or other potential transaction participants, from public sources or otherwise reviewed by Evercore. Evercore assumes no responsibility for independent investigation or verification of such information and has relied on such information being complete and accurate in all material respects. To the extent such information includes estimates and forecasts of future financial performance prepared by or reviewed with the management of the Company and/or other potential transaction participants or obtained from public sources, Evercore has assumed that such estimates and forecasts have been reasonably prepared on bases reflecting the best currently available estimates and judgments of such management (or, with respect to estimates and forecasts obtained from public sources, represent reasonable estimates). No representation or warranty, express or implied, is made as to the accuracy or completeness of such information and nothing contained herein is, or shall be relied upon as, a representation, whether as to the past, the present or the future. These materials were designed for use by specific persons familiar with the business and affairs of the Company. These materials are not intended to provide the sole basis for evaluating, and should not be considered a recommendation with respect to, any transaction or other matter. These materials have been developed by and are proprietary to Evercore and were prepared exclusively for the benefit and internal use by the Company.*

*These materials were compiled on a confidential basis for use by the Company in evaluating the potential transaction described herein and not with a view to public disclosure or filing thereof under state or federal securities laws, and may not be reproduced, disseminated, quoted or referred to, in whole or in part, without the prior written consent of Evercore.*

*These materials do not constitute an offer or solicitation to sell or purchase any securities and are not a commitment by Evercore (or any affiliate) to provide or arrange any financing for any transaction or to purchase any security in connection therewith. Evercore assumes no obligation to update or otherwise revise these materials. These materials may not reflect information known to other professionals in other business areas of Evercore and its affiliates.*

*Evercore and its affiliates do not provide legal, accounting or tax advice. Accordingly, any statements contained herein as to tax matters were neither written nor intended by Evercore or its affiliates to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on such taxpayer. Each person should seek legal, accounting and tax advice based on his, her or its particular circumstances from independent advisors regarding the impact of the transactions or matters described herein.*

EVERCORE

**Preliminary and Confidential Draft – Subject to Change**

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

C O N F I D E N T I A L

This presentation was prepared exclusively for the benefit and internal use of the J.P. Morgan client to whom it is directly addressed and delivered (including such client's subsidiaries, the "Company") in order to assist the Company in evaluating, on a preliminary basis, the feasibility of a possible transaction or transactions and does not carry any right of publication or disclosure, in whole or in part, to any other party. This presentation is for discussion purposes only and is incomplete without reference to, and should be viewed solely in conjunction with, the oral briefing provided by J.P. Morgan. Neither this presentation nor any of its contents may be disclosed or used for any other purpose without the prior written consent of J.P. Morgan.

The information in this presentation is based upon any management forecasts supplied to us and reflects prevailing conditions and our views as of this date, all of which are accordingly subject to change. J.P. Morgan's opinions and estimates constitute J.P. Morgan's judgment and should be regarded as indicative, preliminary and for illustrative purposes only. In preparing this presentation, we have relied upon and assumed, without independent verification, the accuracy and completeness of all information available from public sources or which was provided to us by or on behalf of the Company or which was otherwise reviewed by us. In addition, our analyses are not and do not purport to be appraisals of the assets, stock, or business of the Company or any other entity. J.P. Morgan makes no representations as to the actual value which may be received in connection with a transaction nor the legal, tax or accounting effects of consummating a transaction. Unless expressly contemplated hereby, the information in this presentation does not take into account the effects of a possible transaction or transactions involving an actual or potential change of control, which may have significant valuation and other effects.

Notwithstanding anything herein to the contrary, the Company and each of its employees, representatives or other agents may disclose to any and all persons, without limitation of any kind, the U.S. federal and state income tax treatment and the U.S. federal and state income tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Company relating to such tax treatment and tax structure insofar as such treatment and/or structure relates to a U.S. federal or state income tax strategy provided to the Company by J.P. Morgan. J.P. Morgan's policies on data privacy can be found at http://www.jpmorgan.com/pages/privacy.

J.P. Morgan's policies prohibit employees from offering, directly or indirectly, a favorable research rating or specific price target, or offering to change a rating or price target, to a subject Company as consideration or inducement for the receipt of business or for compensation. J.P. Morgan also prohibits its research analysts from being compensated for involvement in investment banking transactions except to the extent that such participation is intended to benefit investors.

**IRS Circular 230 Disclosure: JPMorgan Chase & Co. and its affiliates do not provide tax advice. Accordingly, any discussion of U.S. tax matters included herein (including any attachments) is not intended or written to be used, and cannot be used, in connection with the promotion, marketing or recommendation by anyone not affiliated with JPMorgan Chase & Co. of any of the matters addressed herein or for the purpose of avoiding U.S. tax-related penalties.**

J.P. Morgan is the marketing name for the Corporate and Investment Banking activities of JPMorgan Chase Bank, N.A., JPMS (member, NYSE), J.P. Morgan PLC  authorized by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority and their investment banking affiliates.

This presentation does not constitute a commitment by any J.P. Morgan entity to underwrite, subscribe for or place any securities or to extend or arrange credit or to provide any other services.

Copyright  2014 JPMorgan Chase & Co. All rights reserved.

J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

**EXHIBIT 1277-0004**

# Table of Contents

|  | Section |
|---|---|
| **Who is ISS?** | **I** |
| **Structure of ISS Meeting – What Will Make the Meeting Successful?** | **II** |
| **ISS Framework and Precedent ISS Analysis** | **III** |
| **Key Arguments for ISS** | **IV** |
| **Q&A** | **V** |
| **Fact vs. Fiction Rebuttals** | **VI** |
| **Appendix** | |

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033387

**EXHIBIT 1277-0005**

# Executive Summary

## Meeting Objectives

- <u>Establish value of the company</u> to provide a strong factual basis for ISS to conclude the Seurat's proposal is inadequate

- <u>Establish we are all about value and have the right team to evaluate it</u> to establish the credibility of our Board and management team, highlighting transactional and industry experience and significant achievements to date

- <u>Explain Van Gogh's business</u> and ensure the ISS attendees understand the key drivers, given that (1) they will not have extensive subject matter expertise; (2) they likely will have just met with Seurat and been presented with their version of the "facts"; and (3) other issues may arise for which we should establish a good foundation on our terms

## Suggested Meeting Logistics / Considerations

- Van Gogh team introductions

- Be open and ask for input

- Unless asked, don't get too into the weeds, but do provide enough detail to address any questions and secure credibility

- Be clinical and objective

- Be attentive to questions asked, will provide some guidance as to where Seurat's messages may have resonated

- Kim should lead the conversation while involving David to discuss specifics around the business. Directors should field all governance questions and show active engagement in corporate strategy and shareholder engagement efforts

## Overall Themes

- This Board is 100% committed to representing Van Gogh shareholders and taking all necessary steps to drive shareholder value

- Seurat's proposal is substantially inadequate and does not provide our shareholders with full value for their shares

- We are committed to executing on our current business strategy and believe that our strategy will deliver greater value to our shareholders over the long-run than Seurat's undervalued proposal

- We have the right board with tremendous transaction experience – particularly in this space -- to determine how, whether and when to sell companies

- We are pleased to be meeting with you today and look forward to hearing your thoughts and perspectives

EVERCORE  J.P.Morgan                         1                *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033388

EXHIBIT 1277-0006

I. Who is ISS?

EVERCORE J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0007**

# Institutional Shareholder Services (ISS)



## Overview

- ISS is the <u>leading proxy advisory service</u>, providing analysis and voting recommendations on any matter brought before shareholders for a vote in all companies held in their client's portfolios

- ISS administers the review of ~10,000 US proxy statements and give recommendations on how their 1,500 clients (domestic and international) should vote. These clients utilize the reports and recommendations in different ways – some count on the ISS analysis and recommendations to cast their votes, some clients utilize a blend of ISS and internal policies, while others use the reports mainly as a data source

- Though ISS has a comprehensive set of policies and guidelines applied by the research team for routine matters, a <u>contested situation is analyzed differently by a specialized group within ISS</u>:

  - The analysis is conducted by a special group tasked with the responsibility over contested situations – including proxy contests, mergers and acquisitions and in general most matters that have a direct economic impact upon the Company and its shareholders (e.g., poison pills)

  - These general policies will not govern the outcome but may be taken into consideration depending on the circumstances that are raised in each particular situation (e.g. identifying which incumbent director(s) to recommend withholding votes for)

  - In a contest for Board seats in connection with an unsolicited offer, ISS applies a three-prong test based on (1) the reasonable certainty of the offer, (2) whether the value being offered is a reasonable starting point for negotiations and (3) the reasonableness of the Board's response to the offer

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                JPMS-00153-SEC-00033390

**EXHIBIT 1277-0008**

## Van Gogh – ISS Meeting Details

***Meeting Date:*** Wednesday, June 29th
***Meeting Time:*** 11am EST
***Meeting Location:*** 702 King Farm Boulevard, Suite 400, Rockville, MD 20850

***Participants:***



**Chris Cernich** joined ISS in June 2010 as Head of M&A and Proxy Contest Research and in January 2015 became Deputy Director of Global Research. He oversees analyses and vote recommendations for high profile and contentious mergers and proxy contests globally.

Prior to joining ISS, he was Director of Mergers & Acquisitions and Quantitative Analysis at Proxy Governance, Inc. His previous management experience includes eight years in corporate finance and strategy at the Ford Motor Company. Mr. Cernich is also the chief author of two studies sponsored by the IRRC Institute: "The Effectiveness of Hybrid Boards" (2009), which examined the impact of shareholder activism on corporate financial performance and "Compensation Peer Groups at Companies With High Pay" (2010), which examined systemic bias in compensation benchmarking practices at S&P 500 companies. Mr. Cernich holds an MBA in Finance and Strategy from the University of Michigan and a PhD in American Literature.



**Cristiano Guerra** currently covers economic proposals and fights for corporate control as a member of ISS' Special Situations Research Team. He previously led the US research team and prior to that the Latin America research team, for ISS. In all these roles, he has actively engaged with issuers, shareholders and other stakeholders regarding investor concerns, disclosure issues and specific governance topics relevant to institutional shareholders.

Prior to joining ISS in 2009, he managed a team of global analysts for TranSecur, a Washington D.C.-based private intelligence firm providing consulting services to multinational companies. Cristiano was a keynote speaker on regional political and security developments at conferences held by the World Bank and U.S. and Canadian energy firms. He has a B.S. in Biology from Indiana University.

*It is likely that 1-2 additional analysts from ISS will participate*

EVERCORE  J.P.Morgan                    3                    *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033391

**EXHIBIT 1277-0009**

## II.   Structure of ISS Meeting – What Will Make the Meeting Successful?

Evercore  J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0010**

# Pointers for a Successful Meeting with ISS

- The meeting with ISS is different than a meeting with actively-managed institutional investors (but still governed by Regulation FD). Performance of the business will be the central focus of discussion, but it is likely that significant attention may also be directed at independent leadership, Board function and corporate governance

- Project that the independent Board is engaged and committed – key roles should be defined for the CEO and Independent Chairman as the two primary leaders of the meeting on our side of the table

  - The ISS meeting should be run by Kim Blickenstaff as the Independent Chairman, with roles of the other Board members and David Hung clearly defined. Other members of management, if present, should participate as needed

  - Convey a well-functioning, independent Board. A meeting dominated by the CEO could lead to a conclusion that the Board is not in charge

  - Involve the Directors in any discussion about governance-related issues, should not only be presented by management

- Refrain from overly negative attacks – focus on the talking points; highlight disagreement with Seurat platform, but avoid general criticisms that are prolonged and unsubstantiated. They will ask about the other side, we can then reply accordingly

  - Don't be emotional about Seurat or their proposal. Instead, stick to the facts

  - Don't dignify the opposition allegations by giving them undue emphasis in the meeting. Address the points raised in their materials by discussing and pointing out the facts that negate their allegations

- There is a possibility the meeting could deviate from the deck and become more interactive. In this case it will be imperative for the directors present to find places to interject in order to effectively demonstrate their value-add and engagement

- Remember that any words you use can show up in print in their report; do not say anything you are not comfortable with showing up publicly

---

EVERCORE J.P.Morgan                4                *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0011**

# Meeting Logistics

- <u>Bidder Typically Meets First</u>:  In a contested situation, ISS does its best to honor an unwritten policy whereby the bidder meets with them first and then the issuer has the "last say."  In the event that a material event occurs after the initial meeting, it is not uncommon to have a follow up phone call to address the new issue(s)

- <u>No Use of Non-public Information</u>: The analysts will not utilize any non-public information and typically will ask at the outset that no such material be shared at the meeting.  If an issue arises that requires clarification and the determination is made to make a public filing in order to put the materials on record, it is possible to do so after the meeting and then forward the filing to ISS to enable them to cite to a public document.  This can be incorporated into the next fight letter, for example, so as not to be a stand-alone filing with one or two items of disclosure

- <u>Bidder Materials Tend to Drive Questions</u>: Most of the questions asked in the meeting will typically be derived from an earlier meeting with the bidder as well as materials filed, press releases and any inbound commentary the ISS staff may have received from their clients. At times this can give the appearance of a predisposition to the bidder's position, however it is not necessarily the case and it is imperative not to get rattled by such an assumption

- <u>Time Management</u>: While the meeting is scheduled to run approximately 90 minutes (typically they allow for up to 30 minutes of overage if needed), the recommended best use of time is to allot 60 minutes for our presentation and Q&A in anticipation that the presentation will be interrupted by questions from the ISS staff. The number of ISS participants varies and final participant details should be ascertainable prior to the meeting

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033394

**EXHIBIT 1277-0012**

# Van Gogh Attendees

## Van Gogh Directors:

- Dawn Svoronos
- Anthony Vernon
- Wendy Yarno
- Kim Blickenstaff

## Van Gogh Senior Management:

- David Hung
- Marion McCourt
- Jennifer Jarrett
- Andrew Powell
- Dominic Piscitelli

## Advisors:

- One advisor from both EVR and JPM teams

## MacKenzie:

- Dan Burch

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                JPMS-00153-SEC-00033395

**EXHIBIT 1277-0013**

# III.  ISS Framework and Precedent ISS Analysis

Evercore   J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0014**

## ISS Analytical Framework for Hostile M&A Board Contests

- **Is the offer reasonably certain?**
  - Commitment of time and resources to pursuit
  - Conditionality of Offer
  - Certainty of Financing
  - Regulatory Concerns
  - History of bid increases

  > *Where the offer has certain financing and is not subject to any non-customary conditions or risks, ISS typically does not focus heavily on this prong*

- **Is the valuation an adequate starting point for negotiations?**
  - Peer valuations
  - Historical premiums for comparable transactions in industry, by market cap and for hostile bids
  - Historical share price performance
  - Shareholder views on offer
  - Analyst price targets
  - Opportunism of offer
  - Whether bid fully reflects expected synergies
  - Downside risk to losing offer

  > *This will be the focus of the discussion and ISS's analysis*

- **Was the incumbent Board's response appropriate?**
  - Expressions of willingness to engage at right price
  - Defensive measures
  - Economic actions

  > *This may provide atmospherics around ISS's view of the Board, but is unlikely to be decisive to the outcome*

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033397

**EXHIBIT 1277-0015**

# Hostile M&A Contests for Board Control Precedent Analyses

**ISS Supports Management ((+)** *means factor favored management and* **(-)** *means factor favored bidder***)**

| Support Management |
| --- |
| **Tribune Publishing/Gannett (2016)** |

- **Is the offer reasonably certain?**
  - No firm offer made - not evaluated
- **Reasonableness of valuation**
  - Timing appears opportunistic (+)
    - Offer made following historic low in stock price (+)
    - May not reflect value of new management and new strategy (+)
    - Company still dealing with financial weakness from spinoff and accounting problems (+)
  - Trading multiples of limited value due to limited analyst coverage and peer group (+)
    - Current offer at or below peer EV/EBITDA multiples (+)
  - Timeline for delivering results under new plan may be significant (-)
- **Appropriateness of Board response**
  - Engagement with Gannett on offer (+)
  - New strategic plan appears a significant departure from prior plan, but has significant risks (+)
  - Timing of next annual meeting provides time for early results on plan (+)

| Support Management |
| --- |
| **Illumina/Roche (2012)** |

- **Is the offer reasonably certain?**
  - Fully financed offer (-)
  - No financing condition (-)
- **Reasonableness of valuation**
  - Bid made during 3-year trough for stock and industry (+)
  - No indication that long-term prospects have declined (+)
  - Illumina had substantial scarcity value for Roche (+)
  - Premium above peer and historical comps (-)
    - But early stage nature of business suggests these metrics are inappropriate (+)
- **Appropriateness of Board response**
  - No indication offer "best and final" (+)
  - Time needed for price discovery (+)
  - Acceleration of meeting date to get to vote shows Board confidence (+)

| **Result: More than 40% withheld votes at annual meeting** | **Result: Management slate was elected** |
| --- | --- |

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033398

**EXHIBIT 1277-0016**

# Hostile M&A Contests for Board Control Precedent Analyses

**ISS Supports Management ((+)** *means factor favored management and* **(-)** *means factor favored bidder***)**

| Support Management | Support Management |
|---|---|
| **Casey's/Couche-Tard (2010)** | **NRG/Exelon (2009)** |

**Casey's/Couche-Tard (2010)**

- **Is the offer reasonably certain?**
  - Fully committed financing (-)
  - Multiple price increases (-)
- **Reasonableness of valuation**
  - Premium above industry comps (-)
    - But below comps based on market cap and hostile deals (+)
  - Price impact on Couche-Tard was muted on announcement (+)
  - Couche-Tard not forthcoming about value of synergies (+)
  - Casey's trading above offer price (+)
- **Appropriateness of Board response**
  - Engaged in discussions with third party buyer (7-Eleven) (+)
  - Self-tender indicates Board confidence in standalone value (+)
  - Financing terms for self-tender designed to deter acquisition (-)

**NRG/Exelon (2009)**

- **Is the offer reasonably certain?**
  - Proxy contest meant to distract from valuation debate (+)
- **Reasonableness of valuation**
  - Valuation "muddy" based on financial crisis and uncertainty of commodity pricing (+)
  - Offer timing highly opportunistic (+)
  - Shareholders have indicated support for transaction, but not at current price (+)
  - Expectation that Exelon will raise price (+)
  - Sell-side analysts bullish, but standalone trading price does not reflect estimates (-)
- **Appropriateness of Board response**
  - Inadequacy of offer price justifies management's refusal to engage (+)
  - Splitting Board would only further complicate any negotiations (+)

| **Result: Management slate was elected** | **Result: Management slate was elected** |
|---|---|

EVERCORE J.P.Morgan                                  9                    *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033399
**EXHIBIT 1277-0017**

# Hostile M&A and Proxy Fight Precedents

## ISS Supports Bidder ((+) *means factor favored management and (-) means factor favored bidder*)

| **Support Two of Nine Nominees** | **Support Bidder Short Slate** |
|---|---|
| **Axiall /Westlake Chemical (2016)** | **Airgas/Air Products (2010)** |

<table>
<tr><td>

■ **Is the offer reasonably certain?**

- No financing condition for cash portion and no vote required for stock consideration (-)
- Westlake had walked away from prior negotiations (+)

■ **Reasonableness of valuation**

- Premium analysis unhelpful because of cyclical nature of industry and offer being made during an "abnormal" low for stock (=)
- Precedent transaction multiples above current offer, but two closest comps suggest a multiple in line with offer (=)
- Trading multiples unclear picture based on lack of robust peer group (=)
- Critical uncertainty around whether offer multiples are overstated because offer was made during trough EBITDA (+)
- Shareholders have publicly supported a transaction, but view current offer as too low (+)
- Offer may not compensate shareholders for planned costs savings achievable without a transaction (+)

■ **Appropriateness of board response**

- Board has initiated process and allowed limited diligence (+)
- Poor coordination between sales process and annual meeting (-)
- Insufficient disclosure about status of sales process warrants two bidder nominee to monitor process (-)

</td><td>

■ **Is the offer reasonably certain?**

- No financing condition (-)
- No Air Products shareholder vote required (-)

■ **Reasonableness of valuation**

- Offer not "best and final" (-)
- Air Products indicated it would raise bid if Airgas negotiated (-)
- Premium below selected peer transactions and broader comps for market cap and hostile deals (+)
- Cash offer eliminates Airgas shareholders from participating in potential synergies (+)

■ **Appropriateness of board response**

- Current offer a compelling starting point for negotiations (-)
- Burden on Airgas to justify refusal to engage (-)
- Best way to ensure negotiation is to elect Air Products directors (-)

</td></tr>
</table>

| **Result: Axiall agreed to sweetened deal with Westlake before vote** | **Result: Bidder slate was elected (but bidder directors later voted against the Air Products offer)** |
|---|---|

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033400

**EXHIBIT 1277-0018**

# Hostile M&A and Proxy Fight Precedents

**ISS Supports Bidder ((+)** *means factor favored management and (-) means factor favored bidder***)**

| Support Bidder Short Slate |
| :-: |
| **Terra/CF Industries (2009)** |

- **Is the offer reasonably certain?**
  - Fully financed offer (-)
  - No financing condition (-)
  - Significant length of pursuit (-)
  - No CF shareholder vote required (-)
- **Reasonableness of valuation**
  - Share price below management's valuation (-)
  - Significant gap between management and Street projections (-)
  - CF open to increase bid in negotiations (-)
  - Premium below recent historical comps for market cap (+)
- **Appropriateness of board response**
  - Current offer a compelling starting point for negotiations (-)
  - Board failed to find better deal in last year (-)
  - Burden on Terra to justify refusal to engage (-)

| Support Bidder Short Slate |
| :-: |
| **International Rectifier/Vishay (2008)** |

- **Is the offer reasonably certain?**
  - Certainty unimportant - sole question whether bidder slate would encourage productive negotiations (-)
- **Reasonableness of valuation**
  - Analysts view management projections as "aggressive" (-)
  - Significant downside risk if Vishay walks (-)
  - Offer not explicitly "best and final" – could be increased in negotiations (-)
  - Street expects bid increase through negotiations (-)
- **Appropriateness of board response**
  - No identified issues (+)

| **Result: Bidder slate was elected** | | **Result: Management slate was elected** |
| :-: | :-: | :-: |

EVERCORE J.P.Morgan       11       *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033401

**EXHIBIT 1277-0019**

# IV.  Key Arguments for ISS

EVERCORE  J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0020**

## Summary of Key Arguments

- **Seurat's proposal substantially undervalues the Company and is not an appropriate point for commencing discussions**

  - The proposal is highly opportunistic, made during a period of significant dislocation in the biotechnology market and the Company and before potentially key value-creating milestones

  - The proposal is significantly below Van Gogh's current trading price

  - Peer trading levels suggest Van Gogh's standalone value is well above the current proposal

  - The proposal is significantly below recent comparable transaction multiples in the industry

  - Research analyst price targets and recommendations recognize that the Seurat proposal is substantially below market expectations for a take-out price

  - The proposal does not reflect the meaningful scarcity value that the Company represents for Seurat

- **Our Board has an proven track record and the right experience to decide the Company's strategic direction, including whether and when to pursue a sale**

  - Our directors have a proven track of success in creating value for our shareholders

  - Our directors have the right experience[1], including meaningful industry and transactional, to decide the future of this business

  - Seurat has not provided any substantial basis for believing our Board is not in the best position to make key decisions about the strategic direction of the business, including whether to engage in a sale

- **Instead of focusing on valuation, Seurat has chosen to focus on procedural tactics to deflect scrutiny of their inadequate proposal**

- **Seurat's tactics raise a question about whether it is a serious bidder willing to pay full value for the Company, or whether it is simply being opportunistic in trying to force the Company into a sale at an inadequate price**

(1)   See pages **34** and **51** for detailed experiences

EVERCORE J.P.Morgan                    12                    *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033403

**EXHIBIT 1277-0021**

## What are Our Key Arguments

1. Standalone Value Based on 2020E Revenue Guidance

2. Standalone Value Based on Trading Comparables

3. Transaction Value Based on Relevant Comparable Transactions

4. A Tale of Two Comps: Pharmacyclics vs. Anacor

5. Proposal Does Not Reflect Van Gogh's Scarcity Value: XTANDI is a Blockbuster Asset

6. Van Gogh Research Analyst Price Targets

7. Van Gogh's Analysts are Beginning to Credit the Pipeline

8. Timing of Seurat Proposal is Highly Opportunistic

9. Premiums Based on Seurat's Data Points are Not an Appropriate Metric

10. The Downside Risk to Stock Price is Outweighed by the Potential for Significant Upside

11. Our Directors Have a Strong Record and the Right Experience

12. Our Response to Seurat's Inadequate Proposal Has Been Appropriate

13. The Certainty of Seurat's Proposal is Questionable

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033404

**EXHIBIT 1277-0022**

**1 Standalone Value Based on 2020E Revenue Guidance**

- **Van Gogh remains focused on executing on its well-defined strategic plan and continuing to deliver value to its stockholders**

  – Seurat's proposal of $52.50 substantially undervalues the Company, its leading oncology franchise and innovative late-stage pipeline

  – To illuminate Van Gogh's view on standalone value, Company Management held a webcast presentation with investors to review the Company's business performance and future prospects on May 5, 2016, which included the disclosure of 2020E non-GAAP revenue guidance

- **2020 non-GAAP revenue guidance implies value well in excess of the proposal value**

  – Applying 1-year and 2-year forward revenue multiples to <u>**Management's 2020E revenue guidance of $2.5B+ supports current trading value of ~$68 – $116/share (1) and current transaction value of ~$93 – $165/share (1)**</u>

    - A proposal of $52.50/share implies an $8.8B enterprise value[2], which is significantly less than the enterprise value implied by the trading and transaction multiples for comparable companies applied to Van Gogh's 2020E non-GAAP revenue guidance

  – Management has **consistently met or beaten** guidance for XTANDI revenue and operating expenses for the past three consecutive years[3]

Source: Company filings, press releases, FactSet
Note: See next page
(1) Ranges based on min and max EV/Forward Revenue multiples of Van Gogh's comparable high growth peers
(2) See page 49 for details on implied enterprise value of proposal
(3) Per FactSet

EVERCORE J.P.Morgan                    14                    *Preliminary and Confidential Draft – Subject to Change*

**EXHIBIT 1277-0023**

## 1  Standalone Value Based on 2020E Revenue Guidance

*($ in millions, except per share items)*

### Implied Enterprise Value Based on 2020E Non-GAAP Revenue Guidance of $2.5B+

**Medivation Non-GAAP Revenue Guidance**

$2,500+

29%+ CAGR

$695

2015A        2020E

**Trading Comparables**

**1-Year Forward**

| EV/Revenue | Implied 2019 EV | Implied Current EV / Share Price [1] | |
|---|---|---|---|
| 6.4x - 10.7x | $16,000 - $26,750 | $12,021 | $20,098 |
| | | $70.56 | $115.64 |

**2-Year Forward**

| EV/Revenue | Implied 2018 EV | Implied Current EV / Share Price [1] | |
|---|---|---|---|
| 5.6x - 9.6x | $14,000 - $24,000 | $11,570 | $19,835 |
| | | $68.07 | $114.15 |

**Transaction Comparables**

**2-Year Forward**

| TEV/Revenue | Implied 2018 TEV | Implied Current TEV / Share Price [1] | |
|---|---|---|---|
| 7.8x - 14.0x | $19,500 - $35,000 | $16,116 | $28,926 |
| | | $93.41 | $164.89 |

Source: Company filings and Wall Street research
Note: Multiple range represents low – high multiples of high growth biotechnology comparables; see pg. 17 and pg. 19 for detailed trading and transaction comparables, respectively
(1)   Derived by discounting "Implied 2018/2019 EV" to 06/30/16 using 10% discount rate

EVERCORE  J.P.Morgan                          15                *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033406

EXHIBIT 1277-0024

**② Standalone Value Based on Trading Comparables**

- **Our peer group's trading levels suggests an implied Van Gogh value well above Seurat's proposal**

  – Comparable peers to Van Gogh include high-growth (above 15% CAGR 4-year CAGR) biotechnology companies, given Van Gogh's 4-year CAGR of 27.9%+

  – Per consensus estimates, Van Gogh will achieve 2-Year forward revenue of $1,400M[1]

  – Van Gogh's peers trade at a median EV/2-Year Forward Revenue multiple of 6.7x

    - **This implies a standalone Van Gogh enterprise value of ~$9.4B or ~$56/share**, absent any control premium

  – Furthermore, our oncology peers trade at a median EV/2-Year Forward Revenue multiple of 7.8x

    - **This implies a standalone Van Gogh enterprise value of ~$10.9B or ~$64/share, absent any control premium**

    - Also, a portion of Van Gogh's revenues in 2 years are expected to be derived from royalties – grossing up our revenues to account for this would result in an even higher implied enterprise value

Source: Company filings, press releases, FactSet
(1)  Full year two-year forward revenue assumed to be FY2018 consensus revenue, per FactSet

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033407

**EXHIBIT 1277-0025**



## 2  Standalone Value Based on Trading Comparables

($ in millions)

Selected high growth comps

| Company | Stock price | % of 52-week high | Market cap | Enterprise value | EV/Revenue 2017E | 2018E | EV/EBITDA 2017E | 2018E | P/E 2017E | 2018E | Rev CAGR '16 - '20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Van Gogh | $58.97 | 93.7% | $10,262 | $9,945 | 8.6x | 7.1x | 25.0x | 20.1x | 28.4x | 21.0x | 28.1% |
| Van Gogh (3/30/16) | 37.39 | 55.0% | 6,361 | 6,210 | 5.2x | 4.3x | 14.1x | 10.4x | 18.1x | 13.8x | 17.0% |
| Seurat offer | 52.50 | 83.4% | 9,103 | 8,785 | 7.6x | 6.3x | 22.1x | 17.8x | 25.3x | 18.7x | 28.1% |
| | | | | | | | | | | | |
| Celgene | 96.86 | 69.7% | 78,455 | 87,016 | 6.7x | 5.8x | 13.1x | 11.1x | 13.8x | 11.2x | 16.5% |
| Shire | 58.34 | 67.7% | 53,960 | 74,227 | 3.4x | 3.2x | 8.0x | 6.7x | 17.3x | 14.9x | 10.4% |
| Biogen | 233.00 | 55.8% | 51,378 | 51,145 | 4.3x | 4.1x | 8.2x | 7.9x | 11.6x | 10.7x | 5.9% |
| Regeneron | 345.14 | 57.0% | 38,990 | 38,458 | 6.4x | 5.6x | 15.4x | 13.6x | 21.7x | 18.3x | 15.2% |
| Alexion | 124.14 | 59.4% | 28,150 | 30,439 | 8.1x | 6.7x | 16.4x | 13.6x | 18.8x | 14.7x | 18.8% |
| Vertex | 85.28 | 59.4% | 21,548 | 21,465 | 8.5x | 6.2x | NM | 15.4x | 26.1x | 14.3x | 28.8% |
| Actelion | 161.94 | 93.0% | 19,282 | 18,790 | 7.7x | 6.7x | 20.3x | 15.4x | 21.1x | 17.3x | 11.6% |
| Incyte | 77.60 | 58.1% | 15,397 | 15,336 | 10.7x | 9.6x | NM | NM | NM | NM | 20.3% |
| BioMarin | 81.22 | 53.5% | 13,912 | 13,920 | 10.6x | 8.7x | NM | NM | NM | NM | 19.7% |
| Seattle Genetics | 38.38 | 73.3% | 5,588 | 4,897 | 9.9x | 7.8x | NM | NM | NM | NM | 26.7% |
| **Mean (high growth biotech only)** | | | | | **8.7x** | **7.2x** | **15.0x** | **13.4x** | **20.1x** | **14.6x** | **20.8%** |
| **Median (high growth biotech only)** | | | | | **8.5x** | **6.7x** | **15.4x** | **13.6x** | **20.2x** | **14.5x** | **19.7%** |
| **Mean (Oncology only)** | | | | | **9.1x** | **7.7x** | **13.1x** | **11.1x** | **13.8x** | **11.2x** | **21.2%** |
| **Median (Oncology only)** | | | | | **9.9x** | **7.8x** | **13.1x** | **11.1x** | **13.8x** | **11.2x** | **20.3%** |

Source: Company filings; Wall Street research; FactSet as of 06/21/16

Note: Means and medians exclude Van Gogh; revenue multiples greater than 30.0x or less than 0.0x and P/E multiples greater than 50.0x or less than 0.0x denoted as "NM"; Van Gogh multiples based on broker consensus revenue estimates; select high growth includes recent transactions with 2016-2020 revenue CAGR greater than 15.0%; Seurat proposal 4-yr CAGR based on 2016-2020 estimates, and incorporates Management's 2020 revenue guidance number of $2.5+bn; Oncology only includes Celgene, Incyte, Seattle Genetics

EVERCORE J.P.Morgan

17

*Preliminary and Confidential Draft – Subject to Change*

**③ Transaction Value Based on Relevant Comparable Transactions**

- Seurat's proposal is priced well below recent (last five years), relevant precedent transactions in our sector based on a number of metrics

  - We selected recent transactions of high growth biotechnology targets as our closest comparable peers (Pharmacyclics/AbbVie, InterMune/Roche, Algeta/Bayer, Onyx/Amgen, Amylin/BMS/AstraZeneca)

    - Based on 2020E non-GAAP revenue guidance of \$2.5B+, Van Gogh's 4-year revenue CAGR of 27.9%+[1] fits well with other high growth biotechnology transactions

  - **On a forward revenue multiples basis, Seurat's proposal is significantly below multiples for comparable transactions**

    - On a Transaction Value/2-Year forward revenue multiple basis, Seurat's proposal represents a 6.3x[2] multiple, whereas our comparable high-growth peers transacted at a median multiple of 10.4x

      - <u>Using that multiple here would imply a \$14.6B transaction value and ~\$85/share</u>

      - The full range of multiples for recent high growth transactions implies a share price of ~\$64 to \$113

    - **Pharmacyclics, the most relevant high-growth oncology comparable, was acquired at a Transaction Value/2-Year forward revenue multiple of 11.5x**

      - <u>Applying the multiple paid for Pharmacyclics would imply a \$16.1B transaction value and ~\$93/share</u>

- **On an acquisition premia basis, Seurat's argument that it is proposing a 50% premium to the Company's "unaffected" share price is opportunistic and, in any case, still substantially undervalues Van Gogh**

  - Seurat's "unaffected" price was cherry picked during a period of disruptive newsflow and market dislocation – hence we would argue that a premiums analysis in this time period is an inappropriate metric

    - **There has not been a lower 2-month VWAP within the last 2 year period**

    - In all but one comparable transaction, the target was sold at a premium to its 52-week high, with a median premium to 52-week high of 31%

    - Seurat's proposal represents a (~21%) discount to Van Gogh's 52-week high of \$66.40[3]

    - Seurat's proposal represents a (~11%) discount to Van Gogh's current trading price

Source: Company filings, press releases, FactSet
(1) Assumes 2016E non-GAAP revenue of \$935mm (midpoint of Management guidance)
(2) See page 49 for details on transaction value calculation and multiples; Full year two-year forward revenue assumed to be FY2018 consensus revenue of \$1,400mm, per FactSet
(3) 52-week high measure as of the date of public announcement of Seurat's proposal (April 28, 2016)

EVERCORE J.P.Morgan                               18                    *Preliminary and Confidential Draft – Subject to Change*

**EXHIBIT 1277-0027**

**3**  **Transaction Value Based on Relevant Comparable Transactions**   [shaded] Selected recent high growth targets

*($ in billions)*

| Date Announced | Target | Acquiror | EV | EV/Revenue 2-Yr Fwd | 4-Yr Rev CAGR | Premium to unaffected price 1-Day | 30-Day | 52-Wk high |
|---|---|---|---|---|---|---|---|---|
| 3/4/15 | Pharmacyclics | Abbvie | $20.2 | 11.5x | 41% | 39% | 60% | 33% |
| 12/8/14 | Cubist | Merck | $9.5 | 5.9x | 11% | 37% | 39% | 24% |
| 8/24/14 | Intermune | Roche | $8.4 | 14.0x | 66% | 63% | 69% | 55% |
| 12/19/13 | Algeta | Bayer | $2.6 | 10.4x | 44% | 37% | 45% | 28% |
| 8/25/13 | Onyx | Amgen | $9.8 | 7.9x | 36% | 44% | 39% | 23% |
| 6/29/12 | Amylin | BMS / AstraZeneca | $6.9 | 7.8x | 20% | 101% | 88% | 68% |
| 2/16/11 | Genzyme | Sanofi | $20.3 | 4.0x | 10% | 48% | 47% | 23% |
| 6/30/10 | Abraxis | Celgene | $2.8 | 5.8x | 17% | 17% | 32% | 13% |
| 5/16/10 | OSI Pharmaceuticals | Astellas | $3.6 | 6.8x | 11% | 55% | 63% | 44% |
| 10/6/08 | ImClone | Lilly | $6.1 | 6.5x | 18% | 51% | 68% | 42% |
| 4/10/08 | Millennium | Takeda | $8.0 | 12.0x | 31% | 53% | 72% | 45% |
| 12/10/07 | MGI | Eisai | $3.9 | 5.5x | 29% | 23% | 31% | 13% |
| 11/18/07 | Pharmion | Celgene | $2.6 | 4.9x | 32% | 46% | 46% | 36% |
| 4/23/07 | MedImmune | AstraZeneca | $15.2 | 9.1x | 13% | 53% | 72% | 51% |
| **Last 5 years - mean** | | | | 9.6x | 36% | 54% | 57% | 39% |
| **Last 5 years - median** | | | | 9.2x | 39% | 41% | 52% | 31% |
| **Select recent high growth - mean** | | | | 10.3x | 41% | 57% | 60% | 42% |
| **Select recent high growth - median** | | | | 10.4x | 41% | 44% | 60% | 33% |
| **Seurat offer** | | | $8.8 | 6.3x | 28% | 40% | 41% | (17%) |

Source: Company filings, press releases, FactSet. Revenue multiple is calculated based on the firm value paid for the target company over the target company's two-year forward estimated revenues at the time of signing. The forward-looking two-year period that was used in each case was the same calendar year for transactions signed prior to June 30 of a given year and the next calendar year for transactions signed following June 30 of a given year. Note: Select high growth includes transactions in the last 5 years with target 4-year revenue CAGR greater than 20.0%. Revenue multiples >30.0x are shown as "NM". Seurat proposal 4-yr CAGR based on 2016-2020 estimates, and incorporates Management's 2020 revenue guidance number of $2.5+bn.

EVERCORE J.P.Morgan          19          *Preliminary and Confidential Draft – Subject to Change*

## 4  A Tale of Two Comps: Pharmacyclics vs. Anacor

The more relevant comparable is clear when observed side-by-side

| | **MEDIVATION** | **pharmacyclics**<br>**$20.2bn**[1] | **ANACOR**<br>**$4.9bn**[1] |
|---|---|---|---|
| **Therapeutic Area** | Oncology | Oncology | Dermatology |
| **Proven Commercial Blockbuster Asset?** | ✓ | ✓ | ✗ |
| **Lead Asset Peak Sales Potential (Wall Street)** | **Xtandi:** ~$6bn[2] | **Imbruvica:** ~$10bn[2] | **Crisaborole:** $2bn[3]<br>(NDA submitted) |
| **Profitable?** | ✓ | ✓ | ✗ |
| **LTM Sales (at time of acquisition)** | $996mm | $816mm | $85mm |
| **De-Risked Business?** | **Xtandi:** Commercialized ✓ | **Imbruvica:** Commercialized ✓ | **Crisaborole:** NDA Submitted ✗ |
| **Meaningful Pipeline Value?** | ✓ Talazoparib, Pidilizumab | ✓ | ✗ |
| **EV / 2-Year Forward Multiple** | 6.3x[4] | 11.5x | 24.2x |
| **Premium to 52-week High** | (17%)[5] | 33% | (37%) |

Source: Company filings, Wall Street research, press releases and FactSet
(1) Figures represent transaction value
(2) Median of Wall Street research estimates at asset level; at time of acquisition for Pharmacyclics
(3) Management projections per acquisition press releases
(4) At Seurat proposal
(5) At Seurat proposal; 52-week high as of 04/28/16, the date of the proposal

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                JPMS-00153-SEC-00033411
**EXHIBIT 1277-0029**

**⑤ Proposal Does Not Reflect Van Gogh's Scarcity Value: XTANDI is a Blockbuster Asset**

- **Seurat's proposal does not reflect the meaningful scarcity value that the Company represents to Seurat's pipeline**
  - Seurat needs to acquire new medicines to make up for declining revenue in the diabetes market after Lantus went off patent in the US, and it's strategic deal for Afrezza inhalable insulin was an abject failure
    - Seurat's internal development of its oncology pipeline has faltered, leaving opportunistic M&A as its last resort
  - Van Gogh is a unique opportunity as one of the few profitable and sizeable oncology companies, with a rapidly-growing, multi-billion dollar oncology product in XTANDI and a wholly-owned, differentiated late-stage pipeline
    - There are very few mid-cap oncology companies with meaningful ownership of a blockbuster drug and even fewer have a late-stage pipeline with blockbuster potential
    - Seurat's undervalued proposal does not reflect Van Gogh's market position and clearly does not include a scarcity premium for Van Gogh's shareholders
  - Xtandi will move from the 8th largest oncology drug by WW product sales in 2015 to the 4th largest oncology drug by WW product sales in 2021, per EvaluatePharma
    - Van Gogh is the only independent mid-cap biotech Company with a top-10 oncology drug in either 2015 or 2021
  - Scarcity of oncology assets with these blockbuster attributes suggest that Van Gogh should transact at metrics of comparable high-growth companies
- **Van Gogh does not need a transaction at this time – left alone, it is fully capable of executing on its business strategy and continue to create value for its shareholders**

Source: EvaluatePharma

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033412

**EXHIBIT 1277-0030**

## High Levels of M&A Activity Leave Few Opportunities of Scale in Oncology, Especially Solid Tumor Programs

**5**



### Number of Public Deals by Therapeutic Area[1] (2005 – 2016 YTD)

| Oncology | CNS | Anti-infective/viral | Derm | CV | Other | Orphan | Inflam. | Metabolic | Ophthamology | Platform |
|---|---|---|---|---|---|---|---|---|---|---|
| 28 | 17 | 16 | 12 | 9 | 8 | 8 | 6 | 5 | 5 | 2 |



### 2016E Oncology Revenue ($ mm)

Company has been acquired
Company remains independent
Company with partnered assets

| | CELG | AMGN | Genen-tech | PCYC | MDVN | INCY | BIIB | ImClone | Cephalon | ONXX | Millen-nium | MGI Pharma | OSI Pharma | Abraxis | SGEN | DNDN | Genzyme | Pharmion | ARIA | SPPI | IMGN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $9,918 | $9,642 | $7,180 | $1,119 | $964 | $936 | $849 | $646 | $514 | $512 | $461 | $361 | $359 | $335 | $330 | $298 | $285 | $267 | $172 | $123 | $53 |
| **Partner** | -- | -- | Roche / Novartis ex-US | JNJ WW profit Share | Astellas WW US co-promote | Novartis ex-US | Roche | BMS / Merck KGaA WW, US co-promote | -- | Bayer WW, US co-promote | JNJ ex-US | -- | Roche WW US co-promote | -- | Takeda ex-US | -- | -- | Celgene ex-US | Otsuka Japan + other Asia | -- | Roche |
| **Txn. Date Value ($bn)** | 3/12/09 $46.8 | 3/04/15 $20.2 | | | | 9/22/08 $6.5 | 10/14/11 $7.5 | 8/25/13 $9.7 | 4/10/08 $8.8 | 12/10/07 $3.9 | 3/01/10 $4.0 | 6/30/10 $2.9 | | | 2/23/15 $0.5 | 2/16/11 $20.1 | 11/18/07 $2.9 | | | |

Source: Company filings, Evaluate Pharma and FactSet
(1)   Excludes Pfizer/Wyeth, Merck/Schering-Plough, Sanofi/Genzyme, Actavis/Forest, Actavis/Allergan, Pfizer/Hospira, Valeant/Salix and Pfizer/Allergan

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033413

**EXHIBIT 1277-0031**

**5** **Medivation is a Scarce Asset Among Public Oncology Companies**

Very Few Midcap Oncology Assets Remain and Van Gogh is the Only Profitable, <u>Blockbuster</u> Player in the Space



Source: FactSet and EvaluatePharma

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC          JPMS-00153-SEC-00033414

**EXHIBIT 1277-0032**

## 6  Van Gogh Research Analyst Price Targets

- **Analyst price targets prior to M&A speculation support meaningful standalone value, even prior to unprecedented business disclosure on the 1Q'16 earnings call**

  - Based on "unaffected" analyst price targets (i.e., targets assigned prior to March 30, 2016), Van Gogh's median price target was $48.00

    - Counter to Seurat's assertion that Van Gogh shares would be trading in the mid $30s absent their proposal, we believe that the "unaffected" analyst price target supports a much higher standalone trading price

- Following Q1'16 earnings call, **analysts increased price targets by 26% on average, a large part of which is attributable to new corporate information released by Management including:**

  - 2020E Non-GAAP Revenue guidance of $2.5bn+

  - "Duration of treatment" data

  - Data showing Xtandi surpassed Zytiga in the US NHT market in Q1'16

  - Clinical development plans for talazoparib

- **Additionally, M&A values derived from research analysts are supportive of our view of value; <u>Seurat's proposal is substantially inadequate</u>**

  - Based on "affected" analyst price targets (i.e., current price targets as of June 8, 2016), **Van Gogh's median price target is $67.00**

  - Median "M&A Takeout Price" range published by research analysts is $56.00 – $75.00/share

---

Source: Company filings, press releases, FactSet

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033415

**EXHIBIT 1277-0033**

## 6 · Van Gogh Research Analyst Price Targets

### Analyst Price Targets Prior to 3/30/16

| Firm | Date | Rating | Price Target |
|---|---|---|---|
| MAXIM | 03/29/16 | Buy | $47 |
| J.M.P. | 03/28/16 | Buy | 56 |
| citi | 03/21/16 | Hold | 37 |
| CANACCORD Genuity | 03/29/16 | Hold | 45 |
| BARCLAYS | 03/30/16 | Buy | 48 |
| RBC Capital Markets | 03/04/16 | Hold | 40 |
| SUNTRUST ROBINSON HUMPHREY | NOT COVERED | | |
| William Blair | 02/25/16 | Buy | 67 |
| STIFEL | 03/28/16 | Buy | 52 |
| LEERINK | 02/26/16 | Hold | 39 |
| CREDIT SUISSE | 03/18/16 | Buy | 47 |
| WEDBUSH | 03/29/16 | Buy | 48 |
| BRÉAN CAPITAL, LLC. | 02/26/16 | Buy | 61 |
| Jefferies | 03/30/16 | Hold | 39 |
| BMO Capital Markets | NOT COVERED | | |
| COWEN | 02/26/16 | Hold | 40 |
| UBS | 03/28/16 | Buy | 50 |
| Bank of America Merrill Lynch | 03/29/16 | Buy | 49 |
| J.P.Morgan | 02/25/16 | Buy | 48 |
| | 03/30/16 | Hold | 44 |
| BTIG | 03/02/16 | Hold | N/A |
| Needham | 02/29/16 | Hold | N/A |
| **Range:** | | | **$37 - $67** |
| **Median:** | | | **48** |

Source: Wall Street research and Bloomberg as of 06/21/16

### Current Analyst Price Targets

| Firm | Date | Rating | Price Target | M&A Takeout Price |
|---|---|---|---|---|
| MAXIM | 05/06/16 | Buy | $76 | - |
| J.M.P. | 06/17/16 | Buy | 73 | $54 - $75 |
| citi | 06/15/16 | Buy | 73 | 68 - 78 |
| CANACCORD Genuity | 05/06/16 | Buy | 70 | - |
| BARCLAYS | 06/17/16 | Buy | 70 | - |
| RBC Capital Markets | 05/19/16 | Hold | 70 | 65 - 75 |
| SUNTRUST ROBINSON HUMPHREY | 05/26/16 | Buy | 70 | 51 - 71 |
| William Blair | 05/06/16 | Buy | 67 | 67 + |
| STIFEL | 05/23/16 | Buy | 66 | 69 - 85 |
| LEERINK | 06/07/16 | Hold | 64 | 35 - 63 |
| CREDIT SUISSE | 06/17/16 | Buy | 64 | 64 |
| WEDBUSH | 06/02/16 | Buy | 63 | 54 - 75 |
| BRÉAN CAPITAL, LLC. | 05/06/16 | Buy | 61 | - |
| Jefferies | 06/22/16 | Hold | 56 | 51 - 75 |
| BMO Capital Markets | 05/18/16 | Hold | 50 | - |
| COWEN | 06/01/16 | Hold | 40 | 60 - 70 |
| UBS | NOT COVERED | | | |
| Bank of America Merrill Lynch | 06/17/16 | Not Rated | N/A | 57 - 68 |
| J.P.Morgan | 04/28/16 | Not Rated | N/A | - |
| | 05/09/16 | Not Rated | N/A | - |
| BTIG | 05/06/16 | Hold | N/A | - |
| Needham | 05/09/16 | Hold | N/A | - |
| **Range:** | | | **$40 - $76** | **$35 - $85** |
| **Median:** | | | **67** | **56 - 75** |

Note: Green shaded cells represent price target increases since 03/30/16

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033416

**EXHIBIT 1277-0034**

**7**  **Van Gogh's Analysts are Beginning to Credit the Pipeline**



**Bank of America Merrill Lynch**

"Van Gogh management has spoken of the potential benefits of tala given with certain other low dose chemo agents. We expect the side effects of tala and carbo would be additive, and are not surprised by the study's conclusions. **There is no change to our $14/share NPV for tala and we view the asset as one of MDVN's key drivers of value**"

*-- Tazeen Ahmad, BAML*
*June 6, 2016*



**RBC Capital Markets**

"We have raised our PT from $40 to $70 and have **assigned $2B in value to talazoparib, $750M to pidilizumab,** and have increased our penetration and peak sales assumptions for Xtandi increasing its value from $31/share to $48/share"

*-- Simos Simeonidis, RBC*
*May 6, 2016*

**BARCLAYS**

"We forecast peak WW sales of ~$800M for talazoparib with very conservative assumptions, but can easily arrive at $1.6-1.9B with differentiated efficacy and/or expansion into BRCA-like population. Based on our analysis, **we are raising our talazoparib valuation from $5/share to $8/share** and raising our NPV-based price target on MDVN shares to $48 from $45."

*-- Geoff Meacham, Barclays*
*March 28, 2016*

| Est. Pipeline Value |
| --- |

- $2.3B of value in talazoparib

*Estimates*
- $14/share for talazoparib
- 168.3M shares outstanding (BAML est.)

| Est. Pipeline Value |
| --- |

- $2.0B of value in talazoparib
- $750M of value in pidilizumab

| Est. Pipeline Value |
| --- |

- $1.3B of value in talazoparib

*Estimates*
- $8/share for talazoparib
- 164.23M shares outstanding (Barclays est.)

Source: Wall Street research

EVERCORE  J.P.Morgan

26

*Preliminary and Confidential Draft – Subject to Change*

## 8   Timing of Proposal is Highly Opportunistic

- **The proposal is opportunistically timed to front-run potentially key value-creating milestones for the Company**
  - PDUFA date for XTANDI TERRAIN/STRIVE label expansion targeting urologists on **October 22, 2016**
  - XTANDI Top-line data from Phase 4 PLATO trial in **2H 2016** for non-metastatic prostate cancer
  - XTANDI Phase 2 ER/PgR+ breast cancer trial data in **2H 2016**
  - A Phase 3 trial of XTANDI in metastatic triple negative breast cancer is expected to initiate later in **2H 2016**
  - Phase 3 Talazoparib data from the EMBRACA trial in BRCA-positive breast cancer in **1H 2017**
  - XTANDI PROSPER trial , targeting the front-line prostate cancer opportunity, is on track to complete enrollment of 1,560 patients in **mid-2017**
- **Given the substantial value creation potential of these events, Seurat's timing is designed to capture for themselves stock appreciation that rightly belongs to Van Gogh's shareholders**

Source: Company filings and Wall Street research

EVERCORE  J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033418

**EXHIBIT 1277-0036**

## 8  Timing of Proposal is Highly Opportunistic



Source: Management Presentation

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**⑨  Premiums Based on Seurat's Data Points are Not an Appropriate Metric**

- **Seurat's proposal was made during a period of significant dislocation in the biotechnology market and a two-year low in the Company's stock price**

  - Seurat's "unaffected" price was selected during a period of challenging newsflow and market dislocation

    - Van Gogh was challenged on XTANDI pricing and March-in-Rights were an overhang on stock

      - On June 20th, the NIH declined to initiate a march-in investigation or utilize the government's license in the patents

    - Concerns around XTANDI's Q1 growth given the Q4 slowdown; (concerns mitigated after announcing worldwide net sales of XTANDI totaling $547M in the first quarter of 2016 (+53% vs. Prior Year))

  - Seurat's "private proposal" was submitted to Van Gogh when the NBI index was off almost 30% from its July 2015 high and Van Gogh was trading at its lowest level in two years

  - Seurat's proposal is 21% below Van Gogh's 52-week high of $66.40 and less than a 14% premium to Van Gogh's 12-month VWAP at the time of the public announcement

  - Seurat's often referenced premium is based on a 2-month VWAP – **there has not been a lower 2-month VWAP for Van Gogh within the last 2 year period**

- **Given the temporary decline in Van Gogh's trading level, upon which Seurat had strategically based its "unaffected" price, premiums are not an appropriate metric upon which to assess the proposal**

  - Shareholders have already spoken as current offer represents (~11%) discount to current price

Source: Company filings and Wall Street research

EVERCORE  J.P.Morgan                          29                  *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033420

**EXHIBIT 1277-0038**

## 9   Premiums Based on Seurat's Data Points are Not an Appropriate Metric



**Seurat's "Unaffected Price" Coincided with NASDAQ Biotechnology Index Bottom**

Source: FactSet as of 06/21/16

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033421

**EXHIBIT 1277-0039**

## 9   Premiums Based on Seurat's Data Points are Not an Appropriate Metric



Source: Press releases and Company presentations
Note: Premia based on unaffected stock prices prior to announcement
(1)  Premium to true unaffected price of $37.39 as of 03/30/16
(2)  Discount to closing price of $58.97 as of 06/21/16

EVERCORE  J.P.Morgan      31      *Preliminary and Confidential Draft – Subject to Change*

**EXHIBIT 1277-0040**

**10**  ## The Downside Risk to Stock Price is Outweighed by the Potential for Significant Upside

- **We believe that our history of execution in addition to the market's reaction to the situation, makes it unlikely that our stock would return to what Seurat refers to as "unaffected" price in the high $30s if Seurat were to walk away**

  – Management disclosed material detail surrounding the development prospects for XTANDI and Talazoparib in the Q1'16 earnings presentation, resulting in analysts increasing their price targets by 26% on average

  – Management guided for substantial near-term growth inherent 2020 non-GAAP revenue guidance of $2.5B+

  – Median price target was $48 based on analyst price targets as of 3/30/16 (prior to M&A rumors)

- **We are confident in our ability to deliver based on our demonstrated track record of superior shareholder return**

  – Van Gogh has significantly outperformed its peers, industry and the S&P 500 over the short- and long-term

  – Van Gogh reached profitability within seven quarters of commercial launch, one of the fastest paths to profitability in biotech history[1]

- **The downside risk of a short-term decline in the stock is outweighed by the risk of accepting a bid that does not adequately compensate shareholders for Van Gogh's short- and long-term upside potential**

---

Source: Company filings, press releases, FactSet
(1)   Profitability defined as four consecutive positive Non-GAAP net income quarters or positive Non-GAAP net income as of most recent quarter

EVERCORE  J.P.Morgan                                32                    *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

## ⑩ The Downside Risk to Stock Price is Outweighed by the Potential for Significant Upside

| | | Shareholder Return [1] | | |
|---|---|---|---|---|
| | | | Van Gogh Relative Return Against | |
| Time Period | Van Gogh Total Return | Van Gogh Comps [2] | NBI | S&P500 |
| LTM (as of 06/21/16) | (0.3%) | + 28.5% | + 33.3% | + 1.3% |
| 3-Year | + 151.6% | + 93.4% | + 100.1% | + 120.4% |
| 5-Year | + 1,028.6% | + 811.3% | + 881.8% | + 967.4% |
| Since First Public Offering [3] | + 15,118.1% | + 13,863.3% | + 14,867.4% | + 15,043.1% |

**Stock Price Performance (5-Year Return)**



Source: FactSet as of 06/21/16
(1)   Stock price performance, excluding dividends
(2)   Comps include: BioMarin, Celgene, Regeneron, Alexion, Vertex, Incyte, and Seattle Genetics        (3)   Indexed to first public offering of Van Gogh stock on 12/17/04

EVERCORE  J.P.Morgan                                33                *Preliminary and Confidential Draft – Subject to Change*

**11** ## Our Directors Have a Strong Record and the Right Experience

- **This is a decision about the appropriate value of the business and who should be entrusted with creating the most value for shareholders, including deciding the strategic direction of the business and whether/when to pursue a sale of the Company**

- **Our directors have the right experience to evaluate and decide the future of this business**

  - Our Chairman, Kim Blickenstaff, was the CEO of Biosite which was the subject of an attempted hostile takeover in 2007. After guiding the Company through a very competitive bidding situation, Kim sold the Company to Inverness Medical. Biosite was sold for $92.50 per share vs. a pre-proposal price of $55.38

  - Wendy Yarno is on the Board of St. Jude which was just acquired by Abbott several weeks ago. She was also on the Board of Durata, another publicly traded biotechnology company, which was acquired by Actavis in 2014

  - Dr. David Hung sold his prior company, ProDuct Health, which developed a breast cancer diagnostic, to Cytyc in 2001

  - Our other Board members held senior positions at public companies that have been acquisitive over the last several years

  - Each of our directors has significant experience in the healthcare/pharmaceutical industry

- **Seurat has not provided any substantial basis for believing our Board is not in the best position to make key decisions about the strategic direction of the business, including whether to engage in a sale process**

  - Many of Seurat's proposed Board members lack the relevant industry experience or transactional background to evaluate a business such as Van Gogh and determine its value

  - Seurat's proposed Board members are not incentivized to act in the best interests of Van Gogh's shareholders, and may be receiving compensation directly from Seurat, presenting a conflict of interest

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                                    JPMS-00153-SEC-00033425

**EXHIBIT 1277-0043**

## 11 Van Gogh Guidance vs. Actuals Summary

*($ in millions, except per share items)*

| | Financial Measure | Guidance Range | | | Midpoint | Actuals | % Difference[3] | Result |
|---|---|---|---|---|---|---|---|---|
| **2013** | Xtandi US Net Sales | $345 | - | $365 | $355 | $392 | 10.5% | **BEAT** |
| | Operating Expenses (GAAP) | $285 | - | $300 | $293 | $295 | 0.9% | **MEET** |
| **2014** | Xtandi US Net Sales[1] | $500 | - | $535 | $518 | $680 | 31.4% | **BEAT** |
| | Milestone Payments related to XTANDI | | $212 | | $212 | $321 | 51.4% | **BEAT** |
| | Operating Expenses (GAAP)[2] | $460 | - | $485 | $473 | $429 | (9.2%) | **BEAT** |
| **2015** | Xtandi US Net Sales | $1,050 | - | $1,125 | $1,088 | $1,151 | 5.8% | **BEAT** |
| | Collaboration Revenue (Non-GAAP) | $600 | - | $650 | $625 | $695 | 11.2% | **BEAT** |
| | Operating Expenses (Non-GAAP) | $410 | - | $450 | $430 | $430 | - | **MEET** |
| | R&D Expenses (Non-GAAP) | $180 | - | $200 | $190 | $181 | (5.0%) | **BEAT** |
| | SG&A Expenses (Non-GAAP) | $230 | - | $250 | $240 | $249 | 3.9% | **MEET** |

*Van Gogh has consistently met or beaten guidance for the past three consecutive years*

Source: Company filings
(1) XTANDI US Net Sales guidance for FY 2014 updated to $600 to $640 on Q2'14 call
(2) Operating Expense (GAAP) guidance for FY 2014 updated to $400 to $430 on Q2'14 call
(3) Calculated vs. the average of the guidance range

EVERCORE  J.P.Morgan

35

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033426

**EXHIBIT 1277-0044**

## 12 Our Response to Seurat's Inadequate Proposal Has Been Appropriate

- **Seurat is not entitled to engagement**
  - As we've demonstrated through our valuation discussion, Seurat's proposal substantially undervalues the Company and is not a basis for engagement, a fact that is evident from the public reaction to their inadequate proposal
    - Our VWAP has been 13.6% above Seurat's proposal since it was publicly announced on April 28
    - The median analyst price target as of June 21st is more than 25% above the Seurat proposal
    - We have received feedback from numerous investors that the value being proposed is not appropriate
  - Seurat is not entitled to engagement or private diligence on the Company – this is a decision for our Board to make based on the reasonableness of Seurat's proposal
    - We have never said that we would not consider a sale at any price – but it has to be the reasonable price before the Company decides to engage with a potential acquirer about maximizing shareholder value through a potential sale

- **Instead of focusing on value, Seurat has chosen to focus on procedural tactics aimed at deflecting scrutiny of its inadequate proposal**
  - This should be a debate focused squarely on value and the inadequacy of Seurat's proposal
  - Seurat's consent solicitation distracts from the valuation debate by providing an unnecessary layer of complicated procedure and debate over the qualifications of the respective director candidates
  - Seurat has failed to provide any substantial basis for believing our qualified and proven Board is incapable of deciding the best course for creating value for our shareholders

- **Seurat's tactics raise a question about whether it is a serious bidder and would be willing to pay full value for the Company, or whether it is simply being opportunistic in trying to force the Company into a sale at an inadequate price**
  - Research analysts have referred to the Seurat proposal as, among other things, "predatory" (Credit Suisse) and "clearly inadequate and insufficient" (Leerink)
  - If a sale process were pursued, a Board composed of hand-picked Seurat nominees would be likely to discourage other bidders, who may take the view that Seurat would have the "inside track" in any sale process

Source: FactSet and Wall Street research as of 06/21/16

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033427

EXHIBIT 1277-0045

## 13 The Certainty of Seurat's Proposal is Questionable

■ **Seurat has made it clear that they want to conduct further diligence**

– Seurat has not reviewed the full Astellas agreement, which they may find to be unattractive

– Seurat is a competitor in prostate cancer

● Van Gogh would be at a competitive disadvantage by sharing confidential data without greater certainty of a transaction

■ **Seurat has indicated that it "may" be able to offer more value pending further diligence, yet there is no certainty that they will do so**

– Seurat has already publicly disparaged Van Gogh's pipeline

– Given Seurat's experience developing iniparib, it may not give us proper credit for talazoparib

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033428

**EXHIBIT 1277-0046**

# V.   Q&A

Evercore   J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0047**

## Questions & Answers

- **What would the trading price be if Seurat withdrew its proposal?**
  - We believe that our history of execution in addition to the market's reaction to the situation, makes it unlikely that our stock would return to what Seurat refers to as "unaffected" price in the high $30s if Seurat were to walk away
  - Prior to Seurat's proposal the median analyst price target was $48 and price targets increased 26% on average following increased business disclosure in our Q1'16 earnings call
  - We are confident in our ability to deliver based on our demonstrated track record of superior shareholder return
  - The downside risk of a short-term decline in the stock is outweighed by the risk of accepting a bid that does not adequately compensate shareholders for Van Gogh's short- and long-term upside potential

- **Why shouldn't ISS rely on Seurat's valuation data?**
  - Seurat's valuation data has been picked to support their substantially inadequate offer
  - Seurat's valuation is based on comparable transactions and companies that don't reflect Van Gogh's unique position as one of the few profitable, commercial-stage, and rapidly-growing oncology companies
  - Mid-cap oncology companies with meaningful ownership of a blockbuster drug are incredibly unique, and even fewer offer the growth potential within XTANDI or have a late-stage pipeline as full of promise as Van Gogh
  - Seurat's valuation data is limited and selected to support their opportunistic proposal. The data presented today is more robust

- **What's wrong with focusing on pre-bid trading prices and research analyst price targets?**
  - On our Q1 earnings call, we provided unprecedented disclosure on our business plan. Revisions to analyst price targets immediately following the disclosures suggest a fundamental value disconnect in our pre-bid trading price and research price targets
  - The proposal is opportunistically timed to front-run potentially key value-creating milestones for the Company
  - Given the substantial value creation potential of these events, Seurat's timing is designed to capture for themselves stock appreciation that rightly belongs to Van Gogh's shareholders
  - Research analyst price targets largely support our position that Seurat's proposal substantially undervalues Van Gogh

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033430

**EXHIBIT 1277-0048**

## Questions & Answers

- **Why not give Seurat access to due diligence and the Astellas information?**

  – What matters for Van Gogh and its Board is value for our shareholders. As we have previously said, Seurat's proposal of $52.50 per share in cash for Van Gogh substantially undervalues our leading oncology franchise and our pipeline's excellent prospects and is not a reasonable basis for engagement

  – We are comfortable that our Board's position is well understood by and reflects the overwhelming sentiment of our shareholders. Our Board is committed to act so that our shareholders realize the value we have created and are continuing to create

  – The only clearly wrong choice here is engaging with Seurat on the basis of their lowball and opportunistic proposal

- **Why is the Medivation board refusing to engage with other buyers – or disclosing its view on other buyers, given the speculation in the press?**

  – We are fiduciaries for our shareholders, and we take that responsibility very seriously. If the best outcome for shareholders is through a transaction at a price which appropriately rewards our shareholders, we will pursue that. And if the best outcome is through executing our strategy we will pursue that approach

  – What we can say is that the Board is focused on the best path for delivering value to shareholders and we also believe that disclosing what we may or not be doing is not helpful to securing that best path forward

- **Why not add a few of Seurat's directors to help ensure Medivation's board is properly considering sale?**

  – Our directors have the right experience to evaluate and decide the future of this business

  – Seurat has not provided any substantial basis for believing our Board is not in the best position to make key decisions about the strategic direction of the business, including whether to engage in a sale process

  – This is a decision about the appropriate value of the business and who should be entrusted with creating the most value for shareholders, including deciding the strategic direction of the business and whether/when to pursue a sale of the Company

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC          JPMS-00153-SEC-00033431

**EXHIBIT 1277-0049**

# Questions & Answers

- **Why not just engage with Seurat and see if an enhanced due diligence process yields a higher proposal?**

  – What matters for Van Gogh and its Board is value for our shareholders. As we have previously said, Seurat's proposal of $52.50 per share in cash for Van Gogh substantially undervalues our leading oncology franchise and our pipeline's excellent prospects and is not a reasonable basis for engagement

  – We are comfortable that our Board's position is well understood by and reflects the overwhelming sentiment of our shareholders. Our Board is committed to act so that our shareholders realize the value we have created and are continuing to create

  – The only clearly wrong choice here is engaging with Seurat on the basis of their lowball and opportunistic proposal

- **At what price would Van Gogh consider selling the Company? Some analysts are suggesting $55 - $85 as M&A take out values—Does Van Gogh agree with this assessment?**

  – It would be inappropriate to comment on this topic

  – We don't have a "threshold price" and will consider each proposal for the Company individually on its terms

  – We are fiduciaries for our shareholders, and we take that responsibility very seriously. If the best outcome for shareholders is through a transaction at a price which appropriately rewards our shareholders, we will pursue that. And if the best outcome is through executing our strategy we will pursue that approach

  – Look at two recent situations in healthcare. Allergan's Board was pilloried for actions that they supposedly were not taking and then surprised the market with a significant premium in a sale to Actavis. On the other hand, the Illumina Board delivered substantial value when they rebuffed Roche's bid and shareholders supported their standalone strategy. Be assured that we are focused on both scenarios, and have a Board with seasoned executives in this space that have sold and built companies

  – The only clearly wrong choice here is engaging with Seurat on the basis of their lowball and opportunistic proposal

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0050**

# Questions & Answers

- **Are the rumors true, have you signed an NDA with other potential strategic acquirers? Have you reached out to other strategic parties? Have others contacted you regarding their interest?**

  – It would be inappropriate to comment on those topics

  – What we can say is that the Board is focused on the best path for delivering value to shareholders and we also believe that disclosing what we may or not be doing is not helpful to securing that best path forward

  – Look at two recent situations in healthcare. Allergan's Board was pilloried for actions that they supposedly were not taking and then surprised the market with a significant premium in a sale to Actavis. On the other hand, the Illumina Board delivered substantial value when they rebuffed Roche's bid and shareholders supported their standalone strategy. Be assured that we are focused on both scenarios, and have a Board with seasoned executives in this space that have sold and built companies. We're sorry we can't say more on this topic, but we will keep you informed as soon as it is appropriate to make additional disclosures

  – The only clearly wrong choice here is engaging with Seurat on the basis of their lowball and opportunistic proposal

- **Shouldn't you now just start a formal process to see where others may be able to provide value that is more in line with management and the Board's views? At what point in time would you be willing to put the Company up for sale?**

  – We are fiduciaries for our shareholders, and we take that responsibility very seriously. If the best outcome for shareholders is through a transaction at a price which appropriately rewards our shareholders, we will pursue that. And if the best outcome is through executing our strategy we will pursue that approach

  – What we can say is that the Board is focused on the best path for delivering value to shareholders and we also believe that disclosing what we may or not be doing is not helpful to securing that best path forward

  – Let's focus on the issue at hand, which is Seurat's inadequate proposal

---

EVERCORE  J.P.Morgan

41

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0051**

# Questions & Answers

- **There have been reports that you would be willing to sell the Company for $65/share. Is that your threshold price for negotiations?**

  - The $65/share is press speculation and we won't comment on that

  - We don't have a "threshold price" and will consider each proposal for the Company individually on its terms

  - What matters for Van Gogh and its Board is creating value for our shareholders

  - We are fiduciaries for our shareholders, and we take that responsibility very seriously. If the best outcome for shareholders is through a transaction at a price which appropriately rewards our shareholders, we will pursue that. And if the best outcome is through executing our strategy we will pursue that approach

  - Let's focus on the issue at hand, which is Seurat's inadequate proposal

- **Why not add one or two independent directors from Seurat's slate? Wouldn't that provide greater confidence that the Board is not entrenched?**

  - Our directors are fiduciaries for our shareholders and we take that responsibility very seriously. Our directors have the right experience to evaluate and decide the future of this business and a strong record of creating value for our shareholders

  - Our shareholders are entitled to a clean referendum on Seurat's inadequate proposal. Recommending a split Board will provide an unclear picture of shareholder support for a transaction

  - Splitting the Board will neither ensure that the Board will negotiate with Seurat nor will it ensure that Seurat pays a full and fair price

  - Adding Seurat directors to the Board could discourage other potential bidders for the Company, who may take the view that Seurat would have the "inside track" in any sales process

---

Evercore J.P.Morgan                    42              *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

## Questions & Answers

- **What happens if another bidder emerges?**

  - It is our policy not to comment on market or press rumors regarding M&A

  - Let's focus on the issue at hand, which is Seurat's inadequate proposal

- **Why did you amend your bylaws in response to Seurat's proposal?**

  - The bylaw amendments regarding the consent solicitation process are administrative and intended to provide an orderly process in the event of a consent solicitation

  - We have not limited any of our shareholders', including Seurat's, rights to pursue a written consent in any manner

  - With respect to the forum selection clause, as a Delaware Company, it is in our shareholders best interests to have any dispute related to the consent solicitation, any potential hostile tender offer or any other dispute regarding our internal affairs litigated in Delaware courts, which are highly experienced and efficient in dealing with these complicated matters

  - We set the record date when Seurat requested it, although we could have set it earlier. We wanted to give our shareholders the opportunity to speak promptly, so we can remove the distraction of Seurat's lowball bid and return to focus on our business and opportunities

- **You have a shareholder rights plan in place – will you waive it for Seurat if they make a hostile bid?  Why not redeem it altogether?  Isn't this a strong signal that the Board is entrenched?**

  - We will not speculate about what actions Seurat might take

  - The rights plan was enacted nearly 10 years ago and is scheduled to expire in January.   Its trigger threshold is 20 percent.  Given recent events, the annual election of directors and the ability of our shareholders to act by written consent, we don't believe it would block an interested party from approaching the Company

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033435

**EXHIBIT 1277-0053**

# VI.  Fact vs. Fiction Rebuttals

Evercore  J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

JPMS-00153-SEC-00033436
**EXHIBIT 1277-0054**

## Fact vs. Fiction

| Seurat Assertion | Fact |
|---|---|
| **"Compares very favorably to precedent public oncology transactions…"** | ▪ 2-Year forward revenue multiples for other relevant precedent transactions are significantly higher than Seurat's proposed 6.3x multiple<br>— Pharmacyclics acquired for 11.5x 2-year forward revenue in March 2015<br>— Median 2-year forward revenue multiple of 10.4x for high-growth peers<br>— AbbVie paid $5.8 billion upfront and up to $4 billion in earn-outs for Stemcentrx (no marketed products, lead asset Rova-T in pivotal trial) in April 2016 |
| **"Seurat's offer compares very favorably to the only other public biotech transaction of size in 2016: Anacor"** | ▪ Pfizer's acquisition of Anacor is not a comparable transaction<br>— Anacor's lead asset, Crisaborole, currently under review by the FDA (not approved), is a potential dermatology drug<br>— Even if Anacor were included in the peer set, the 2-year forward revenue multiple of 24.2x is meaningfully higher than Seurat's proposed 6.3x multiple for Medivation<br>▪ Does not compare favorably to AbbVie's acquisition of Stemcentrx<br>— No marketed products (Rova-T in pivotal trial) |
| **"If Van Gogh were to engage and provide information, Seurat would be in a position to increase its offer…"** | ▪ $52.50 is not a basis for engagement or a valid starting point for negotiations |
| **"Proposed purchase price is a premium of >50% to Medivation's unaffected average trading price" (60-day calendar VWAP 1/22-3/21)** | ▪ Fundamental value is key and premiums are not relevant<br>— Period of challenging newsflow (XTANDI pricing and March-in-Rights debates) and severe dislocation in biotech market<br>— 2-month VWAP coincides with trough in NBI<br>— (~11%) discount to current Van Gogh trading price |

Source: Wall Street research, Company press releases and FactSet

EVERCORE J.P.Morgan

44

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033437

**EXHIBIT 1277-0055**

## Fact vs. Fiction (Cont'd)

| Seurat Assertion | Fact |
|---|---|
| **"Seurat's proposal is compelling when measured against public oncology transactions >$1bn and <$25bn since 2010"** | ■ Only compelling for Seurat and its shareholders<br><br>■ High growth precedents had a median multiple of 10.4x 2-year forward revenue vs. 6.3x for Seurat's lowball proposal<br><br>■ Seurat's own cited transactions[1] had a median multiple of 7.9x 2-year forward revenue vs. 6.3x for Seurat's lowball proposal (25% premium) |
| **"In absence of a transaction, we believe Van Gogh's share price would be trading dramatically below our offer"** | ■ Analyst share price targets on March 30, 2016 ranged from $37 to $67 per share<br><br>■ On May 5, 2016, Van Gogh provided substantial information to the market, which resulted in an $14.00 increase in the median price target (5/6/16 price targets compared to 5/4/16 price targets) |
| **"Van Gogh has only offered information already known to the market to justify its refusal to engage"** | ■ On May 5, 2016, Van Gogh provided substantial information to the market, which resulted in an $14.00 increase in the median price target (5/6/16 price targets compared to 5/4/16 price targets)<br><br>■ Van Gogh's refusal to engage is solely based on Seurat's lowball $52.50 proposal |
| **"Refusal to announce a sale process or even engage with Seurat underscores that the current Van Gogh Board is not listening to shareholders"** | ■ Van Gogh has held [x] meetings with shareholders as of June [x], 2016<br><br>■ Shareholders overwhelmingly support Van Gogh's rejection of Seurat's lowball proposal |

Source: Wall Street research
(1)   Includes OSI/Astellas, Abraxis/Celgene, Onyx/Amgen, Algeta/Bayer, Pharmacyclics/AbbVie

EVERCORE  J.P.Morgan                                          45                    *Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                JPMS-00153-SEC-00033438

**EXHIBIT 1277-0056**

# Fact vs. Fiction (Cont'd)

| Seurat Assertion | Fact |
|---|---|
| **"We believe that the proposed directors are committed to acting in best interest of Van Gogh shareholders"** | ■ Each of Van Gogh's current directors has first-hand working knowledge of the Company, its operations, its employees, its marketed product and pipeline<br><br>■ In contrast, Seurat and the Seurat nominees have limited or no familiarity with the Company and collectively lack experience in the biopharmaceutical industry<br><br>■ Seurat Nominees, despite being subject to the same fiduciary duties under Delaware law as the current directors:<br><br>  – may have conflicts of interest<br><br>  – may not independently evaluate and manage the Company's business to enhance value for all of the Company's stockholders;<br><br>  – may not undertake a comprehensive and impartial review of all of the Company's strategic alternatives (including Van Gogh's prospects as a standalone company) other than the Seurat Non-Binding Proposal<br><br>  – may not vigorously negotiate with Seurat (or any other third party) on behalf of Van Gogh's stockholders |
| **"Seurat-Genzyme: a Blueprint for Mutually Beneficial M&A"** | ■ Not a comparable situation<br><br>  – Agitating activist situation<br><br>  – Genzyme had material manufacturing issues, which created severe shortages for Cerezyme and Fabrazyme<br><br>  – Van Gogh has an enviable track-record of execution |
| **"Values Van Gogh at approximately $9.4 billion"** | ■ Seurat's calculation excludes the ~$300mm of cash proceeds from the exercise of these dilutive securities and ~$300mm of operating cash ($8.8bn enterprise value offer) |

46

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033439

**EXHIBIT 1277-0057**

# Fact vs. Fiction (Cont'd)

| Seurat Assertion | Fact |
|---|---|
| "Combining Seurat and Van Gogh represents a compelling strategic and financial opportunity" | ▪ ….for Seurat and its shareholders<br>▪ Seurat's proposal is designed to seize for Seurat value that rightly belongs to Van Gogh's stockholders |
| "Van Gogh share price before takeover rumors reflected sector reset and company-specific newsflow" | ▪ Analyst share price targets on March 30, 2016 ranged from $37 to $67 per share<br>▪ On May 5, 2016, Van Gogh provided substantial information to the market, which resulted in an $14.00 increase in the median price target (5/6/16 price targets compared to 5/4/16 price targets) |
| Not opportunistic approach with respect to biotech market | ▪ 2-month VWAP coincides with trough in NBI |
| "52-week high is irrelevant – Van Gogh's share price has been driven by operational set-backs and market expectation in addition to broader rerating of biotech sector" | ▪ No operational set-backs – Q1'16 XTANDI US sales grew 37% year-over-year; Q1'16 ex-US sales grew 80% year-over-year<br>▪ Pipeline continues to progress on track<br>▪ Median current analyst price target is $67/share |
| "Reference to 52-week high above $60 is stale" | ▪ At time of Seurat's approach and Seurat's publication of its lowball proposal, 52-week high was $66.40 |
| "Van Gogh management has been overly optimistic in the past" | ▪ Van Gogh sourced XTANDI and acquired the program for [$x]mm developing it into a product with $2.2bn in run-rate sales – no other party [including Seurat, which at the time had a much larger prostate cancer franchise] had the foresight to see the potential of XTANDI<br>▪ Van Gogh has an enviable track record of delivering returns to shareholders<br>   – 152% TSR over past 3 years; 1,029% TSR over past 5 years; 15,118% TSR since first public offering |

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033440

**EXHIBIT 1277-0058**

# Fact vs. Fiction (Cont'd)

| Seurat Assertion | Fact |
|---|---|
| **Van Gogh exaggerates the potential of talazoparib and ignores competitive and clinical risks** | ▪ Talazoparib has exhibited significantly greater potency in vitro relative to other PARP inhibitors (Velaparib, Rucaparib, and Olaparib)<br><br>  – Compelling clinical data with high / differentiated response rate observed in ovarian and breast<br><br>  – EMBRACA data readout expected in 1H 2017<br><br>▪ Following Van Gogh's May 6, 2016 presentation, several analysts provided specific values for Talazoparib<br><br>  – BAML (6/6): $14.00/share<br><br>  – Barclays (5/6): $8.00/share<br><br>  – Leerink (5/6): $5.94/share<br><br>  – RBC (5/6): $11.88/share<br><br>  – SunTrust Robinson Humphrey (5/9): $2.00/share - $8.00/share<br><br>  – William Blair (5/6): $5.14/share<br><br>▪ Seurat is overly pessimistic on talozoparib given its experiences with iniparib<br><br>  – At ASCO 2013, Seurat announced that iniparib failed Phase III trials triggering a $285mm charge |

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033441

**EXHIBIT 1277-0059**

# Appendix

Evercore  J.P.Morgan

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0060**

# Capitalization of Van Gogh

## Public Market Overview

*($ in millions, except per share data)*

| Trading Statistics (Net Debt as of 03/31/16) | | |
|---|---|---|
| **Share Performance** | Seurat Proposal Per Share | $52.50 |
| | 52-Week High | 66.40 |
| | 52-Week Low | 26.41 |
| | *% of 52 Week High* | *79.1%* |
| | *Premium / (Discount) to Current* | *(11.0%)* |
| | LTM Average Daily Volume (k) | 2,564 |
| **Share Count** [1] | Basic Shares Outstanding (mm) | 164.6 |
| | In-the-money Options / Warrants [2] | 8.8 |
| | Fully Diluted Shares Outstanding (mm) | 173.4 |
| **Equity Value** | Fully Diluted Equity Value | $9,102.9 |
| **Net Debt** [3] | Cash and Cash Equivalents | $317.4 |
| | Debt | - |
| | Net Debt | ($317.4) |
| **Enterprise Value** | Fully Diluted Enterprise Value | $8,785.5 |
| | EV / 2017E Revenue | 7.58x |
| | EV / 2018E Revenue | 6.27x |
| | EV / 2017E EBITDA | 22.1x |
| | EV / 2018E EBITDA | 17.8x |

| Observations |
|---|
| **①** **Seurat's proposal is at $52.50/share; Van Gogh shares are currently trading at $58.97/share** |
| ▪ **As of the date of the proposal, the 52-week high was $66.40 on June 1, 2015** |
| ▪ **Proposal is at a (11%) discount to the current trading price of $58.97** |
| **②** **Van Gogh has approximately 173 million diluted shares outstanding based on the Treasury Stock method at the proposed purchase price; all Van Gogh options, stock appreciation rights and warrants are currently in-the-money (as of 12/31/15 financials and 04/28/16 Annual Meeting proxy statement )** |
| **③** **Van Gogh had approximately $317 million in cash and equivalents as of March 31, 2016. Van Gogh has no debt on the balance sheet after redeeming the 2017 convertible notes in July 2015 and paying down $75mm in revolving credit in 1Q'16** |

Source: Company filings and FactSet as of 06/21/16
Note: Enterprise Value multiples based on consensus estimates

(1) In-the-money options and warrants calculated using Treasury Stock method
(2) Includes RSUs
(3) Cash and debt balances are as of 03/31/16

EVERCORE   J.P.Morgan

49

*Preliminary and Confidential Draft – Subject to Change*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1277-0061**

## Shareholder Base / Overview

| | | | | | | Investor characteristics | | |
|---|---|---|---|---|---|---|---|---|
| Rank | Investor | % O/S | Cumulative O/S | Position change | Market value ($mm) | Style | Country | Source |
| 1 | Fidelity Management & Research Co. | 13.4% | 21.9 | 0.26 | 1,337 | Growth | United States | 13F |
| 2 | The Vanguard Group, Inc. | 7.1% | 11.7 | 0.33 | 713 | Index | United States | 13F |
| 3 | BlackRock Fund Advisors | 4.6% | 7.5 | 0.06 | 459 | Index | United States | 13F |
| 4 | Knoll Capital Management LP | 2.7% | 4.4 | 0.00 | 268 | Aggressive Growth | United States | 13F |
| 5 | SSgA Funds Management, Inc. | 2.2% | 3.7 | 0.26 | 224 | Index | United States | 13F |
| 6 | Janus Capital Management LLC | 2.1% | 3.5 | 0.58 | 214 | Growth | United States | 13F |
| 7 | TimesSquare Capital Management LLC | 1.9% | 3.1 | 0.28 | 191 | Growth | United States | 13F |
| 8 | Scopia Capital Management LP | 1.7% | 2.8 | 2.80 | 171 | Growth | United States | 13F |
| 9 | Bellevue Asset Management AG | 1.6% | 2.6 | 0.00 | 161 | Aggressive Growth | Switzerland | 13F |
| 10 | ING Bank NV (Investment Management) | 1.5% | 2.5 | 2.45 | 150 | GARP | Netherlands | 13F |
| 11 | Frontier Capital Management Co. LLC | 1.3% | 2.2 | 0.15 | 132 | Growth | United States | 13F |
| 12 | Discovery Capital Management LLC | 1.3% | 2.1 | (1.37) | 131 | Growth | United States | 13F |
| 13 | FIAM LLC | 1.3% | 2.1 | (0.13) | 127 | Growth | United States | 13F |
| 14 | PointState Capital LP | 1.3% | 2.1 | 2.07 | 126 | Value | United States | 13F |
| 15 | HealthCor Management LP | 1.2% | 2.0 | (0.29) | 123 | Aggressive Growth | United States | 13F |
| 16 | Adage Capital Management LP | 1.2% | 2.0 | (0.32) | 123 | Growth | United States | 13F |
| 17 | Franklin Advisers, Inc. | 1.2% | 1.9 | 0.02 | 118 | Yield | United States | 13F |
| 18 | Redmile Group LLC | 1.1% | 1.8 | 0.19 | 109 | Growth | United States | 13F |
| 19 | Columbia Wanger Asset Management LLC | 1.1% | 1.8 | 1.78 | 109 | Growth | United States | 13F |
| 20 | David T. Hung | 1.0% | 1.7 | 0.00 | 103 | N/A | N/A | Proxy |

Source: Company filings
Note: % O/S reflects positions as of latest public filings; market value as of 06/03/16; GARP represents "growth at a reasonable price"

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC          JPMS-00153-SEC-00033444

**EXHIBIT 1277-0062**

# Good Governance and Board of Directors with Relevant Expertise

- **Kim D. Blickenstaff (Chairman): Director since 2005**
    - President and CEO of Tandem Diabetes Care Inc.; Former Chairman and CEO of Biosite Inc. (acquired by Inverness Medical Innovation, Inc.); Director of Tandem Diabetes Care, Inc.; Past director of SenoRx Inc. (acquired by C.R. Bard, Inc.); B.A. and MBA from Loyola University

- **David T. Hung: Director since 2003**
    - Co-Founder, President and CEO of Van Gogh Inc.; Former Chief Scientific Officer, President and CEO of ProDuct Health, Inc. (acquired by Cytyc Corporation) and consultant to Cytyc Corporation; Director of NKT Therapeutics Inc. and Establishment Labs S.A.; Past director of Opexa Therapeutics Inc.; A.B. from Harvard (Biology) and M.D. from UCSF

- **Kathryn E. Falberg (Chair of Audit Committee): Director since 2013**
    - Full-time independent director, with extensive experience serving on a number of public Company Boards (Aimmune Therapeutics, Inc., aTyr Pharma, Inc., Halozyme Therapeutics, Inc.)
    - Former SVP, EVP and CFO of Jazz Pharmaceuticals PLC; Past VP, SVP, Controller, Chief Accounting Officer and CFO of Amgen; Past director of QLT Inc., Human Genome Sciences, Inc., VISX and Fresh del Monte, Inc.; B.A. (Economics) and MBA from UCLA

- **Michael L. King: Director since 2015**
    - Professor of practice at the University of Virginia School of Engineering and Applied Science and independent consultant to the pharmaceutical and biologics/vaccine industries; Former SVP, advisor to the Chairman, President, and CEO of Merck & Co.; B.S. (Chemical Engineering) from Virginia Tech, M.S. (Chemical Engineering) from University of Virginia and Ph.D. (Chemical Engineering) from the University of Delaware

- **C. Patrick Machado: Director since 2014**
    - Former SVP, Chief Business Officer and CFO of Van Gogh Inc.; Past VP, SVP, General Counsel and CFO of ProDuct Health, Inc. (acquired by Cytyc Corporation) and consultant to Cytyc Corporation; Director of Chimerix, Inc., SCYNEXIS, Inc. and Armaron Bio Pty. Ltd.; B.A. (German) and B.S. (Economics) from Santa Clara University and J.D. from Harvard Law School

- **Dawn Svoronos (Chair of Nominating/Corporate Gov. Committee): Director since 2013**
    - Former Interim Chief Commercial Officer of Van Gogh Inc. and VP of Asia Pacific and President of Europe and Canada for Merck & Co.; Director of Theratechnologies, Inc., Centre for Drug Research and Development in Vancouver, Canada and AgNovos Healthcare Co.

- **W. Anthony Vernon: Director since 2006**
    - Former EVP, President of North America, CEO and Senior Advisor of Kraft Foods Group, Inc. and Healthcare Industry Partner at Ripplewood Holdings, Inc.; Past executive positions at Johnson & Johnson, Depuy Inc., Centocor, Inc., and McNeil Consumer Products and Nutritionals; Past director of NovoCure Ltd., Intersect ENT, Inc. The WhiteWave Foods Company and Kraft Foods Group, Inc.; B.A. from Lawrence University and MBA from Northwestern University Kellogg Graduate School of Management

- **Wendy L. Yarno (Chair of Compensation Committee): Director since 2013**
    - Former General Manager (Cardiovascular/Metabolic U.S. Business Unit), SVP, and CMO of Merck & Co., CMO of HemoShear LLC and independent consultant in the life sciences industry; Director of St. Jude Medical, Inc. (acquisition offer from Abbott) and Aratana Therapeutics; Past director of Durata Therapeutics, Inc. (acquired by Actavis Plc); B.S. (Business Administration) from Portland State University and MBA from Temple University

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC                    JPMS-00153-SEC-00033445

EXHIBIT 1277-0063

# Comments From Research Analysts – Van Gogh Research Analysts

| | | | Summary analyst perspectives | | |
|---|---|---|---|---|---|
| Broker | Rating | Price target | Potential M&A take-out price | Methodology | Transaction commentary |
| MaxIM (05/06/16) | Buy | $76 | N/A | DCF / SOTP | N/A |
| JMP (06/17/16) | Buy | $73 | $50 — $54 ◆ — $75 — $90 | DCF | ▪ While we agree that the Seurat bid of $52.50/share is low, in our view, Van Gogh remains a potential takeover candidate. As such, we are convinced that it is only a matter of time before Van Gogh finds a takeover attempt at a higher price, either by Seurat or another party |
| citi (06/15/16) | Buy | $73 | $50 — $68 ◆ $78 — $90 | DCF Standalone: PT = $48 | ▪ Given add'l interest from other parties per Bloomberg (AstraZeneca, Pfizer) and Van Gogh's preparations for a takeover attempt, we view the likelihood of an acquisition in the near term as very high. |
| CANACCORD Genuity (05/06/16) | Buy | $70 | N/A | DCF / NPV / P/E | ▪ Based on Seurat's letter to Van Gogh's Board disclosed today, we expect the process may quickly become hostile, but doubt investors will endorse any bids below the prior high of $70 for the stock<br>▪ Although Astellas' prior September 2016 standstill is now null, we are unclear if the Company would put forward a bid. However, we believe that any large acquirer may seek to obtain full US rights to Xtandi, and could also seek US Xtandi rights for cancer types outside of prostate cancer<br>▪ We do agree with Van Gogh that pressure from Seurat to consummate a transaction quickly seeks to avoid significant upside as 2016 progresses |
| SunTrust Robinson Humphrey (05/26/16) | Buy | $70 | $50 $51 ◆ — $71 — $90 | DCF / NPV SOTP / Discounted P/E | ▪ So far all we've seen is: 1) what we view is as a low-ball bid by Seurat at $52.50, 2) market speculation that there could be others entering the process, and 3) a very long earnings conference call rejecting the $52.50 bid and highlighting management's view, and in part our view, of the deeper value of Van Gogh<br>▪ We believe Van Gogh could be appealing to both 1) encamped oncology pharma and big biotech, and 2) those wanting Van Gogh as beachhead in oncology. What is more with an active bid, Van Gogh's partner, Astellas is freed up to enter the M&A process<br>▪ We do not expect this to be a speedy process. We wouldn't be surprised to see other bidders, nor do we see a shortage of potential acquirers. We have a $70 M&A based PT, and we think cash is king and contingent value rights are unlikely at this juncture |
| BARCLAYS (06/17/16) | Buy | $70 | N/A | DCF / SOTP | ▪ Better disclosures around the commercial and development strategy should provide investors enough comfort in the outlook to support the rejection of Seurat's offer at $52.50. However, that wasn't really in doubt and today's performance was more on the next offer, rather than Seurat's low-ball bid, in our view<br>▪ Overall, we still think there is underappreciated scarcity value in Van Gogh shares given Xtandi's best-in-class profile and line-of-sight to tapping into new segments of the prostate market. Combine that with important data read-outs for Xtandi and talazoparib in breast cancer over the next 12 months, and we think the portfolio can support higher valuations even before factoring in synergies with strategic suitors |

Source: Wall Street research

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC    JPMS-00153-SEC-00033446

EXHIBIT 1277-0064

# Comments From Research Analysts – Van Gogh Research Analysts (Cont'd)



**Summary analyst perspectives**

| Broker | Rating | Price target | Potential M&A take-out price | Methodology | Transaction commentary |
|---|---|---|---|---|---|
| RBC Capital Markets (05/19/16) | Hold | $70 | $65–$75 range ($50–$90) | SOTP | • We believe that Van Gogh has significant scarcity value, with an oral approved agent for a large oncology indication, and **don't expect it to remain independent past 2016** |
| *William Blair* (05/06/16) | Buy | $67 | $67+ ($50–$90) | DCF | • In conclusion, we believe that a transaction of a Van Gogh acquisition **should be valued much higher than the Seurat offer on the table right now. In our opinion, a more accurate valuation could consist of our current price target of $67 or higher,** plus CVRs for Xtandi in breast cancer and for the talazoparib franchise to accurately reflect the potential of these opportunities |
| STIFEL (05/23/16)(1) | Buy | $66 | AstraZeneca $80 $85 ($50–$90); $69 $85 ($50–$90) | DCF M&A: (20%) TGR, 8.1% WACC Standalone: PT = $52 based on 20x 2018 P/E, 15% discount | • **While we agree that the Seurat bid of $52.50/share is low, in our view, Van Gogh remains a potential takeover candidate.** As such, we are convinced that it is only a matter of time before Van Gogh is acquired at a higher price, either by Seurat or another party |
| LEERINK (06/07/16) | Hold | $64 | $64 ($30–$90) | DCF / SOTP | • We have increased our price target for Van Gogh from $39 to $64 and continue to rate the stock Market Perform. The basis for our new valuation is straightforward acquisition-based valuation, using both DCF/sum of the parts and industry standard acquisition premia. **Both point us toward a mid-$60's acquisition price,** which seems to be where investors are increasingly satisfied with their return <br><br> • Seurat's initial offer of $52.50 is **clearly inadequate and insufficient, and we do view the Company as undervalued for its potential,** at even the current price. Whether a buyer will endorse management's vision for the potential of Xtandi in multiple indications, and for talazoparib too, remains to be seen |
| CREDIT SUISSE (06/17/16) | Buy | $63 | AstraZeneca $59 $75 ($50–$90); SANOFI $55 $65 ($50–$90); Roche $54 $60 ($50–$90) | M&A DCF ($49 standalone) | • **We see little likelihood of current Van Gogh shareholders accepting Seurat's predatory bid of $52.50/share. As such, we anticipate Seurat will raise its bid considerably following this finalization of the record date** for consent solicitation in order to bring shareholders on Board. <br><br> • A messaging dichotomy between Seurat and Van Gogh has emerged with both mgmt. teams claiming the backing of Van Gogh's largest shareholders: Seurat claims "overwhelming" support for a sale of the Company while Van Gogh mgmt. claims support for independent operations. **We anticipate basis for each case, with shareholders viewing the Seurat offer as opportunistic and undervaluing Van Gogh, though we anticipate potential for sellers at a higher price** |

Source: Wall Street research
(1) $69-$85 M&A take-out price range represents broader takeout target

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC     JPMS-00153-SEC-00033447

**EXHIBIT 1277-0065**

# Comments From Research Analysts – Van Gogh Research Analysts (Cont'd)

| | | | Summary analyst perspectives | | |
|---|---|---|---|---|---|
| **Broker** | **Rating** | **Price target** | **Potential M&A take-out price** | **Methodology** | **Transaction commentary** |
| **WEDBUSH** (06/02/16) | Buy | $63 | $55 $63 / $50 — $90 | NPV | • Seurat's public letter to the Board of Van Gogh, which implies the pharma is ready to go hostile with their $52.50/share bid, **is unlikely to be the final offer, given that multiple bidders (Amgen, Astra, Pfizer and Novartis) are reportedly in the mix.** Our new PT is at the high end of the **$55-$63 takeout range we previously calculated**, and is based on significant post-purchase synergies (50% R&D, 80% SG&A and 11% discount rate)<br>• A takeover could potentially occur above our range (Van Gogh management has indicated a floor of $65/share) |
| **Brean Capital, LLC** (05/06/16) | Buy | $61 | N/A | DCF | N/A |
| **Jefferies** (06/22/16) | Hold | $56 | AMGEN $54 $75 / $50 — $90   SANOFI $51 $71 / $50 — $90 | DCF | • We chose Seurat, Bayer, and Amgen because **each either has a treatment approved in prostate cancer or has treatments approved for marketing to urologists and therefore could realize sales synergies** |
| **BMO** (05/18/16) | Hold | $50 | N/A | DCF | N/A |
| **COWEN** (06/01/16) | Hold | $40 | $60 $70 / $50 — $90 | DCF / Forward 2017 P/E | N/A |
| **Goldman Sachs** (05/09/16) | N/A | N/A | N/A | – | N/A |
| **Bank of America Merrill Lynch** (06/17/16) | N/A | N/A | $57 $68 / $50 — $90 | DCF | • During the call, Hung elaborated, stating the price was below Van Gogh's 52-week high ($66/sh in May 2015), and that the reference period used by SNY closely coincided with the recent bottom of the biotech market. While we value Van Gogh based on it remaining a stand-alone Company, our **EU Pharma team provided its analysis on the impact of such an acquisition for SNY. We believe Van Gogh's longer-term guidance is designed to remind shareholders of potential unlocked value.** |

Source: Wall Street research

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC   JPMS-00153-SEC-00033448

**EXHIBIT 1277-0066**

## Comments From Research Analysts – Van Gogh Research Analysts (Cont'd)

| | | Price | | | |
|---|---|---|---|---|---|
| **Broker** | **Rating** | **target** | **Potential M&A take-out price** | **Methodology** | **Transaction commentary** |
| ■BTIG (05/06/16) | Hold | N/A | N/A | DCF / Forward 2017 P/E | • We believe that it is **merely an attention grabbing opening offer.** While we are Neutral rated on Van Gogh as a stand-alone entity, **we believe that a strategic buyer like Seurat can accrue significant top-line and bottom-line benefits from such a transaction. The fact that Seurat has a prostate cancer franchise that can be materially bolstered by Van Gogh's Xtandi, makes us believe that this is an opening gambit in a final offer that should be north of $60/share.** |
| Needham (05/09/16) | Hold | N/A | N/A | DCF | N/A |
| Min | | $40 | $51-$60 | | |
| Mean | | $65 | $60-$72 | | |
| Median | | $67 | $58-$71 | | |
| Max | | $76 | $80-$85 | | |

**Summary analyst perspectives**

> *Qualitative commentary from analysts outline the inadequate nature of the current proposal*

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC     JPMS-00153-SEC-00033449

**EXHIBIT 1277-0067**

## Comments From Research Analysts – Seurat Research Analysts

| Broker | Date | Commentary |
|---|---|---|
| Jefferies | 5/6/16 | • Whilst management were inevitably asked to comment on Seurat's pursuit of Van Gogh, they declined to make comments beyond what has been already publicly disclosed<br>• In general they **do not currently aspire to be a "top oncology Company", but instead are looking to make targeted investments** in terms of oncology R&D<br>• Management clarified that they are committed to oncology, regardless of what plays out with Van Gogh and that they are also looking at assets in immunology in terms of business development |
| SOCIETE GENERALE | 5/2/16 | • The $9.3bn cash offer for Van Gogh (rejected by the Board) **introduces some uncertainties. It is not a transformational deal (we preferred Regeneron)**<br>• Seurat **has some room to sweeten its offer** to around $60 per share. According to our estimates, the deal would still be accretive, create value and enhance the group's growth profile, margin and cancer pipeline |
| HSBC Global Research | 4/29/16 | • Building oncology franchise is a key priority for Seurat but **looks to overpay** for a single product and weak pipeline<br>• Given a total deal value of USD9.3bn, this would equate to a 2017e EV/Sales of 8.9x and EV/EBITDA of 21.8x vs sector averages of 4.3x and 14.7x, respectively. In our view, Van Gogh is a single product Company with a weak pipeline and arguably does not justify such a premium<br>• Even putting aside the high premium Seurat is willing to pay (and Seurat has the balance sheet to finance this without stretch), **we would question the rationale for the deal**. CEO Olivier Brandicort has expressed a strong desire to build a presence in oncology and given Seurat's small in-house pipeline, an acquisition could make sense. However, Van Gogh has only one product on the market, Xtandi, an androgen receptor antagonist for metastatic castration-resistant prostate cancer (USD1.6bn in worldwide sales in 2014)<br>• **In our view, acquiring Van Gogh would not transform Seurat's oncology franchise**: We think Seurat looks to be paying too high a price to acquire what is essentially a high-cost single oncology asset in a crowded therapeutic category, and in an area which is likely to suffer generic competition from late 2018 in a price sensitive US market |
| COWEN | 4/29/16 | • A Van Gogh acquisition **would be a good strategic fit**<br>• Van Gogh's only commercialized product is Xtandi, a leading drug for prostate cancer, which would fit well with SNY's Jevtana |
| NATIXIS | 4/28/16 | • The acquisition of Van Gogh **restores a strong position in oncology and is bang in line with the announced strategy**<br>• The deal, which is financially and strategically attractive, is reassuring on the use of cash<br>• Olivier Brandicort has applied to the letter the strategy he described on 6 November 2015 and has **hit another homerun with the bid for Van Gogh**, which would round out Seurat's oncology division after the acquisition of Boehringer's OTC<br>• There is **no doubt about the strategic interest of the acquisition**, which, moreover, would be earnings enhancing, and largely preferable to a pure pipeline deal (riskier) |
| CREDIT SUISSE | 4/28/16 | • Assuming **Seurat would have to raise the bid to $80** we still see accretion of 7% in 2020 based on an all cash deal financed at 2.5%<br>• We have assumed a slight uptick in sales from the synergies of combining with Jevtana promotion. We have assumed 5% higher sales on unchanged probabilities for talazoparib and pidilizumab based on Seurat's global marketing presence<br>• In our US colleague Kennan MacKay's recent Van Gogh report, we outline alternate potential bidders: AstraZeneca, Roche and Astellas |
| UBS | 4/28/16 | • Van Gogh's primary focus is on oncology, which would **mark a shift from an FT report on 28 February indicating that Seurat was looking at acquisitions in rare diseases** up to the size of its Genzyme acquisition ($20bn in 2011)<br>• Seurat indicated this deal would be immediately accretive to earnings. We estimate accretion of 8% by 2020E, even assuming no cost synergies given Astellas's role in global promotion |

Source: Wall Street research

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC    JPMS-00153-SEC-00033450

EXHIBIT 1277-0068

# Performance of Biopharmas After Achieving $1B in Company Sales

($ in millions)

## Share Price Performance of Selected Independent Biopharma Companies After Achieving $1B in Sales (2005 – 2015)

| | Revenues | | | | | | | | | | | Performance Since Achieving $1B sales | Share Price CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | | |
| ACTELION | $533 | $755 | $1,099 | $1,364 | $1,637 | $1,855 | $2,031 | $1,844 | $1,925 | $2,139 | $2,121 | 198% | 14% |
| ALEXION | 2 | 2 | 72 | 259 | 387 | 541 | 783 | 1,134 | 1,551 | 2,234 | 2,603 | 32% | 8% |
| Almirall | 916 | 1,064 | 1,248 | 1,543 | 1,435 | 1,321 | 1,206 | 1,124 | 1,049 | 1,090 | 813 | (13%) | (1%) |
| Celgene | 537 | 899 | 1,406 | 2,238 | 2,677 | 3,601 | 4,814 | 5,507 | 6,494 | 7,670 | 9,256 | 319% | 18% |
| endo | 820 | 910 | 1,086 | 1,261 | 1,461 | 1,716 | 2,730 | 2,816 | 2,125 | 2,381 | 3,269 | (42%) | (6%) |
| GRIFOLS | 652 | 815 | 964 | 1,197 | 1,273 | 1,315 | 2,499 | 3,370 | 3,642 | 4,458 | 4,365 | 247% | 18% |
| PSVA | 262 | 317 | 449 | 581 | 637 | 731 | 918 | 1,109 | 1,365 | 1,489 | 1,440 | 190% | 36% |
| Jazz Pharmaceuticals | 21 | 45 | 65 | 68 | 128 | 174 | 272 | 586 | 872 | 1,173 | 1,325 | (13%) | (9%) |
| ORION | 729 | 805 | 932 | 1,044 | 1,075 | 1,128 | 1,278 | 1,261 | 1,338 | 1,349 | 1,127 | 188% | 15% |
| RECORDATI | 717 | 724 | 862 | 1,013 | 1,042 | 966 | 1,061 | 1,065 | 1,251 | 1,312 | 1,162 | 284% | 47% |
| REGENERON | 66 | 63 | 125 | 238 | 379 | 459 | 446 | 1,378 | 2,105 | 2,820 | 4,104 | 102% | 22% |
| United Therapeutics | 116 | 160 | 211 | 281 | 359 | 593 | 743 | 916 | 1,117 | 1,289 | 1,466 | (10%) | (4%) |
| VERTEX | 161 | 216 | 199 | 176 | 102 | 143 | 1,096 | 1,527 | 1,030 | 536 | 1,008 | 157% | 23% |

☐ First Year of $1B+ Total Company Sales

| Mean | 126% | 14% |
|---|---|---|
| Median | 157% | 15% |
| NBI CAGR[1] | | 12% |

Source: EvaluatePharma and FactSet as of 06/21/16
Note: Performance and CAGRs based on January 1st, calendar year immediately following first full-year sales reaching $1B through 06/21/16 (e.g., Actelion performance measured from 01/01/2008 through 06/21/16)
(1)   NBI CAGR measured from 01/01/06 through 06/21/16

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

JPMS-00153-SEC-00033451

EXHIBIT 1277-0069