MONIQUE C. WINKLER (Cal. Bar No. 213031)
JASON H. LEE (Cal. Bar No. 253140)
BERNARD B. SMYTH (Cal. Bar No. 217741)
  smythb@sec.gov
JASON M. BUSSEY (Cal. Bar No. 227185)
  busseyja@sec.gov
MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
  meyerhoferm@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW PANUWAT,<br><br>Defendant. | Case No. 21-cv-06322-WHO<br><br>**SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL**<br><br>Date:       August 7, 2024<br>Time:       2:00 p.m.<br>Hon. William H. Orrick |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    ARGUMENT .................................................................................................... 2

       A.    The Court's Jury Instructions Were Correct And Do Not
             Warrant A New Trial ....................................................................... 2

             1.    The Court Correctly Instructed the Jury on Duty ....................... 2

             2.    The Court Correctly Instructed the Jury on Scienter ................. 5

             3.    The Phrase "Insider Trading" Was Not Unfairly
                   Prejudicial ............................................................................. 9

       B.    The Court Did Not Err In Allowing Dr. Becker's
             Testimony ....................................................................................... 9

       C.    The Court's Rulings On Defendant's Relypsa And Tesaro
             Trades Were Correct And Did Not Result In Harmful
             Error ............................................................................................ 13

       D.    The SEC's Statement in Opening About Cheating Other
             Investors Was Not Improper or Prejudicial And Does Not
             Warrant A New Trial ..................................................................... 15

       E.    The SEC Did Not Make Any Improper Statements Or
             Arguments About Defendant's Whereabouts Or About
             News And Analyst Commentary That Justify A New Trial ............ 17

             1.    The SEC's Questions And Statements About
                   Defendant's Whereabouts On August 18 Were
                   Proper ................................................................................... 17

             2.    The SEC Offered News And Analyst Reports For
                   Non-Hearsay Purposes .......................................................... 18

       F.    The Court Did Not Deprive Defendant Of The Ability To
             Present Admissible Evidence ......................................................... 20

             1.    The Court Properly Prohibited Defendant From
                   Introducing Irrelevant Evidence of Witnesses'
                   Unexpressed and Post-Hoc Interpretations of
                   Medivation's Policies ........................................................... 20

             2.    The Court Properly Precluded Defendant And Other
                   Witnesses From Characterizing This Case As
                   "Novel" ................................................................................ 22

3.   There Was Nothing Unfair About The SEC's Descriptions Of This Case As "Simple And Straightforward" ............................................................... 24

G.   There Is No "Cumulative Weight" To The Court's Purported Errors ........................................................................... 24

III.   CONCLUSION ............................................................................. 25

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Aguilar v. Int'l Longshoremen's Union Loc*. No. 10, 966 F.2d 443 (9th Cir. 1992) ................. 20

4

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960 (9th Cir. 2013) .................... 10

5

*Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980) ...................................................... 2

6

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*,
  2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009) ...................................................................... 9

7

*Arizona v. Washington*, 434 U.S. 497 (1978) ...................................................... 16, 17

8

*In re Asbestos Cases*, 847 F.2d 523 (9th Cir. 1988) ................................................ 8

9

*Benigni v. City of Hemet*, 879 F.2d 473 (9th Cir. 1988) ...................................... 7

10

*Bird v. Glacier Electric Coop. Inc.*, 255 F.3d 1136 (9th Cir. 2001) ........................... 18

11

*Bos. Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102 (N.D. Cal. 2008)................. 13, 20

12

*Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949) ................................................ 3

13

*Cane v. O'Neill*, 2023 WL 8271977 (9th Cir. Nov. 30, 2023)................................ 16

14

*Carpenter v. United States,* 484 U.S. 19 (1987) ........................................................ 23

15

*Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014) ........................................ 15

16

*Clem v. Lomeli*, 566 F.3d 1177 (9th Cir. 2009) .......................................................... 7

17

*Coursen v. A.H. Robins Co.*, 764 F.2d 1329 (9th Cir. 1985) ..................................... 21

18

*Crow Tribe of Indians v. Racicot*, 87 F.3d 1039 (9th Cir. 1996)................................ 20

19

*Cunha v. Ward Foods, Inc.*, 804 F.2d 1418 (9th Cir. 1986) ................................. 2, 7, 8

20

*Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005)............................................................... 7

21

*Erickson Productions, Inc. v. Kast*, 921 F.3d 822 (9th Cir. 2019)................................ 2

22

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)...................................................... 5

23

*Evangelista v. Inlandboatmen's Union of Pac*., 777 F.2d 1390 (9th Cir. 1985) ........... 20

24

*Fisher v. Clark*, 2024 WL 71801 (E.D. Cal. Jan. 5, 2024) ........................................ 20

25

*Gantt v. City of Los Angeles*, 717 F.3d 702 (9th Cir. 2013) ........................................ 2

26

27

28

*Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503 (1939) .................................................. 3

*Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021) ....................................... 9, 10

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002)........................... 18, 20, 24

*Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656 (9th Cir.1986) ..................... 18

*Kennedy v. So. Cal. Edison Co.*, 268 F.3d 763 (9th Cir. 2001) .................................. 8

*Lind v. United States*, 768 Fed. Appx. 663 (9th Cir. 2019) .................................... 13

*MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*,
    232 F. Supp. 3d 558 (S.D.N.Y. 2017) ......................................................... 9

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978) ............................ 9

*SEC v. Bauer*, 723 F.3d 758 (7th Cir. 2013) ............................................... 6

*SEC v. Clark*, 915 F.2d 439 (9th Cir. 1990)............................................. 4, 5

*SEC v. Cuban*, 620 F.3d 551 (5th Cir. 2010) ............................................ 9

*SEC v. Jasper*, 678 F.3d 1116 (9th Cir. 2012) .......................................... 18

*SEC v. Moshayedi*, 2013 WL 12129282 (C.D. Cal. Nov. 20, 2013) ....................... 10

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2021) ............................................ 6-8

*SEC v. Rocklage*, 470 F.3d 1 (1st Cir. 2006) .......................................... 9

*SEC v. Talbot*, 530 F.3d 1085 (9th Cir. 2008) ............................... 3-6, 15, 23

*SEC v. Yun*, 327 F.3d 1263 (11th Cir. 2003)........................................... 9

*Settlegoode v. Portland Pub*. Sch., 371 F.3d 503 (9th Cir. 2004) ................... 15, 18

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001)............. 2

*State v. Kirk,* 2010 WL 1818894 (Ohio Ct. App. May 7, 2010)............................. 20

*Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033 (7th Cir. 1977)..................... 9

*Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001) .............................. 8

*Tennison v. Circus Circus Enterprises, Inc.,* 244 F.3d 684 (9th Cir. 2001) ............ 13, 22

*United States v. Cantwell*, 64 F.4th 396 (1st Cir. 2023) ........................... 19, 20

*United States v. Cardenas-Mendoza*, 579 F.3d 1024 (9th Cir. 2009)....................... 16

*United States v. Chestman,* 947 F.2d 551 (2d Cir. 1991).......................... 3, 4, 6

*United States v. 4.0 Acres of Land*, 175 F.3d 1133 (9th Cir. 1999) ................................................ 2

*United States v. Lawson*, 776 F.3d 519 (7th Cir. 2015) ........................................................ 11, 16

*United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) ................................................................ 6

*United States. v. O'Hagan*, 521 U.S. 642 (1997) .................................................. 3, 6, 8, 9, 15, 23

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ............................................................ 9

*United States v. Randall*, 162 F.3d 557 (9th Cir. 1998) ................................................................ 16

*United States v. Rhodes*, 713 F.2d 463 (9th Cir. 1983) ................................................................ 16

*United States. v. Salman*, 792 F.3d 1087 (9th Cir. 2015) (*aff'd* 580 U.S. 39 (2016)) ................. 3

*United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998) ................................................................ 9

*United States v. Valdez-Soto*, 31 F.3d 1467 (9th Cir. 1994) ........................................................ 16

**OTHER AUTHORITIES**

Exchange Act Section 10(b) ........................................................................................ 5

Fed. R. Civ. P. 59(a)(1) ................................................................................................ 2

Fed. R. Evidence 403 .................................................................................................. 10

Fed. R. Evidence 702 .................................................................................................. 9

**I.**     **INTRODUCTION**

Defendant's Motion For A New Trial ("Mot. New Trial") fails to identify any errors, let alone reversible errors, from the two-week jury trial that culminated in a unanimous verdict finding that Defendant Matthew Panuwat ("Defendant") engaged in insider trading. Rather, the motion mostly repeats arguments concerning jury instructions and evidentiary issues that the Court considered and rejected previously. The only new arguments are unfounded attempts to transmute permissible questions, statements, and arguments made by SEC attorneys into prejudicial misconduct. All these arguments fail, and the Court should deny the motion.

The Court's jury instructions correctly explained the law of insider trading. The Court properly explained that the jury had to find that Defendant owed a duty of trust and confidence to Medivation and that such a duty could be derived multiple ways: from an express agreement or from a relationship where an employer entrusts an employee with its confidential information. The Court also properly explained that the SEC had to prove that Defendant acted with an intent to defraud, that Defendant bought Incyte securities on the basis of Medivation information that he was aware was nonpublic and material, and that Defendant knew he lacked Medivation's consent for the trade.

The Court's evidentiary rulings allowed the parties to present admissible evidence in support of their respective cases. Dr. Chyhe Becker was amply qualified to provide relevant testimony about the typical effect of a merger announcement on the stock market, and about the specific stock price movements at issue in this case. Consistent with the Court's rulings, the SEC used analyst reports and news articles for proper, limited non-hearsay purposes. Defendant was similarly allowed to present the admissible evidence that supported his theory of the case. The Court permitted him to testify about his understanding of Medivation's policies at the time he traded. And the Court never prevented Defendant from testifying about his "thousands upon thousands" of other trades; it evenhandedly determined that if Defendant introduced evidence concerning the circumstances of two of those trades, the SEC would be permitted to do the same. The Court prohibited the Defendant only from taking actions that would have unfairly injected

1  irrelevant issues into this case, like this case's purported legal "novelty" and witnesses' previously

2  unexpressed, post-hoc interpretations of Medivation's policies.

3        In short, the Court's evidentiary rulings permitted the parties to present properly their

4  respective cases to the jury, and the Court's legal instructions correctly told the jury what the SEC

5  needed to prove to prevail. Defendant received a fair trial by a jury of his peers, and his request for

6  a new trial should be denied.

7  **II.    ARGUMENT**

8        A court may grant a new trial "for any reason for which a new trial has heretofore been

9  granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). "A trial court may grant a

10 new trial if the verdict is contrary to the clear weight of the evidence, or is based upon evidence

11 which is false, or to prevent . . . a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of*

12 *Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (quoting *United States v. 4.0 Acres of Land*,

13 175 F.3d 1133, 1139 (9th Cir. 1999)). But a court "may not grant a new trial simply because it

14 would have arrived at a different verdict." *Id.* The trial court is afforded substantial discretion in

15 making this determination. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

16       **A.    The Court's Jury Instructions Were Correct And Do Not Warrant A New Trial**

17       Defendant challenges several of the Court's jury instructions. "Jury instructions 'must fairly

18 and adequately cover the issues presented, must correctly state the law, and must not be misleading.'"

19 *Erickson Productions, Inc. v. Kast*, 921 F.3d 822, 828 (9th Cir. 2019) (quoting *Gantt v. City of Los*

20 *Angeles*, 717 F.3d 702, 706 (9th Cir. 2013)). Jury instructions are evaluated "as a whole," and a court

21 is "under no obligation to use any particular language offered by a party." *Cunha v. Ward Foods,*

22 *Inc.*, 804 F.2d 1418, 1431 (9th Cir. 1986) (citations omitted). Harmless instructional errors do not

23 warrant reversal, but in reviewing for harmlessness, "the burden shifts to the [party that prevailed at

24 trial] to demonstrate that it is more probable than not that the jury would have reached the same

25 verdict had it been properly instructed." *Gantt*, 717 F.3d at 707 (citations omitted).

26            **1.    The Court Correctly Instructed the Jury on Duty**

27       The Court's instruction that a duty of trust and confidence arises "when an employer entrusts

28 an employee with confidential information" correctly stated the law. A company's confidential

information is its property, and a company's agents are prohibited from converting that property for their own benefit. *U.S. v. O'Hagan*, 521 U.S. 642, 654 (1997) ("A company's confidential information . . . qualifies as its property to which the company has a right of exclusive use. The undisclosed misappropriation of such information, in violation of a fiduciary duty . . . constitutes fraud akin to embezzlement—the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.") (citations and quotations omitted); *U.S. v. Salman*, 792 F.3d 1087, 1092 & n.4 (9th Cir. 2015) (*aff'd* 580 U.S. 39 (2016)) (employees have a duty "not to exploit company information for [their] personal benefit."); *SEC v. Talbot*, 530 F.3d 1085, 1094-95 (9th Cir. 2008) ("Talbot, as a member of Fidelity's Board, owed a duty arising from a relationship of trust and confidence to Fidelity . . . . The information on which Talbot traded was confidential, as it was property 'entrusted' to him by Fidelity in his capacity as a Fidelity director.") (citing Restatement (Second) of Agency § 395); *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503, 510 (1939) ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.") (quoted by *Talbot*). These principles are rooted in agency law and apply to employees as well as officers and directors. *See Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7 (Del. Ch. 1949) (cited by *Talbot*) ("[I]f an employee in the course of his employment acquires secret information relating to his employer's business, he occupies a position of trust and confidence toward it, analogous in most respects to that of a fiduciary, and must govern his actions accordingly.") (citations omitted).

Defendant argues that the Court's instruction was incorrect "because a source cannot unilaterally impose a fiduciary-type relationship merely by conveying nonpublic information." Mot. New Trial at 6:24-25. But that principle, articulated in *United States v. Chestman*, has no application here. In *Chestman*, the Second Circuit held that a duty of trust and confidence did not arise when the niece of a corporate insider told her husband about an impending tender offer. 947 F.2d 551 (2d Cir. 1991). The court contrasted this scenario from associations that "are inherently fiduciary," like those between "principal and agent." *Id.* at 567-68. Like *O'Hagan* and *Talbot*, *Chestman* recognized that a fiduciary duty arises whenever an individual handles money or property "for the benefit of another person," explaining, "Because the fiduciary obtains access to this property to serve the ends of the

1   fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use." *Id.* at

2   568-69 (quotation omitted). Whereas the tipper in *Chestman* had not "been brought into the family's

3   inner circle, whose members, it appears, discussed confidential business information," (*id.* at 570),

4   Defendant was part of Medivation's "inner circle," *i.e.*, the company's senior executive leadership.

5   And Medivation did not entrust Defendant with confidential information "unilaterally." Rather,

6   Defendant joined Medivation voluntarily as an employee; he signed multiple agreements

7   acknowledging the confidential nature of information entrusted to him through his employment

8   relationship, and he actively worked in furtherance of the Medivation sale process. He was also well-

9   compensated as part of this principal-agent relationship, receiving not only a base salary, but an

10  annual bonus, a stock options package, restricted stock, health insurance, an employee stock purchase

11  plan, and 401(k) matching. Ex. A, Trial Tr. 939:9-940:4 (Panuwat).

12         Defendant further argues that the jury was required to find specifically that Defendant's duty

13  to Medivation included a "duty not to trade." Mot. New Trial 7:1-15. This misstates the law. The

14  prohibition against trading on confidential information arises directly from the fiduciary's duty of

15  trust or confidence. *Talbot*, 530 F.3d at 1092 (endorsing the view that "Talbot had a duty to Fidelity,

16  to keep information about the LendingTree transaction confidential, and . . . secretly breached *that*

17  *duty* by trading securities for personal profit.") (citation omitted, emphasis added); *SEC v. Clark*, 915

18  F.2d 439, 448 (9th Cir. 1990) ("[B]y becoming part of a fiduciary or similar relationship, an

19  individual is implicitly stating that she will not divulge or use to her own advantage information

20  entrusted to her in the utmost confidence."). Even if such a finding was required, the Court's failure

21  to so instruct the jury was harmless. Defendant admitted at trial that he was forbidden from using

22  Medivation's nonpublic information to trade. Ex. A, Trial Tr. 1166:16-19 ("Q [Y]ou understood that

23  you weren't free to use Medivation's confidential information to make trades in the stock market;

24  correct? A. That's correct."). The jury inevitably would have concluded from this admission that

25  Defendant had a "duty not to trade" using Medivation's confidential information.

26         In a footnote, Defendant also argues that "even if Mr. Panuwat's fiduciary duty could be

27  satisfied on the basis of his employment relationship with Medivation, . . . the instruction was still

28  error because the jury was never tasked with finding that his role gave rise to a fiduciary duty." This

1   is plainly wrong. The Court instructed jurors that one of the elements the SEC needed to prove was

2   "That the Defendant owed a duty of trust, confidence, or confidentiality to his employer,

3   Medivation." Jury Inst. 16 (Dkt. 155 at 17; Ex. A, Trial Tr. 1274:2-3).[1] The Court further instructed

4   jurors that: "In determining whether a duty of trust and confidence existed between the Defendant

5   and Medivation, you must consider all the facts and circumstances presented to you about

6   Defendant's relationship with Medivation." Jury Inst. 17 (Dkt. 155 at 18; Ex. A, Trial Tr. 1275:11-

7   14). In other words, the Court explicitly asked the jury to determine whether a fiduciary duty existed

8   and told the jury to consider broadly any relevant facts when making this determination.

9                   **2.      The Court Correctly Instructed the Jury on Scienter**

10          The Court's scienter instructions were also correct. The first paragraph of Instruction 16

11  described insider trading as acting with "an *intent to defraud* the source of confidential, material and

12  nonpublic information by either *knowingly or recklessly* misappropriating that information for

13  securities trading purposes, in breach of a duty . . . ." Jury Inst. 16 (Dkt. 155 at 17; Ex. A, Trial Tr.

14  1273-74) (emphases added). This description encompasses both the Ninth Circuit's formulation of

15  insider trading in *Talbot* and the more general proposition that "intent to defraud" is an element of a

16  claim under Section 10(b) of the Securities Exchange Act of 1934. *Talbot*, 530 F.3d at 1092 (citing

17  *SEC v. Clark*, 915 F.2d 439, 443 (9th Cir. 1990)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193

18  (1976). Instruction 16 also required the jury to find that Defendant, at the time he traded, knew (or

19  acted recklessly as to whether) *both* that the information he traded on was nonpublic and material to

20  Incyte *and* that he lacked Medivation's consent to use that information. *Id.* By requiring the jury to

21  find that Defendant knew he "lacked consent from Medivation" to use Medivation's information to

22  trade, the Court ensured that the jury would only hold Defendant liable if Defendant's

23  "misappropriation" of Medivation's confidential information was "knowing."

24          Defendant contends that the Court's scienter instruction improperly "lowered the SEC's

25  burden" by not requiring the SEC to "show that Mr. Panuwat knew he was breaching a fiduciary

26  duty." This argument fails, for at least three reasons.

27  _____

28  [1] Lettered Exhibits are attached to the concurrently-filed Declaration of Matthew Meyerhofer in
    Support of Securities and Exchange Commission's Opposition to Defendant's Motion for New Trial.

*First*: The SEC need not prove that the defendant specifically knew that he was breaching a duty. While "intent to defraud" is an element of any insider trading charge, the relevant deception in a misappropriation case consists of trading on the basis of material, nonpublic information for personal gain while feigning loyalty to the source. *O'Hagan*, 521 U.S. at 653 ("A fiduciary who pretends loyalty to the principal while secretly converting the principal's information for personal gain . . . dupes or defrauds the principal") (quotations omitted); *Talbot*, 530 F.3d at 1094 (characterizing a director's trading on the basis of his company's nonpublic information as "textbook misappropriation"). "[T]he fiduciary's fraud is consummated not when he obtains the confidential information, but when, without disclosure to his principal, he uses the information in purchasing or selling securities." *O'Hagan*, 521 U.S. at 643. The Court's instructions appropriately required the jury to find both that Defendant traded Incyte "because of [Medivation's] material nonpublic information he *knowingly* possessed" and that Defendant "*knew* that the information he received from Medivation was nonpublic and material to Incyte." Jury Inst. 16, 18 (Dkt. 155 at 17, 19; Ex. A, Trial Tr. 1274:10-12, 1275:15-18) (emphases added); *see SEC v. Bauer*, 723 F.3d 758, 776-77 (7th Cir. 2013) (characterizing the scienter element of insider trading as requiring proof that the defendant knew she was trading on the basis of information that was nonpublic and material). Defendant fails to identify any authorities from within the Ninth Circuit that would require the Court to give his preferred instruction. Moreover, Defendant's proffered Second Circuit authorities are all tipping cases, where liability depends on the *tippee* understanding that the *tipper* betrayed a duty or confidence. *See SEC v. Obus*, 693 F.3d 276, 286-93 (2d Cir. 2021); *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996); *Chestman*, 947 F.2d at 565.

*Second:* Assuming the jury *was* required to find that "Mr. Panuwat knew he was breaching a fiduciary duty," Defendant's argument fails because the Court's instructions met this standard. There is no meaningful difference between saying Defendant "knew that. . . he lacked consent" to trade (which is what the Court instructed) and saying Defendant "knew that he was breaching a fiduciary duty" by trading (which is what Defendant claims is required). To say an individual knew he "lacked consent" to do an act means that doing the act without consent would knowingly violate a duty. *See O'Hagan*, 521 U.S. at 654–55 & 659 n.9 (an agent trading on the basis of material nonpublic

information can show that there was "no deception" by demonstrating that he "disclosed his trading plans to, or obtained authorization from, the principal"). This is especially true in the context of Instruction 16, whose first paragraph characterized insider trading as encompassing an "intent to defraud," "knowing[] . . . misappropriat[ion]," and "breach of a duty." Ex. A, Trial Tr. 1273:17-23. Furthermore, to be liable for insider trading, a defendant "need not have specific knowledge of the legal nature of a breach of fiduciary duty." *See Obus,* 693 F.3d at 286. Read as a whole, Instruction 16 "fairly covered" the concept of knowledge of breach, and the Court was under no obligation to adopt Defendant's preferred phrasing. *Cunha,* 804 F.2d at 1431 ("[T]he court was under no obligation to use any particular language offered by a party. . . . The court's only obligation was to fairly cover the issues.") (citation omitted).

*Third*: Defendant's "lowered burden" argument also fails because Defendant's admissions at trial clearly establish that he knew that using Medivation's confidential information to trade would violate his duty to the company, rendering any instructional error on this issue harmless. During cross examination, Defendant admitted knowing he had a duty not to use Medivation's confidential information to enrich himself, including specifically by trading securities. Ex. A, Trial Tr. 1128:24-1129:2 ("Q. And you knew, separate and apart from any written policy, that you were not supposed to use Medivation's confidential information for your own personal benefit. A. Yes, I believe I had that understanding".), 1166:16-19 ("Q [Y]ou understood that you weren't free to use Medivation's confidential information to make trades in the stock market; correct? A. That's correct."). Consequently, when the jury found that Defendant traded Incyte securities on the basis of Medivation information that he knew to be material and nonpublic (as Instructions 16 and 18, collectively, required), it must *also* have concluded that Defendant knew he was violating a duty to Medivation. This is more than sufficient to "demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (quoting *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005)). Therefore, any purported failure in instruction about his knowledge of his breach was harmless. *See also Benigni v. City of Hemet*, 879 F.2d 473, 480 (9th Cir. 1988) (district court's failure to give a reasonableness instruction was harmless because the jury's punitive damages award showed that the jury would have found the

1  defendant's conduct unreasonable); *Kennedy v. So. Cal. Edison Co.*, 268 F.3d 763, 770-71 (9th Cir.

2  2001) (instructional error was harmless when evidence relating to erroneous instruction was

3  uncontradicted).

4       Defendant's other objections to the Court's scienter instructions are also unavailing.

5  Defendant's argument that "if the source does not object to the trader's use of material nonpublic

6  information in trading, then no deception has occurred" misstates the law. *O'Hagan* states that a

7  trader can avoid insider trading liability by affirmatively disclosing his trading plans to, or obtaining

8  trading authorization from, the source of the nonpublic information, but it does not predicate liability

9  on the source making any kind of "objection" to the trade. 521 U.S. at 659 n.9. And there are good

10  reasons why such an objection is not required to prove a violation: a company might be unaware of

11  the trade (unless the "disloyal agent discloses his imminent breach of duty" (*O'Hagan*, 521 U.S. at

12  659 n. 9)), it might be unaware of the evidence showing why the trade was improper, or it might have

13  motivations for not identifying its employee's misconduct. *See Obus*, 693 F.3d at 291 (company's

14  determination that defendant did not breach a duty was not dispositive; company had only limited

15  information and may have been motivated by interests other than unearthing wrongdoing).

16       Defendant's argument that the Court erred because it "failed to instruct the jury as a distinct

17  element of the offense that the SEC must prove intent to defraud" also has no merit. Instruction 16

18  specifically identified "intent to defraud" as a component of insider trading, and element 4 of that

19  instruction accurately described the concept of scienter. As noted above, jury instructions are

20  evaluated as a whole, not in isolation, and the Court had no obligation to present "intent to defraud"

21  as a "distinct" legal element. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 807 (9th Cir. 2001)

22  (explaining that a court should not "look[] at any one jury instruction in isolation" because prejudicial

23  error exists only when "the instructions as a whole" do not fairly and correctly explain the law)

24  (quoting *In re Asbestos Cases*, 847 F.2d 523, 524 (9th Cir. 1988)); *Cunha* 804 F.2d at 1431.

25  Defendant's argument that the Court erroneously denied his request for a "Good Faith" instruction

26  fails for the same reason. The Court's jury instructions accurately explained the scienter element, and

27  there was no need for the court to issue a separate "good faith" instruction on the same element.

28  Because the jury found that the Defendant acted with an intent to defraud, it could not find that the

Defendant acted in good faith. *See Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044. n.17 (7th Cir. 1977) ("good faith is not appropriate as a defense to reckless or intentional behavior"); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 n.15 (2d Cir. 1978) (same).

### 3.   The Phrase "Insider Trading" Was Not Unfairly Prejudicial

Defendant also renews his argument that it was unfairly prejudicial for the Court and the SEC to use the phrase "insider trading." The Court rejected this argument before, and it should do so again. As the SEC noted previously, several Courts of Appeal, including the Ninth Circuit, have described the misappropriation theory as a species of insider trading. *See, e.g., United States v. Smith*, 155 F.3d 1051, 1063 n.19 (9th Cir. 1998) (describing the misappropriation theory as "a second type of insider trading liability"); *United States v. Rajaratnam*, 719 F.3d 139, 158 (2d Cir. 2013) (misappropriation is one of "two theories of insider trading"); *SEC v. Cuban*, 620 F.3d 551, 552 (5th Cir. 2010) (same); *SEC v. Rocklage*, 470 F.3d 1, 3, 5 (1st Cir. 2006) (same); *SEC v. Yun*, 327 F.3d 1263, 1269 (11th Cir. 2003) (same); *see generally O'Hagan*, 521 U.S. at 651-53; 17 C.F.R. 240.10b5-2. It was not unfair for the Court and the SEC to use the phrase "insider trading" when "insider trading" is precisely what the SEC charged. *See* Compl. (Dkt. 1) ¶ 1. Courts ban the use of "pejorative terms" only when such terms are "unnecessary to prove a claim" and "do not bear on the issues being tried," which is not the case here. *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017) (quoting *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, 2009 WL 3111766, at *7 (S.D.N.Y. Sept. 28, 2009)). In any event, the Court cured any possible prejudice associated with this term by instructing the jury that "insider trading" is a legal term of art and not pejorative. Ex. A, Trial Tr. 1273:14-16.

### B.   The Court Did Not Err In Allowing Dr. Becker's Testimony

Defendant next argues that a new trial is warranted because "the Court erred in allowing Dr. [Chyhe] Becker to testify as an expert" and improperly allowed Dr. Becker to introduce hearsay testimony. Rule 702 permits expert testimony that (a) will help the trier of fact to determine a fact in issue, (b) is based on sufficient facts or data, (c) is the product of reliable principles and methods, and (d) reliably applies such principles and methods to the facts of the case. Fed. R. Evid 702. "This inquiry is flexible," and courts should apply it "with a liberal thrust favoring admission." *Hardeman*

1   *v. Monsanto Co.*, 997 F.3d 941, 960 (9th Cir. 2021) (cleaned up). The Court "is supposed to screen

2   the jury from unreliable nonsense opinions, but not exclude opinions merely because they are

3   impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

4   Defendant contends that Dr. Becker (1) overstated her qualifications, (2) improperly sponsored

5   hearsay testimony for its truth, and (3) based her opinions on "cherry-picked results." Mot. New Trial

6   at 12. None of these arguments have any merit.

7          First, Defendant claims that Dr. Becker "seemingly overstated her experience in biopharma"

8   when she testified that "she had 25 years of experience specifically 'looking at stock price reactions

9   to news by biopharmaceutical companies'" and suggests that this was not adequately disclosed during

10  expert discovery. Mot. New Trial at 12 n.5. Not so. When first questioned about her experience at her

11  June 2023 deposition, Dr. Becker testified that her training and experience involved analysis of

12  securities in many different industries, including in "the healthcare industry" and in cases involving

13  "pharmaceutical drugs." Ex. B, Becker Depo. Tr. at 61:9-14, 61:21-62:9. Defendant also contrasts Dr.

14  Becker's trial testimony with a statement in the SEC's opposition to Defendant's motion in limine

15  that Dr. Becker had worked on a prior case addressing valuation questions in the biotech industry.

16  Mot. New Trial at 12, n.5. But that statement was about Dr. Becker's work on expert reports

17  specifically, not her broader experience analyzing stock price reactions of companies in the biotech

18  industry. *See* SEC Opp. to Def.'s MILs at 9 (Dkt. 110).

19         Second, Defendant claims that a new trial is warranted because Dr. Becker improperly

20  sponsored hearsay testimony in the form of analyst reports and news articles. Defendant's argument

21  fails because, as the Court ruled in denying Defendant's motion in limine, "Experts may rely on

22  hearsay where an expert in the field would reasonably rely upon such information to form an

23  opinion." Order Ruling On MILs (Dkt. 126) at 10 (citing Fed. R. Evidence Rule 403 and *SEC v.*

24  *Moshayedi*, 2013 WL 12129282, at *2 (C.D. Cal. Nov. 20, 2013)). Defendant suggests that the

25  Court's Order limited Dr. Becker's reliance on analyst reports and news articles to ruling out

26  confounding news. But the Order makes clear that "Dr. Becker cites to news and analyst reports to

27  screen for confounding news *and confirm her opinions* about what caused Incyte's stock price

28  increase on August 22, 2016; this is perfectly acceptable." *Id.* (emphasis added). Dr. Becker's

testimony at trial was crystal clear; she relied on news and analyst reports for the "perfectly acceptable" purpose of confirming her opinions regarding the reason for Incyte's stock price increase. *See, e.g.*, Ex. A, Trial Tr. at 568:6-13 ("[T]his [Exhibit 1220] is another article that confirmed my opinion that spillover effects were relevant in this particular industry"), Trial Tr. at 570:19-24 (testifying that Exhibit 1276, which was not admitted into evidence, "confirms my view that industry – market observers would expect Incyte stock to react when Medivation's merger was announced")). Her testimony regarding news and analyst reports was therefore proper.

Defendant also argues that the Court "erred by failing to issue the required limiting instruction" with respect to the news and analyst reports to which Dr. Becker testified. That misstates the record. Defendant identifies three exhibits for which he says a limiting instruction should have been given: Exhibits 1216, 1220 and 1276. Exhibit 1216 was initially admitted into evidence without objection. Ex. A, Trial Tr. 320:25-322:4. Later, following an objection that a question regarding the exhibit called for speculation, the Court provided a limiting instruction. *Id.*, Trial Tr. 324:2-11. Exhibit 1220 was admitted into evidence on the same basis. *Id.*, Trial Tr. at 328:5-10. Exhibit 1276, on the other hand, was never admitted into evidence. Dr. Becker merely testified that the document was one she relied on in reaching her opinions and the Court was clear that the document, while not admissible, is the type of document an expert can rely on for her opinion and is thus appropriately one to which an expert may testify. *Id.*, Trial Tr. at 569:20-25. The Court also provided multiple limiting instructions with respect to news articles generally. *Id.*, Trial Tr. 771:25-772:2 ("And just to be clear for the jury, these articles are not admitted for their truth. They're admitted for the fact that this news was out, such as it is."), *Id.*, Trial Tr. 1147:22-1148:2 ("Ladies and gentlemen, let me remind you what I said earlier with respect to some of the news articles. These articles aren't introduced for the truth of the — of what is written. The questions deal with what market observers were saying, and it's for those purposes; it's not – they're not introduced for the truth."). Defendant never requested that the court issue any additional or different limiting instructions with respect to the news and analyst reports. *See United States v. Lawson*, 776 F.3d 519, 522 (7th Cir. 2015) (failure to ask the court for a different limiting instruction at trial waived issue on appeal).

Defendant further misstates the record with respect to these exhibits by falsely asserting that the SEC failed to ask, "in all but one instance … How the evidence informed her opinions." Mot. New Trial at 13:20-22. The record is clear that, in fact, Dr. Becker testified to exactly that with respect to each of the three exhibits. Ex. A, Trial Tr. 561:24-562:25 (Dr. Becker testimony that Exhibit 1216 was an article she relied on to confirm her opinions); Trial Tr. 568:6-13 (testimony as to how Exhibit 1220 was relevant to Dr. Becker's opinions); Trial Tr. 569:13-570:24 (testimony as to how Exhibit 1276 was relevant to Dr. Becker's opinions).

Third, Defendant attempts to resurrect a failed argument from his motion in limine in asserting that Dr. Becker's opinions relied on improperly "cherry-picked results." Mot. New Trial at 12, n.3. Defendant baldly asserts, without further explanation, that two event studies that Dr. Becker conducted, and to which she testified, "lacked objective criteria for their selection." That argument fails, as the Court already determined when it denied Defendant's motion in limine. Dkt. 126 at 7-9. In fact, Dr. Becker testified in detail as to the objective criteria she used to choose the dates on which she conducted event studies. Ex. A, Trial Tr. at 579:7-581:17. Specifically, Dr. Becker testified that she used the August 22, 2016 Medivation acquisition announcement as a "benchmark" and then looked for similar events that met the following objective criteria: (1) there was "a biopharma merger news event", (2) "the company being acquired, had a comparable price increase", and (3) the biopharma merger news event involved "either Medivation or a similar company." Ex. A, Trial Tr. at 580:1-22.

Finally, in a footnote, Defendant argues that Dr. Becker's testimony that "market observers" would have expected Incyte's stock price to react to news of Medivation's acquisition announcement was prejudicial because her expert report states that "economists" would have had this reaction. Mot. New Trial at 12, n.6. Unsurprisingly, Defendant fails to explain how this minor variation in wording caused any prejudice, as there is no inconsistency between the two terms. As Dr. Becker explained at her June 2023 deposition, "People other than economists would also have that expectation, I believe. I was using the term, economist, because many of the papers that I studied in forming this opinion were written by economists . . . ." Ex. B, Becker Depo. Tr. at 118:22-119:22. Moreover, the defense repeatedly failed to object to questions and testimony in which Dr. Becker opined as to what "market

observers," rather than "economists", would have expected. *See* Ex. A, Trial Tr. at 539:5-9, 559:14-19, 559:25-560:11, 570:19-24, 587:13-21, 595:3-21. The court should not entertain those objections now, especially since Defendant has not shown significant prejudice. *Lind v. United States*, 768 Fed. Appx. 663, 664-65 (9th Cir. 2019) (objections to expert testimony not preserved at trial reviewed only for plain error).

### C.   The Court's Rulings On Defendant's Relypsa And Tesaro Trades Were Correct And Did Not Result In Harmful Error

Although Defendant argues the Court "unfairly limit[ed] Mr. Panuwat's ability to defend himself" by "applying the prior bad act rule" (Mot. New Trial at 14:4-5), the Court, as he later admits (*id.* at 14:15-16), did not prevent him from introducing any evidence about his Tesaro and Relypsa trades. The Court simply permitted the SEC to cross examine him about those trades if Defendant made them "a more central part of his defense." Dkt. 126 at 3. The "burden of showing harmful error rests on the party seeking the new trial" (*Bos. Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1110 (N.D. Cal. 2008)), but Defendant does not even attempt to identify any error in the Court's prior ruling; he merely states, in a footnote, that he "incorporates by reference all prior arguments and briefing on the subject." Mot. New Trial at 14, n. 7. He has given the Court no reason to conclude that its prior ruling was erroneous.

Even assuming the Court erred, Defendant does not seriously attempt to establish prejudice, which requires showing that the ruling "tainted the verdict." *Tennison v. Circus Circus Enterprises, Inc.,* 244 F.3d 684, 688 (9th Cir. 2001). Defendant argues the ruling deprived him of the "means [to] rebut[] arguments that the SEC relied on to establish causation," (Mot. New Trial at 14:20-22)—namely, the "false claim that the Incyte trade was unusual" compared to his other trades. *Id.* at 14:6-7. But the SEC made no such "false claim;" it established that, as of August 18, 2016, Defendant's Incyte trades constituted his largest securities purchase, his largest options purchase, and his first ever trade involving Incyte. As Defendant admitted on cross examination, each of those points is accurate. Ex. A, Trial Tr. 1170 (Panuwat).

And the defense hardly lacked the means to argue the Incyte trades were *not* unusual. Defendant testified at length on the subject, explaining that he made "thousands, thousands upon

thousands" of trades (*id.* at 933:4-9); that he "overwhelmingly" invested in "biotechnology" (*id.*at 936:21-22); that some of his trades "involve call options" (*id.* at 938:18-20); that "the amount that [he] invested, tend[ed] to increase over time" (*id.* at 942:13-16); that he made "55 trades" of "over $48,000 from 2013 to 2020" and 33 that were "over $90,000" during that period (*id.*at 944:11-945:13); and that he made "total trading profits" of $265,000 in 2016 before the Incyte trades (*id.* 939:5-8) in part because he was "getting better at making investments" (*id.* at 943:4-8). Defendant's summary witness made many of the same points with the aid of multiple exhibits. Trial Tr. 887:11-895:3 (Shorr); Ex. E, Trial Exhibit ("TX") 2984 (summary of Merrill Lynch trades); Ex. F, TX 2965 (summary of trades over $48,000); Ex. G, TX 2966 (summary of 2016 trades, including early 2016 trading gains). Additional details about the Tesaro and Relypsa trades would not have significantly changed the defense presentation on this subject.

In any event, most of the SEC's evidence that Defendant traded "on the basis" of Medivation's material, nonpublic information had nothing to do with Defendant's trading history. It included the timing of Defendant's Incyte trades in relation to both Medivation CEO Dr. David Hung's August 18, 2016 email indicating that a deal with Pfizer, Inc. was imminent, and the announcement of the Medivation acquisition four days later; the fact that Defendant said nothing to anyone about the trade under circumstances that made his silence surprising; Defendant's claimed inability to remember why he traded when initially questioned by the SEC; his dramatically improved memory at trial; the elaborate nature of the explanation he provided to the jury; and his lack of candor about whether he read Dr. Hung's email and where he was on August 18, 2016. *See* Opp. To Rule 50(b) Mot. at 18-21. Defendant himself argues in his Rule 50(b) motion that the SEC "relied principally on timing" to establish causation, not the unusual nature of his trade. Dkt. 191 at 20:4-5. The jury evidently did not find the causation question difficult, as it returned its verdict, Defendant admits, "swift[ly]." *Id.* at 25:12. That result would not have been different had Defendant presented a few additional details about two of his trades.

Finally, Defendant claims he was prejudiced because he purportedly "had no means to rehabilitate an attack on his credibility that he remembered the Tesaro trade, but not the Incyte trade." Mot. New Trial at 14:22-26. Here, Defendant refers to a single question and answer that

1  was played from his investigative testimony. *See* Order Granting Stip. Re Investigative Testimony

2  (Dkt. 194) at 2:23-24. But Defendant never presented an objection to the Court about the SEC

3  playing the testimony in question. He cannot, therefore, establish prejudice based on that testimony

4  now. *Settlegoode v. Portland Pub.* Sch., 371 F.3d 503, 517 (9th Cir. 2004) ("There is an even

5  higher threshold for granting a new trial where, as here, defendants failed to object to the alleged

6  misconduct during trial.") Nor can he claim prejudice from the fact the jury learned he was

7  questioned about other trades, as he made a centerpiece of his defense that the SEC did a "set up"

8  of him. Ex. A, Trial Tr. 974:1-14 (Panuwat) (testifying that SEC subpoena identified another

9  company, not Incyte); *id.*1319-21 (closing).

10  **D.**   **The SEC's Statement In Opening About Cheating Other Investors Was Not**
          **Improper or Prejudicial And Does Not Warrant A New Trial**

11

12  Defendant asserts that a new trial is required because the jury was tainted by the SEC's

13  purportedly improper statements in opening that Defendant "cheated other investors." He argues

14  that the concept of cheating other investors is relevant only to the "classical" theory of insider

15  trading and not the "misappropriation" theory on which this case is brought. Defendant also argues

16  that the court's curative instruction was inadequate. He is wrong on both counts.

17  As the Supreme Court noted in *O'Hagan* (the very case on which Defendant relies), "A

18  misappropriator who trades on the basis of material, nonpublic information . . . gains his

19  advantageous market position through deception; he deceives the source of the information *and*

20  *simultaneously harms members of the investing public*." 521 U.S. 642, 656 (1997) (emphasis

21  added) (citation omitted); *see also Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 388 (2014)

22  (explaining that, in *O'Hagan*, the "victims were members of the investing public harmed by the

23  defendant's gaining of an advantageous market position through insider trading") (quotations

24  omitted); *Talbot*, 530 F.3d at 1096 (finding that the defendant's misappropriation "most certainly

25  injured the trading public").

26  Moreover, even if the SEC's statements did cause prejudice (and they did not), the Court

27  cured it by instructing the jury, "What you heard yesterday from the lawyers is – is their

28  perspective on things. It's not evidence. Evidence is going to start today." Ex. A, Trial Tr. 223:20-

22; *see United States v. Randall*, 162 F.3d 557, 559 (9th Cir. 1998) ("Ordinarily, cautionary

instructions or other prompt and effective actions by the trial court are sufficient to cure the effects

of improper comments, because juries are presumed to follow such cautionary instructions.

Moreover, 'declaring a mistrial is appropriate only where a cautionary instruction is unlikely to

cure the prejudicial effect of an error.'") (quoting *United States v. Valdez-Soto*, 31 F.3d 1467, 1473

(9th Cir. 1994); *see also Cane v. O'Neill*, 2023 WL 8271977 at *1 (9th Cir. Nov. 30, 2023)

(court's instructions, including "not to treat opening statements as evidence," cured prejudicial

effects, if any, of comment made in opening). Any possible prejudice caused by the SEC's

statements is further mitigated by the fact that the SEC did not make unfairness to public investors

a part of its factual presentation to the jury. *See United States v. Rhodes*, 713 F.2d 463, 469 (9th

Cir. 1983) (motion for mistrial based on remarks in opening was properly denied where remarks

occurred at onset of over three-week trial, no further references were made regarding the subject

matter of the remarks, and the jury was admonished that it could not consider attorney's remarks as

evidence); *see also United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1029-30 (9th Cir. 2009)

(prosecutor's allusion in opening statement to Defendant's prior bad acts was not grounds for

mistrial where judge reminded the jury that attorneys' statements were not evidence and the

prosecution did not subsequently introduce evidence of the prior bad acts). Moreover, when

Defendant first raised this objection at trial, the Court clearly articulated that its proposed remedy

was to give the curative instruction that it did. Ex. A, Trial Tr. 202:24-203:5. If Defendant thought

the instruction was inadequate, he should have said so then. *See Lawson*, 776 F.3d at 522.

Defendant's sole authority on this issue, *Arizona v. Washington*, 434 U.S. 497 (1978), is

inapposite. *Washington* concerned whether the double jeopardy clause precluded retrying a

defendant whose trial had been dismissed by a mistrial ruling. The Court held that the trial judge

acted reasonably in ordering a mistrial after defense counsel made improper comments in opening

about prosecutorial misconduct, but it based this decision in part on "appellate deference to the

trial judge's evaluation of the significance of possible juror bias," since the trial judge was the

person most familiar with the jurors, the evidence, and the arguments. *Id*. at 513-14. Unlike in

*Washington*, the SEC's statement in opening that defendant "cheated other investors" was relevant

to the SEC's theory and was thus not "improper" or "prejudicial." Regardless, the Court in this case exercised its discretion at trial to give a curative instruction and not to declare a mistrial. *Washington* fully supports deference to that discretion.

**E.**   **The SEC Did Not Make Any Improper Statements Or Arguments About Defendant's Whereabouts Or About News And Analyst Commentary That Justify A New Trial**

**1.**   **The SEC's Questions And Statements About Defendant's Whereabouts On August 18 Were Proper**

Defendant claims he should receive a new trial because the SEC suggested during his cross examination and argued in its closing that he was in the office on August 18, 2016 when he traded and that his evasiveness about his whereabouts that day therefore reflected a consciousness of guilt. Mot. New Trial at 16:10-24. According to Defendant, this conduct was improper because "the SEC knew that Mr. Panuwat was not lying about his location on that day," yet it exploited the Court's in limine order "around testimony about his son," which prevented Defendant from rebutting the suggestion of dishonesty. *Id.* This argument fails for at least three reasons.

First, the claim that the SEC knew Defendant was not at work, which Defendant offers without a single supporting record citation, is demonstrably false. Defendant initially told the SEC he was "not entirely sure" and "could have been on vacation" that day. Ex. C, Investigation Testimony Tr. 180:20-181:5. At his deposition, he again said, "I'm not actually sure," adding that because "my son was in the hospital, spending a majority of my time there, I just can't recall exactly where I was…."; Ex. D, Panuwat Depo. Tr. 139:21-141:1. If *Defendant* did not claim to "know" he was at the hospital, the SEC obviously could not know that either. Nor was the SEC required to ignore evidence strongly indicating that Defendant *was* at work. That evidence included the many work-related emails Defendant sent on August 18, 2016 (Exs. H through M, TXs 1344, 1345, 1343, 1330, 1328, 1334); his practice of not normally working remotely at that time (Ex. A, Trial Tr. 1093:24-1094:2 (Panuwat)); the fact that his colleagues, who presumably knew his whereabouts, emailed him about, and invited him to, in-person meetings, without any indication that he was absent. Ex. L, TX 1344; Ex. N, TX 1321; *see also* Ex. A, Trial Tr. 478:4-483:12 (Jarrett); and the fact that he began trading seven minutes after receiving Dr. Hung's email.

Second, the Court *denied* the SEC's motion in limine on this subject. Dkt. 126 at 13:1-8. It ruled that "[t]o the extent that Panuwat's child's challenges are relevant to his conduct in this matter, he may testify to those facts." *Id.* The Court merely cautioned Defendant against using "his child's condition to attempt to evoke sympathy from the jury, either in testimony or argument" and stated that "[r]eference to the child should be fact-based and brief." *Id.* Defendant does not explain how that ruling meaningfully constrained him, nor does he identify the testimony he would have provided had it not "limited" him.

If that were not enough—and it is—Defendant did not object at trial to the questions or statements he now claims were improper, and he cannot demonstrate "plain error." *SEC v. Jasper*, 678 F.3d 1116, 1124 (9th Cir. 2012) (applying plain error standard where "nothing in the record" established Defendant objected at trial); *Settlegoode*, 371 F.3d at 517. Indeed, the jury heard Defendant's pretrial testimony, unconstrained by any motion in limine, regarding his whereabouts. Ex. C, Investigation Testimony Tr. at 180:20-181:5. The jury knew Defendant had suggested he might have been at the hospital or on vacation. It just did not believe him.

### 2. The SEC Offered News And Analyst Reports For Non-Hearsay Purposes

Defendant also claims that a new trial is warranted because the SEC purportedly "engaged in misconduct by arguing in closing a truth purpose for news articles that were not admitted for their truth." Mot. New Trial at 17-18. Defendant did not raise this objection at trial, and "federal courts erect a 'high threshold' to claims of improper closing arguments in civil cases raised for the first time after trial." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (citing *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th Cir. 1986)). The Court should only grant a new trial where the movant can show a "fundamental error," *i.e.*, that "the integrity or fundamental fairness of the proceedings in the trial court is called into serious question." *Id.* (quoting *Bird v. Glacier Electric Coop. Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001)). Defendant has made no such showing.

Defendant attacks two statements from the SEC's closing: that "many market observers connected Incyte and Medivation's stock price both before and after the acquisition was announced

on August 22nd" and that "[m]arket observers, both before and after the Medivation merger, linked the idea of a Medivation acquisition to Incyte itself being acquired. They also linked Medivation's acquisition directly to Incyte's stock price." Mot. New Trial at 17:17-23 (citing Trial Tr. 1292 and 1309). However, the SECs statements, referring to certain news articles, were not offering these documents for their truth. The SEC's statements mirrored the limiting instruction that the Court had already given during trial: that the news articles received into evidence were to be considered only for the limited purpose of showing "what market observers were saying." Ex. A, Trial Tr. 1147:22-1148:2. And the SEC linked these documents to a non-hearsay purpose: Defendant's knowledge of the market link between Incyte and Medivation. Immediately after the portions of the closing to which Defendant cites, the SEC stated:

> How do we know that **Mr. Panuwat knew** about the connection between the two companies? How do we know that **he expected** an announcement of Medivation's acquisition to increase Incyte's stock price?
> …
> The articles were also delivered to Mr. Panuwat's e-mail inbox, and we know **he was paying attention** to those articles because he wrote an e-mail to Ms. Jarrett early in the sale process commentating on how he had rescued the e-mails from his spam folder and wanted to make sure everyone was getting them.
> …
> Some of those articles were sent after Mr. Panuwat traded, but they are still important in considering **what Mr. Panuwat had in his mind** when he traded.
> …
> If all these other people drew the same conclusion on August 22nd and August 23rd, it could **not have been a surprise**, on August 18th, **to Mr. Panuwat** that that would happen.

Ex. A (Trial Tr. At 1294:5-1295:5) (emphases added).The news articles and analyst reports were also relevant to show what a reasonable investor would have believed about the link between Medivation and Incyte, another valid non-hearsay purpose.

Even if the statements Defendant cites were improper (and they are not), Defendant has certainly not shown that those arguments called the "fundamental fairness" of the trial into question. The SEC adduced voluminous evidence, including unrebutted expert testimony, establishing that Incyte and Medivation's stock prices were linked. The SEC's brief citation of a handful of news articles making the same point did not affect the trial's fundamental integrity, especially in light of the Court's limiting instructions. *See United States v. Cantwell*, 64 F.4th 396, 406-408 (1st Cir. 2023)

1  (prosecutor's improper use of hearsay statement during closing did not warrant reversal because

2  government provided ample additional evidence supporting the element in question); *Hemmings*, 285

3  F.3d at 1194 (no "fundamental error" where "the misconduct was an isolated, short comment" in a

4  lengthy closing).

5       The cases Defendant cites are inapposite. In *State v. Kirk*, an Ohio state appellate court

6  overturned a criminal conviction because the prosecutor's closing argument depended on hearsay to

7  establish key facts, referred to evidence not in the record, and made erroneous statements about the

8  nature of hearsay itself. 2010 WL 1818894 (Ohio Ct. App. May 7, 2010). In *Fisher v. Clark*, 2024

9  WL 71801 (E.D. Cal. Jan. 5, 2024), the district court did not even consider whether the purportedly

10  hearsay evidence at issue was appropriately admitted. The court did, however, cite the underlying

11  state appellate court decision, which found that the trial court did not abuse its discretion in admitting

12  the text messages at issue for the "purpose of showing their effect on defendant's state of mind." *Id.*

13  at *3-4.

14  **F.**    **The Court Did Not Deprive Defendant Of The Ability To Present Admissible Evidence**

15       **1.    The Court Properly Prohibited Defendant From Introducing Irrelevant**
16       **Evidence of Witnesses' Unexpressed and Post-Hoc Interpretations of**
            **Medivation's Policies**

17       Although Defendant demands a new trial due to the Court's limits on testimony "about

18  Medivation's policies," he does not explain why those rulings were erroneous. Mot. New Trial at 18-

19  19. He does not, for example, distinguish the cases the SEC cited in support of its motion in limine.

20  *See* SEC's Motions in Limine (Dkt. 98) at 6-8 (citing *Evangelista v. Inlandboatmen's Union of Pac.*,

21  777 F.2d 1390, 1398, n.3 (9th Cir. 1985); *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th

22  Cir. 1996), and *Aguilar v. Int'l Longshoremen's Union Loc.* No. 10, 966 F.2d 443, 447 (9th Cir.

23  1992)). Nor does he address the SEC's arguments that much of the anticipated testimony about the

24  policies was irrelevant, more prejudicial than probative, and lacked foundation. SEC's Motions in

25  Limine (Dkt. 98) at 8-10. The "burden of showing harmful error rests on the party seeking the new

26  trial." *Bos. Sci. Corp.*, 550 F. Supp. at 1110. Defendant cannot "show" the Court erred by simply

27  declaring that it did.

28

Defendant also does not—and cannot—establish prejudice. For one thing, he misstates the Court's ruling, which allowed him to present evidence of training, enforcement, office culture, his own contemporaneous state of mind, and non-hearsay conversations with others. Dkt. 126 at 12. Thus, his suggestion that Piscitelli was barred from testifying about "training on the legal meaning of the policy" and how the policy was "rolled out" (Mot. New Trial at 19:5-9), is incorrect. Defendant simply never offered that testimony. Likewise, Defendant was not barred from generally testifying as to "why Medivation's insider trading policy was ambiguous to him." Mot. New Trial at 18.21-22. The SEC objected only when Defendant started to testify that "*[a]s I sit here today*…I think it's a bit unclear," and the objection was only "to the extent" he was offering that current interpretation. Ex. A, Trial Tr. 1009:9-20 (emphasis added). Defendant does not explain how that testimony could have been relevant.

As for Hung and Kenneth Guernsey, the only other two witnesses whose testimony Defendant now cites, he never called them to testify, leaving the Court to speculate how they might have navigated its evidentiary rulings. *See Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1342 (9th Cir. 1985) (noting that "in limine rulings are by their very nature preliminary" and citing authority for proposition that "since defendant did not testify, any possible prejudice flowing from in limine ruling" was "wholly speculative"). Nevertheless, the excerpt Defendant cites from Hung's deposition—where he testifies that, "*reading the paragraph… it seems like* [the policy] applies" in a particular manner—strongly suggests he lacked a foundation to testify about the policy. Mot. New Trial at 18; Hung Dep. at 22:6-25 (Dkt. 193-11) (emphasis added). And while Defendant claims Guernsey was "involved in amending Medivation's inside training policy in 2014," the testimony he cites states only that "it *was* amended during my tenure." Mot. New Trial at 18; Guernsey Dep. at 10:12-15, 17:5-10 (Dkt 193-12). Defendant has never explained what relevant evidence Guernsey, who never spoke to Defendant about the policy, might offer. Indeed, at trial Defendant claimed that because Jarrett was knowledgeable only about that same 2014 version of the policy, she should not be allowed to testify *at all* about the earlier one Defendant signed, arguing: it was "policy that she didn't craft, that she didn't provide training on, that she doesn't remember… it doesn't seem relevant and

1  there would be no foundation for it." Ex. A, Trial Tr. 213:5-18; *see also id.* (calling the two

2  documents "materially different"). These points apply equally to Guernsey.

3        Most important, however, there *could not* have been prejudice given Defendant's own

4  testimony. "A reviewing court should find prejudice only if it concludes that, more probably than not,

5  the lower court's error tainted the verdict." *Tennison*, 244 F.3d at 688. Defendant now argues that the

6  Court's ruling prejudiced "his ability to argue [that] he owed no duty …that encompassed a trade in

7  Incyte" and that he acted without scienter. Mot. New Trial at 19:12-17. But Defendant admitted that

8  he "knew, separate and apart from any written policy, that [he was] not supposed to use Medivation's

9  confidential information for [his] own personal benefit." Ex. A, Trial Tr. 1128:20-1129:2 (Panuwat).

10 And he admitted he "understood that [he was not] free to use Medivation's confidential information

11 to make trades in the stock market." Ex. A, Trial Tr. 1166:16-19 (Panuwat). Nothing more was

12 required to establish a duty or, accepting the jury's factual finding that Defendant did use

13 Medivation's confidential information, breach and scienter. Thus, even if the Court's rulings were

14 erroneous, they did not prejudice Defendant.

15        **2.    The Court Properly Precluded Defendant And Other Witnesses From Characterizing This Case As "Novel"**

16

17        Defendant argues that the Court unfairly deprived him of "critical evidence negating scienter"

18 when it precluded him (and other witnesses) from, in his words, "explaining to the jury that the

19 SEC's prosecution was a pilot enforcement action testing a new theory of liability." Mot. New Trial

20 at 20. This argument is a non-sequitur, misstates the Court's in limine ruling, and ignores the trial

21 record. As Defendant acknowledges, the Court expressly permitted him to "testify that he was

22 unaware of similar cases" (Dkt. 126 at 13:27-14:1), and Defendant's *awareness* is what matters for

23 purposes of scienter. In explaining his awareness, Defendant did not need to resort to irrelevant

24 rhetoric about the purported uniqueness of this case, which is what the Court's in limine ruling

25 prohibited. Dkt. 126 at 14:5-9. Such rhetoric would have invited jury nullification by appealing to

26 jurors' extraneous concerns about the government or the markets. Moreover, although the Court

27 expressly permitted Defense expert Michiel McCarty to "corroborate that insider trading cases

28 typically involve trading stock of the company whose MNPI was learned by the defendant" (Dkt. 126

at 14:3-5), Defendant declined to call Mr. McCarty as a witness. Defendant cannot credibly maintain that the Court unfairly hamstrung his defense on this issue when he voluntarily declined to use the evidence he had.

Furthermore, Defendant *did* testify about his awareness of the legality of his actions. He testified that he understood what constituted insider trading. Ex. A, Trial Tr. 1007:20-1008:4. He testified that he had never heard of "any other time where the SEC had alleged that someone violated the securities laws by using his or her employer's confidential information to trade in the stock of another public company that had no business or competitive relationship with their employer." Ex. A, Trial Tr. 1008:13-19. And he testified that he had "no idea" that "the SEC might later suggest that [his] trading in the stock of another biotech company during the sales process would somehow violate securities laws." Ex. A, Trial Tr. 1008:20-24.

Moreover, Defendant's contention that this case rests on a "new theory of liability" is wrong. As the Court recognized when it denied Defendant's motions to dismiss and for summary judgment, this case is based on a straightforward application of the misappropriation theory. The idea that an individual can be held liable for using his employer's confidential information to trade in the securities of another company with which his employer has no commercial or competitive relationship is not new. This was precisely the situation in *Carpenter v. United States*, in which the Supreme Court affirmed the conviction of a Wall Street Journal employee who gave advance notice of the timing and content of certain newspaper articles to another individual, who then traded based on the probable impact the articles would have on the market. 484 U.S. 19, 22-24 (1987) (unanimously affirming mail fraud convictions and dividing evenly on securities fraud convictions). The Supreme Court's opinion focused on the defendant's mail fraud and wire fraud violations, not the securities fraud conviction, but *O'Hagan* endorsed *Carpenter* as an example of insider trading under the misappropriation theory. 521 U.S. at 653-54 (characterizing *Carpenter* as "a particularly apt source of guidance" in securities cases); *see also Talbot*, 530 F.3d at 1094 (relying on *Carpenter* for the proposition that "a continuous chain of duties is not required for liability under the misappropriation theory").

**3.** **There Was Nothing Unfair About The SEC's Description Of This Case As "Simple And Straightforward"**

Defendant also contends that it was unfair for the Court to permit the SEC to describe its case as "simple and straightforward." Not so. In using this phrase, the SEC was simply asking the jury to focus on the uncontested facts that were strongly indicative of Defendant's culpability: seven minutes after receiving an email with nonpublic information about Medivation's impending merger announcement, Defendant made the largest securities purchase of his life, a $117,000 wager on short-term Incyte call options. There was nothing improper about this argument. Moreover, Defendant did not raise this objection during the SEC's closing, and his argument does not begin to explain how the SEC's use of these words amounted to "fundamental error." *Hemmings*, 285 F.3d at 1194.

**G.** **There Is No "Cumulative Weight" To The Court's Purported Errors**

Finally, Defendant argues that even if none of these purported errors individually justify a new trial, their "cumulative weight" does. Specifically, Defendant claims that the supposed errors in the Court's "duty" and "scienter" instructions were "compounded by the Court's ruling that Mr. Panuwat could not explain why he genuinely intended no harm to Medivation: because he could not fathom in 2016 that the SEC would accuse him of fraud, which was a legitimate understanding given that the SEC's novel theory of liability had not yet been established." Mot. New Trial at 22:13-16. As explained above, Defendant's contention is unavailing. This case does not rest on a novel theory of liability. And since the Court's in limine ruling fully permitted Defendant to testify as to his unawareness of similar cases, Defendant's inability to characterize this case as "novel" did nothing to "compound" the Court's scienter instructions. The Court's in limine ruling also had no cumulative effect related to the Court's "duty" instruction: Whether this case is "novel" or not has nothing to do with Defendant's duty of trust and confidence to Medivation, which derives from Defendant's relationship to his employer.

The SEC's and the Court's use of the term "insider trading" also had no cumulative effect on any of these issues. Defendant's assertion that the SEC, simply by using this term, caused the jury to conclude that Defendant was lying about his lack of awareness of any similar cases makes no sense.

1   Mot. New Trial at 22. The Court explained to the jurors that they had to decide whether to believe all,

2   part, or none of what each witness said, and that in doing so, they could consider a long list of factors,

3   like the witness's memory, manner, interest in the outcome of the case, bias, and many other factors.

4   Jury Inst. 8 (Dkt. 155 at 9; Ex. A, Trial Tr. 1268:4-1269:9). The Court also repeatedly cautioned

5   jurors that questions, objections, and arguments by lawyers are not evidence. *E.g.* Jury Inst. 4 (Dkt.

6   155 at 5; Ex. A, Trial Tr. 1266:5). There is no basis for Defendant's assertion that, despite these

7   instructions, the jury reflexively rejected his testimony simply because the SEC used the phrase

8   "insider trading" when describing its case and the Court used the same term in its jury instructions.

9   **III.   <u>CONCLUSION</u>**

10        Defendant received a fair trial by a jury of his peers. Nothing in the Court's evidentiary

11   rulings or jury instructions—or in the SEC's questions, statements, and arguments—improperly

12   lowered the SEC's burden or prevented the Defendant from presenting valid defenses. Defendant's

13   Motion For New Trial should accordingly be denied.

14

15   Dated: June 18, 2024                          Respectfully submitted,

16

17                                                */s/ Matthew Meyerhofer*
                                                 Jason M. Bussey
18                                               Bernard B. Smyth
                                                 Matthew Meyerhofer
19                                               Attorneys for Plaintiff
                                                 SECURITIES AND EXCHANGE COMMISSION

20

21

22

23

24

25

26

27

28