MONIQUE C. WINKLER (Cal. Bar No. 213031)
JASON H. LEE (Cal. Bar No. 253140)
BERNARD B. SMYTH (Cal. Bar No. 217741)
  smythb@sec.gov
JASON M. BUSSEY (Cal. Bar No. 227185)
  busseyja@sec.gov
MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
  meyerhoferm@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW PANUWAT,<br><br>Defendant. | Case No. 21-cv-06322-WHO<br><br>**SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF MOTION TO IMPOSE REMEDIES AND ENTER FINAL JUDGMENT**<br><br>Date:   August 7, 2024<br>Time:   2:00 p.m.<br>Hon. William H. Orrick |

## I. INTRODUCTION

On April 5, 2024, a jury found that Defendant Matthew Panuwat ("Panuwat") committed securities fraud and engaged in insider trading when he purchased Incyte call options in August 2016. Having failed to persuade the jury that his trades were lawful, Panuwat now asks the Court to undercut the jury's verdict by imposing the lightest sanction: that he simply be ordered to pay back his illicit profits. This "remedy" would in fact leave Panuwat better off than he would have been had he refrained from insider trading in the first place, as it effectively converts his ill-gotten gains into an eight-year, interest-free loan. Such an outcome would contravene the "overriding concern of the civil penalty against insider trading," which is "to make insider trading a money-losing proposition." *SEC v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019) (quoting *SEC v. Rajaratnam*, 918 F.3d 36, 41 (2d Cir. 2019)). And by arguing against the imposition of an officer-and-director bar, Panuwat is asking the Court to pronounce that he can safely be invested in a position of trust despite his record of abusing such trust and making misleading statements. Such an outcome is plainly inadequate.

Panuwat tries to justify his request for lenience by repeatedly appealing to the idea that this case is "groundbreaking" and an "extension" of the securities laws. This is not true. *See* SEC's Opp. Def.'s Mot. New Trial at 23 (Dkt. 198). But more importantly, the purported "novelty" of this case does nothing to mitigate Panuwat's culpability. Panuwat testified that he understood he had a duty not to use Medivation's confidential information to enrich himself. Ex. A[1], Trial Tr. 1128:24-1129:2, 1166:16-19 (Panuwat). He never claimed that he thought he could use Medivation's confidential information to trade in Incyte. To the contrary, he has consistently asserted that the confidential information he possessed about Medivation's sale process had nothing at all to do with his Incyte trades. *See, e.g.,* Ex. A, Trial Tr. 1166:4-15 (Panuwat). But the jury, in finding Panuwat liable, rejected that assertion as false. And there is only one plausible explanation for why Panuwat would make this false statement, repeatedly, and under oath: From the very beginning, he understood that his Incyte trades were improper.

---

[1] The SEC previously filed the lettered exhibits referenced in this brief as exhibits to the Declaration of Bernard B. Smyth In Support of Securities and Exchange Commission's Motion To Impose Remedies And Enter Final Judgment (Dkt. 190).

The SEC respectfully requests that the Court enter a judgment proportional to the seriousness of Panuwat's misconduct. Panuwat committed securities fraud. He abused the trust that Medivation placed in him and exploited his role as one of Medivation's most senior executives by extracting personal profit from the company's confidential information. And afterwards, he repeatedly gave misleading testimony in an attempt to evade responsibility. To prevent and deter such misconduct, the Court should impose a permanent officer-and-director bar, a permanent injunction, and a $321,197.40 civil penalty.

## II.  ARGUMENT

### A.  The Court Should Impose A Permanent Officer-and-Director Bar

The Court may enter an officer-and-director bar against a person whose "conduct demonstrates unfitness to serve as an officer or director." 15 U.S.C. § 78u(d)(2). In making this determination, the Court has "substantial discretion," and may consider "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1988); *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995).

#### 1.  *Egregiousness*

Panuwat contends that his conduct was not egregious. Because this case is "novel," he argues, it was not "blatantly obvious" that trading Incyte securities on the basis of Medivation's nonpublic information was illegal. Def.'s Opp. SEC's Mot. Impose Remedies (Dkt. 195) ("Opp.") at 4:23, 5:9. As noted above, this argument ignores the fact that Panuwat violated a duty he understood well. Panuwat knew he was not permitted to use Medivation's confidential information to enrich himself, including by buying securities. When asked, "you knew, separate and apart from any written policy, that you were not supposed to use Medivation's confidential information for your own personal benefit," Panuwat responded, "Yes." Ex. A, Trial Tr. 1128:24-1129:2 (Panuwat). When further asked, "you understood that you weren't free to use Medivation's confidential information to make trades in the stock market," Panuwat responded—without qualification—"That's correct." Ex. A, Trial Tr. 1166:16-19. (Panuwat). But that is exactly what Panuwat did when he used his knowledge

of Medivation's impending acquisition announcement to buy Incyte call options. And evidently, it *was* "obvious" to Panuwat that he had done something wrong, because when he testified to the SEC, he falsely claimed that the sale process had nothing to do with his Incyte trades.

Panuwat also argues at length that his conduct is distinguishable from the defendant's conduct in *SEC v. Chapman*, 826 F. Supp. 2d 847 (D. Md. 2011). But he is unable to deny that he and the *Chapman* defendant are alike in at least one crucial respect: they both betrayed the trust that others placed in them for their own personal enrichment. That is egregious conduct, even for first-time offenders.

### 2. *Repeat Offender Status*

The SEC agrees that Panuwat is not a repeat offender. However, Panuwat does not dispute that a lengthy or permanent bar may be imposed against a first-time offender when the balance of factors shows that the offender is unfit to serve as an officer or director. *See, e.g.*, *SEC v. Sabrdaran*, 252 F. Supp. 3d 866 (N.D. Cal. 2017) (permanent bar for first-time offender); *SEC v. Bankosky*, No. 12 Civ. 1012 (HB), 2012 WL 1849000, at *3 (S.D.N.Y. May 21, 2012) (10-year bar for first-time offender).

### 3. *Role or Position*

Panuwat argues that his role at Medivation does not weigh in favor of a bar because "he did not direct or lead any subordinates as part of the charged conduct." Opp. at 7:6-7. In support of this proposition, he cites no case law, merely a law review article opining that executives who direct fraudulent schemes are more culpable than junior employees who carry them out. Jayne W. Barnard, *Rule 10B-5 and the "Unfitness" Question*, 47 Ariz. L. Rev. 9, 48 (2005). But that principle is not a mitigating factor here. Panuwat was a senior executive, and he acted on his own initiative.

Panuwat tries to distinguish his role at Medivation from the roles of the *Sabrdaran* and *Bankosky* defendants, arguing that those cases each featured "some additional fact about the defendant's specific job-related duty that renders a violation of that duty additionally aggravating." Opp. at 7:14-15. But this purported distinction does not withstand scrutiny. For example, Panuwat notes that Dr. Sabrdaran occupied a position that "required heightened candor." Opp. at 7:15-18. But so did Panuwat. He was responsible for responding to due diligence requests from Medivation's

potential buyers. Ex. A, Trial Tr. 1103:10-24 (Panuwat); *id.*, Trial Tr. 382:1-11 (Jarrett). "Heightened candor" is clearly required when answering questions from a party that is prepared to spend more than $10 *billion* to acquire a company. Similarly, Panuwat highlights that the *Bankosky* defendant was bound by a code of conduct that forbade employees from trading based on material, nonpublic information. Opp. at 7:19-24. Again, so was Panuwat. In fact, Panuwat was bound by *two* policies that prohibited him from using Medivation's confidential information to enrich himself, including by trading securities. Ex. C (TX 1371); Ex. D (TX 1372).

### 4. *Degree of Scienter*

Panuwat argues that his degree of scienter does not support a permanent bar because "at the time of his trade, it was not clearly established that a trader who lacked MNPI about the company in which he traded would be forbidden from trading in that company." Opp. at 8:17-19. Again, this argument fails because it ignores that, by trading Incyte, Panuwat violated a simple duty that he knew he had: a duty not to use Medivation's confidential information to enrich himself, including by trading securities. Nothing about this duty, or Panuwat's violation of it, required special knowledge of insider trading law or precedents.

Panuwat also argues that the SEC's contention that he acted with a high degree of scienter is inconsistent with the SEC's prior arguments. This is incorrect. The SEC consistently requested that the jury be given scienter instructions that comported with the well-established principle that scienter can be proven based on a showing of knowledge or recklessness. *See, e.g, SEC v. Bauer*, 723 F.3d 758, 776-77 (7th Cir. 2013) (characterizing the scienter element of insider trading as requiring proof that the defendant knew she was trading on the basis of information that was nonpublic and material). Regardless, the Court may properly consider the jury instructions that it actually gave when evaluating the defendant's degree of scienter. *SEC v. Jasper*, 883 F. Supp. 2d 915, 928-29 (N.D. Cal. 2010) (relying on jury's findings to support finding that defendant acted with a high degree of scienter).

### 5. *Economic Stake*

Panuwat acknowledges that his insider trading profits were "not insubstantial." Opp. at 10:5-7. He argues that his illicit gains compare favorably to other insider traders whose profits measure in

the millions, but million-dollar gains are not a prerequisite for a permanent or lengthy officer-and-director bar. *See, e.g., See Bankosky*, 2012 WL 1849000, at *1-*3 (imposing 10-year bar on defendant with insider trading profits of $63,000); *SEC v. Drucker*, 528 F. Supp. 2d 450, 453 (S.D.N.Y. 2007) (imposing permanent bar on defendant with insider trading profits of $138,174), *aff'd* 346 Fed. Appx. 663 (2d Cir. 2009). Panuwat also asserts that the Court should consider it a mitigating factor that he did not sell all his Incyte call options immediately, holding some of them until they were no longer profitable. Opp. at 10:10-14. But he does not explain why this should be considered mitigating, especially when his actual, realized trading profits of $120,031.32 were *higher* than the $107,065.80 in theoretical trading profits that form the basis for the SEC's penalty calculations.

### 6.   *Likelihood of Future Misconduct*

Panuwat's repeated false testimony shows that there is a substantial risk that he will engage in deceptive conduct again in the future. "Officers and directors of public companies hold positions of trust," and a person who makes misleading statements under oath "is likely to fail to live up to the trust with which such a position is endowed." *SEC v. Apuzzo*, 184 F. Supp. 3d 1, 10 (D. Conn. 2016). Although the jury clearly concluded that Panuwat's testimony about the reasons for his Incyte trades was false, Panuwat claims the Court may not draw the same conclusion, purportedly because "there is no objective basis" for it. Opp. at 11:14-17. But he fails to supply authority for this "objective basis" requirement, or for the proposition that a court is precluded from making its own determinations about a defendant's truthfulness. In any event, there is "objective" evidence that Panuwat gave misleading testimony: He answered various questions differently at trial than he did in previous sworn testimony. *See* SEC Remedies Mot. (Dkt. 189) at 7-10.

Panuwat tries to wave away his false and misleading statements, characterizing them as consequences of an "imperfect memory." Opp. at 13:11. But an imperfect memory does not explain why Panuwat's 2024 trial testimony about the reasons for his Incyte trades was much more detailed even than his 2023 deposition testimony on the same subject. Panuwat says that he "gave his most fulsome explanation" at trial because he "underst[ood] that the jury would be judging him." Opp. at 11:25-28. But he offers no explanation as to why he was unable to give the same fulsome explanation

at his deposition, or at his second SEC interview. If Panuwat means to suggest that he did not prepare as carefully for his second SEC interview, or for his deposition, as he did for trial, that is hardly an excuse.

Panuwat also argues that his untruthfulness should be distinguished from the defendant's deceitfulness in *Sabrdaran*, pointing to Dr. Sabrdaran's destruction of evidence. Opp. at 12:19-21. While this case does not involve the destruction of evidence, the court's reasoning in *Sabrdaran* applies with equal force to Panuwat. Dr. Sabrdaran's destruction of evidence was relevant because it was part of a sustained pattern of dishonest conduct. 252 F. Supp. 3d at 891. His conduct demonstrated an "instinct to lie" which made it "likely that Dr. Sabrdaran will again engage in dishonest misconduct, rendering him substantially unfit to serve as an officer or director of a public company." *Id*. at 892. Panuwat demonstrated a similar instinct through his testimony alone.

Panuwat also argues that the Court should credit his trial testimony that he did not intend to violate the securities laws and that it never occurred to him that his Incyte trades would have violated the securities laws. This is yet another effort to shift the Court's focus away from Panuwat's duties as a senior executive. Panuwat knowingly violated his obligation not to use Medivation's confidential information for his own profit. The state of his knowledge of the securities laws has no bearing on that fact.

Finally, Panuwat argues that his failure to accept responsibility for his misconduct ought not be counted against him because requiring him to accept responsibility would impair his appellate rights. Opp. at 14:1-16. This frames the inquiry too narrowly. The Court's task is not simply to ask whether Panuwat has formally admitted liability. Rather, the Court should consider whether Panuwat has done *anything at all* that shows recognition that he acted improperly. He has not.

7. *Lack of Stealth*

Panuwat also argues that his purported "lack of stealth and concealment" weighs against a permanent bar. Opp. at 15:3. In support of this argument, Panuwat cites to his purported "cooperation" with the SEC's investigation, but it was not cooperative for him to make false statements to the SEC about the reasons for his Incyte trades and his knowledge of the Medivation sale process. Indeed, Panuwat's own brief suggests that a bar is appropriate "where the defendant

'misled . . . investigators.'" Opp. at 15:14-16 (quoting *SEC v. Suman*, 684 F. Supp. 2d 378, 392 (S.D.N.Y. 2010)). Moreover, it is fair to infer that Panuwat's decision to use the information he had about the Medivation sale process to trade in *Incyte* securities, rather than Medivation securities, was itself a form of concealment. Panuwat presumably believed that if he had purchased *Medivation* call options, he quickly would have been found out and held accountable for insider trading.

### 8.   *A Permanent Officer-and-Director Bar Is Warranted*

Finally, Panuwat argues that if an officer-and-director bar is warranted, it should be limited to two years. Opp. at 17:7-9. But the four cases he cites in support of this contention—only one of which involved insider trading—have important distinctions from this action. In *SEC v. Jasper*, the court imposed a two-year bar on a CFO who facilitated a stock option backdating scheme. The court noted that the defendant had "reaped only indirect benefits from the backdating scheme" and had difficulty finding employment after the misconduct came to light. This led the court to conclude that the defendant "had already been effectively barred from his profession for three and a half years." *Jasper*, 883 F. Supp. 2d at 930-31. Panuwat, by contrast, directly profited from his misconduct and has not suffered any employment consequences.

In both *SEC v. Johnston* and *SEC v. Selden*, the defendants' violations consisted of misleading disclosures, but they sold only a small portion of their respective stock holdings during their misconduct, leading the court in each case to characterize the defendant's economic stake in the misconduct as minimal. 368 F. Supp. 3d 247, 252 (D. Mass. 2019), *aff'd* 986 F.3d 63 (1st Cir. 2021); 632 F. Supp. 2d 91, 99 (D. Mass. 2009). Panuwat's misconduct, on the other hand, was his trading activity itself. Finally, in *SEC v. Carr*, the court based its decision to impose a two-year bar in substantial part on the defendant's "age [74] and the fact that he is not currently working at a public company." No. 3:18-cv-1135 (SRU), 2020 WL 13303131, at *9-10 (D. Conn. Jan. 10, 2020). Panuwat, however, is only in his 40s and continues to work as a high-ranking executive at a public company.

### B.   The Court Should Impose A $321,197.40 Civil Penalty

"[T]he overriding concern of the civil penalty against insider trading is to 'effect general deterrence and to make insider trading a money-losing proposition.'" *Williky*, 942 F.3d at 393

(quoting *Rajaratnam*, 918 F.3d at 41). Panuwat asks that the Court "impose a penalty of $107,065.80, a figure equal to Mr. Panuwat's trading profit." Opp. at 18:11-12. But to impose a penalty merely equal to Panuwat's trading profit would result in Panuwat financially benefiting from his unlawful conduct and would thus be insufficient to address the "overriding concern" a civil penalty is meant to address. A penalty substantially larger than the amount of Panuwat's trading profit is necessary to satisfy the goal of deterrence. Here, the circumstances warrant a civil penalty of $321,197.40, an amount equal to three times Panuwat's trading profits.

Because the SEC does not seek disgorgement, the imposition of a substantial civil penalty is the only way to ensure that Panuwat does not financially benefit from his insider trades. Panuwat claims that the lack of a disgorgement claim is an SEC "mistake" or a "drafting error." Opp. at 19:22-25. That is false. In any event, Panuwat concedes (as he must) that the Court may consider that, absent an adequate civil penalty, Panuwat "would be allowed to retain [his] trading profit." *Id.* Here, Panuwat obtained $107,065.80 in trading profit in 2016. He will have enjoyed the benefits of those illicit gains, including interest earned, for about eight years by the time a final judgment is entered against him. A civil penalty merely equal to his trading profit would therefore be an inadequate deterrent since it would leave Panuwat in a better financial position than had he not engaged in insider trading at all.

Panuwat cites ten cases in support of his claim that a civil penalty equal to three times his trading profit would be "disparately harsh." Opp. at 19:2-16. One of those cases, *Bankosky*, did not involve a civil penalty determination. 2012 WL 1849000 (disgorgement plus civil penalty equal to defendant's trading profits ordered pursuant to a Consent Judgment). In eight of the remaining nine, the court cited the defendant's inability to pay as a factor justifying a smaller civil penalty. *See SEC v. Gunn*, No. 3:08-CV-1013-G, 2010 WL 3359465, at *11 (N.D. Tex. Aug. 25, 2010) ("The court's decision to impose a fine on the lower end of the statutory range is heavily influenced by the fact that Gunn's financial condition is such that he is unlikely to be able to satisfy the court's order of disgorgement, much less pay whatever penalty is imposed."); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1297 (M.D. Fla. 2001) (court found that defendant trader was "impecunious"); *SEC v. Svoboda*, 409 F. Supp. 2d 331, 348 (S.D.N.Y. 2006) ("Both defendants should be assessed less than the maximum

penalty in light of their financial condition."); *SEC v. Berrettini*, 218 F. Supp. 3d 754, 764 (N.D. Ill. 2016) (imposing disgorgement plus an equivalent penalty on an insider trader who claimed substantial financial hardship); *SEC v. Gowrish*, No. C 09-05883 SI, 2011 WL 2790482, at *10 (N.D. Cal. July 14, 2011) (court considered defendant's low net worth); *SEC v. Soroosh*, 166 F.3d 343, 1998 WL 904696, at *2 (9th Cir. 1998) ("Taking into account the fact that Soroosh did not have substantial remaining resources, the district court assessed a civil penalty that represented a little more than 30 percent of the profit Soroosh gained from his insider trading."). In fact, in two of those eight cases, the defendant had a *negative* net worth. *SEC v. Daubenspeck*, 469 F. Supp. 3d 859, 862-63 (N.D. Ill. 2020) (defendant's negative net worth "weigh[ed] against imposition of a high penalty, in part because the deterrent effect of the penalty depends in large part on defendant's available resources"); *SEC v. Pardue*, 367 F. Supp. 2d 773, 777 (E.D. Pa. 2005) (defendant had a negative net worth of between $50,000 and $100,000).

In stark contrast to the defendants in these cases, Panuwat admits he "is in a better position than most" to pay a substantial civil penalty. Opp. at 18:25-28 (citation omitted). He argues that "ability to pay alone cannot tip the balance in favor of the imposition of a civil penalty where other factors are lacking" (*id.*), but "net worth and corresponding ability to pay has proven to be one of the most important factors that district courts consider when determining how much of a civil penalty to assess in an insider-trading case." *Gunn*, 2010 WL 3359465, at *10. And, despite Panuwat's claim to the contrary, the other *Murphy* factors are present here and weigh in favor of a large penalty. As described in detail above, Panuwat acted with a high degree of scienter when he misappropriated his employer's confidential information, knowing he was prohibited from doing so. He has never acknowledged that his conduct was wrongful, has exhibited no contrition, and, despite conceding that his position at his current employer "exposes him to confidential information," he has provided no assurances against future violations.

Moreover, several of the cases Panuwat cites involved defendants subject to criminal or other sanctions. Under those circumstances, courts found that a large civil penalty was unnecessary because the other sanctions satisfied the important goal of deterrence. *See SEC v. Mellert*, No. C03-0619 MHP, 2006 WL 927743, at *2 (N.D. Cal. Mar. 29, 2006) (felony conviction and criminal fine satisfied

SEC'S REPLY ISO MOTION TO IMPOSE
REMEDIES AND ENTER FINAL JUDGMENT

9

SEC V. PANUWAT
CASE NO. 21-CV-06322-WHO

"dual purposes of individual and societal deterrence"); *see also Gunn*, 2010 WL 3359465, at \*10-\*11 (defendant subject to additional administrative penalties); *Svoboda*, 409 F. Supp. 2d at 348 (defendant was subject to criminal fine). Here, Panuwat is not subject to criminal or other potential sanctions for his insider trading. A substantial civil penalty is thus required to act as an adequate deterrent.

    **C. The Court Should Permanently Enjoin Panuwat From Violating Exchange Act Section 10(b) and Exchange Act Rule 10b-5**

Panuwat summarily states that "no blanket injunction is warranted," but he makes no argument other than to refer generally to the other portions of his brief. Opp. at 20:4-5. Many of the authorities Panuwat's brief relies upon in arguing against an officer-and-director bar or a significant penalty, however, concluded that an injunction was warranted under the circumstances. *See, e.g., Johnston*, 368 F. Supp. at 255-56; *Jasper*, 883 F. Supp. 2d at 929; *Gowrish*, 2011 WL 2790482, at \*6; *Gunn*, 2010 WL 3359465, at \*3. For the reasons set forth in the SEC's moving brief, a permanent injunction is warranted here as well.

**III. CONCLUSION**

For the reasons set forth above, the SEC respectfully requests that the Court permanently enjoin Panuwat from further violations of Section 10(b) and Rule 10b-5 of the Exchange Act, permanently bar Panuwat from serving as an officer or director of a public company, and order Panuwat to pay a civil penalty of $321,197.40.

Dated: July 3, 2024                          Respectfully submitted,

                                              */s/ Matthew Meyerhofer*
                                              Bernard B. Smyth
                                              Jason M. Bussey
                                              Matthew Meyerhofer
                                              Attorneys for Plaintiff
                                              SECURITIES AND EXCHANGE COMMISSION

SEC'S REPLY ISO MOTION TO IMPOSE REMEDIES AND ENTER FINAL JUDGMENT     10     SEC V. PANUWAT CASE NO. 21-CV-06322-WHO