1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

7  SECURITIES AND EXCHANGE            Case No. 21-cv-06322-WHO
   COMMISSION,
8                                     **ORDER ON POST-TRIAL AND**
              Plaintiff,              **REMEDIES MOTIONS**
9
       v.                            Re: Dkt. Nos. 189, 191, 192
10
   MATTHEW PANUWAT,
11
              Defendant.
12

13         Plaintiff Securities and Exchange Commission ("SEC") charged that defendant Matthew

14  Panuwat engaged in insider trading in violation of Section 10(b) and Rule 10b-5 of the Securities

15  Exchange Act of 1934 (the "Exchange Act"), by using his insider knowledge about Medivation,

16  Inc.'s plan to announce an upcoming merger to make leveraged, short-term trades in Incyte

17  Corporation ("Incyte") call options.  Following a one-week jury trial, the jury returned a verdict in

18  the SEC's favor.  Now pending before me are Panuwat's motion for a new trial and renewed

19  motion for judgment as a matter of law, and the SEC's post-trial remedies motion.  His motions

20  raise previously addressed issues and, for the reasons discussed below, are DENIED.  His one-

21  time conduct was a serious violation of the law that deserves a remedy that will deter him and

22  others from similar conduct, but not permanently damage his career in the way that imposition of

23  the officer/director bar would.  I will instead impose the maximum civil penalty of $321,197.40

24  and enjoin him from future violations of securities laws.

25                              **BACKGROUND**

26         Between 2014 and 2017, Panuwat worked for Medivation, a mid-cap, oncology-focused

27  biopharmaceutical company.  When he started working at Medivation, he signed the company's

28  Insider Trading Policy and its Confidentiality Agreement.  As part of his job, Panuwat was

United States District Court
Northern District of California

United States District Court
Northern District of California

1    responsible for finding, evaluating, and pursuing acquisition opportunities for Medivation.  To do
2    this, Panuwat necessarily tracked developments in the biopharmaceutical industry.

3        In March 2016, Medivation was approached by Sanofi S.A. ("Sanofi"), another
4    pharmaceutical company, that wanted to acquire it.  Medivation was not interested.  Panuwat
5    helped prepare presentations and disclosures related to Medivation's efforts to repel Sanofi's
6    attempted acquisition.  The takeover process turned hostile over the course of March and April of
7    2016, and Medivation began looking outward for help resisting Sanofi's efforts.  The Medivation
8    board directed its investment bankers, J.P. Morgan and Evercore, to contact industry participants
9    and assess their interest in potentially acquiring Medivation on terms that were more favorable to
10   Medivation.  One of the companies that Medivation contacted was Pfizer, the multibillion dollar
11   pharmaceutical company.

12       Throughout the sale process, industry analysts speculated and wrote about Medivation's
13   relative position within the biopharmaceutical market, and financial analysts discussed the
14   potential effect that a Medivation acquisition would have on other biopharmaceutical companies.
15   This analysis included speculation about how a larger company acquiring Medivation could
16   impact Incyte Corporation, a somewhat similar company to Medivation, largely predicting a
17   positive impact on Incyte's stock price.  But this speculation was just that: speculation.
18   Medivation outsiders were not aware of the events occurring at Medivation.  Panuwat was.
19   Throughout the search for a potential buyer other than Sanofi, Panuwat was privy to material, non-
20   public information ("MNPI") about Medivation and about its potential sale.  Medivation and its
21   investment bankers used code words to discuss potential buyers, and Panuwat understood that
22   much of the information he was learning and receiving about the potential sale from Medivation
23   was confidential.  Some of the MNPI of which Panuwat was aware included the status of various
24   offers; how serious potential acquirers were; when offers could be expected; and what those
25   potential buyers were offering in terms of price per share.

26       On August 18, 2016, Medivation CEO David Hung sent Panuwat and twelve other high-
27   level Medivation employees an email at their work email addresses at 12:19 p.m. Pacific Time
28   ("PT").  The email contained information about the status of the Medivation sale process that was

not available to the public.  The email stated that Pfizer (code-named in the email) was very interested in acquiring Medivation, that it wanted to finalize a deal that weekend, and it had named a specific price point for Medivation.

Seven minutes after receiving that email, at 12:26 p.m. PT, Panuwat started purchasing Incyte call options.  Over the course of the next 33 minutes, Panuwat purchased 578 Incyte call options for a total of $116,905.  He purchased at three different strike prices, and his purchases at each strike price represented, respectively, 81%, 70%, and 84% of the daily volume of those call options sold in the market that day.

On Monday, August 22, 2016, Pfizer's acquisition of Medivation was announced before the markets opened.  That day, Incyte's stock price opened at $79.80 and closed at $81.98, which was 7.7% higher than the prior trading day's close.  Two days later, on August 24, 2016, Panuwat sold 300 of the 578 call options for a profit.  He sold the remainder in September of the same year. Panuwat realized $120,031.32 in profit from these trades.

The SEC brought suit on August 17, 2021, alleging that Panuwat violated Section 10(b) of the Exchange Act and Rule 10b-5 when he purchased the Incyte stock.  I denied Panuwat's motion to dismiss.  Dkt. No. 26.  He argued that the action was an "unprecedented expansion of the [Exchange Act]" and that the SEC had failed to allege that the information Panuwat had about the upcoming sale process was material to Incyte, and thus he could not have traded in Incyte securities "on the basis of [MNPI] about that security or issuer."  He also argued that the SEC had not shown that he possessed any confidential information about Incyte when he purchased its stock options, but that the SEC was instead relying on the conclusory allegation that because Panuwat had confidential information about Medivation, that information was material to other similar biopharmaceutical companies.  I found this argument to be unpersuasive, and agreed with the SEC's portrayal of Section 10(b) and its regulations.   Section 10(b) and Rule 10b-5 cast a wide net that prohibits insider trading of "*any* security" using "*any* manipulative or deceptive device," and do not state that information "about that security or issuer" must originate with the security or issuer itself in order to be material.  Dkt. No 26 at 7.  I later denied Panuwat's motion for summary judgment, finding that the SEC had shown genuine disputes of material fact

United States District Court
Northern District of California

concerning each of the elements necessary to prove a Section 10(b) case: (i) whether Panuwat received nonpublic information, (ii) whether that information was material to Incyte, (iii) whether Panuwat breached his duty to Medivation by using its confidential information to personally benefit himself, and (iv) whether Panuwat acted with scienter. *See* Dkt. No. 85.

After a trial, the jury ruled in the SEC's favor, finding that the SEC established by a preponderance of the evidence that Panuwat was liable under the civil misappropriation theory of insider trading. *See* Dkt. No. 169 (Verdict Form). I ordered the parties to provide briefing on proposed remedies. Panuwat then filed a renewed motion for judgment as a matter of law and a motion for a new trial.

## DISCUSSION

### I.   MOTIONS FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, A NEW TRIAL

Panuwat renews his motion for judgment as a matter of law and, in the alternative, moves for a new trial. His Renewed Motion for Judgment as a Matter of Law ("RJMOL Motion"), contends that: (1) the court's instructions were erroneous, and there was insufficient evidence to find Panuwat liable under both the "correct" understanding of the law *and* under the understanding reflected by the court's instructions; (2) the SEC did not introduce evidence from which a reasonable juror could conclude that Panuwat's duty to Medivation encompassed his Incyte trades; and (3) the SEC failed to show that Panuwat breached any duty to Medivation. *See* RJMOL Motion [Dkt. No. 191].

His Motion for a New Trial ("New Trial Motion") proceeds similarly. He argues that the court (1) wrongly instructed the jury on the elements of misappropriation; (2) wrongly permitted Dr. Chyhe Becker's testimony and allowed her to introduce prejudicial hearsay; (3) prejudicially prevented Panuwat from testifying about other trades; (4) erred in denying Panuwat's motion for a mistrial; and (5) denied Panuwat a fair trial by precluding evidence of his valid defense theories. He also contends that the SEC misrepresented facts and evidence to the jury. And he argues that the cumulative weight of these errors rendered him unable to effectively defend himself, necessitating a new trial. *See* New Trial Motion [Dkt. No. 192].

United States District Court
Northern District of California

**A.**     **Legal Standard**

A Rule 50(b) motion is appropriate when the evidence permits only one reasonable conclusion, and that conclusion is contrary to that of the jury. *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009).  The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009), and the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

Under Rule 59, a court has the discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  The grounds for a new trial include: (1) a verdict that is contrary to the weight of the evidence; (2) a verdict that is based on false or perjurious evidence; or (3) to prevent a miscarriage of justice.  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation marks and citation omitted).  Erroneous evidentiary rulings and errors in jury instructions are also grounds for a new trial. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

When a Rule 59 motion for a new trial is based on insufficiency of the evidence, the court may weigh the evidence and assess the credibility of witnesses and need not view the evidence from the perspective most favorable to the prevailing party.  *See Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  The decision to grant a new trial motion lies within the court's discretion.  *See Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1013 (9th Cir. 2007). However, the court "is not justified in granting a new trial merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (internal quotation marks and citation omitted).  Rather, a new trial should be granted where, after "giv[ing] full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed" by

the jury. *Landes Contr. Co*., 833 F.2d at 1365.

**B.      Analysis**

**1.      Jury Instructions**

Panuwat challenges several of the court's jury instructions.  His arguments repeat those raised before trial.  I will address Panuwat's arguments about the jury instructions both with respect to his New Trial Motion and his RJMOL Motion.

Jury instructions "must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *Gantt v. City of Los Angeles*, 717 F.3d 702, 706 (9th Cir. 2013) (quotation marks and citation omitted).  There is no question that the jury instructions for this case looked different than those in some other securities cases because the SEC's theory of this case was different than others it has prosecuted in the past.  But the instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading.

**a.      Duty Instruction**

First, Panuwat argues that the court wrongly instructed the jury "that it could find a fiduciary duty based only on the receipt of nonpublic information." New Trial Motion 4; *see also* RJMOL Motion 6.  This misrepresents my instruction.  I did not instruct the jury that it could find that Panuwat had a duty to Medivation based only on the receipt of nonpublic information—I instructed the jury that *one way* it could find such a duty is if it found that Medivation had *entrusted* Panuwat, *as its employee* with confidential information.  *See* Jury Instruction ("Jury Inst.") No. 16.

The Ninth Circuit has held that to find a defendant liable under the misappropriation theory of insider trading, the SEC must demonstrate that the defendant "knowingly misappropriated [MNPI] for securities trading purposes, *in a breach of duty* arising from a *relationship of trust and confidence owed to the source* of the information." *S.E.C. v. Talbot*, 530 F.3d 1085, 1091 (9th Cir. 2008) (emphasis added); *see also United States v. O'Hagan*, 521 U.S. 642, 652-63 (1997). This duty of trust, confidence, or confidentiality can arise from several sources:  It can arise from an express agreement between an employee and his employer (written or otherwise), but it can also arise when an employer entrusts its employee with confidential information.  The latter duty

United States District Court
Northern District of California

is derived largely from agency law principles.

The parties have always agreed that *Talbot* is instructive, though they disagree about what it instructs.  In *Talbot*, as here, the defendant traded in the securities of a corporation for which he was not an insider, meaning that liability could attach "only under the misappropriation theory." 530 F.3d 1085, 1092.  The Ninth Circuit held that a relationship of trust and confidence (required by Section 10(b) and Rule 10b-5 for misappropriation liability) arose from the defendant's position inside his company because he was entrusted by his employer with confidential information.  To prevail on appeal, the SEC had to demonstrate that "(1) Talbot breached a fiduciary duty arising from a relationship of trust and confidence owed to the source of the information on which he traded; and (2) the information on which Talbot traded was material." *Id.* at 1092.  The court found that the SEC demonstrated both, holding that "Talbot, as a member of Fidelity's Board, owed a duty arising from a relationship of trust and confidence to Fidelity, the source of the information on which he traded.  The information on which Talbot traded was confidential, *as it was property 'entrusted' to him* by Fidelity in his capacity as a Fidelity director. This is textbook misappropriation." *Id.*, 530 F.3d 1085, 1094 (emphasis added).

The court in *Talbot* did not base its finding on any written confidentiality agreement or insider trading policy, but rather in "traditional principles of agency law," *id.* at 1094 (citing Agency Restatement (Second)), and in Supreme Court precedent, namely *O'Hagan* and *Carpenter v. United States*, 484 U.S. 19 (1987).[1]  It looked to principles of agency law to explain the duty of trust and confidence owed by an employee to their employer.  The general fiduciary principle requires that an agent refrain from using his or her position or the principal's property to benefit him or herself unless the principle consents to such use.  Restatement (Third) of Agency § 8.01 (2006).  It says "[a]ll who assent to act on behalf of another person and subject to that person's control are common-law agents . . . and are subject to the general fiduciary principles described in

---

[1] This was not a novel theory or a departure from Ninth Circuit or Supreme Court precedent.  *See, e.g. SEC v. Clark*, 915 F.2d 439, 448 (9th Cir. 1990) ("[B]y becoming part of a fiduciary or similar relationship, an individual is implicitly stating that she will not divulge or use to her own advantage information entrusted to her in the utmost confidence.").

[§ 8.01].” Accordingly, the fiduciary principle “is applicable to . . . employees as well as to nonemployee professionals.” *Id.*  “[C]ases that limit the fiduciary duty owed by employees generally involve postemployment disputes . . . and do not support the limitation of an employee’s fiduciary duty to exclude, for example, liability for self-dealing or unconsented-to use of the employer’s property during the employment relationship.”  *Id.*

The kind of relationship that gives rise to this general duty of trust and confidence is not limited to the officer/principal relationship; derived as it is from agency law, it applies to employees so long as they are acting on behalf of their employer and subject to its control.[2]  It is independent from written or express agreements and does not rely on the employer specifically laying out what is allowed and what is prohibited in terms of use of its confidential information.

With this caselaw in mind, I instructed the jury, in relevant part:

> In order for you to find the Defendant liable for insider trading, the SEC must prove each of the following elements by a preponderance of the evidence:  . . . That the *Defendant owed a duty of trust, confidence, or confidentiality to his employer, Medivation*[.]

Inst. No. 16 (Elements – duty element) (emphasis added).  And I instructed the jury on what constituted duty:

> An employee has a duty of trust, confidence, or confidentiality with regard to nonpublic information *when he expressly agrees to maintain the confidentiality of his employer’s nonpublic information* or to refrain from using that information for personal gain. *A duty also arises, even in the absence of a written agreement, when an employer entrusts an employee with confidential information.* This is because a company’s confidential information is the company’s property, and *employees are not permitted to use their position of trust and confidence to further their private interests without fully disclosing that use to the company and gaining the company’s consent.* In determining whether a duty of trust and confidence existed between the Defendant and Medivation, you must consider all the facts and circumstances presented to you about Defendant’s relationship with Medivation.

Inst. No. 17 (Duty, defined) (emphasis added).  Panuwat argues that the instruction was incorrect “because a source cannot unilaterally impose a fiduciary-type relationship merely by conveying nonpublic information.” New Trial Motion 6.

---

[2] Other cases have also found employees who are not officers of their employer still owe their employers a duty of trust and confidence.  *See, e.g. SEC v. Obus*, 693 F.3d 276, 289 (2d Cir. 2012) (finding that the defendant, as an employee for the source of the nonpublic information, owed his employer a “fiduciary duty”).

United States District Court
Northern District of California

As a preliminary matter, the jury was not instructed that Medivation could "unilaterally impose a fiduciary-type relationship merely by conveying nonpublic information." But that aside, the case Panuwat cites in support of his argument, *United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991), is both non-controlling and inapposite. I did not use it in writing the duty instruction, and I do not find it persuasive now.

In *Chestman*, the Second Circuit held that no duty of trust and confidence arose when the niece of a corporate insider conveyed confidential information about an impending offer to her husband and he subsequently traded on that information. *See Chestman*, 947 F.2d at 567-68. The court found that no duty arose but distinguished that case from those cases where associations were "inherently fiduciary," such as those between a "principal and agent." *Id.* It held that no fiduciary relation or similar relationship of trust and confidence existed between husband and wife and husband and wife's family to impose Rule 10b-5 liability on husband's stockbroker with respect to information received from husband regarding wife's family business. *See id.*

Here, of course, Panuwat was part of Medivation's leadership team throughout the acquisition process in 2016. Medivation deliberately entrusted him with confidential information as a function of his employment. *See* 3/26/2024 Trial Tr. 261-62 (Baxter testimony); 3/27/2024 Trial Tr. 419-420 (Jarrett testimony); 4/5/2024 Trial Tr. 1128, 1134, 1165 (Panuwat testimony). He signed multiple agreements that signaled his acknowledgment that he was to be so entrusted. He acted as an agent of Medivation in all meaningful ways. He received a base salary, an employee stock purchase plan, and 401(k) matching. He was authorized to represent the company's interests to both corporate insiders and outsiders.

The jury was not instructed that Panuwat's duty arose unilaterally from Medivation's entrusting him with confidential information. It was instructed that one way a duty of trust and confidence to one's company arises is when one is entrusted with confidential information. This is consistent with Ninth Circuit law and law from other circuits. The instruction was correct. And even if it were not, the same instruction told the jury that it could find that a duty arose from the confidentiality agreement and insider trading policy that Panuwat signed as a Medivation employee, and the evidence presented at trial (that Panuwat signed both agreements and

understood them to foreclose any misappropriation of Medivation's MNPI for his own personal trading gain), allowed the jury to find a duty arising from two other sources besides Panuwat's receipt of nonpublic information.

### b.   "Expressly Forbade"

Panuwat argues, as he did before trial, that the SEC should have been made to show *both* that he had a duty to Medivation *and* that Medivation expressly forbade him from trading Incyte securities.  Before trial, Panuwat proposed including an instruction that the jury must "decide whether Mr. Panuwat used confidential information belonging to Medivation *for a purpose that Medivation prohibited*." *See* Proposed Instructions Nos. 29 (emphasis added).  I did not give that instruction because Medivation was entitled, as his employer, to expect that Panuwat would only use the information it entrusted to him to benefit the company and would abstain from or disclose any trades he made based on that information.  *See Talbot*, 530 F.3d 1085, 1094.

Panuwat grounds this argument in authority that emphasizes how full disclosure forecloses liability; the law he cites is applicable to Section 10(b) liability in general but has little to do with whether a company prohibits the use of its confidential information.[3]  No authority states that such a prohibition is an element the SEC must show to prove misappropriation; the authority Panuwat cites stands, at best, for the principle that full disclosure is an affirmative defense to liability.  For example, the Supreme Court in *O'Hagan* (a criminal case brought by the government arguing Section 10(b) liability) discussed the effect of full disclosure *by* the defendant, *of* his intent to trade, *to* the source of the information; there, the Court held that that if a defendant shows that he fully disclosed his trade to his employer, there would be no deception under the Securities Act, foreclosing any finding of misappropriation.  *See O'Hagan*, at 655 ("full disclosure forecloses

---

[3] Panuwat argued at the pretrial conference that this is relevant because it was his understanding that Medivation did not prohibit the kinds of trade he made in Incyte, so he did not need to disclose the trade.  Panuwat argued this to the jury: they apparently did not believe him.  He did not provide authority that suggests such an instruction was appropriate; to the contrary, instructing the jury that a breach of duty would only occur if Medivation had expressly forbidden Panuwat's Incyte trade would defeat the purpose of holding employees to a general duty of trust and confidence with respect to their employers.  Panuwat provides no case where a court instructed a jury that it must find that an employer expressly forbade an employee from trading on the basis of its MNPI to find that employee liable for insider trading.

United States District Court
Northern District of California

liability under the misappropriation theory[.]").[4]

In *O'Hagan,* the Court positively referenced the government's argument that while "[t]o satisfy the common law rule that a trustee may not use the property that [has] been entrusted [to] him, there would have to be *consent* . . . [t]o satisfy the requirement of the Securities Act that there be no deception, there would *only have to be disclosure*." *Id.* (emphasis added).  In the Court's view, at least in the criminal context, a showing of *consent by* the employer/source or a showing of *full disclosure to* the employer/source by the defendant could defeat Section 10(b) liability because it would show there was no deception.  But this reference to the possible effect of consent on criminal Section 10(b) liability by the Court in *O'Hagan* does not justify instructing the jury that the SEC had to show that Medivation expressly forbade his trade, or even instructing it that if Panuwat showed that Medivation consented to his use of its information, such a showing would defeat the deception element of insider trading.[5]  That was not an affirmative defense; it was an argument Panuwat could (and did) make (unsuccessfully) to the jury.[6]

The SEC's theory at trial was that Medivation entrusted Panuwat with confidential information and he exploited it for his own gain.  In addition to the contents of the August 18 email, which conveyed information that a jury could determine was not public, the record at trial showed that at various times Panuwat was entrusted with Medivation's confidential information in his capacity as "Senior Director of Business Development."  The caselaw is clear that a duty of trust and confidence arose between Panuwat and Medivation as a result.  Critically, Panuwat never

---

[4] In the civil context, this would seem to be an affirmative defense, subject to the preponderance of the evidence standard.

[5] This argument bleeds into Panuwat's argument in favor of a separate "good faith" instruction, which I address later.  *See infra* Section I(B)(2).

[6] I have been generous in describing Panuwat's "consent" argument by referencing the Court's comments in *O'Hagan* about how consent and disclosure can defeat the deception element of Section 10(b).  He grounds his "consent" argument in a non-majority opinion from Justice Clarence Thomas, who stated that "were the source expressly to authorize its agent to trade on the confidential information . . . there would likewise be no Section 10(b) violation." *O'Hagan*, at 689-90 (Thomas, J., concurring and dissenting in part). Panuwat does not even discuss the part of *O'Hagan* that compares consent with full disclosure vis-à-vis defeating an assertion of liability under Section 10(b), which requires deception.

United States District Court
Northern District of California

1   contested that he did not fully disclose his Incyte trade to Medivation.  And he does not point to

2   any caselaw that suggests the jury needs to be instructed that he only breached his duty if he knew

3   that the trades were prohibited by Medivation; that would largely defeat the purpose of the duty of

4   trust and confidence that the Supreme Court and Ninth Circuit have described.  The final duty

5   instruction was correct on the law.

### 2.   Scienter

7        Next, Panuwat argues that the court's scienter instruction was erroneous in four ways.  I

8   will address each.  But first, I will provide a brief overview of how the Ninth Circuit's model

9   instructions address the scienter element of misappropriation trading.

10       Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud."

11   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976).  It may be established "by proving

12   *either actual knowledge or recklessness*." *Gebhart v. SEC*, 595 F.3d 1034, 1040-41 (9th Cir. 2010)

13   (emphasis added); *see also SEC v. Bauer*, 723 F.3d 758, 776-77 (7th Cir. 2013) (holding that the

14   SEC could establish scienter in an insider trading case by showing that the defendant knew or

15   recklessly disregarded that she had material, nonpublic information); *Clark*, 915 F.2d at 453

16   ("[A]n employee's knowing misappropriation and use of his employer's material nonpublic

17   information regarding its intention to acquire another firm constitutes a violation of Section

18   10(b)and Rule 10b–5."); *Ponce v. SEC*, 345 F.3d 722, 729 (9th Cir. 2003) ("[S]cienter may be

19   established by demonstrating that the defendant acted recklessly.")

20       The Ninth Circuit model instructions for civil securities litigation address what is required

21   for scienter:

> [A defendant acts knowingly when [he] [she] [it] makes an untrue
> statement with the knowledge that the statement was false or with
> reckless disregard for whether the statement was true.] [A defendant
> acts knowingly when [he] [she] [it] omits necessary information *with
> the knowledge that the omission would make the statement false or
> misleading or with reckless disregard* for whether the omission would
> make the statement false or misleading.] ["Reckless" means highly
> unreasonable conduct that is an extreme departure from ordinary care,
> presenting a danger of misleading investors, which is either known to
> the defendant or is so obvious that the defendant must have been
> aware of it.

27   *See* 9th Cir. Model Jury Instructions ("Model Instructions") 18.5 (emphasis added).

28       The final instruction on the elements the SEC must show to prove liability read as follows

United States District Court
Northern District of California

as to scienter:

> A person is liable for a violation of the securities laws if that person *acts with an intent to defraud the source of confidential, material, and nonpublic information by either knowingly or recklessly misappropriating that information for securities trading purposes*, in breach of a duty arising from a relationship of trust and confidence owed to the source of the information on which he traded . . .
>
> [and to do this, the SEC must show, with respect to scienter,] . . .
>
> That the Defendant, at the time he bought Incyte call options, *knew* that the information he received from Medivation was both nonpublic and material to Incyte *or acted recklessly* as to whether the information was both material and nonpublic, and *knew that, or acted recklessly as to whether*, he lacked consent from Medivation to use the information.

*See* Instruction No. 16 (emphasis added).

Panuwat's first argument is that the court improperly "lowered the SEC's burden" by telling the jury that scienter required that Panuwat "knew that, or acted recklessly as to whether he lacked consent from Medivation to use the information." New Trial Motion 7; *see* 4/5/2024 Trial Tr. 1274.  He contends that the SEC had to show that Panuwat *knew* that he was breaching a fiduciary duty, and that the court's instruction did not reflect that requirement.  *See* New Trial Motion 7.  To support this argument, he cites *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), where the Supreme Court held that Section 10(b) liability requires a "mental state embracing intent to deceive, manipulate, or defraud."  425 U.S. at 193.

Panuwat is right that the SEC had to show that he had such a mental state, but he is wrong that the jury was not instructed regarding it.  As discussed above, the first paragraph of the instruction on the elements of insider trading described insider trading as an act with "an intent to defraud the source of confidential, material, and nonpublic information."  Jury Inst. No. 16 [Dkt. No. 155 at 17; Trial Tr. 1273-74].  The instruction then provided that the SEC could show that Panuwat acted with an intent to defraud by showing that he "either knowingly or recklessly misappropriate[ed] that information for securities trading purposes."  *Id.*  This instruction encompassed the Supreme Court's ruling in *Hochfelder* and complied with the Ninth Circuit's understanding of insider trading as described in *Talbot*.  This instruction was also consistent with *O'Hagan*, where the Supreme Court held that "the fiduciary's fraud is consummated not when he

1   obtains the confidential information, but when, without disclosure to his principal, he uses the

2   information in purchasing or selling securities." *O'Hagan*, 521 U.S. at 643.

3          Moreover, even if I had improperly "lowered the burden" for the SEC to prove its case,

4   Panuwat's admissions at trial showed that he knew that using Medivation's confidential

5   information would violate his duty to his company.  He admitted that he had a duty not to use

6   Medivation's information to enrich himself, including a duty to not trade securities using

7   Medivation's confidential information.  *See* 4/5/2024 Trial Tr. 1128:24- 1129:2 ("Q. And you

8   knew, separate and apart from any written policy, that you were not supposed to use Medivation's

9   confidential information for your own personal benefit. A. Yes, I believe I had that

10  understanding".), 1166:16-19 ("Q [Y]ou understood that you weren't free to use Medivation's

11  confidential information to make trades in the stock market; correct? A. That's correct.").

12  Assuming, arguendo, that the court's instruction was wrong, this demonstrates that it is "more

13  probable than not that the jury would have reached the same verdict if it had been properly

14  instructed." " *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (quoting *Dang v. Cross*, 422

15  F.3d 800, 811 (9th Cir. 2005)).

16         Second, Panuwat argues that the court's instruction on scienter "conflated the subjective

17  element of scienter with the objective element of breach." New Trial Motion 8:6-16.  He insists

18  that violating Section 10(b) requires a deceptive device, but that if the source does not object to the

19  trader's use of its material and nonpublic information in trading, then no deception has occurred.

20  But this framing is askew.  *O'Hagan*, which Panuwat cites for this rule, does not stand for that.

21  *O'Hagan* provides that if the source of MNPI gives the defendant permission to trade based on

22  that MNPI, then that permission defeats the deception element of Section 10(b) liability. *See*

23  *O'Hagan*, 521 U.S. at 659.  *O'Hagan* does not stand for the rule that deception cannot be shown

24  unless the source of MNPI has explicitly objected to or prohibited the defendant from trading

25  based on its MNPI.  Such a rule would predicate liability on the source of confidential information

26  expressly objecting to misappropriation of its information.  That is not what the law requires

27  today.  Panuwat's deception arose from his failure to disclose what amounted to a breach of his

28  duty to Medivation.

United States District Court
Northern District of California

14

Third, Panuwat argues that the court erred in "fail[ing] to instruct the jury as a distinct element of the offense that the SEC must prove intent to defraud." New Trial Motion 8. This argument lacks merit. Before trial, the SEC proposed a scienter instruction that largely conformed with the Ninth Circuit's model instructions. But Panuwat wanted to include a fourth element: that, to prevail on its claim, the SEC must prove by a preponderance of the evidence that Panuwat "*acted with an intent to defraud* Medivation, Inc." *See* Joint Proposed Jury Instructions ("Proposed Instructions") No. 22 [Dkt. No. 103] 29:21-23 (emphasis added), and No. 27 50:4-20. I determined that Panuwat's proposed addition improperly included "intent to defraud" as a distinct element within scienter that the SEC had to prove at trial. But I also found Panuwat's concern about the SEC's proposed instruction to be meaningful. The Ninth Circuit is clear about what is required to prove scienter for these cases: Section 10(b)'s scienter requirement mandates that the plaintiff show that the defendant had a "mental state embracing intent to deceive, manipulate, or defraud." *See SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) (internal quotations omitted). It is also clear that the SEC may establish this intent "by proving either actual knowledge or recklessness." *See Gebhart*, 595 F.3d at 1041. In short, since recklessness and knowledge are both sufficient to prove scienter, a plaintiff can establish the requisite intent to defraud in a misappropriation case either by showing that the defendant knew that she was trading based on material, nonpublic information or that she recklessly disregarded the same.

Accordingly, the jury was instructed that the SEC must show that Panuwat acted with "an intent to defraud", and it was instructed on how the SEC could make such a showing. *See* Instr. No. 16; *see supra* Section A(2). While Panuwat wanted the "elements" portion of the instruction to include an "intent to defraud" element, no case he points to requires that, and the necessary effect was achieved by the instruction as written. No prejudicial error occurred because (1) the instruction was consistent with misappropriation law, and (2) the instruction, as a whole, fairly and correctly explained the law. *See Swinton v. Potomac Cor.*, 270 F. 3d 794, 807 (9th Cir. 2001).

Finally, Panuwat argues that the court "magnified the error of its deficient instruction on intent to defraud by declining . . . to instruct the jury that good faith was a complete defense." New Trial Motion 8-9. But, as discussed, Instruction 16 instructed the jury that "intent to defraud"

was a necessary component of insider trading, and element 4 of the same instruction correctly explained what the SEC had to show to establish scienter.  This obviated the need for a separate "good faith" instruction.  If the jury found that the SEC had not shown that Panuwat acted with an intent to defraud—in other words, if it was apparent that Panuwat had acted in good faith—that would defeat the SEC's case.  Including a separate "good faith" instruction ran the risk of confusing the jury as to the elements of misappropriation liability.

The cases Panuwat cited in pretrial motions to support his request for a "good faith" instruction were inapplicable to his case; they were "controlling persons" cases.[7]  The Ninth Circuit has a model "good faith" instruction for such cases.  But the SEC did not assert "controlling person liability" against Panuwat.  He points to no misappropriation case where the court found it appropriate to include a "good faith" instruction.  Even if the "good faith" instruction *were* somehow applicable to Panuwat's case, putting aside that there was no controlling person liability at issue, Panuwat would have had the burden of proving good faith, contrary to the instruction he proposed.  *See* Model Instructions 18.10; *see also Hollinger*, 914 F.3d 1564, 1576.

### 3.    Use of the Phrase "Insider Trading"

Panuwat contends that it was "manifestly unjust" for the court to "endorse the prejudicial phrase 'insider trading'" when instructing the jury.  New Trial Motion 9-10.  He insists that the term was "empirically prejudicial," and inaccurate because he was "not charged with *insider trading*," because the Supreme Court has stated that misappropriation and classical insider trading theories are "complementary."  *Id.* 9.  Panuwat essentially outlines the prevailing counterargument in his brief.  As he points out, the Supreme Court in *O'Hagan* did clarify that under the

---

[7] *See, e.g. Arthur Children's Trust v. Keim*, 994 F.3d 1390, 1398 (9th Cir. 1993) ("a defendant who is a controlling person of an issuer with scienter may assert a good faith defense by proving an absence of scienter.") (internal quotations omitted); *Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000) (where the plaintiff brought a securities fraud suit that involved questions of "controlling person liability" and the defendant asserted a good faith defense); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) (where private investors filed a securities fraud action against a broker dealer and financial counseling firm, and the court found that the broker dealer was a "controlling person" with respect to its registered representatives, and thus had the burden of proving a "good faith" defense).

United States District Court
Northern District of California

"traditional" or "classical" theory of insider trading, Section 10(b) and Rule 10b-5 are violated when a corporate insider trades in his corporation's securities on the basis of MNPI. *See O'Hagan*, 521 U.S. at 652.  In contrast, the Court explained, the "misappropriation theory" holds that a person commits fraud "in connection with" a securities transaction, in violation of the same rules, when he misappropriates confidential information for securities trading purposes in a breach of duty owed to the source of that information.  *Id.*  The Court went onto to explain that the "two theories are complementary," with the "classical theory target[ing] a corporate insider's breach of duty to shareholders with whom the insider transactions," and "the misappropriation theory outlaw[ing] trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information." *Id.* 652-53.  The way that the Court juxtaposed those theories makes it very apparent that the Court considered the misappropriation to be an alternate theory of insider trading, to be contrasted with the "classical" or "traditional" theory of the same.  Any other reading is an attempt to twist the Court's words and is belied by a common sense reading of *O'Hagan*.[8]

***

For the foregoing reasons, the jury was properly instructed concerning the elements that the SEC had to show for the jury to find that Panuwat had misappropriated his employer's information in violation of the securities laws.

### 4.    Evidentiary Rulings

Panuwat argues that the court's "erroneous rulings" prevented him from effectively presenting a "truthful defense" to the jury.  Motion for a New Trial ("New Trial Motion") [Dkt. No. 192] 3.  He says that absent those errors, the jury could have heard that: (i) Panuwat had a "good faith belief in the honesty of his Incyte trade, which was reasonable given the historical understanding of securities fraud"; (ii) Panuwat understood the company policies as not

---

[8] Panuwat also argues that my use of the phrase "insider trading" while instructing the jury was prejudicial because the term is "pejorative."  First, courts ban the use of "pejorative" terms when they are unnecessary to prove a claim or "do not bear on the issues being tried," which certainly is not the case here, in an insider trading civil liability case.  I instructed the jury that the phrase "insider trading" was a legal term of art and not pejorative, which cured any potential prejudice.

United States District Court
Northern District of California

1    preventing him from trading Incyte stock, and that view was reasonable and shared by

2    Medivation's executives and outside legal counsel; and (iii) Medivation did not object to

3    Panuwat's trades, and the SEC introduced no  testimony that anyone at Medivation viewed

4    Panuwat's trades as wrongful, nor did the company perceive its policies to prohibit his Incyte

5    trades and there would not have been a consequence to him had Medivation learned of his trades

6    in 2016.  New Trial Motion 3:2-12.  None of these arguments have merit.

### a.      Becker's Testimony

8          Panuwat argues that a new trial is warranted because the court "erred by allowing Dr.

9    Becker to testify as an expert, and then compounded the error by allowing her to introduce hearsay

10   testimony." New Trial Motion 12-13.  Dr. Becker, a Deputy Director in charge of the Office of

11   Litigation Economics in the Division of Economic and Risk Analysis at the SEC, who had

12   previously worked as a principal at the Economic Consulting group at Deloitte, and received her

13   M.B.A. and Ph.D in Financial Economics from the University of Chicago Booth School of

14   Business, was qualified to give the testimony she did.

15         Federal Rule of Evidence 702 governs expert testimony. It provides:

16         A witness who is qualified as an expert by knowledge, skill,
           experience, training, or education may testify in the form of an
           opinion or otherwise if: (a) the expert's scientific, technical, or other
17         specialized knowledge will help the trier of fact to understand the
           evidence or to determine a fact in issue; (b) the testimony is based on
18         sufficient facts or data; (c) the testimony is the product of reliable
           principles and methods; and (d) the expert has reliably applied the
19         principles and methods to the facts of the case.

20   Fed. R. Evidence 702.  The district court judge must ensure that all admitted expert testimony is

21   both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993).  In

22   performing its gatekeeper function under *Daubert*, the court "is not tasked with deciding whether

23   the expert is right or wrong, just whether his testimony has substance such that it would be helpful

24   to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc*., 2013 WL 4779709 at * 7 (9th Cir.

25   June 19, 2013).

26         Dr. Becker met these standards, and I denied Panuwat's motion in limine to exclude her

27   testimony.  *See* Order on Motions in Limine ("MIL Order") [Dkt. No. 126] 4-6.  Panuwat asserted

28   then and now that Dr. Becker was unqualified to opine about mergers and acquisitions in the

biopharmaceutical industry because she "lacked necessary expert qualifications, used unreliable methodologies, and impermissibly relied on hearsay to prepare her report." New Trial Motion 12:11-15. But Dr. Becker had significant experience in market and risk analysis, and her opinions on how the market would perceive Medivation and Incyte's stock prices in relation to one another (which was her key area of testimony) did not require specific biopharmaceutical knowledge. *See* MIL Order at 7.

Panuwat contends that "three specific errors" occurred at trial with respect to Becker. New Trial Motion 12-13. I will address each piece of challenged testimony.

### i. Confounding News

The first error, Panuwat argues, occurred when the SEC "violated the Court's ruling that Becker could testify about analyst reports as relevant to the existence of confounding news … by introducing analyst reports related to a wholly separate issue." New Trial Motion 13:7-14. He says that the SEC "in fact introduced no analyst reports as relevant to Becker's confounding news analysis and introduced the hearsay opinions of three analysts solely in support of Becker's claim that the so-called economic phenomenon of a spillover effect . . . was relevant to the biopharma industry." New Trial Motion 13 (citing 3/27/2024 Trial Tr. 557-58). Panuwat believes that Dr. Becker adopted the contents of three article exhibits (Dkt. No. 99-3 at 41-42; 45-46; and 111-112) without conducting any independent analysis. He contends that Exhibits 1220 and 1276 did not confirm Dr. Becker's opinion, but rather "they [were] her opinion," and thus were impermissible hearsay. *See* Reply ISO New Trial Motion [Dkt. No. 201] 9.

Dr. Becker's testimony at trial suggests that she relied on hearsay opinions asserted in analyst reports to confirm her opinions, not for their truth. As she said, "[Exhibit 1220] is another article that confirmed my opinion that spillover effects were relevant in this particular industry," *see* 3/27/2024 Trial Tr. 568:19-24, and that Exhibit 1276 (not in evidence) "confirm[ed] [her] view that . . . market observers would expect Incyte's stock to react when Medivation's merger was announced." *Id.* at 570:19-25.

Contrary to Panuwat's assertion that Dr. Becker "adopted the contents of [these exhibits] …without conducting any independent analysis," her testimony shows that she had bases for her

own opinions on spillover effects in the market.  *See id.* at 556-560.  She stated that there was peer-reviewed research on the idea of spillover effects*, see id*. at 558:3-8, explained why news of a merger would lead to a spillover effect, *see id.* at 558:12-20, and why market observers would have expected Incyte's stock price reaction to Medivation's merger news, using exhibits, *see id.* at 559:15-561.  She went on to explain the other things she did to determine whether, in her expert opinion, spillover effects would have affected Incyte's stock price.  *See id.* at 561-563.  At no point did Dr. Becker testify that her opinion on spillover effects was based on the at-issue article exhibits.  Her testimony about confounding news was proper and complied with the court's limiting order.

### ii.      Limiting Instruction

Relatedly, Panuwat also argues that the limiting instructions I gave with respect to use of hearsay opinions were insufficient.  Specifically, he argues that "even if these hearsay opinions were relevantly admitted to explain [Dr. Becker's] conclusions on confounding news, the Court erred by failing to issue the required limiting instruction."  New Trial Motion 13:14-17.  I disagree with this portrayal.  At trial, I provided specific limiting instructions as to Exhibit 1216 after Panuwat objected that a question pertaining to that exhibit called for speculation.  *See* 3/26/2024 Trial Tr. 324-25 (instructing the jury to "note that this is . . . a reporter's analysis.  [D]on't take it as truth, but it is what was written.").  I also instructed the jury generally, several times, that news articles were not admitted for their truth, but only for the "fact that this news was out, such as it is," *see* 3/27/2024 Trial Tr. 771-772, or to show "what market observers were saying," *see* 4/4/2024 Trial Tr. 1147-48.

### iii.     Cherry Picked Statements

Panuwat also contends that Dr. Becker's opinions relied on "cherry-picked results" from the outset.  *See* Motion 12, n. 6; Reply 9:16-26.  He posits that her opinion that "market observers would expect Incyte's stock price to increase" on announcement of Medivation's merger was not based on objective criteria, but was instead result-oriented.  He says that her explanation for how she reached her conclusions was prejudicial because "the jury lacked the skillset necessary to properly evaluate the unreliability of her methods."  New Trial Motion 12-13, n.6.

When asked "how [she] identif[ied]" the event studies she used, Dr. Becker stated that "what I looked for was were there times when pretty much the same thing had happened in the past . . . and when I say the same thing, I mean the same thing as Medivation's August 22 merger announcement, and what I'm looking to see is how did Incyte's stock price react to those prior events that are similar"; she prepared a demonstrative to help explain what she meant.  3/27/2024 Trial Tr. 579:11-580.  She testified:

> "[The first thing she looked for was whether] there [was] a news announcement that was biopharma merger news . . . because the thing that happened on August 22 was that Medivation announced it was being acquired by Pfizer . . . so that's my benchmark that I'm trying to match to. And it was a biopharma merger news event, so I'm looking for other biopharma merger news. The other thing I'm looking for is a comparable price increase, because remember, Medivation's stock price increased by 19 percent. I'm looking for another time when the target company, the company being acquired, had a comparable price increase. And there is a reason for that. That's because these spillover effects -- like you don't expect a spillover effect unless the initial -- except in cases where the news is kind of a big deal … a small event doesn't have a spillover effect . . .that's the reason why I'm looking for a comparable price increase. And the last thing I looked for was, was the event occurring to either Medivation or a similar company."

*See id.* at 580:1-22.  Dr. Becker explained that she found two prior similar events that she used as event studies.  One was a prior announcement that Medivation was a takeover target, the second was a rumor that another company that was "similar" to Medivation (in that it was a biopharmaceutical company focused on oncology drugs) was also a takeover target.  *See id*. at 581:1-11.

Dr. Becker provided the jury with an explanation for why she chose the event studies she did.  Panuwat had the opportunity to cross-examine her; his argument that they were cherry-picked is conclusory.  As for his argument that the jury "lacked the skillset necessary" to determine whether Becker's opinion was reliable, Panuwat provides no evidence or reason in support of this position.

### b.     Tesaro and Relypsa Trades

Next, Panuwat renews his argument, originally made at the motions in limine stage, that he should have been allowed to introduce evidence that he had traded in the biopharmaceutical companies Tesaro and Relypsa.  He wanted to make this argument in response to what he

1    described as the SEC's "false claim that the Incyte trade was unusual insomuch as it was an outlier

2    from his entire trading history."  New Trial Motion 14:4-10.

3         In the MIL Order, I allowed Panuwat to introduce evidence about his Tesaro and Relypsa

4    trades without rebuttal so long as the "evidence [was] cabined to the facts that these trades

5    occurred in 2016, that they were in biopharma stocks, and that he had a gain from those trades and

6    was less averse to risk as a result." MIL Order 2:13-20.  To the extent that Panuwat limited his

7    discussion of the trades to that scope, the SEC was not to cross-examine him on them.  But I

8    allowed the SEC to cross-examine him if he opened the door and talked about how many options

9    he bought in the two companies, when he traded, and/or that he bought call options specifically.

10   *See id.* at 13-14.

11        Panuwat says this was error because it "effectively prohibited [him] from giving testimony

12   that would have directly refuted the SEC's portrayal of his trade as unusual." Reply ISO New

13   Trial Motion 10:6-7.  Panuwat argued that preventing him from testifying about the other trades

14   would be very prejudicial.  I agreed.  That is why I did not prevent him from testifying about the

15   Tesaro and Relypsa trades; I merely informed him that if he were to open the door as described

16   before, that would expose him to cross-examination at trial.  As I stated at trial, I was "not

17   precluding anybody from doing anything with respect to Tesaro and Relypsa . . . I'm not going to

18   shackle anybody." 3/27/2024 Trial Tr. 410:14-24.  Panuwat was not unable to show that he had

19   traded in biotech options prior to making the Incyte trade; he chose not to show that evidence

20   under the conditions that he could be cross-examined if he opened the door.  At oral argument,

21   Panuwat's counsel said that it was his calculation at trial that it was not worth it to introduce more

22   specific evidence about the Tesaro and Relypsa trades at trial for fear of biasing the jury against

23   his client.  That was Panuwat's legal team's calculation to make, and they made it.

24        Even if it was erroneous to instruct Panuwat that were he to get into more detail about the

25   Tesaro and Relypsa trades he would risk opening himself up to cross-examination, the error was

26   not prejudicial.  The SEC's argument at trial did not rely upon comparisons between Panuwat's

27   trading history and his Incyte trades.  It primarily relied on the temporal proximity between

28   Panuwat learning confidential information that was material to both Medivation and Incyte from

United States District Court
Northern District of California

his company's CEO and then purchasing the vast majority of Incyte call options sold that day, as well as on the inconsistencies between Panuwat's various justifications for that trade.

### c.      Opening Statement

Panuwat argues that a new trial is also warranted because SEC counsel told the jury in its opening statement that Panuwat had "cheated other investors."  3/25/2024 Trial Tr. 153-55. Panuwat moved for a mistrial on the same basis.  While I agree that this was an inappropriate comment to make, because the SEC's theory of Panuwat's liability did not involve injury to investors, my instruction the next day cured any (doubtful) prejudicial effect.

The day after opening statements, I instructed the jury that "[w]hat you heard yesterday from the lawyers is – is their perspective on things.  It's not evidence.  Evidence is going to start today."  3/26/2024 Trial Tr. 223:20-22.  I had previously given the model instruction that what lawyers say is not evidence. The SEC did not press this theory of the case at any other point during the case, and there was no prejudice.  *See United States v. Rhodes*, 713 F.2d 463, 469 (9th Cir. 1983) (court was justified in denying mistrial based on prejudicial remarks when those remarks occurred at the start of a three-week trial, and no more references were made regarding the subject of the remarks, and the court issued a curative instruction).  A mistrial is only appropriate where a cautionary instruction is "unlikely to cure the prejudicial effect of an error." *See United States v. Randall*, 162 F.3d 557, 559 (9th Cir. 1998).  Nothing suggests that my instruction could not or did not cure any potential prejudice arising from the SEC's improper comment in opening statements.

The only authority Panuwat provides in support, *Arizona v. Washington*, 434 U.S. 497 (1978), does not persuade me otherwise.  In *Washington*, an Arizona trial judge granted the prosecutor's motion for a mistrial predicated on improper and prejudicial comment during defense counsel's opening statement: defense counsel had told the jury that because of the state's misconduct in an earlier trial involving the same matter, the Supreme Court of Arizona had granted a new trial. *Washington*, 434 U.S. at 498.  The trial judge did not expressly find that there was "manifest necessity" for a mistrial, and he also did not expressly state that he had considered other solutions and found them inadequate, but he did grant the mistrial motion. *See id.* at 500.  In

23

the habeas proceeding that followed, the United States District Court for the District of Arizona held that the Double Jeopardy Clause protected the defendant from another trial in the same matter.  The Ninth Circuit affirmed.

On review, the Supreme Court considered whether the record reflected the kind of "necessity" for the mistrial ruling that would avoid a valid double jeopardy plea, and if so, "whether the plea must nevertheless be allowed because the Arizona trial judge did not fully explain the reasons for his mistrial ruling." *Id.* at 499.   The Court concluded that the trial judge acted reasonably in ordering a mistrial, but emphasized that its decision was largely guided by "appellate deference to the trial judge's evaluation of the significance of potential juror bias" because the trial judge is the judge "most familiar with the evidence and the background of the case on trial [and] has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors."  *Id.* at 514.

As the trial judge who is familiar with the evidence and background of this case (having already considered the entire record and ruled on a motion for summary judgment before the case went to trial, and then having considered all of the parties' pretrial motions and proposed jury instructions), I am well positioned to decide whether the SEC's comment about investors prejudiced Panuwat.  Considering my curative instruction given the next day and that the problematic remark was not repeated or relied upon by the SEC, I conclude that it does not warrant a new trial.

### d.    Panuwat's Whereabouts

Panuwat also contends that the SEC "repeatedly claimed that Mr. Panuwat fabricated the possibility that he was not in the office on August 18, 2016, in an attempt to minimize his culpability when the SEC knew that the reason Mr. Panuwat could not be sure he was in the office that day had nothing to do with wanting to appear innocent." New Trial Motion 16:10-25.  This is a weak argument.  As the SEC points out, the SEC did not definitively know that Panuwat was not at work when it questioned him at trial; at the time of trial, and even today, the record reflects uncertainty concerning Panuwat's whereabouts on August 18, 2016.  Some testimony Panuwat gave suggested he was at home that day, perhaps caring for a sick child.  *See e.g.* Investigation

1    Testimony Tr. at 180:20-181:5; Panuwat Depo. Tr. at 139-141.  Other evidence suggested that

2    Panuwat was at work.  *See e.g.* Trial Exs. H-M (work emails sent August 18, 2016); 4/5/2024

3    Trial Tr. 1093-94.

4         The jury heard this conflicting testimony and evidence, some of it introduced by the SEC,

5    some of it by Panuwat.  They weighed the evidence, all of it admissible.  They clearly did not

6    believe that Panuwat had not read Hung's email on August 18, 2016.

7                              **e.      News and Analyst Commentary**

8         Panuwat argues that the SEC wrongfully argued in closing a "truth purpose" for news

9    articles that were not admitted for their truth.  New Trial Motion 17-18.  The challenged conduct is

10   that the SEC claimed that Incyte's stock price increased on August 22, 2016, because Medivation

11   announced its acquisition.  The SEC went on to cite in support several articles that I had

12   previously instructed the jury were only to be considered for their existence, not for the truth of the

13   matters they assert.

14        First, the SEC is right to note that because Panuwat did not raise this issue at trial, it is held

15   to a high threshold.  *See* New Trial Oppo. 18:16-25 (citing *Hemmings v. Tidyman's Inc*, 285 F.3d

16   1174, 1193 (9th Cir. 2002)).  Nevertheless, if Panuwat shows "fundamental error," meaning that

17   the "fundamental fairness of the proceedings . . . is called into serious question," *see id.*, then I

18   should grant new trial.  He has not made that showing.

19        Panuwat claims that the SEC used these articles and analyst reports for their truth, but the

20   trial transcripts do not support that framing.  The SEC's statements complied with the court's

21   limiting instruction, given before the start of trial, that the news articles received into evidence

22   could only be cited to show "what market observers were saying," such that the SEC could argue

23   that Panuwat had reason to believe the same.  The SEC explained in closing that the news articles

24   about the connection between Incyte and Medivation were delivered to Panuwat's email inbox, *see*

25   4/5/2024 Trial Tr. 1294:11-15, suggesting that Panuwat, as a sophisticated and experienced trader,

26   may have seen those articles connecting Medivation and Incyte stock prices and used that

27   information to help him decide to trade.  This was an acceptable use of the articles and analyst

28   reports that was consistent with my instruction that the news articles be limited in purpose to

United States District Court
Northern District of California

showing "what market observers were saying" around the time Panuwat traded Incyte call options. *See* 4/4/2024 Trial Tr. 1147-1148:2.

Panuwat does not point to any authority that calls for a different conclusion. The cases he cites either do not address the issue, vary on the facts, or support a finding of no "fundamental error." For example, *Fisher v. Clark*, 2024 WL 71801 (E.D. Cal. Jan. 5, 2024) is a report and recommendation for a habeas petition to be denied that did not consider whether supposedly hearsay evidence was appropriately admitted. And *State v. Kirk*, 2010 WL 1818894 (Ohio Ct. App. May 7, 2010) is an Ohio state appellate decision where the court chose to overturn a criminal conviction because the state's closing argument depending on hearsay to establish facts that were critical to the conviction. In *Kirk*, the trial court had also erroneously instructed the jury about the role of hearsay in the trial. The same is not true here on either front. Panuwat points to no apposite authority where courts have found that similar circumstances warranted a new trial.

### f.    Medivation's Policies

Panuwat argues that the court's decision to preclude him from introducing testimony about Medivation's internal policies beyond conversations that he had regarding those policies or their associated training or enforcement, along with the court's decision to prohibit any testimony about the "legal meaning of the policies," was "substantially prejudicial" and warrants a new trial. *See* New Trial Motion 18-19.

I chose to exclude the following evidence:

- Testimony from Panuwat explaining why Medivation's insider trading policy was ambiguous to him;
- Testimony from Hung stating that Medivation's insider trading policy did not prohibit employees from trading on Medivation's confidential information in the securities of third-party companies with which it had no business dealings and that, in 2016, Medivation and Incyte had no business dealings;
- Testimony from Medivation's lead outside counsel, Kenneth Guernsey, stating that although the insider trading policy was ambiguous in scope in one place, the policy was clearer in other places that it prohibited employees from using Medivation's MNPI to trade in the securities of companies with which Medivation had business dealings; and
- Testimony from Medivation's Vice President of Finance, Dominic

Piscatelli that the policy "absolutely did not" prohibit an employee from trading with Medivation's MNPI in the security of another company with which it had no business dealings.

Panuwat argues that all of this evidence was "undoubtedly relevant" to the fact issue of whether Panuwat owed Medivation a duty that encompassed the conduct at issue, and also to scienter. New Trial Motion 19:12-16. But this perspective depends on the same misreading of the caselaw that Panuwat has relied upon to make many of his arguments about how the jury should be instructed, what evidence should be admitted, and ultimately, what the SEC had to show to prove this case.

Before trial, the SEC filed a motion in limine to preclude testimony concerning the meaning of Medivation's Insider Trading and Confidentiality Policies, or any non-party witness's understanding of the same. I granted this motion in part and denied it in part. As discussed in the MIL Order, the jury was asked at trial to decide whether Panuwat breached a duty to Medivation, either by violating the terms of express agreements he signed with the company or by violating his general duty as an employee/agent entrusted by his employer/principal with confidential information to disclose or abstain from trading on the basis of that information. For that reason, it was critical that the jury understand the meaning of Medivation's internal policies and practices vis-à-vis the type of trade that Panuwat made.

With this in mind, I ordered that Panuwat could testify to what he understood the policies to mean as of the date of the Incyte trade and why, including any lack of training, lack of knowledge of his conduct as misappropriation, conversations with executives, or similar testimony. MIL Order 12. I also ordered that Medivation employees including the CEO David Hung, Vice President of Finance Dominic Piscatelli, and Medivation general counsel Kenneth Guernsey could testify about: (1) non-hearsay conversations with Panuwat about issues related to Medivation's policies vis-à-vis trading with Incyte or similar companies; (2) trainings regarding the policies; and (3) enforcement of the policies. They could also describe their perception of the culture at Medivation as it may have related to the Incyte trade.

The only explicit limitation I put on the defense witnesses to this end was that they were not allowed to claim that there was a policy, practice, or understanding without the defense first

laying a proper foundation, they were not allowed to speak to the legal meaning of the policies (as no proposed defense witnesses had written the policies) and they could not speculate.  *See* MIL Order 12.  I did not allow them to testify in hindsight about their understanding of Medivation's policies concerning trades like Panuwat's Incyte trades if they had not talked to Panuwat about them, not done trainings or been trained on them, or not enforced them.  I wanted to avoid post hoc rationalizations, which would be irrelevant.[9]  In short, I limited Medivation employees' testimony about their understanding of the policies and related company practices to testimony that was connected to the facts at issue in Panuwat's case.

### g.      "Novel Case"

Finally, Panuwat again argues that the court "deprived [him] of critical evidence negating scienter when it precluded him from explaining to the jury that the SEC's prosecution was a pilot enforcement action testing a new theory of liability under § 10(b)."  New Trial Motion 20-21.  But, as he acknowledges, he was permitted to testify that he was "unaware of similar cases" [Dkt. No. 126 at 13:27-14:1], which went to his awareness, which is relevant to scienter.  And Panuwat did so.  He testified that while he was aware of the concept of insider trading, he had never heard of "any other time where the SEC had alleged that someone violated the securities laws by using his or her employer's confidential information to trade in the stock of another public company that had no business or competitive relationship with their employer."  4/3/2024 Trial Tr. 1008:13-19.  And Piscitelli agreed that he did not see anything wrong with trading in biopharma.

While that evidence was admissible, I had also determined at summary judgment that the SEC's legal theory of this case was sound and could proceed.  The relative rarity of this type of enforcement action was not relevant to the jury's determination and would have been prejudicial.  Therefore, I ordered that no one at trial could characterize the case as "highly unusual," "unique," "novel," "unanticipated," "unexpected," or brought without fair notice.  Given that Panuwat was allowed to testify that he was unaware that his actions constituted securities violations, because he

---

[9] I did not, as Panuwat implies, exclude Medivation general counsel Kenneth Guernsey's testimony; I cautioned Panuwat that his team should "proceed with caution" because there was no evidence that Guernsey had drafted the policies, spoken with Panuwat about them, or trained anyone with respect to trades like the Incyte trade. *See* MIL Order 12, n.5.

had never heard of an SEC case analogous to his, the (low) probative value of such terms would have been outweighed by their prejudicial effect. Moreover, although I permitted a defense witness (Michael McCarty) in pretrial motions to testify that insider trading cases "typically involve trading stock of the company whose MNPI was learned by the defendant," Dkt. No. 126 at 14:3-5, Panuwat chose not to call him.

Panuwat also insists that it was "grossly unfair" that the SEC was able to "argue the case under a garden variety theory of insider trading." New Trial Motion 21:8-19. Of course, here Panuwat takes issue with the theory of liability that the SEC advanced, not any one event at trial. The simple fact is this: The SEC brought this case under the misappropriation theory of insider trading, rather than the traditional or classical. The jury was instructed that the SEC was bringing such a case; the jury instructions distinguished between misappropriation and the classical or traditional theory of insider trading, in accordance with how the Supreme Court drew that distinction in *United States v. O'Hagan*, 521 U.S. 642, 652 (1997).

While this case may be unusual in terms of the underlying circumstances that gave rise to the SEC's suit—a fact that was presented to the jury via defense witnesses explaining that they were not familiar with cases like this—the SEC's task at trial was to present those facts to a jury and ask the jury whether they gave rise to liability under the well-understood theory of misappropriation liability under Section 10(b) and Rule 10b-5. That the jury found in the SEC's favor is not a function of any prejudice arising from use of the term "insider trading" throughout the trial, but rather a function of the jury finding that Panuwat misappropriated information for his own personal profit, in violation of the securities laws.

### h.    Cumulative Weight

Panuwat argues that even if none of the purported errors he raises themselves justify a new trial, their "cumulative weight" does. He contends that what he perceives as errors in the court's "duty" and "scienter" instructions were compounded by my ruling that he could not describe this case as per se "novel" to the jury. New Trial Motion 22:13-16. But the jury found that Panuwat had a duty of trust and confidence to his employer, which he breached when he traded on its confidential information without disclosing that to Medivation. Whether or not the case is novel

29

did not factor into the jury's finding on that point.  The court's use of the term "insider trading," which I instructed the jury was a term of art and not pejorative, did not lend weight to the court's other purported errors.  The jury heard testimony that supported the SEC's theory of the case and came to its conclusions based on that evidence.

### C.  Evidence That Panuwat Had a Duty to Medivation

In support of his RJMOL Motion, Panuwat argues that the SEC failed to introduce evidence from which a reasonable juror could conclude that his duty to Medivation reached his Incyte trades.  RJMOL Motion 7-10.  This argument proceeds in three parts, none of which is convincing.

First, Panuwat contends that the SEC failed to introduce evidence to support its claim that the scope of Medivation's Insider Trading Policy (the "Policy") or its Confidentiality Agreement (the "Agreement") encompassed any trade in Incyte.  The Policy states, in relevant part:

> During the course of your employment, temporary assignment, consultancy or directorship with the Company, you may receive important information that is not yet publicly disseminated ("inside information"), about the Company or about other publicly-traded companies with which the Company has business dealings. Because of your access to this information, you may be in a position to profit financially by buying or selling or in some other way dealing in the Company's securities (including not only stock but also debt securities such as convertible notes) or the securities of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors of the Company, or to disclose such information to a third party who does so (a "tippee").

3/27/2024 Trial Tr. 488; Ex. 1372

The Agreement states, in relevant part:

> Company Information. I agree at all times during the term of my employment and thereafter to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Company, any trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs (including source code and object code), data bases, other original works of authorship, customers lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants or licensees.

3/27/2024 Trial Tr. at 487; Ex. 1371.

Panuwat says that the "central question for trial on this element was one of scope."  He is correct that to establish liability, "the SEC needed to prove that Mr. Panuwat had a fiduciary

United States District Court
Northern District of California

relationship with Medivation that included a duty not to use its material nonpublic information ("MNPI") to trade in the securities of a company with which it had no business relationship." RJMOL Motion 8:10-14.  He is incorrect that the jury lacked sufficient evidence to find that the Policy (or the Agreement) created that duty.

I instructed the jury that it could find Panuwat owed a duty to Medivation if the company "entrust[ed]" him with its secrets or if he "expressly agreed" to maintain the confidentiality of that information or refrain from using it for "personal gain." *See* Instruction No. 17 (Duty of Trust, Confidence, or Confidentiality); *see supra* Section B(1).  I also instructed the jury that in determining whether Panuwat had such a duty, they must "consider all the facts and circumstances presented" about Panuwat's relationship with Medivation.  This meant that the jury could find that Panuwat had a duty to Medivation in one of three ways: (1) by finding that the Policy conferred that duty upon him; (2) by finding that the Agreement conferred that duty upon him; or (3) by finding that Medivation entrusted him with confidential information.  The SEC showed evidence sufficient for the jury to find that a duty arose from each of them.

### 1.      Entrustment

The jury was instructed that one way it could find that a duty of trust, confidence, or confidentiality arose between Panuwat and Medivation was if the SEC showed that Medivation "entrust[ed] [Panuwat] with confidential information." Instruction No. 17.  Panuwat takes issue with the law here, arguing that the instruction was wrong, and that  the SEC had to show more than this to establish a duty.  But as discussed *supra*, Section B(1), his argument comes up short because it relies on out-of-circuit caselaw that is largely inapplicable to this case.[10]

_____

[10] Panuwat cites *United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) for the rule that a "fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." Motion 6:21-28 (citing *Chestman*, 947 F.2d at 567).  As already discussed, *see supra* Section B(1)(a), in *Chestman* the Second Circuit held that no duty of trust and confidence arose when the niece of a corporate insider conveyed confidential information about an impending offer to her husband, and he then traded on that information.  947 F.2d at 567-68.  The court found that no duty arose but distinguished that case from those where associations were "inherently fiduciary," such as those between a "principal and agent."  Here, the jury was (correctly) instructed that a duty arises when an "employer entrusts an employee" with confidential information; in the context of that principal/agent relationship, a duty arises not from "unilaterally" entrusting a random person with information, but from the fiduciary-like relationship between an employer and its high-level employee.

United States District Court
Northern District of California

1    The SEC provided ample evidence from which the jury could infer that a relationship

2    giving rise to a duty of trust, confidence, or confidentiality existed between Panuwat and

3    Medivation.  Panuwat worked for Medivation, *see* 4/4/2024 Trial Tr. 1125:8-13, Ex. 1320

4    (Panuwat resume), he understood that emails he received during the course of his employment

5    with Medivation about Medivation's impending acquisition were confidential, *see* 4/4/2024 Trial

6    Tr. 1128:8-19 (and this was confirmed by the SEC's witness Jarrett), and that confidential

7    information was entrusted to him when it was sent to him directly, by Medivation, via his work

8    email address.  He admitted that he knew he was supposed to maintain the confidentiality of

9    information entrusted to him by Medivation; he testified that he knew *separate and apart* from

10   any written policy that he was not supposed to use that confidential information for personal gain.

11   *See* 4/4/2024 Trial Tr. 1128:20-1129:2.  This all constituted sufficient evidence from which the

12   jury could find that Panuwat had a duty to Medivation.

13       At oral argument, counsel for Panuwat took a new position: he argued for the first time that

14   Panuwat played a minor role at Medivation, one that did not give rise to a fiduciary-like duty to

15   his company.  Counsel argued that Panuwat was not a director, did not have the responsibility to

16   report to the SEC, and only dealt with due diligence.  Oral Argument Tr. 8/7/2024 23:13-24:21.  It

17   makes sense that counsel did not pursue this defense at the summary judgment stage or at trial

18   because it is not true.  The record shows that Panuwat was on the leadership team, one of a

19   handful of Medivation employees privy to details about impending acquisition offers during

20   Medivation's efforts to fend off Sanofi's hostile takeover attempt.  He was inarguably entrusted

21   with confidential information as a function of his role at Medivation.

22                   **2.      Insider Trading Policy**

23       The jury also had sufficient basis to find that a duty arose from the Insider Trading Policy

24   that Panuwat signed as a condition of employment with Medivation.  Panuwat argues that the

25   plain text of the Policy, stated in relevant part above, *see supra* Section C, "did not prohibit [his]

26   conduct," *see* RJMOL Motion 9:6-8, and that the jury could not have reasonably concluded

27   otherwise because "it makes no sense" to read the  term "another publicly traded company" as not

28   being limited to the list that follows it, which states that "another publicly traded company"

United States District Court
Northern District of California

1    includes "all significant collaborators, customers, partners, suppliers or competitors of the

2    Company." *Id.*; *see also* Insider Trading Policy.[11]

3         I have rejected this argument twice already; first when denying Panuwat's motion to

4    dismiss, and again at summary judgment. *See* Dkt. No. 85 (Order Denying Defendant's Motion

5    for Summary Judgment) at 16 (citing *Fed. Land Bank of St. Paul v. Bismarck Lumber Co*, 314

6    U.S. 95, 100 (1941) for the rule that "the term 'including' . . . connotes simply an illustrative

7    application of the general principle"). Those prior orders are incorporated by reference. This

8    argument is no more convincing now than it was then.

9         Panuwat's other arguments are equally unpersuasive. He contends that the Policy should

10   be interpreted as applying solely to "business entities with relationships sufficiently similar" to

11   those listed as exemplary of the general principle stated in the Policy, and as excluding "entities

12   that do not fit the qualitative baseline established by the list of examples." RJMOL Motion 11, n.

13   4. This is a new argument. If Panuwat wanted to argue that the Policy, as it was understood by its

14   drafters, excluded companies like Incyte, he should have put on witnesses to do that. He did not.

15   The jury was free to interpret it alongside my duty instruction, and they did.

16        Panuwat's argument also creates a false dichotomy between what he presents as only two

17   possible interpretations of Medivation's Insider Trading Policy. He says that "while the policy

18   prohibits employees (and other agents) from using certain nonpublic information received from

19   Medivation, the issue is whether the duty applies to *all* publicly traded companies, the position

20   advanced by the SEC in its summary judgment brief, or whether it applies to the narrower subset

21   of companies like those listed in the policy." RJMOL Motion 8:16-20 (emphasis in original).

22        I do not understand the SEC's duty theory the same way. The SEC's theory of Panuwat's

23   duty is that Incyte and Medivation occupied sufficiently similar spaces in the market that

24   information material to Medivation at the time of Panuwat's trade was also material to Incyte. As

25   the SEC states in its response brief, "an obvious 'similar[ity]' . . . connect[ed] both the listed

26   _____

27   [11] Panuwat's arguments with respect to the Confidentiality Agreement are only briefly touched
     upon in his brief, and seemingly raise the same issues that he raises about the Insider Trading

28   Policy. The following analysis applies to both Medivation policies and their use at trial.

United States District Court
Northern District of California

examples and Medivation's peers like Incyte [insofar as] they are all entities whose securities Medivation's employees "may be in a position to profit financially by buying", *see* Trial Ex. 1372, using Medivation's confidential information.  SEC's Opposition to RJMOL Motion ("RJMOL Oppo.") [Dkt. No. 196] 10:15-27.  This is where Panuwat's attempts to paint the SEC's theory of duty as encompassing "*all* publicly traded companies" falters.  The SEC's theory, as it was presented to the jury, was that Medivation and Incyte were sufficiently alike so as to create a duty for Medivation employees not to use MNPI they learned from Medivation to trade in Incyte.

Panuwat's argument that the SEC had to show that Panuwat "assented to that understanding of the scope of the policy," see RJMOL Motion 9:9-22, is unsupported.  He cites no authority that to prevail on a misappropriation theory where an employee's duty to his employer stems from an insider trading policy, the SEC must show that the employee, at the time he traded, understood the "scope" of the policy to encompass the at-issue trade.

Panuwat's theory that the SEC had to show that Medivation understood him to have breached its Policy also comes up short.  RJMOL Motion 9:12-13; 10:6-17.  In *SEC v. Davis*, No. 2:20-cv-03271-SBKS, 2022 WL 3575769, at *2 (C.D. Cal. June 23, 2022), a case he relies on, the court considered a motion in limine and chose to exclude testimony from an expert about the scope of a company policy because the defendant in that case was going to testify regarding his understanding of the policy.  *Davis* does not stand for a rule that a company must understand its confidentiality policies to encompass the kinds of trades its employees are accused of making in violation of securities laws.  *Bond v. The Bon, Inc*., No. 97-35292, 1998 WL 746130, at *1 (9th Cir. Oct. 16, 1998) is also inapplicable, because there, the court merely noted that there was a "question of fact" concerning the meaning of an internal policy that precluded summary judgment. Here, the SEC presented the terms of the Insider Trading Policy to the jury, and the jury was able to determine what it meant for itself.  Panuwat is not entitled to judgment on this issue.[12]

---

[12] As for Panuwat's arguments about Medivation's understanding of insider trading laws in 2009 (the time of the Policy's drafting), and his position that it is "unreasonable to think it drafted a policy to reduce exposure to liability it did not foresee," this argument also finds no basis caselaw or evidence, and I will not address it.

United States District Court
Northern District of California

### 3. "Actually Guarded"

Panuwat also argues that the SEC "failed to carry its burden to demonstrate that Medivation actually guarded its information against Mr. Panuwat's misuse." RJMOL Motion 13-14. He cites a Second Circuit decision, *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012), for the rule that "to establish the existence of a duty of confidentiality under a misappropriation theory in the absence of a fiduciary relationship, the plaintiff must show that a company '[took] affirmative steps to treat it as [confidential]' and took affirmative steps to 'maintain exclusivity.'" *Mahaffy*, 693 F.3d at 135, n.14.

This argument fails for two reasons. First, the Ninth Circuit has not followed *Mahaffy*. In *Talbot*, which all parties agree applies, the court adopted no such "affirmative steps" approach. Instead, it found that the defendant's duty arose from his relationship of trust and confidence with his employer. *See Talbot*, at 1090-92. Second, even if the Ninth Circuit *had* adopted the *Mahaffy* rule (and it is more of a guideline than a rule), the SEC introduced plenty of evidence at trial that Medivation *did* take affirmative steps to treat information about its 2016 acquisition as confidential and took "affirmative steps" to "maintain" its "exclusivity". For instance, as Panuwat admitted at trial, Medivation used code names when discussing potential buyers, limited sensitive emails to solely Medivation leadership (which included Panuwat), and used closed-door meeting strategies when discussing acquisition. *See* 3/26/2024 Trial Tr. 243:6-11, 262:14-22 (Baxter); *id.* at 386:19-20 (Jarrett); 3/28/2024 Trial Tr. 716:7-16 (playing Panuwat testimony at Dkt. 186-2, including 3/23/23 testimony, at 59:6-22). As several witnesses testified, information specific to the deal with Pfizer (and other potential buyers, when they were making offers) was not public. 3/26/2024 Trial Tr. 261:20-262:22 (Baxter); 3/27/2024 Trial Tr. 419:12- 420:3 (Jarrett); 4/4/2024 Trial Tr. 1128:8-19, 1134:2-17, 1165:10-18 (Panuwat). That the SEC showed no evidence that Medivation had ever disciplined an employee who broke its policies or practices surrounding confidentiality is of no moment. No court requires such a showing to establish a duty of confidentiality.

### D. Evidence That Panuwat Breached His Duty to Medivation

Panuwat also argues in support of his RJMOL Motion that the SEC failed to introduce

1  evidence sufficient for any juror to reasonably conclude that he breached a duty he owed to

2  Medivation, or that he did so "knowingly" or "recklessly".  RJMOL Motion 15.  He says that the

3  SEC failed to produce evidence from which a reasonable juror could conclude either that he had

4  (1) committed an act of misappropriation, or (2) possessed nonpublic information that was

5  material to Incyte.  He is wrong on both counts.

6  **1.  Misappropriation**

7  Panuwat claims that the SEC "failed to carry its burden of showing any evidence of

8  misappropriation as needed to support breach." RJMOL Motion 15:12-16:7.  He argues that the

9  SEC "produced no evidence that Mr. Panuwat did anything expressly forbidden by Medivation,"

10  nor did it produce any evidence of a "blackout period" around the time Panuwat traded, or that any

11  company policy "prohibited Mr. Panuwat's conduct," but "instead relied on the plain meaning of

12  the policies."  *Id.*  This argument relies on both a misunderstanding of what the SEC was obligated

13  to show and a misrepresentation of what it did show.

14  His "expressly forbidden" argument fails for the same reasons discussed above, *see supra*

15  Section B(1)(b).  Panuwat points to no authority requiring that Medivation expressly forbid him

16  from misappropriating its confidential information for that misappropriation to constitute a breach

17  of his duty.  And Panuwat's own testimony made clear that he understood he was not supposed to

18  use Medivation's confidential information for his own personal benefit.  *See* 4/5/2024 Trial Tr.

19  1128-29.

20  **2.  MNPI Possession**

21  As for Panuwat's second argument, concerning whether the SEC showed evidence from

22  which a reasonable juror could conclude that he possessed nonpublic information material to

23  Incyte, I will break that into two parts.

24  First, Hung's August 18, 2016, email is sufficient evidence from which the jury could

25  conclude that Panuwat possessed nonpublic information.  It contained timeline details about the

26  Medivation acquisition that were not known to the public.  Moreover, Panuwat sat in on meetings

27  and phone calls where confidential information was discussed. *See* 3/26/2024 Trial Tr. 261:8-

28  262:22 (Baxter); 3/27/2024 Trial Tr. 419:12-420:3 (Jarrett); 4/4/2024 Trial Tr. 1128:8-19, 1134:2-

17, 1165:10-18 (Panuwat); 3/29/2024 Trial Tr. 845:21-847:8 (Piscitelli).  Contrary to Panuwat's argument, the public did not have this information about the upcoming acquisition.

Second, a driving question in this litigation was whether the information Panuwat received about Medivation's impending acquisition was material to Incyte.  The SEC leaned heavily on testimony from Dr. Becker to establish materiality.  I already discussed the admissibility of Dr. Becker's testimony in the context of Panuwat's New Trial Motion.  She provided sufficient explanation for her studies and opinions for the jury to weigh her credibility.  *See supra* Section B(4)(a).

Panuwat argues that even crediting Dr. Becker's testimony and the SEC's theory of stock price connection between Medivation and Incyte, "a reasonable investor in Incyte had all the information needed to take advantage of the same trade as Mr. Panuwat on August 10, 2016," well before the day he made his trade.  RJMOL Motion 18:10-14.[13]  He argues that because Dr. Becker testified that market observers would have expected Incyte's stock price reaction to Medivation's merger news, *see* 3/27/2024 Trial Tr. 559-60, it follows that a reasonable Incyte investor would have had all the information necessary to "take advantage of a possible spillover effect" on Incyte's stock price the likes of which Dr. Becker had described, *see id.*, based on "entirely public information" about Medivation's merger.  RJMOL Motion 18:16-24.  He insists that the information in Hung's email would not have "altered the total mix of information" about Incyte and was therefore not material.

This argument ignores the uncontested fact that the precise details of the Medivation acquisition—including date and price point—were yet unknown to the market when Panuwat traded in Incyte securities.  Hung's email stated "Pfizer," then just one of several possible acquirers, "was excited" about the potential acquisition, and it also stated that the parties were set up to announce the acquisition on August 22, 2016, and that Pfizer wanted to get the deal done

---

[13] Notably, Panuwat does not argue that Dr. Becker's testimony linking Medivation and Incyte in the market did not provide sufficient evidence from which the jury could infer the Hung email contained information material to Incyte.  He does attempt to discredit all of her testimony, *see supra* Section B(4)(a), but he did not bring his own expert at trial to counter her position that the two companies were peers in the market such that information about the acquisition of one might be material to another.

United States District Court
Northern District of California

"smoothly and quickly." 3/27/2024 Trial Tr. 464. Even though the public knew that a Medivation deal was expected in mid-August, for the purposes of trading, Panuwat had more information about a deal that could impact Incyte's stock price than did the market. The jury considered all of this in rendering its verdict. It was not unreasonable for the jury to find that information that was material to Medivation at the time was also material to Incyte.

### E.   Evidence That Panuwat Traded "On the Basis Of" Medivation's Nonpublic Information

Next, Panuwat argues that the only evidence advanced by the SEC to show that he traded "on the basis" of MNPI "negates the inference of causation." RJMOL Motion 19-20. Section 10(b) of the Exchange Act proscribes "(1) *using* any deceptive device (2) in connection with the purchase or sale of securities, in contravention of rules prescribed by the [SEC]" *O'Hagan*, 521 U.S. 642, 651.

The jury was properly instructed that the SEC had to prove that Panuwat "purchased Incyte call options because of material nonpublic information he knowingly possessed." Instruction No. 18. This instruction was based on the Ninth Circuit's ruling in *United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998), where the court considered what the "use" requirement for Rule 10b-5 insider trading violations was. In *Smith,* the court determined that a trial court was correct when it instructed a jury that "the government must prove that the defendant [sold the stock *because of* material nonpublic information that he knowingly possessed," and also cautioned that "[i]t is not sufficient that the government proves that the defendant [sold the stock] while knowingly in possession of the material nonpublic information." This was a proper instruction for Section 10(b) liability. I adopted the same instruction.

Now, Panuwat argues that the SEC's argument, which relied largely on the temporal proximity between Panuwat learning confidential information from the Hung email and trading Incyte call options, "invited the jury to resolve the case merely on speculation." RJMOL Motion 19:23-20:6. He says that "causation is on thin ground when supported by timing alone," citing a Seventh Circuit case that affirmed summary judgment for defendant in a wrongful termination case where the plaintiff relied solely on timing as evidence that his protected activity caused his

termination; there, six months had elapsed between the alleged protected activity and the

termination. *See Sklyarsky v. Means-Knaus Partners L.P*, 777 F.3d 892, 898 (7th Cir. 2015).

Panuwat's argument not only relies on factually dissimilar or out-of-circuit cases, *see also e.g.*

*Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797 (9th Cir. 2009), it also understates the SEC's

proffered evidence.  At trial, the SEC showed evidence that Panuwat had traded in Incyte call

options *seven minutes* after he received confidential information material to Incyte.  Quite to the

contrary of Panuwat's argument, courts in this circuit have observed that even less expedient

turnarounds for trading parties constituted evidence of causation. *See e.g. Smith*, 155 F.3d at 1069

(observing that if a defendant was shown to have traded the day after he received MNPI, that

would support an inference of "use").

Moreover, the jury was shown other evidence of causation beyond temporal proximity.

For instance, the SEC showed that Panuwat's Incyte call options trades were distinct from his

typical trading practices.  I addressed Panuwat's arguments to the contrary already. *See supra*

Section B(4)(b) (Tesaro and Relypsa Trades).  In his RJMOL Motion, Panuwat asks that I remain

skeptical of any corroboration of causation via the nature of the Incyte trade relative to Panuwat's

trading history. *See* RJMOL Motion 20, n.7 (noting that "the SEC sought and obtained a

favorable ruling from the Court that denied Mr. Panuwat the ability to challenge [the divergent

nature of his Incyte trade] without suffering the deeply prejudicial consequence of the SEC's use

of classic bad acts evidence . . . [and] [h]ad the jury learned more about Mr. Panuwat's actual

trading history, it would have considerably weakened the argument that Mr. Panuwat's Incyte

purchase represented a stark deviation from any of his prior trades.").  I will state again what I

stated at pretrial: If Panuwat wanted to argue that his trades were not a departure from his normal

trading practices, he could.  I issued no ruling preventing him from doing so.  I only informed him

that if he were to get into the details of his prior trades—say, in Tesaro and Relypsa—the SEC

could cross-examine him on the circumstances of those trades. *See* MIL Order 2-3.

The press releases and news articles admitted during trial to show what Panuwat knew

about the market when he traded also showed causation. *See* Trial Exs. 1216, 1218, 1220, 1224,

1227, 1245.  (Exhibit 1216 was admitted at trial without objection.)  They all went to showing

1    Panuwat's state of mind when he traded, a non-hearsay purpose.  *See United States v. Wilson*, 843

2    U.S. F. App'x 889, 892 (9th Cir. 2021) (district court did not abuse its discretion when it admitted

3    press releases offered to show defendant's state of mind).

4         Finally, at trial, Panuwat offered a new explanation for his trades, one he had not made

5    before.  He explained that he had a tax strategy that motivated his trade in Incyte, *see* 4/3/2024

6    Trial Tr. 1035-36, and he also stated that he had received a Goldman Sachs trading

7    recommendation alongside an Incyte earnings report, *see* 4/5/2024 Trial Tr. 1156:23-1157:23, all

8    while observing a nine-day drop in Incyte's stock price, which Panuwat found to be inexplicable.

9    This all muddied the waters around Panuwat's prior statements that he could not remember why

10   he traded in Incyte call options.  A reasonable jury could have weighed all of this evidence and

11   found that his explanation was not credible.

12        **F.        Evidence That Panuwat Intended to Defraud Medivation**

13        Finally, Panuwat argues that the jury could not have reasonably found from the evidence

14   that Panuwat intended to defraud Medivation.  RJMOL Motion 23-25.  The jury was instructed

15   that it could find Panuwat liable for misappropriation if the evidence showed that he intended to

16   defraud Medivation by knowingly or recklessly using, without the company's consent, its

17   confidential and material information for securities trading.  *See* Instruction No. 16; 4/5/2024 Trial

18   Tr. 1273:17-23.

19        Panuwat's motion frames the downfall of his own argument: He asserts that the only

20   evidence that the SEC presented at trial showing scienter was that he possessed "confidential

21   information," that the timing of his trade "suggested he recognized the information he possessed

22   was material to Incyte," and that Panuwat allegedly "knew he lacked consent" because he "never

23   told anyone about his trades."  Motion 23:23-26 (citing 4/5/2024 Trial Tr. 1311-12); *see also*

24   RJMOL Oppo. 23:1-15.  In so outlining the evidence the SEC presented at trial, Panuwat has

25   indicated the reason why his RJMOL Motion cannot prevail on this point either.  He points to no

26   authority suggesting that this evidence is insufficient to show the requisite scienter in a Section

27   10(b) case like this one.  It was sufficient for a jury to conclude that Panuwat acted knowingly or

28   recklessly in using Medivation's confidential information that was material to Incyte to trade in—

United States District Court
Northern District of California

and profit greatly from trades in—Incyte call options.

As for Panuwat's argument in Reply that the SEC is now arguing a different theory of scienter than it did at trial, *see* Reply ISO Def's RJMOL Motion [Dkt. No. 202] 12-13, that is incorrect. The SEC points out that Panuwat's arguments against its evidence at trial going to scienter were baseless. *See* RJMOL Oppo. 23. And the other evidence that it presented at trial *also* showed scienter. *See id.* This is not a new theory of scienter; it is simply the SEC responding to Panuwat's arguments in post-trial motions.

***

Because (i) the court's jury instructions were appropriate, (ii) there was substantial evidence to support the jury's finding that Panuwat intentionally breached his duty to Medivation when he misappropriated its confidential information to trade securities in another biopharmaceutical company, and (iii) my evidentiary rulings did not individually or cumulatively deprive Panuwat of the opportunity to fully defend himself, I DENY the Renewed Motion for Judgment as a Matter of Law and the New Trial Motion. The jury's verdict stands.

## II.    REMEDIES

The SEC asks that I enter a final judgment that: (1) permanently and unconditionally bars Panuwat from serving as an officer or director of a public company; (2) orders him to pay a civil penalty of $321,197.40, which is the maximum civil penalty available under the law; and (3) permanently enjoins him from violating Section 10(b) and Rule 10b-5 of the Exchange Act. Panuwat responds that these penalties are overly harsh and unwarranted because the SEC provides "no evidence" that he is likely to engage in future misconduct, this is his first offense, the case is novel, and the proposed penalties are mismatched with those that other courts have imposed in similar circumstances. He asks for no officer/director bar and a civil penalty of $107,065.80, which is the amount of his trading profit.[14] He does not substantively challenge the proposed

---

[14] As the SEC notes in a footnote: "As proven at trial, Panuwat's realized insider trading profits were $120,031.32. Ex. P (TX 1386). However, 15 U.S.C. § 78u-1(e) defines "profit gained" not as realized profits, but as " 'the difference between the purchase or sale price of the security and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information.'" *See* Remedies Motion 16, n.3. "Because Dr. Chyhe Becker calculated that if Panuwat had sold all his Incyte call options at the last-traded price

permanent injunction.

### A.    Officer and Director Bar

The SEC asks that I impose a permanent officer and director bar on Panuwat because his conduct demonstrates unfitness to serve as an officer or director of a public company. *See* Motion to Impose Remedies and Enter Final Judgment ("Remedies Motion") [Dkt. No. 189]. A district court "may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine," any person "from acting as an officer or director [of a public company] if the person's conduct demonstrates unfitness to serve as an officer or director." 15 U.S.C. § 78u(d)(2). As I noted at the hearing, out of all the remedies the SEC seeks, I consider this one to be the most serious punishment. A bar of any length would have long-lasting consequences on Panuwat's career. Even if the bar were only for a day, it could have the effect of blacklisting Panuwat from the public sector.

The decision whether to impose an officer and director bar is within the court's discretion. *See SEC v. First Pac. Bancorp.*, 142 F.3d 1186, 1193 (9th Cir. 1998) (citations omitted). In exercising that discretion, a district court may consider:

> (1) the "egregiousness" of the underlying securities law violation; (2) the defendant's "repeat offender" status; (3) the defendant's "role" or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

*Id.* (adopting factors as listed in *SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) (the "*Patel* factors") (quoting 15 U.S.C. § 78u(d)(2)). Courts have also considered "whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might [have been] sufficient, especially where there [was] no prior history of unfitness." *Patel*, 61 F.3d at 142.

Panuwat argues that an officer/director bar of any length would be "extreme." I agree, in large part because (i) the context of the insider trading in this case is different from other cases,

---

on August 22, 2016, the date Medivation announced its acquisition, his profits would have been $107,065.80. *See id.* (citing Expert Report of Chyhe Becker, Ph.D., dated April 28, 2023). Multiplied by three, which is the maximum penalty multiplier, this generates a penalty amount of $321,197.40.

and is less egregious than conduct in cases where other courts issued an officer and director bar, and (ii) this was Panuwat's first offense.  There is no doubt Panuwat knew he was using Medivation's inside information when he made the Incyte trade, and this offense is serious.  I will proceed through each *Patel* factor; the first two factors influence my thinking the most.

### 1. Factors 1 and 2: Panuwat's Conduct Violated The Law But Was Not Egregious and He Is Not a Repeat Offender

The Ninth Circuit has not defined the type of misconduct that constitutes an egregious violation of the securities laws, but other federal courts have considered it.  The SEC cites *SEC v. Gunn*, No. 3:08-CV-1013-G, 2010 WL 3359465, *4 (N.D. Tex. Aug. 25, 2010), where a district court in Texas weighed the egregiousness of the defendant's violation of federal securities laws while determining whether a permanent injunction should issue against him.  Lacking Fifth Circuit precedent, the court reviewed how other federal courts around the country have answered the same question.  It noted that some evaluated whether the defendant's violation was "flagrant and deliberate" as opposed to "merely technical in nature," *see e.g.*, *SEC v. First City Financial Corp. Limited*, 890 F.2d 1215, 1228 (D.C. Cir. 1989), the former showing egregiousness and the latter not.  Others found insider trading to be egregious when it was also a breach of duty, *see e.g.*, *SEC v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004).  Still others considered whether the defendant's violation caused others to suffer losses, *see e.g.*, *Commodity Futures Trading Commission v. Investors Freedom Club, Inc.*, 2005 WL 940897, at *2 (M.D. Fla. Apr. 4, 2005).  In *Gunn*, the court determined that Gunn's insider trading was egregious because it was "flagrant, deliberate, and [a] serious violation of the federal securities laws," and was "in no sense merely technical."  *Gunn*, at *4.

Courts in this district have found the "egregiousness" factor to be "neutral" where the defendant only admitted to one incident of misconduct, and where that action only indirectly affected investors.  *See SEC v. Hilsenrath*, 2009 WL 1855283-WA, at *3 (N.D. Cal. Jun. 29, 2009).  The Hon. Jacqueline Scott Corley considered the isolated nature of a defendant's misconduct in *SEC v. Sabrdaran*, 252 F. Supp. 866, 890-91 (N.D. Cal. 2017), an unlawful tipping case, where the defendant made a single tip on a single occasion to another defendant about a single company.  While Judge Corley noted that it is never appropriate to tip MNPI, and the tip

was certainly a violation of the defendant's duty to his company, it was "not of a magnitude to warrant a finding of 'egregiousness' that supports a permanent officer and director bar." *Id.* at 890. She also observed that courts "tend to relate egregiousness to the isolated versus recurrent nature of the misconduct and whether the defendant abused a position of trust to mislead the public." *Id.* at 890-91 (citing *Hilsenrath*, at *3, and *SEC v. Jasper*, 833 F. Supp. 915, 930 (N.D. Cal. 2010) (noting that the egregiousness factor weighed in favor of a bar where the defendant in that case "on multiple occasions misstated the company's financials, certified false reports to the SEC, and concealed the company's backdating practices from [its] auditors and board of directors.")).

Panuwat's conduct was not egregious, although it was close to the line. He did not engage in a pattern of misconduct. The harm he caused was the general harm to the market when someone trades based on insider information, not specific harm to a person or entity; his wrongdoing only indirectly affected investors. His actions were wrong, but the context matters. The facts underlying this case are not typical for insider trading cases. Panuwat knew he was using confidential information for his purchase of Incyte stock, but he may not (as he testified) have realized that the SEC would, or even could, prosecute him for it. And this is Panuwat's first securities fraud violation. This factor weighs against an officer and director bar. *See e.g.*, *SEC v. Chan*, 465 F. Supp. 3d 18, 35-36 (D. Mass. 2020); *SEC v. Bankosky*, 2012 WL 1849000, at *2 (S.D.N.Y. May 21, 2012); *SEC v. Boey*, 2013 WL 3805127 (D.N.H. Jul. 22, 2013) ("A lifetime bar . . . is an extraordinary remedy, usually reserved for those defendants who engaged in prior securities violations[.]"). On balance, the first two factors weigh against a bar.

### 2. Factors 3, 4, 5, and 6: Panuwat's Role at Medivation, Degree of Scienter, Economic Stake, and Likelihood of Reoffending

With respect to factor three, at the time of his violation, Panuwat was Medivation's Head of Business Development and reported directly to Medivation's CEO and Chief Financial Officer ("CFO"). His high-level position at Medivation when he misappropriated its confidential information for personal gain weighs in favor of a bar. Where the defendant in an insider trading case commits securities fraud while occupying a role where candor is crucial and he is one of a "small number of people privy" to confidential information, that weighs in favor of a bar. *See*

*SEC v. Sabrdaran*, 252 F.Supp. 866 (N.D. Cal. 2017).[15]   Factor four is neutral; Panuwat possessed the requisite scienter for misappropriation liability, but the SEC presented no evidence suggesting that he deliberated on a scheme to defraud his company.  He acted with intent, but it was intent based on his understanding that he was using Medivation's MNPI to trade.

Panuwat clearly had an economic stake in his misconduct: $107,065.80 worth.  Other courts have found smaller profits to weigh in favor of a bar.  *See e.g.*, *Bankosky*, 2012 WL 1849000, at *1-*3 (imposing 10-year bar on defendant with insider trading profits of $63,000); *SEC v. Drucker*, 528 F. Supp. 2d 450, 453 (S.D.N.Y. 2007) (permanent bar imposed on defendant with insider trading profit of $138,174), *aff'd* 346 Fed. Appx. 663 (2d Cir. 2009).  Factor five weighs in favor of a bar.

And with respect to the last factor, Panuwat is currently in a position to repeat this offense, and the evidence is sufficient to require a permanent injunction, as discussed below, but I think the likelihood of recidivism is relatively low. The SEC points to his varied testimony throughout the course of litigation concerning why he traded in Incyte call options as evidence of obfuscation and an intent to recidivate.  Inconsistencies in Panuwat's trial testimony may have contributed to the jury discrediting his story about why he traded in Incyte.[16]  But that does not imply an intent to repeat wrongdoing.  This factor is neutral.

---

[15] Panuwat argues that his case is distinguishable from *Sabrdaran* because that case stands for the rule that "a defendant's role is an aggravating factor where there is some additional fact about the defendant's specific job-related duty that renders a violation of that duty *additionally* aggravating."  I take his point that the defendant in *Sabrdaran* had a specific affirmative duty to report any issues with a drug trial to his superiors, and instead reported salient information on the topic to a friend, (he "tipped"), whereas Panuwat had no analogous affirmative duty, but I do not think this distinguishes his situation as much as he thinks.  As Head of Business Development, he had a duty to maintain Medivation's confidential information.  He arguably had a greater duty to his company because of his high degree of exposure to that confidential information and his role in helping Medivation in the acquisition process.

[16] For example, he testified that when he traded in 2016, he was not aware of the pricing details of bids that potential acquirers had submitted to Medivation, but the SEC introduced evidence that showed he had received a detailed summary of those bids.  Remedies Motion Ex. G.  He also testified at trial that he participated in daily meetings with Medivation leadership about those bids. *Id.* Ex. A (Trial Tr. 479-480).  He also provided inconsistent testimony about whether he was in the office on the day that the Hung email went out.  Remedies Oppo. 9:14-28 (citing trial transcript).

United States District Court
Northern District of California

***

The first and second *Patel* factor weigh sufficiently against an officer and director bar of any length that I will not impose it.  The remedy would be too harsh.

### B.    Civil Monetary Penalty

The Insider Trading Sanctions Act of 1984 ("ITSA"), Section 21A of the Securities and Exchange Act, provides for civil penalties for insider trading.  *See* 15 U.S.C. § 78u–1(a)(2).  The penalties are largely intended to provide a deterrent effect.  *See SEC v. Sargent*, 329 F.3d 34, 42 n.2 (1st Cir. 2003) (citing Section 21A's legislative history); *see also SEC v. Henke*, 275 F.Supp.2d 1075, 1083 (N.D. Cal. 2003) ("The penalties authorized by the ITSA are intended to supplement traditional equitable remedies of disgorgement to enhance deterrence of insider trading") (citation omitted).

"The amount of the penalty which may be imposed . . . shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided" as a result of the unlawful conduct.  *Id.*  ITSA defines " 'profit gained' or 'loss avoided'" as "the difference between the purchase or sale price of the security and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information." *Id.* § 78u–1(e). In other words, the statutory penalty amount is tethered to the profits—the statute "make[s] the amount of financial liability to which a violator of the insider trading laws may be exposed directly proportional to the amount of the profit gained or the loss avoided" from the purchase or sale of a security.  *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) (citing 15 U.S.C. § 78u–1(a)(2)).

The Ninth Circuit has not addressed application of this civil penalties provision. But the First Circuit, and courts in this District and elsewhere, have applied the following factors when considering whether, and how much, to financially penalize individuals liable for securities violations:

> (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry.

*Gowrish*, 2011 WL 2790482, at *9 (citing *Happ*, 392 F.3d at 32); *see also, e.g.*, *Sabrdaran*, 252 F.Supp. 3d at 905 (same); *SEC v. Mellert*, No. C03-0619 MHP, 2006 WL 927743, at *1 (N.D. Cal. Mar. 29, 2006) (same).

I have already discussed some of these factors.  *See supra* Section II(A).  But while I have concluded that it would be too harsh to impose the officer/director bar, Panuwat's conduct got close to the "egregious" line; he was a high-ranking official who knew that he was using confidential information that others did not have to make a considerable profit from the purchase of Incyte stock.  I do not want my decision not to impose the bar to suggest that what Panuwat did was not a serious violation of insider trading laws.  It deserves a serious penalty.

I have not discussed the defendant's financial condition, where I should consider whether defendant's worth is "so high as to require civil penalties." *See SEC v. Sargent,* 329 F.3d 34, 42 (1st Cir. 2003).  This factor favors the maximum civil penalty.  As the SEC points out, Panuwat testified in May 2020 that in June 2016 he had a net worth of around $2 million.  Remedies Motion 17, Ex. A (May 2020 Testimony Tr. 138).  Panuwat has since that time continued to work as a senior executive at various biopharmaceutical companies.  In addition to a substantial yearly salary in these positions, Panuwat has investments that have likely grown throughout the duration of this litigation.  His net worth distinguishes his situation from that of the defendant in *SEC v. Gunn*, 2010 WL 3359465 (N.D. Tex. Aug. 25, 2010), where the court imposed a civil monetary penalty equal to roughly .5x the profits realized by the defendant's misdeeds.  There, the SEC sought disgorgement of Gunn's roughly $108,000 profit but the court found it appropriate to only impose an additional $50,000 civil monetary penalty largely because of Gunn's "modest financial worth" (he was only worth approximately $47,000).  Here, of course, Panuwat is worth considerably more.

Panuwat provided inconsistent explanations about why he traded throughout the course of the investigation and throughout trial, and while he did not conceal his trading in the manner that courts often consider to be justificatory of a civil penalty, he did not disclose it to Medivation either.  The fourth factor is therefore neutral, or slightly in favor of a penalty.  Factor five weighs in favor of the penalty, because Panuwat faces no other financial penalties—the SEC is not

seeking disgorgement and I have not imposed the bar.  Finally, factor six weighs against a civil penalty, because Panuwat is not employed in the securities industry.

***

The judgment in this case should have a deterrent effect on Panuwat and others who would misappropriate confidential information for their personal gain.  Panuwat has resources.  A fine in the amount of his profit does not match the gravity of his conduct.  This is a serious matter that demands a serious penalty.  I agree with the SEC that the appropriate civil penalty is three times his profit of $107,065.80, or $321,197.40.

### C.       Permanent Injunction

The Exchange Act authorizes courts to grant injunctions against future violations of the securities laws. 15 U.S.C. § 78u(d)(1). To obtain a permanent injunction against future violations of Section 10(b) and Rule 10b-5 of the Exchange Act, the SEC must show a reasonable likelihood of future violations. *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996).  This involves consideration of factors such as "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations." *Id.* at 1295-96 (citing *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980)).  A permanent injunction is appropriate and will issue.

#### 1.       "Degree of Scienter"

To demonstrate "a reasonable likelihood that the wrong will be repeated ... it will almost always be necessary for the [SEC] to demonstrate that the defendant's past sins have been the result of more than negligence." *Aaron v. SEC*, 446 U.S. 680, 703, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).  I refer back to my previous analysis of Panuwat's scienter, *see supra* Section A(4).  The jury found he had scienter in making his Incyte trades.  Specifically, it found that he acted with an intent to defraud Medivation in that, when he bought Incyte call options, he knew that the information he received from Medivation was both nonpublic and material to Incyte or he acted recklessly as to whether the information was both nonpublic and material, and he knew that, or acted recklessly as to whether he lacked consent from Medivation to purchase the call options.

*See* Jury Instruction No. 16; *see* Verdict Form.  The first factor weighs in favor of a permanent injunction.

### 2.      Isolated or Recurrent Nature of Infraction

This was Panuwat's first offense.  *See supra* Section II(A).  This is not to say first-time offenders are immune from a permanent injunction.  Courts in this district have considered "whether 'the violative acts were part of an ongoing pattern of conduct rather than isolated incidents.'" *Sabrdaran*, at 909 (quoting *SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974)).  The SEC did not show an ongoing pattern of conduct.  This factor weighs against a permanent injunction.

### 3.      Recognition of Wrongful Conduct and Sincerity of Assurances Against Future Violations

Until post-trial proceedings, Panuwat did not acknowledge that his conduct was wrongful.  This factor weighs in favor of a permanent injunction.  Panuwat's lack of contrition also weighs slightly against factor five, which considers the "sincerity of assurances against future violations." *Fehn*, 97 F.3d at 1295-96.  Panuwat states in his response to the SEC's remedies motion that he "has no intention to commit any securities violations in the future." Opposition to Remedies Motion [Dkt. No. 195] 20:4-8.  He wrote a letter expressing his recognition of wrongdoing prior to the hearing on post-trial motions.  Dkt. No. 205.  I appreciate his words.  And I recognize that offering a passionate defense in and of itself does not constitute failure to recognize one's wrongdoing.  *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989) (explaining that securities defendants are "not to be punished because they vigorously contest the government's accusations").  But the way Panuwat defended this case demonstrates that a permanent injunction is warranted.  He blamed the SEC repeatedly for prosecuting his case and for the manner in which it did so, not his use of MNPI.  I am concerned that were a permanent injunction not to issue, Panuwat may be tempted to follow his understanding of securities law rather than the law itself.  Both factors three and five weigh in favor of a permanent injunction.

### 4.      Panuwat's Present Occupation

The court also considers the likelihood that future offenses might occur given defendant's

United States District Court
Northern District of California

occupation, age, and opportunities to engage in insider trading. *See Fehn*, 97 F.3d at 1295-96; *see e.g.*, *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980) (noting that the defendant's new business venture "provides ample opportunity for continued misconduct"). Panuwat is currently employed as an officer of a public company, meaning he could repeat his offenses. He is still a young man. He says he has no intention of committing further insider trading, *see* Oppo. 25, but this factor still weighs in favor of a permanent injunction.

### 5.    The Totality of the Circumstances

Four of five factors weigh in favor of a permanent injunction, but those factors are not the finish line for the court's considerations; I also consider the totality of the circumstances. *See Murphy*, 626 F.2d at 655.

This was the first securities violation in Panuwat's career. He committed it with an intent to defraud his company. While he says he will not reoffend, he maintained throughout the course of litigation that his actions did not constitute violations of securities laws. And today he sits as an officer of a public company with ample opportunity to repeat his misconduct and misappropriate inside information for his own gain. A permanent injunction is warranted and shall issue.

### CONCLUSION

For the reasons described above, I DENY defendant's motion for judgment as a matter of law and DENY his motion for a new trial. I GRANT IN PART the SEC's remedies motion as set forth above. The SEC shall submit a proposed judgment in accordance with the following.

1. **Officer and Director Bar**: The court declines to enjoin Panuwat from serving as an officer or director of a public company.

2. **Civil Monetary Penalty**: The court imposes the maximum civil monetary penalty of $321,197.40.

3. **Injunction**: The court permanently enjoins Panuwat from further violations of securities laws.

**IT IS SO ORDERED.**

Dated: September 9, 2024



William H. Orrick
United States District Judge